# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NEW GEORGIA PROJECT, *et al.*,

    *Plaintiffs*,

      v.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of the State of Georgia, *et al.*,

    *Defendants*.

Civil Action No. 1:24-cv-03412-SDG

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**INTRODUCTION**

Georgia legislators have continued to update Georgia election laws to address issues related to voter confidence in elections. Plaintiffs disagree with the most recent iteration of election integrity legislation, titled SB 189, but do not provide any basis for this Court to enjoin or limit its scope. Plaintiffs do not show any injury or that they are aggrieved persons for purposes of the statute, and their allegations cannot support organizational or associational standing. Further, they cannot show that many of their claims are traceable to or redressable by State Defendants. Instead, they offer speculation about what might happen, which is not enough to invoke this Court's jurisdiction.

But even if this Court had jurisdiction, Plaintiffs have failed to state a claim. The National Voter Registration Act (NVRA) provisions on which they rely are consistent with SB 189. Establishing probable cause for purposes of hearing a challenge does not mean a voter will be removed from the registration rolls—it only continues the process for registrars to engage in their statutory duty to ensure the voter rolls are correct and that only eligible voters are allowed to vote. There is nothing in the NVRA that allows an ineligible voter to vote. The requirements for homeless voters likewise do not violate the notice requirements because they only apply to the specific category of voters without valid addresses. Further, there is no violation of the uniformity provisions of the NVRA, because none of the

challenged processes involve removal programs and registrars are required by law to change voter statuses as they become aware of information about those voters. And there is no unconstitutional burden on the right to vote from processes designed to ensure Georgia voter rolls accurately reflect voters' residences and information. This Court should dismiss Plaintiffs' complaint.

## FACTUAL BACKGROUND

### I.     Georgia voter list requirements and processes.

Each county's board of registrars has the statutory responsibility for determining the eligibility of new individuals registering to vote. O.C.G.A. § 21-2-226(a). Those county boards also have the continuing duty of "examining from time to time the qualifications of each elector" over whom they have responsibility. O.C.G.A. § 21-2-228(a). So, while the Secretary of State maintains the official list of registered voters, both active and inactive, in a state database, county officials are ultimately responsible for the information entered into that statewide voter database. *See* O.C.G.A. § 21-2-50(a)(14); *see also Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1163 (N.D. Ga. 2022).

County registrars use an extensive list of factors to determine where a person resides for voting purposes. O.C.G.A. § 21-2-217. All of the factors must be considered and a single factor cannot be elevated above the others. *Handel v. Powell*, 284 Ga. 550, 554–55 (2008). The primary focus of the statutory factors is to

determine the intent of the individual voter. O.C.G.A. § 21-2-217(a)(1). For example, when voters register and live in areas without house numbers and street names, the voter registration application advises them to include a drawing of their location to help identify the correct precinct. *See* https://sos.ga.gov/sites/default/files/forms/GA_VR_APP_2019.pdf at Instructions, ¶ 9.

Counties also have continuing obligations to update the voter registration list based on new data.[1] That includes reviewing data for new felons, individuals declared mentally incompetent, and people who said they were not citizens when called for jury duty. O.C.G.A. § 21-2-231(c). Further, county officials are charged with removing individuals from the list of electors when they learn information showing someone has died. O.C.G.A. § 21-2-231(e.1); *see also Fair Fight Action*, 634 F. Supp. 3d at 1170. Individual electors can also request that their name be removed from the voter list. O.C.G.A. § 21-2-232.

---

[1] Only certain types of list maintenance are the responsibility of the Secretary of State, specifically individuals who have died, O.C.G.A. § 21-2-231(e), individuals who filed change of address information with the Post Office, O.C.G.A. § 21-2-233(a), and voters who have no contact over multiple election cycles, O.C.G.A. § 21-2-234. When a mailing to an elector is returned as undeliverable, the voter is mailed a notice that will result in the voter being moved to inactive status if they do not respond. O.C.G.A. § 21-2-234(b). Once a voter is placed in inactive status and has no further contact with election officials for two general elections, the voter is moved from inactive to cancelled status and is then unable to vote. O.C.G.A. § 21-2-235(b). Plaintiffs do not challenge any of these provisions.

In addition to these processes, Georgia law has long provided for two methods of other voters challenging the eligibility of individuals on the voter list. Under O.C.G.A. § 21-2-229, electors can challenge the qualifications of new registrants and those on the voter list for their county to be listed as a voter, with the challenger bearing the burden of proof. *Id*. at (c). After a hearing, the decision of the board of registrars can be appealed. *Id*. at (e). Separately, under O.C.G.A. § 21-2-230, a separate process exists to challenge the right of an elector to have their vote counted in a specific election. This type of challenge requires the board of registrars to consider whether probable cause exists to sustain the challenge. *Id*. If probable cause exists, the voter can still vote, but must vote a provisional ballot until the challenge can be resolved. *Id*. at (d), (h).

## II.    Changes made by in SB 189.

In the 2024 legislative session, SB 189 updated several provisions of Title 21, but only two sections of the bill are challenged in this case. In Section 4, SB 189 established a consistent and uniform mailing address for homeless voters who do not have a permanent address, clarified that voting in another state means the person has changed their residence for voting purposes, and added filings of National Change of Address forms with the Post Office as a factor the registrars can consider. Section 5 defined probable cause for purposes of challenges under O.C.G.A. § 21-2-230, provided a window before certification of the election where

challenges must be postponed, and clarified that challenges in one election continue through runoffs of that election. *Id.* at (b), (k).

### III. State obligations under the NVRA.

The NVRA sets national requirements for voter registration. 52 U.S.C. § 20501(b). This includes opportunities to register to vote, 52 U.S.C. § 20503, and processes for changing addresses and conducting list maintenance, 52 U.S.C. § 20507. States may not conduct programs "the purpose of which is to systematically remove the names of ineligible voters" within 90 days of a federal primary or general election. 52 U.S.C. § 20507(c)(2)(A). This specifically does not include changes to the registration list at the request of the registrant, removal of felons, and removal for death. 52 U.S.C. § 20507(c)(2)(B). The 90-day provision does not provide, and Plaintiffs do not assert otherwise, that voters who do not retain all the qualifications to vote (including continued residency in Georgia) are allowed to have their vote counted because it does not bestow eligibility to ineligible voters.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Legal standard.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S.

662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678–79. In addition to the complaint, this Court may consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II. Plaintiffs lack standing.

In federal court, "[s]tanding is 'built on a single basic idea — the idea of separation of powers.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (*AHM*); *see also TransUnion LLC v. Ramirez,* 594 U.S. 413, 422-423 (2021) (standing is "woven into" the Constitution). That is why, as part of the threshold standing inquiry federal courts must undertake in every case, plaintiffs need "a *personal* stake" in the outcome, which "ensure[s] that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *AHM,* 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 487 (1982)). This is because "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* at 382.

Instead, federal courts must only decide "Cases" or "Controversies." U.S. CONST. Art. III, § 2. To implement this requirement, courts apply the three-part inquiry requiring a plaintiff demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief. *See Summers v. Earth Island Institute*, 555 U. S. 488, 493 (2009); *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022).

The first requirement of an injury-in-fact, "prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *AHM,* 602 U.S. at 382 (quoting *Allen v. Wright*, 468 U. S. 737, 756 (1984) (quotation marks omitted)). And the causation requirement contained in the second part, traceability, similarly "screens out plaintiffs who were not injured by the defendant's action" so that courts do not have to be "'virtually continuing monitors of the wisdom and soundness' of government action." *Id.* at 383 (quoting *Allen,* 468 U.S. at 760). The third part, redressability, is often considered along with traceability to be "flip sides of the same coin." *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008).

Plaintiffs in this case are two organizations challenging several aspects of SB 189 under the NVRA and there are no individual plaintiffs. [Doc. 1, ¶¶ 1–6].

Organizations can establish standing through a diversion-of-resources theory or an associational standing theory. *See Arcia v. Sec'y of Fla.*, 772 F.3d 1335, (11th Cir. 2014). Based on the allegations, Plaintiff New Georgia Project (NGP) alleges only that it has organizational standing, whereas Plaintiff A. Phillip Randolph Institute (APRI) alleges both theories.

### A.    Neither Plaintiff has organizational standing.

"Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia,* 772 F.3d at 1341. "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *AHM,* 602 U.S. at 392–93. And like individuals, an organization "may not establish standing based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct…" *Id.* (quoting *Valley Forge*, 454 U.S. at 486). This is true "no matter how longstanding the interest and no matter how qualified the organization." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

> 1.    *Plaintiffs have not adequately pleaded an injury in fact through resource diversion.*

Plaintiff NGP alleges SB 189 forces the organization to divert resources in several ways. Some of these allegations involve State Defendants while others do not. Broadly, however, NGP first claims that "[v]oter challenges are causing and

will continue to cause harm to NGP's mission of encouraging voter registration and participation among underserved communities." [Doc. 1, ¶ 12]. They next contend that "removals of eligible voters is [*sic*] causing and will cause NGP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is being challenged…" *Id.* And finally, they allege that "[t]he mailing address restriction contained in Section 4 of SB 189 will force NGP to divert resources, such as staff and volunteer time, to educate unhoused voters without a permanent address about when and where to retrieve their election mail." *Id.* at ¶ 13. Although NGP claims it took these actions to counteract the effects of SB 189, they are not sufficient to establish standing.

"A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *AHM,* 602 U.S. at 394 (quoting *Havens Realty*, 455 U.S. 363, 379 (1982)). And standing cannot be manufactured simply "when an organization diverts its resources in response to a defendant's actions." *Id.* at 370. Indeed, such a "theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.*

The resources NGP purports to expend "in response" to SB 189 do not directly counteract any conduct that has been specifically targeted to *them* as an organization. Other cases have required a more direct and concrete injury to the

organization itself. For example, the defendant in *Havens Realty* provided false information about apartment availability *directly* to black employees of HOME, which "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Havens Realty*, 455 U.S. at 379; *see also AHM*, 602 U.S. at 395. Thus, "Havens's actions directly affected and interfered with HOME's core business activities." *Id.* Not so here, where NGP complains about a law that exclusively governs the conduct of *others*. While NGP may have a strong interest in those other individuals, an organization "may not establish standing based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct…" *Id.* at 394.

APRI fares no better on its alleged diversions. Much like NGP, APRI claims that the "ongoing removal practices" of SB 189 require it to "expend additional resources, such as staff member, and volunteer time, instructing voters on how to avoid being successfully targeted by a voter challenge and what to do if they are challenged." [Doc. 1, ¶ 16]. They also claim that the mailing-address provisions of SB 189 require it to "expend additional resources… by instructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve election mail," and providing transportation services to unhoused voters when necessary. *Id.* at ¶ 17.

None of these allegations are sufficient to establish organizational standing. They almost exactly match allegations found insufficient in *AHM*. In that case, the plaintiffs claimed that the challenged rule "impaired" their "ability to provide services and achieve their organizational missions," in part because it forced them "to conduct their own studies on [the drug] so that the associations can better inform their members and public about [its] risks." *AHM,* 602 U.S. at 394. They further claimed the FDA "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy *and public education.*" *Id.* (emphasis added). Finally, they alleged these expenditures occurred "to the detriment of other spending priorities." *Id.* But this was not enough: "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *AHM,* 602 U.S. 367, 394.

Thus, APRI cannot establish an injury by "instructing voters on how to avoid being targeted" by SB 189 or by "reaching out to and assisting challenged voters." [Doc. 1, ¶ 16]. Nor is it injured by the permanent-address provisions of SB 189 when it is "[i]nstructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve election mail, and providing low cost or free transportation options." *Id.* at ¶ 17. These are the

same self-imposed expenditures found insufficient in *AHM* when the plaintiffs said they were conducting studies and formulating petitions to address the rule they challenged, because "[a]n organization cannot manufacture its own standing in that way." *AHM,* 602 U.S at 394.

Because neither NGP nor APRI have adequately alleged a direct injury to their organization as a result of SB 189, they have not established an injury in fact and thus cannot proceed under a diversion-of-resources theory. But even if they could demonstrate such an injury, neither are able to trace their injury related to Section 5 of SB 189 to State Defendants.

> ### 2. *Plaintiffs' challenges to O.C.G.A § 21-2-230 are not traceable to State Defendants.*

Neither of the organizational plaintiffs can trace their alleged injury regarding Section 5 of SB 189 to State Defendants because the voter-challenge provisions are enforced by each of Georgia's 159 counties. "To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action *of the defendant,* and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)) (emphasis added). "Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action. Without the causation requirement, courts would be 'virtually continuing monitors of the

wisdom and soundness' of government action." *AHM*, 602 U.S. at 383–84 (quoting *Allen*, 468 U. S. at 760) (quotation marks omitted). Applying that rule to Plaintiffs' claims about Section 5 of SB 189, codified at O.C.G.A. § 21-2-230, the statute governs the conduct of registrars of the individual counties and not the Secretary of State nor the State Election Board. So there can be no causal link between the complained-of law and State Defendants. *See Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553855, at *12 (N.D. Ga. Feb. 16, 2021) (dismissing claim regarding polling places because state law assigned responsibility to counties). For this reason, Count I should be dismissed against State Defendants.

Additionally, the injury complained of related to the challenge and removal provisions of SB 189 is far too speculative to establish the traceability necessary for standing under Article III. "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *AHM*, 602 U.S. at 383. But this speculation is infused in each part of the Complaint regarding the challenge to Section 5 of SB 189.

First, some elector somewhere in Georgia must discover information indicating that some individual somehow connected to Plaintiffs may not be eligible to vote in order to assert standing. Then, that elector must initiate the challenge process identified in Section 5 of SB 189. Then the county board of

registrars must decide to hear the challenge and rule in a way that is unfavorable to the person the organization alleges an interest in. There are far too many unknowns in this chain of events. And that is directly contrary to the requirement that the alleged "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Clapper v. Amnesty Int'l*, 568 U. S. 398, 409 (2013).

Because Plaintiffs' claims regarding the removal provisions are too speculative, Count I should be dismissed as to State Defendants.

> 3. *Plaintiffs lack standing to challenge O.C.G.A § 21-2-230 because the relief requested will not redress the alleged harm.*

"A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). First, as already discussed, the State Defendants do not remove voters from the registration rolls under any challenged provision of SB 189. So the request that this Court issue an order "prohibiting all Defendants from removing voters from the registration list under O.C.G.A. S 21-2-230" can have no effect on them. [Doc. 1, p. 33]. Second, Plaintiffs request two other forms of relief: "ordering Secretary Raffensperger… to restore [affected] voters to the registration list," and "ordering all Defendants to maintain, preserve, and not destroy" records related to voter challenges. *Id.*

As to the first request, it is beyond the scope of this Court's injunction authority. This Court cannot order the Secretary to adopt some process to restore

voters to the rolls because "[t]he Federal Judiciary does not have the power to excise, erase, alter, or otherwise strike down a statute." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 253 (2020) (Thomas, J. concurring in part). "The power of judicial review is more limited: It permits a court to decline to enforce a statute in a particular case or controversy, and it permits a court to enjoin executive officials from taking steps to enforce a statute…" Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018), *see also, id*. at n. 5 (collecting cases). Thus, this Court can enjoin the Secretary and/or the State Election Board from enforcing provisions of SB 189 it deems illegal, but this type of injunction is not likely to redress the Plaintiffs' alleged injury because it cannot direct the Secretary to take particular action regarding voter records. And while Plaintiffs may wish for more, "[t]he Framers of the Constitution did not 'set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts.'" *U.S. v. Richardson*, 418 U.S. 166, 179 (1974); *see U.S. v. Texas*, 599 U.S. 670, 685 (2023). As to Plaintiffs' second request, it has no effect on State Defendants because they are not involved in voter challenges.

Both of these realities show that there is no redressability for Plaintiffs' claims because State Defendants cannot redress the alleged harm, even if it existed.

**B.     Plaintiff A. Phillip Randolph Institute does not have standing to bring this action on behalf of its members.**

Under an associational standing theory, an organization may bring suit "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000). "To establish standing under this theory, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Summers*, 555 U.S. at 498)). But "an organization's self-descriptions of its membership" are not sufficient to make this showing. *Id.* (cleaned up).

In *Ga. Republican Party,* a political organization challenged a rule that governed the political contributions of covered individuals. 888 F. 3d at 1200. The Eleventh Circuit held the plaintiff lacked standing because "the Georgia Party has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation." *Id.* at 1203.

Here, APRI is in the same boat. It broadly alleges that "APRI members are *at risk of being the target* of mass challenges brought pursuant to O.C.G.A. § 21-2-230, as amended by Section 5 of SB 189." [Doc. 1, ¶ 15] (emphasis added). And that

"Defendants' violations will impact and harm APRI's members and constituents." But these conclusory allegations are insufficient for at least two reasons. First, they ignore the requirement "that an organization name at least one member who can establish an *actual or imminent* injury." 888 F.3d at 1204 (emphasis added). As a result, this Court is left to guess at whether any of APRI's members are among the individuals that *might* be affected by the provisions of Section 4 of SB 189 establishing a mailing address for purposes of election-related mail. Nor can it determine whether any member has been or likely will have their registration status challenged under the provisions of Section 5 of SB 189.

But even if they identified a member, Plaintiffs' challenge to Section 5 of SB 189 is not sufficiently imminent to establish standing for any member the organizations could potentially point to. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Lujan*, 504 U.S. at 565 n.2). Indeed, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (alteration and emphases in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). And, perhaps most relevant here, it has "been reluctant to endorse

standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id*. at 413.

Nevertheless, "guesswork as to how independent decisionmakers will exercise their judgment" is precisely what APRI relies on here to challenge Section 5 of SB 189. As already discussed with respect to organizational standing, APRI's complaint on behalf of its members requires a tenuous chain of events that is insufficient to establish standing. A member would only have an injury *if* another voter discovered something and challenged them, then *if* the county board of registrars decided to hear the challenge, and *if* the board of registrars ruled against the member. The uncertain decisions—which may never come to pass—of each of these independent actors not before the Court fail to establish the necessary traceability to State Defendants, even if they had a role in the voter-removal process set forth in Section 5 of SB 189. And associational standing does not solve the other traceability problem: that State Defendants are entirely uninvolved in the alleged injury caused by the voter removal process.

For the foregoing reasons, APRI cannot establish standing by bringing this action on behalf of its own members. It has not alleged sufficient information to do so in the first place. But even if it had, at least as the Complaint relates to Section 5 of SB 189, APRI relies on speculative harms against unnamed members that lack

the required imminence for Article III standing. At minimum, this Court should dismiss those claims against State Defendants.

### III.  Plaintiffs have failed to state a claim against State Defendants under the NVRA.

In their Complaint, Plaintiffs bring claims against State Defendants under the NVRA in Counts I, III, IV, and V. But even if Plaintiffs' alleged facts are presumed true, they have shown no right to relief under the NVRA. Unlike the Voting Rights Act, the NVRA specifically provides a private right of action for individuals to bring a case in this Court after sufficient notice. 52 U.S.C. § 20510(b). Plaintiffs have provided notice, [Doc. 1-1], and are proceeding under the statute.

### A.  The probable-cause provisions of SB 189 do not violate the NVRA (Count I).

Plaintiffs first claim that the probable-cause provisions of SB 189, codified at O.C.G.A. § 21-2-230, violate Subsection 8(d) the NVRA. [Doc. 1, ¶¶ 85–88]. But that section is limited to removals that occur "*on the ground* that the registrant has changed residence…" 52 U.S.C. § 20507(d)(1) (emphasis added). That is not how the probable-cause provisions of SB 189 are implemented. Voters are not removed from the voter rolls solely "on the ground" of a change in residence. If a challenge is pending against a voter and they show up to vote, they can vote a provisional ballot until the challenge is resolved. O.C.G.A. § 21-2-230(i). Thus, they are not removed "on the ground that the registrant has changed residence," at all. Instead,

the voter challenge *initiates* the probable-cause requirements, which results in an additional investigative process. When the probable-cause process is carried out, it involves the kind of "rigorous individualized inquiry" that courts have previously considered acceptable under the NVRA. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

Because the probable-cause provisions of O.C.G.A. § 21-2-230 do not implicate Section 8(d) of the NVRA, Count I should be dismissed in its entirety.

**B.    The mailing address provisions for homeless voters do not violate the NVRA (Counts III and IV).**

Plaintiffs next challenge the mailing-address provisions for homeless voters under the NVRA because they claim the provisions (1) do not provide sufficient notice (Count III), and (2) do not provide a uniform and nondiscriminatory process (Count IV). Neither has any merit and the provisions regarding mailing addresses comply with the NVRA.

*1.    The mailing address provisions comply with the notice requirements (Count III).*

When new voters register to vote, registrars are required to "send notice to each applicant of the disposition of the application." 52 U.S.C. § 20507(a)(2). That required notice has to go somewhere—meaning it has to go to some address. If a voter does not have a permanent address where he or she can receive mail and does not provide a mailing address like a P.O. Box or other address to receive mail,

then, under SB 189, the registrar will place the voter's address information at the county registrar's office as their mailing address for voting purposes. O.C.G.A. § 21-2-217(a). And this makes sense because voters without permanent addresses and without valid mailing addresses have nowhere else to receive mail, just like voters who live in areas where the Postal Service does not deliver who must have a separate mailing address to receive notices. But the NVRA only requires registrars to send notice to the voters—it does not require the voters to receive the notice, understand it, and be able to act on it. *See, e.g., Bellitto v. Snipes*, 935 F.3d 1192, 1206 (11th Cir. 2019) (explaining Florida's death-notice process, which included notice to the voter, who is presumably deceased and unable to act).

While State Defendants and registrars strive to ensure that every eligible voter is able to register and vote—and Georgia's automatic voter registration process is one of the best in the country[2]—the NVRA does not require more than providing notice to the voter and SB 189 strikes a reasonable balance for providing a place where homeless voters without permanent addresses can receive mail. Thus, it does not violate the NVRA and Count III should also be dismissed.

---

[2] *See* Center for Election Innovation and Research, *Analyzing the Impact of Automatic Voter Registration in Georgia*, https://electioninnovation.org/update/new-ceir-report-analyzing-the-impact-of-automatic-voter-registration-in-georgia/ (June 2023).

2.   *The mailing address provisions comply with the uniform and*
     *nondiscriminatory requirement (Count IV).*

Plaintiffs next discuss the general provisions of the NVRA that list-maintenance programs be uniform and nondiscriminatory.[3] 52 U.S.C. § 20507(b)(1). Initially, this provision by its terms only relates to voters who are already registered, not to "individuals not yet registered to vote." *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1095 (D. Ariz. 2023). And this provision is limited to state *removal programs*, not to every component of the administration of voter registrations, because its text makes that clear. It applies to a "program or activity to protect the integrity of the electoral process," 52 U.S.C. § 20507(b)(1), which is only applicable to "state removal programs." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 764 (2018).

As a result, this provision is not applicable to the requirement that homeless voters have their mailing address as the registrar's office, because that requirement is not a state program to remove voters. *Id.* But even if it was applied to homeless individuals who are registered, it is uniform and nondiscriminatory because everyone who is similarly situated is treated the same way—they must use the

_____

[3] Plaintiffs add the word "unreasonable" when discussing these provisions, [Doc. 1, ¶ 97], but that is not part of the NVRA's statutory language.

mailing address as the registrar's office. This provides a clear location for any homeless voter without another means of receiving mail to receive election mail.

Thus, Plaintiffs have not sufficiently pleaded any violation of the NVRA in Counts III and IV and those claims should be dismissed against State Defendants.

## IV. Plaintiffs have failed to state a claim under the Constitution (Count V).

Finally, Plaintiffs challenge Section 4 of SB 189 as an unconstitutional burden on the right to vote against the State Election Board (Count V). Those kinds of claims are evaluated "under what is known as the *Anderson-Burdick* test, weighing 'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.' *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (internal quotation marks omitted))." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022). The inquiry is a sliding scale, with severe burdens subjected to strict scrutiny while reasonable and nondiscriminatory burdens can be justified by the "State's important regulatory interests in conducting orderly elections." *Id*. Courts use this balancing test because there is "no license for 'second-guessing and interfering with' state decisions; *the Constitution charges States, not federal courts, with designing election rules*." *Id*. (quoting *New Georgia Project*, 976 F.3d at 1284) (emphasis added). The "state undisputedly has a compelling interest in preserving the integrity of its

election process," maintaining the accuracy of it its voter rolls and "promoting voter confidence." *Common Cause/GA v. Billups,* 554 F.3d 1340, 1353 (11th Cir. 2009) (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4, (2006) and citing *Crawford v. Marion County Election Bd.,* 553 U.S. 181, 197 (2008)).

Applying these principles to Plaintiffs' constitutional claim demonstrates the lack of any violation by SB 189. Requiring voters to include an address where they are able to receive mail, even if it requires a trip to the registrar's office, is not a burden on the right to vote or is only a minimal burden—just like obtaining a photo ID in order to vote in person or re-registering if removed during list maintenance. *See Crawford*, 553 U.S. at 198–99 (photo ID), *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553856, at *18 (N.D. Ga. Mar. 31, 2021) (re-registering). Thus, there is no increase over the usual burdens of voting by requiring a specific address for voters without one. *Curling*, 50 F.4th at 1123.

But even if this Court looks further at the potential burden, Plaintiffs' Complaint does not allege any "reliable evidence that quantifies the extent and scope of the [alleged] burden imposed by the Georgia statute." *Billups*, 554 F.3d at 1354. The only fact alleged by Plaintiffs that could be relevant is a 2022 count of homeless individuals, [Doc. 1, ¶ 51], but that allegation does not indicate how many of those individuals would be eligible voters and how many do not have a permanent address. By its terms, it includes both sheltered and unsheltered

individuals, at least some of whom would have a permanent address. But even if every individual alleged by Plaintiffs would be impacted by SB 189, the total is 0.13% of the registered voters in Georgia.[4] And according to Plaintiffs' allegation, almost a third of these individuals reside in just three counties. [Doc. 1, ¶ 51]. Thus, any burden on the right to vote is minimal at best.

Without a more significant burden, the important regulatory interests of the state in conducting orderly elections and ensuring accurate voter rolls more than justifies any burden on the right to vote. *Curling*, 50 F.4th at 1121. This Court should also dismiss Count V.

## CONCLUSION

Plaintiffs have a policy disagreement with the State. But this Court is not the correct location to hear that dispute because Plaintiffs do not have standing. And even if they did, Plaintiffs have failed to state a claim for relief under federal law and the Constitution. This Court should dismiss Plaintiffs' Complaint and allow the legislatively chosen solution to remain in force.

---

[4] Currently, Georgia has more than 8.2 million registered voters. Secretary of State, *Election Data Hub*, https://sos.ga.gov/election-data-hub. This Court may take judicial notice of this fact on a motion to dismiss. *See Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (using matters of public record on motion to dismiss); *see also Fusaro v. Cogan*, 930 F.3d 241, 246 (4th Cir. 2019) (taking judicial notice of registered voters).

Respectfully submitted this 15th day of October, 2024.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**
800 Battery Ave SE
Suite 100
Atlanta, Georgia 30339
678.370.4377 (phone)

*Counsel for State Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Brief has been prepared in Book Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Bryan P. Tyson
Bryan P. Tyson