**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION**

NEW GEORGIA PROJECT, SANG
HUYNH, GEORGIA MUSLIM VOTER
PROJECT, and A. PHILIP RANDOLPH
INSTITUTE,

               Plaintiffs,

v.

BRAD RAFFENSPERGER, in his offi-
cial capacity as Georgia Secretary of
State,

JOHN FERVIER, SARA TINDALL
GHAZAL, JANICE W. JOHNSTON,
RICK JEFFARES, and JANELLE
KING, in their official capacity as
members of the Georgia State Election
Board,

COLIN McRAE, WANDA ANDREWS,
WILLIAM L. NORSE, KATHERINE A.
DURSO, and DEBRA GEIGER, in their
official capacity as members of the Chat-
ham County Board of Registrars,

BARBARA LUTH, JOEL NATT,
CARLA RADZIKINAS, ANITA
TUCKER, and DAN THALIMER, in
their official capacity as members of
the Forsyth County Board of Voter
Registrations and Elections,

SHERRI ALLEN, AARON V.
JOHNSON, MICHAEL HEEKIN,

No. 1:24-cv-3412-SDG

Complaint - Class Action

CONSOLIDATED FIRST
AMENDED COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF

<u>**Section 8 of the National Voter
Registration Act of 1993 (52
U.S.C. § 20507); First and Four-
teenth Amendments to the
United States Constitution**</u>

1

TERESA K. CRAWFORD, and JULIE
ADAMS, in their official capacity as
members of the Fulton County Board
of Registration and Elections,

KAREN EVANS-DANIEL, ROBERT
ABBOTT, JOEL HAZARD, THOMAS
ELLINGTON, and MIKE KAPLAN,
in their official capacity as members of
the Macon-Bibb County Board of Elec-
tions,

WANDY TAYLOR, DAVID HAN-
COCK, LORETTA MIRANDOLA, AL-
ICE O'LENICK, and ANTHONY
RODRIGUEZ, in their official capacity
as members of the Gwinnett County
Board of Registrations and Elections,
and

BEN JOHNSON, JAMES NEWLAND,
ROY McCLAIN, JAMES A. O'BRIEN,
and DEXTER WIMBISH, in their offi-
cial capacity as members of the Spalding
County Board of Elections
and Voter Registration,

    Defendants.

GEORGIA STATE CONFERENCE OF
THE NAACP, GEORGIA
COALITION FOR THE PEOPLE'S
AGENDA, INC., and VOTERIDERS

    Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official capacity as Georgia Secretary of State,

JOHN FERVIER, SARA TINDALL GHAZAL, JANICE W. JOHNSTON, RICK JEFFARES, and JANELLE KING, in their official capacity as members of the Georgia State Election Board,

CHEROKEE COUNTY BOARD OF ELECTIONS AND REGISTRATIONS; GLEN JOHNSON, JULIE GLADE, SCOTT LITTLE, LARRY HAND, and JOHN WALLACE in their official capacity as members of the Cherokee County Board of Elections and Registrations;

CHATHAM COUNTY BOARD OF REGISTRARS; COLIN McRAE, WANDA ANDREWS, WILLIAM L. NORSE, KATHERINE A. DURSO, and DEBRA GEIGER, in their official capacity as members of the Chatham County Board of Registrars;

COBB COUNTY BOARD OF ELECTIONS AND REGISTRATIONS; STEVEN BRUNING, TORI SILAS, STACY EFRAT, DEBBIE FISHER, and JENNIFER MOSBACHER, in their official capacity as members of the Cobb County Board of Elections and Registrations;

COLUMBIA COUNTY BOARD OF ELECTIONS; ANN CUSHMAN, WANDA DUFFIE, and LARRY WIGGINS in their official capacity as members of the Columbia County Board of Elections;

DEKALB COUNTY BOARD OF REGISTRATIONS AND ELECTIONS; VASU ABHIRAMAN, NANCY JESTER, ANTHONY LEWIS, SUSAN MOTTER, and KARLI SWIFT, in their official capacity as members of the Dekalb County Board of Registrations and Elections;

DOUGHTERY COUNTY BOARD OF ELECTIONS; FREDERICK WILLIAMS, BENNY HAND, ANNABELLE STUBBS, PRICE CORR, and JACOB CLAWSON, in their official capacity as members of the Doughtery County Board of Elections;

FORSYTH COUNTY BOARD OF VOTER REGISTRATIONS AND ELECTIONS; BARBARA LUTH, JOEL NATT, CARLA RADZIKINAS, ANITA TUCKER, and DAN THALIMER, in their official capacity as members of the Forsyth County Board of Voter Registrations and Elections;

FULTON COUNTY BOARD OF REGISTRATIONS AND ELECTIONS; SHERRI ALLEN, AARON V.

JOHNSON, MICHAEL HEEKIN, TE-
RESA K. CRAWFORD, and JULIE AD-
AMS, in their official capacity as mem-
bers of the Fulton County Board of Reg-
istration and Elections;

GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS;
WANDY TAYLOR, DAVID HAN-
COCK, LORETTA MIRANDOLA, AL-
ICE O'LENICK, and ANTHONY RO-
DRIGUEZ, in their official capacity as
members of the Gwinnett County Board
of Registrations and Elections;

HALL COUNTY BOARD OF ELEC-
TIONS AND REGISTRATIONS; JACK
NOA, DAVID KENNEDY, KEN
COCHRAN, JOHNNY VARNER, and
GALA SHEATS in their official capacity
as members of the Hall County Board of
Elections and Registrations;

MACON-BIBB COUNTY BOARD OF
ELECTIONS; KAREN EVANS-DAN-
IEL, ROBERT ABBOTT, JOEL HAZ-
ARD, THOMAS ELLINGTON, and
MIKE KAPLAN, in their official capac-
ity as members of the Macon-Bibb
County Board of Elections;

LEE COUNTY BOARD OF ELEC-
TIONS AND REGISTRATIONS; MIKE
SABOT, SCOTT BEELEY, WILLIE AL-
LEN, CHARLES JOHNSON, and
GEORGE HOUSTON, in their official

5

capacity as members of the Lee County Board of Elections and Registration;

LOWNDES COUNTY BOARD OF ELECTIONS; RAY CORBETT, JACKIE GOOLSBY, and CARLA JORDAN in their official capacity as members of the Lowndes County Board of Elections;

RICHMOND COUNTY BOARD OF ELECTIONS; TIM McFALLS, MAR-CIA BROWN, ISAAC McADAMS, SHERRY BARNES, and BETTY REECE in their official capacity as mem-bers of the Richmond County Board of Elections;

SPALDING COUNTY BOARD OF ELECTIONS AND VOTER REGIS-TRATION; BEN JOHNSON, JAMES NEWLAND, ROY McCLAIN, JAMES A. O'BRIEN, and DEXTER WIMBISH, in their official capacity as members of the Spalding County Board of Elections and Voter Registration

WHITFIELD COUNTY BOARD OF ELECTIONS; STEPHEN KELEHEAR, ROB COWAN, and CAROL BYERS, in their official capacity as members of the Whitfield County Board of Elections;

WORTH COUNTY BOARD OF ELEC-TIONS AND REGISTRATION; FOR-ESTINE MORRIS, DREW CHEST-NUTT, FELICIA CRAPP, MELVIN HARRIS, and JILL IVEY, in their

official capacity as members of the Worth County Board of Elections and Registration;

Gwinnett County Board of Registration and Elections on behalf of a class of all boards of registrars in the State of Georgia[1]

Defendants.

SECURE FAMILIES INITIATIVE AND THEIR MEMBERS,

Plaintiff,

v.

BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia; JON FERVIER, in his official capacity as Chairman of the STATE ELECTION BOARD; SARAH TINDALL GHAZAL, JANICE JOHNSTON, RICK JEFFARES, AND JANELLE KING, in their official capacities as members of the STATE ELECTION BOARD; Gwinnett County Board of Registrations and Elections on behalf of a class of all boards of registrars in the State of Georgia

---

[1] Only with respect to Plaintiffs Georgia NAACP, GCPA, and VoteRiders' constitutional claims.



Defendants.

**INTRODUCTION**

1.      Plaintiffs in these consolidated cases bring this Consolidated Complaint against Defendants. This Consolidated Complaint is submitted pursuant to the Consolidation Order, ECF 137, to serve the administrative functions of efficiency and economy of presenting certain common questions of fact and law for appropriate action by this or other courts of competent jurisdiction.[2] Plaintiffs allege the

---

[2] This filing is an amended consolidated complaint in the three actions: 1:24-cv-03412-SDG, filed on July 31, 2024 by the New Georgia Project and A. Philip Randolph Institute, 1:24-cv-04287-SDG, filed on September 24, 2024 by Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., and their members, and 1:24-cv-04659-SDG, filed on October 15, 2024 by Secure Families Initiative and its members (the "original actions"). On October 24, 2024, the Court ordered the parties to the original actions to show cause why the actions should not be consolidated pursuant to Federal Rule of Civil Procedure 42(a). ECF 129. The parties to the original actions consented to consolidation, and on November 4, 2024, the Court issued a Consolidation Order consolidating the above-captioned cases for all pretrial purposes in this docket (1:24-cv-03412-SDG) and directing the parties to submit a proposed schedule to the Court, including a deadline for Plaintiffs to file a consolidated amended complaint. ECF 137. On November 5, 2024, the Court issued an order directing the Court's clerk to administratively close cases 1:24-cv-04287-SDG and 1:24-cv-04659-SDG. ECF 138. On November 22, 2024, the parties to the

following facts, which support the claims and requested relief below. Each claim includes a designation of the plaintiff(s) bringing it, as well as the defendant(s) against which it is brought.

2.    This action seeks declaratory and injunctive relief to stop the (1) repeated, unlawful removal of eligible voters from Georgia's voter registration list; (2) implementation of Section 5 of Georgia Senate Bill 189 ("S.B. 189") (Exhibit 1),[3] which further enables unlawful mass-challenge voter disenfranchisement and removals by enshrining them in state law; and (3) enforcement of Section 4 of S.B. 189, which forces unhoused voters without a permanent address to use their county registrar's office as their mailing address for election purposes.

3.    Under Section 8(d) of the National Voter Registration Act of 1993 ("NVRA")[4], an election official may only remove voters from the registration list on

---

original actions submitted a proposed joint scheduling order, ECF 141, and on November 27, 2024, the Court adopted the parties' proposed scheduling order directing Plaintiffs to file an amended complaint by December 17, 2024, ECF 142. Pursuant to the Court's November 27, 2024 Order, Plaintiffs now file this amended consolidated complaint.

[3] A copy of S.B. 189 as passed by the Georgia General Assembly on March 29, 2024 ("S.B. 189/AP"), and enacted into law on May 6, 2024, is available on the Georgia's General Assembly website at: https://www.legis.ga.gov/legislation/64471 and is attached herein as Exhibit 1.

[4] On July 10, 2024, Plaintiffs Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, and Secure Families Initiative served notice of

the basis that they have moved if one of two requirements are met. First, voters may be removed if the voter confirms in writing that they have moved. Second, voters may be removed if they receive written notice that their address needs to be confirmed and they fail to vote or otherwise confirm their address with election officials during the next two federal election cycles. 52 U.S.C. §§ 20507(d)(4).

4. Election officials in several Georgia counties, including but not necessarily limited to Chatham, Gwinnett, Forsyth, and Spalding Counties, are violating Section 8(d) by removing voters who have been subjected to mass challenges based on an alleged change of address without meeting either of these requirements. These county boards have purged voters based on unvetted documentation and unreliable information provided by private citizens, such as screenshots of purported property records or social media posts.

5. Section 5 of S.B. 189 enables disenfranchisement and unlawful voter removals stemming from mass challenges. Section 5 adds, for the first time,

_____

violation of the NVRA on Defendants Secretary Raffensperger, the State Election Board, and Macon-Bibb, Chatham, Cherokee, Columbia, Forsyth, Hall, Lowndes, Richmond, Spalding, Whitfield, Worth, Dougherty, Lee, Cobb, DeKalb, Fulton, and Gwinnett Counties. A copy of the notice is attached as Exhibit 2. Plaintiffs Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, and VoteRiders are preparing a supplemental NVRA notice letter to the remaining counties in Georgia and reserve all rights to amend the complaint to include the remaining counties as Defendants with respect to the pending NVRA claims and/or to join the proposed class action against the counties.

language to Georgia state law sanctioning residency-based voter disenfranchisement and removals. It provides, for example, that probable cause to challenge and remove a voter is established if a voter obtains a homestead exemption in a different jurisdiction or if a voter is "registered at a nonresidential address." In addition, S.B. 189 purports to remove the ability of county administrators to use their discretion to dismiss unfounded challenges, directing county boards of registrars to find probable cause to sustain a voter challenge based on documentation showing that the challenged voter has allegedly moved or is registered at a "nonresidential address." Such challenges to the voter's residence are challenges to the qualifications of the voter to remain on the list of electors. O.C.G.A. § 21-2-216(a)(4), (f). If a challenge to a voter's residence or eligibility is upheld, the challenged voter's "name shall be removed from the list of electors," O.C.G.A. § 21-2-230(g)–(i), 21-2-229(d), without regard to the safeguards of the NVRA. Section 5 consequently violates the NVRA.

6.      Section 4 of S.B. 189, which will become effective on January 1, 2025, forces unhoused voters without a permanent address—and only such voters—to receive all of their election mail at their county registrar's office. This prohibits unhoused voters without a permanent address from retrieving election mail from a post office box, homeless shelter, friend or relative's house, or any other mailing address of their choosing. Many unhoused voters lack the transportation and resources necessary to reach their registrar's office and timely receive their election mail,

including notices required by the NVRA. Section 4 consequently violates the United States Constitution and the NVRA.

7.     Unless the Court grants the relief requested herein, county boards of elections and registration, including County Defendants, Secretary of State Raffensperger, members of the Georgia State Elections Board, and other election officials will continue to unlawfully subject validly registered voters to challenge hearings and unlawfully remove voters from the registration list and/or disenfranchise them. In addition, many unhoused voters without a permanent address will be unable to obtain or will be unduly burdened in obtaining their essential election mail, including NVRA required notices, due to the unlawful mailing address restriction.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the United States Constitution and laws of the United States; under 28 U.S.C. §§ 1343(a)(3)–(4) and 1357 because this action seeks equitable and other relief pursuant to an act of Congress providing for the protection of the right to vote; and under 42 U.S.C. §§ 1983 and 1988 because this action seeks to enforce rights and privileges secured by the United States Constitution and laws of the United States.

9.     This Court has authority to issue declaratory and injunctive relief in this action under 28 U.S.C. §§ 2201 and 2202.

10.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

11.     Venue is proper in the United States District Court for the Northern District of Georgia under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and in this division under Local Rule 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this district.

## PARTIES

### I.    Plaintiffs

#### A.    Plaintiffs New Georgia Project, Georgia Muslim Voter Project, A. Philip Randolph Institute, and Sang Huynh

12.     Plaintiffs New Georgia Project, Georgia Muslim Voter Project, A. Philip Randolph Institute, and Sang Huynh (referred to as the "NGP Plaintiffs Group") collectively sue Defendant Secretary of State Raffensperger, the members of the State Election Board ("SEB Defendants"), and members of six counties' boards of elections and registration ("County Defendants").

<u>New Georgia Project</u>

13.     Plaintiff **New Georgia Project** ("NGP") is a nonpartisan, nonprofit organization that works to increase the civic participation of historically marginalized communities across Georgia through nonpartisan voter registration, voter education, and get-out-the-vote ("GOTV") efforts, as well as by organizing and advocating on

issues important to those communities. NGP employs over 100 people working out of 12 offices across the state, including in Fulton, Chatham, Gwinnett, and Macon-Bibb Counties. NGP works closely with a network of key activists and leaders from underserved communities, including communities of color, working class communities, university students, low-income communities, and communities of unhoused Georgians, with members seeking to register to vote. These activists participate in NGP's activities, help shape NGP's agenda, and play a critical role in implementing NGP's programs. NGP thus serves a crucial role in providing a vehicle through which NGP's constituents express their collective views and protect their collective interests.

14.    NGP registers tens of thousands of voters every year, most of whom are people of color or under the age of 25. NGP hosts voter registration drives across the state, including at universities, homeless shelters, food drives, and community events. NGP also engages in GOTV work, calling hundreds of thousands of voters and knocking on hundreds of thousands of doors during election season. As part of those efforts, NGP provides rides to the polls for voters lacking transportation, and has a program for providing rides to the polls for unhoused voters. NGP also assists voters whose registrations have been challenged.

15.    Voters who registered through registration drives conducted by NGP or were aided by NGP's GOTV efforts have had their eligibility to vote challenged

through mass voter challenges. On information and belief, NGP expects these challenges to continue in the future.

16.     Voter challenges are causing and will continue to cause harm to NGP's mission of encouraging voter registration and participation among underserved communities. Defendants' actions are causing and will continue to cause NGP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is being challenged. NGP must divert resources to train staff and volunteers on how to assist voters who have been challenged, educate voters about what to do when they are challenged, and mobilize voters whose eligibility to vote is being challenged. NGP has also expended additional resources regularly monitoring boards of elections for voter challenges. As part of this work, NGP attends challenge-related meetings and hearings; educates and assists voters on how to address and seek dismissal of challenges or prevent a challenge from impacting their registration status and right to vote; and mobilizes groups of voters, such as students and low-income Georgians, to avoid being targeted by challenges. NGP has also worked with students and alumni at local campuses to protect students' right to vote, including by conducting trainings on how targeted students could contest their challenges, avoid being removed from the rolls and cast a ballot that counts, and attend and testify at board meetings.

17.     NGP's core voter registration and GOTV work includes, among many other forms of work in counties across Georgia, efforts in Chatham and Fulton Counties to register unhoused voters who lack a permanent address and help them vote. The mailing address restriction contained in Section 4 of S.B. 189 will force NGP to divert resources, such as staff and volunteer time, to train staff and volunteers on how to assist voters harmed by the law, and to educate unhoused voters without a permanent address about when and where to retrieve their election mail. This will include helping impacted voters create a plan to retrieve election mail or, in some cases, providing transportation or otherwise helping unhoused voters obtain their election mail. Without new and additional forms of assistance, unhoused voters in Chatham and Fulton Counties lacking a permanent address who are registered to vote by NGP and aided by NGP's GOTV efforts will be unable to access their election mail due to the mailing address restriction.

18.     As a result, NGP is forced, and will continue to be forced, to devote fewer resources to its core organizational activities, including voter registration drives and GOTV work, unless the practice of using challenges to unlawfully remove eligible voters from the registration list, infringe their right to vote, and disenfranchise them is enjoined. These diversions will also continue to occur due to all Defendants' enforcement of the unlawful provisions of O.C.G.A. §§ 21-2-230 (effective July 1, 2024) and 21-2-217(a)(1.1) (effective Jan. 1, 2025). Additionally,

Defendants' violations will impact and harm NGP's constituents within and among underserved communities, including communities of color, working class communities, low-income communities, and communities of unhoused Georgians.

The Georgia Muslim Voter Project

19.     Plaintiff **Georgia Muslim Voter Project** ("GAMVP") is a nonpartisan, nonprofit organization whose mission is to activate and elevate the voices of Muslim voters in Georgia. Voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities. GAMVP is committed to ensuring that every Muslim in Georgia who is eligible to vote has the opportunity to do so.

20.     GAMVP is the largest Muslim civic organization in the state. It has engaged over 100,000 voters across the state through voter registration efforts; by holding educational events—like advocacy trainings, candidate trainings, and voter education workshops—to provide the Muslim community with the tools to protect their right to vote; and by engaging in GOTV activities like text-banking, phone-banking, and door-knocking.

21.     GAMVP has served and continues to serve Muslims of all races and ethnic backgrounds. GAMVP also works with a wide range of age groups. For instance, GAMVP has held civic engagement workshops for teenagers at Islamic

schools as well as voter education sessions at mosques with a focus on their elder members.

22.     GAMVP works closely with a network of key activists and leaders from the Muslim community seeking to register to vote. These activists participate in GAMVP's activities, help shape GAMVP's agenda, and play a critical role in implementing GAMVP's programs. GAMVP thus serves a critical role in providing a vehicle through which GAMVP's constituents express their collective views and protect their collective interests.

23.     GAMVP has 18 employees who work in more than a dozen counties throughout Georgia, including in Gwinnett, Fulton, Forsyth, Macon-Bibb, and Chatham County. GAMVP also has volunteers who work throughout the state.

24.     GAMVP provides assistance to Muslim voters whose registrations have been challenged and has been monitoring the impact of S.B. 189 on the Muslim community in Georgia. GAMVP regularly reviews lists of challenged voters—comparing those lists with their constituent list and other lists of Muslim voters across the state, conducts outreach to impacted voters within the Muslim community, and educates and assists voters facing challenges with removing any burdens on their right to vote.

25.     Voters who registered through GAVMP registration drives or were aided by GAMVP's GOTV efforts have had their eligibility to vote challenged

through mass voter challenges. GAMVP expects these challenges to continue in the future.

26.    Voter challenges are causing, and will continue to cause, harm to GAMVP's mission of encouraging voter registration and participation among the Muslim community. Defendants' actions are causing, and will continue to cause, GAMVP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is being challenged—for example, by training staff and volunteers on how to assist voters harmed by challenges, educating voters about what to do if they are challenged, and mobilizing and assisting challenged voters. GAMVP must also expend additional resources monitoring boards of elections for voter challenges and tracking voter challenges.

27.    As a result, GAMVP is limited, and will continue to be limited, to devoting fewer resources to its core organizational activities, including voter registration drives and GOTV work, unless the practice of unlawfully removing voters from the registration list, impinging their right to vote, and disenfranchising them is enjoined. Diversions will also continue to occur due to Defendants' enforcement of the unlawful provisions of O.C.G.A. §§ 21-2-230. Additionally, Defendants' violations will impact and harm GAMVP's constituents.

## The A. Philip Randolph Institute

28.     Plaintiff **A. Philip Randolph Institute** ("APRI") is a nonpartisan, non-profit civic organization of trade unionists who fight for racial equality and social and economic justice for working families. APRI challenges Sections 4 and 5 of S.B. 189 on behalf of itself as an organization. APRI registers voters, provides voter education services, and organizes GOTV initiatives. APRI is a membership organization that has members statewide, and chapters based in Fulton, Macon-Bibb, and Chatham Counties. APRI members and constituents are at risk of being challenged pursuant to O.C.G.A. § 21-2-230, as amended by Section 5 of S.B. 189.

29.     APRI works closely with a network of key activists and leaders assisting trade unionists in registering and voting. These activists participate in APRI's activities, help shape APRI's agenda, and play a critical role in implementing APRI's programs. APRI thus provides a critical vehicle through which APRI's constituents express their collective views and protect their collective interests.

30.     Because of the ongoing removal practices and the unlawful provisions of O.C.G.A. § 21-2-230, APRI must expend additional resources, such as staff, member, and volunteer time, instructing voters on what to do if they are challenged. APRI must also expend additional resources reaching out to and assisting challenged voters. Further, APRI must pull in additional resources from other state APRI

chapters, including staff, members, and volunteers, to support statewide and local efforts to counteract the impact of Section 5 of S.B. 189.

31. Because of Section 4 of S.B. 189, APRI will expend additional resources counteracting the unlawful provisions of O.C.G.A. § 21-2-217(a) by instructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve election mail, and providing low-cost or free transportation options, like bus cards, to retrieve election mail. Further, APRI will have to pull in additional resources from other state APRI chapters, including staff, members, and volunteers, to support statewide and local efforts to assist unhoused individuals impacted by Section 4 of S.B. 189.

32. Resources expended on these activities are diverted away from APRI's core voting and advocacy related activities, including, for example, voter registration and GOTV efforts, advocacy on labor issues, and other important projects. Resources expended counteracting Defendants' violations are additionally diverted away from APRI's projects in other states. Diversions will continue to occur for as long as the practice of unlawfully removing voters from the registration list is not enjoined. Diversions will also continue to occur due to Defendants' enforcement of the unlawful provisions of O.C.G.A. §§ 21-2-230 and 21-2-217(a). Additionally, Defendants' violations will impact and harm APRI's members and constituents.

## Sang Huynh

33.     Plaintiff **Sang Huynh** is an unhoused Georgia resident who is eligible to vote and plans to vote in future elections in Georgia. Plaintiff Huynh resides in a tent on John Portman Boulevard Northeast between Peachtree Street Northeast and Peachtree Center Avenue Northeast in Fulton County, Georgia. His current mailing address is at 5515 Stonewood Court, Norcross, Georgia 30093, which is his ex-wife's residence in Gwinnett County. He does not reside at his mailing address and his ability to continue using that mailing address in the future is tenuous. Mr. Huynh does not own a car. He walks or takes the train to travel around the Atlanta metropolitan area.

34.     Under Section 4 of S.B 189, Mr. Huynh will be required to receive his election mail at a Fulton County Department of Registration and Elections office. The Fulton County Elections Hub and Operations Center, which is located at 5600 Campbellton Fairburn Road in Union City, is more than 20 miles away from Mr. Huynh's current residence.

**B.      Plaintiffs Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, Inc., and VoteRiders**

35.     Plaintiffs Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, Inc., and VoteRiders (referred to as a group as the "Georgia NAACP, People's Agenda and VoteRiders Plaintiffs") sue Defendant

Secretary of State Raffensperger, the members of the State Election Board ("SEB Defendants"), and the Gwinnett County Board of Registration and Elections on behalf of a class of all boards of registrars in the State of Georgia (the "Defendant Class") with respect to their constitutional claims. In addition, Plaintiffs Georgia NAACP and People's Agenda sue Secretary of State Raffensperger, the SEB Defendants, and the boards and members of seventeen counties' boards of elections and registration with respect to their NVRA claims.

<u>Georgia State Conference of the NAACP</u>

36.     Plaintiff **Georgia State Conference of the NAACP** ("Georgia NAACP" or "GA-NAACP") is a non-partisan, interracial, nonprofit membership organization founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular Black Americans. It is headquartered in Atlanta and currently has approximately 10,000 members, across approximately 180 local units in at least 120 counties in Georgia, including several college and university units.

37.     The Georgia NAACP has long sought to prevent efforts to suppress or disenfranchise Black voters and other voters of color and continues to work to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts,

election protection, and census participation. The organization focuses efforts on Black and other underrepresented communities in Georgia. It partners with local churches, shelters and transitional housing facilities, and other organizations to help register to vote unhoused or housing-insecure individuals, students, nursing home residents, and other individuals residing in premises that may be classified as "non-residential" under S.B. 189. The Georgia NAACP also works to help these individuals secure, exercise, and, when necessary, defend their right to vote.

38. The Georgia NAACP branches across Georgia are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts, including Sunday early voting events, such as "Souls to the Polls." Beyond voting, the Georgia NAACP's general mission focuses on multiple pillars of social justice and civil rights, including ensuring political, educational, social, and economic equality of rights for all persons, and eliminating racial hatred and racial discrimination.

39. The Georgia NAACP has conducted text and phone-banking programs as well as in-person outreach and engagement with voters throughout Georgia to encourage voter participation and to educate the public about all aspects of the voting process, including about the challenged provisions of S.B. 189.

40. The college and university units of the Georgia NAACP are located throughout Georgia. The college and university units have engaged in voter

registration drives and public education to ensure student unit members and other students can participate in elections. Dormitories or other student housing facilities located at universities and colleges in Georgia may be classified as "nonresidential" in zoning designations in some jurisdictions, making student unit members and other students who reside on campus in such dormitories or other student housing facilities vulnerable to challenge under Section 5 of S.B. 189.

41.    Spelman College is a Historically Black College located in Fulton County, with over 97% of students identifying as Black.[5] The Spelman College NAACP ("Spelman NAACP") unit has participated in voter registration drives to encourage students to register to vote and assists them with registering and voting. Spelman NAACP has worked with Represent Georgia ("RepGA") and Black Voters Matter on their Black Youth Renaissance Tour and specifically on their "Vote Where You Live, Vote Where You Learn" program, encouraging students to register at their address on campus. This includes addresses of dormitories on campus, which are located in an area that is zoned as nonresidential. *See Living on Campus*, SPELMAN COLLEGE, https://www.spelman.edu/student-life/housing-and-residence-life/living-on-campus/ (all dormitories use address 350 Spelman Lane S.W., Atlanta, GA 30314); Official Zoning Map Department of City Planning, ATLANTA,

---

[5] *2022–23 Fact Book*, SPELMAN COLLEGE 16, https://www.spelman.edu/_1_Docs-and-Files/about/institutional-research/2022-23-fact-book-final.pdf.

https://gis.atlantaga.gov/zoningmap/, (350 Spelman Lane S.W., Atlanta, GA 30314 zoned "Office-Institutional"). Spelman NAACP has to divert resources to change this programming in light of S.B. 189—changing its voter registration guidelines, updating its educational programming to prepare students for potential challenges, and printing updated material—and many of its members are vulnerable to voter challenges because they are registered at campus, nonresidential addresses.

42.     As another example, Savannah State University, located in Chatham County, is the oldest public Historically Black College or University in Georgia with over 83% of students identifying as Black.[6] The Savannah State University NAACP ("Savannah State NAACP") unit has participated in voter registration drives to encourage students to register to vote and assist them with registering and voting. This includes encouraging students residing at one of Savannah State's seven residential facilities to register to vote at their campus address. These facilities are in an area that is zoned as nonresidential. *See Residential Facilities*, SAVANNAH STATE UNIVERSITY, https://www.savannahstate.edu/housing/facilities.shtml (all residential facilities located on campus); SAGIS map viewer, *available at* https://www.sagis.org/map/ (all campus addresses zoned "Institutional

_____

[6] SSU Fast Facts and Figures 2021–22, SAVANNAH STATE UNIVERSITY, https://www.savannahstate.edu/irp/documents/ssu-fast-facts-and-figures-2021-2022.pdf.

Professional"). The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it assists with navigating the registration and voting process.

43.    Due to the substantial changes in what constitutes probable cause for voter challenges and the new mandate that "homeless" voters without a "permanent address" must receive their election-related mail at their county registrar's office, the Georgia NAACP not only has to modify its messaging to reflect these changes, it also has to divert resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist voters impacted by these provisions.

44.    The Georgia NAACP brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout Georgia whose right to vote is threatened by the challenged provisions of S.B. 189.

<u>The Georgia Coalition for the People's Agenda, Inc.</u>

45.    Plaintiff the **Georgia Coalition for The People's Agenda, Inc.** (the "GCPA" or "People's Agenda") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members across Georgia in various cities and counties.

46.     In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, LaGrange, and Rome, through which it provides outreach and support to voters and prospective voters of color and underrepresented communities outside of the Metro Atlanta area. Each office serves roughly 10 to 12 surrounding counties on a regular basis.

47.     The GCPA works to encourage and support voter registration and participation, particularly among Black and other underrepresented communities in Georgia, including unhoused, "homeless," and housing-insecure individuals, students, nursing home residents, and other individuals who are residing at addresses which may be characterized as "nonresidential." This includes, but is not limited to, registering voters at Georgia high schools, universities, churches and centers that provide meals to unhoused and housing-insecure individuals, and senior and assisted living facilities.

48.     The GCPA's support of voting rights is central to its mission. The organization commits time and resources to protecting voting rights through advocacy, communication, and outreach. This includes work to promote voter registration, voter education, GOTV efforts, election protection, census participation, and litigation.

49.     The GCPA conducts voter registration drives; provides voter ID assistance; distributes civic-education materials; sponsors public service announcements;

places billboard ads; conducts phone banking and text message campaigns; participates in media appearances; and organizes "Souls to the Polls" rides to the polls, and other GOTV and voter assistance efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underrepresented communities.

50.     The GCPA also participates in voter education and voter empowerment programs, including, but not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about their voting options; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely; and helping voters understand new requirements and processes affecting voter registration, voting, and voter qualification challenges, including the challenged provisions of S.B. 189.

51.     Outside of the voting arena, the GCPA works on criminal justice reform, equity in education, economic empowerment for Black-owned businesses, environmental justice, and elder issues. The GCPA seeks to balance its limited time and resources between these areas.

52.     The GCPA has limited resources to devote to and implement its programmatic work. It currently has seven paid full-time staff members working in the main Atlanta office, and six coordinators, each assigned to a particular area of Georgia. The coordinators are responsible for organizing the GCPA's activities in the

communities they serve, including civic engagement activities, voter registration drives, voter mobilization efforts, and the organization's education and coalition work. The GCPA also relies upon unpaid volunteers to assist the organization with its work across Georgia, including in Atlanta.

53.    Due to the changes to the challenge process and the uncertainty created by the challenged provisions of S.B. 189, the GCPA has had to, and will continue to have to, divert the attention of its staff and membership away from its other programmatic areas and focus instead on voter education, defense, and support.

54.    For example, the GCPA Executive Director, who is responsible for overseeing all aspects of the organization's mission, and the GCPA Policy and Engagement Director, who is responsible for overseeing the overarching policy goals of the organization beyond the voting context, have been forced to divert their attention from work related to GCPA's non-voting initiatives in order to focus on the increase in the number of challenges as a result of S.B. 189, including spending days attending challenge meetings in multiple counties including Forsyth and Gwinnett Counties. Additionally, the GCPA Chatham County Coordinator has had to divert time and attention from her work setting up citizen review boards to address challenges to students registered at Savannah State University, one of the universities that GCPA visits to register voters.

55.     Also, in response to S.B. 189, GCPA has had to divert resources from other initiatives to create tailored phone- and text-bank efforts to reach potentially impacted members and individuals that GCPA has helped register who might be susceptible to challenges under Section 5 of S.B. 189. This detracts time and energy from GCPA's other voting and non-voting work.

56.     The GCPA is active in supporting student voter registration and education programs at numerous colleges and universities including, but not limited to, Savannah State University, Spelman College, Morehouse College, Clark Atlanta University, Georgia State University, and Mercer University. Students residing in facilities located on campus at these institutions are vulnerable to challenges brought under Section 5 of S.B. 189 on the basis that their address is zoned as nonresidential.

57.     The GCPA is also active in supporting high school voter registration and education programs, including focusing on supporting students who are unhoused or housing insecure to register and pre-register to vote. These individuals are vulnerable both to challenge under Section 5 of S.B. 189 on the basis that their address is nonresidential and to being forced to use their county registrar's office as their voter registration mailing address under Section 4 of S.B. 189 on the basis that they are homeless or lack a permanent address.

58.    The GCPA has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

59.    The GCPA brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout the State of Georgia and whose right to vote will be threatened by the challenged provisions of S.B. 189.

VoteRiders

60.    Plaintiff **VoteRiders** is a non-partisan, non-profit organization incorporated in California but operating nationwide, including in Georgia, dedicated to ensuring all citizens have the information and proof of identification ("ID") they need to exercise their right to vote. VoteRiders provides voter education and works directly with individuals who are eligible to vote to obtain state IDs and any underlying documents required (birth certificate, Social Security card, etc.). The organization pays for fees and transportation costs associated with obtaining an ID. The organization also covers the cost of transportation to vote for individuals who VoteRiders previously provided ID assistance. VoteRiders has two full time staff in Georgia, one based in Atlanta and one based in Columbus, as well as dozens of volunteers throughout the state.

61.     In Georgia, VoteRiders' work entails direct outreach to voters, other non-partisan organizations, and direct service providers who focus on marginalized communities; educational programs such as voter ID information sessions and presentations; and providing free one-on-one assistance to voters who do not have an accepted form of ID for voting. Many voters that VoteRiders assists are housing insecure. Year-round the organization hosts multiple "Voter ID Clinics" at shelters for unhoused voters and women impacted by domestic violence where VoteRiders staff or trained volunteers provide onsite ID help to individuals. Individuals with unstable housing or those that move frequently are more likely to lack an ID that matches their current name and address. These same voters are likely to use a P.O. box or other nonresidential address to receive their election-related mail.

62.     VoteRiders staff and volunteers encourage the individuals they work with to receive an ID to also register to vote. When assisting an individual applying for an ID with the Georgia Department of Driver Services VoteRiders encourages voters not to opt out of automatic voter registration. Doing so ensures that they will be registered to vote at the address listed on their new ID. Participating in automatic voter registration also means VoteRiders does not need to then separately assist the voter to register to vote.

63.     S.B. 189's requirement that homeless voters receive their election mail at the county registrar's office, will hinder VoteRiders in accomplishing its mission

of ensuring that voter ID laws do not prevent eligible voters from exercising their right to vote. Prior to S.B. 189, unhoused individuals could have election mail sent to a friend's house or a shelter. Under S.B. 189, voters who VoteRiders has assisted in receiving ID and registering to vote may have to miss work, pay for childcare or miss school in order to get to the county elections office during business hours to receive election mail or absentee ballots. "Homeless" or unhoused voters who do not regularly check their election mail at the county registrar's office will not receive mailings confirming their residence and thus will not respond as required to keep their voter registration active. Voters who do not know they are in inactive status are at risk of being purged. The time and money that VoteRiders invests into ensuring that voters are registered and have the ID that is necessary to vote will all be for naught if those voters are then purged without their knowledge. The organization will also have to incur transportation costs to help unhoused voters who wish to vote by mail to travel to their county election office to receive their absentee ballots.

64.     VoteRiders will need to expend time and resources to effectively assist "homeless" voters affected by S.B. 189. The organization must review their records of individuals they previously assisted in obtaining an ID to determine which are housing insecure in order to provide the additional assistance now necessary to ensure they can still vote successfully. This may entail staff time to call or otherwise expend time and resources to locate voters (many of whom are not reachable by

phone), to confirm their current voter registration status and create a plan to ensure they can now pick up their election mail at county elections offices, including paying for transportation for these voters to their county elections office. Additionally, in response to S.B. 189, VoteRiders will have to develop new guidance for their staff and volunteers working with unhoused voters. Such guidance will need to be communicated to partner organizations who refer voters to VoteRiders for ID assistance. Staff will also have to spend time retraining individuals involved in providing ID assistance on behalf of VoteRiders on how to assist housing insecure voters access ID and register to vote in a way that complies with S.B. 189. VoteRiders' website and voter education programs will need to be updated to accurately explain the different rules for voters depending on their housing status. Overall, S.B. 189 will harm the "homeless," unhoused and housing insecure communities that VoteRiders assists.

C. **Plaintiff Secure Families Initiative**

65.     Plaintiff Secure Families Initiative sues Defendant Raffensperger, SEB Defendants, and the Gwinnett County Board of Registration and Elections on behalf of a class of all boards of registrars in the State of Georgia (the "Defendant Class").[7]

---

[7] During the 2024 Georgia session, the legislature passed and the governor signed Senate Bill 212, which goes into effect on January 1, 2025. *See* S.B. 212, Current Version, available at https://www.legis.ga.gov/legislation/64513 (last visited Nov. 25, 2024). Once effective, the legislation will amend previous laws that allow the duties of a county "elections superintendent" to be performed either by a multi-member board, as is the case in most counties, or by a probate judge. *See, e.g.*, O.C.G.A.

66.     Plaintiff **Secure Families Initiative** ("SFI") is a nonpartisan 501(c)(4) not-for-profit organization comprised of military spouses and family members. SFI is affiliated with the 501(c)(3) organization, Secure Families Foundation ("SFF").

67.     SFI began under an incubation program in January 2020 and became a standalone nonprofit in January 2021. SFI is incorporated in Washington, D.C., and has four full-time staff members, four part-time staff members, and 44,403 members. SFI represents military members and their families serving abroad in at least eight different countries. Member families are also posted to military bases within the United States.

68.     SFI's mission is to mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities. Recognizing military members make enormous sacrifices to strengthen and defend our country, SFI seeks to influence issues of foreign policy and national security that especially impact SFI's members and their families. SFI believes that mobilizing their community to vote and advocate is the most effective way to reshape the country's conversations around military intervention and ensure their members have a seat at the table over decisions that affect their own lives.

---

§ 21-2-2(35). The new legislation requires the creation of multi-member boards in every county, eliminating the option of having a probate judge serve as superintendent.

69.     Additionally, SFI advocates for federal and state policies that increase accessibility for absentee voters and registered military affiliated and disenfranchised voters. For example, SFI has endorsed pieces of federal legislation that would study the efficacy of the Department of Defense's ("DOD") Voter Assistance Officer[8] program; standardize the ballot return deadline for ballots cast nationwide pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"); and require all 50 states to provide UOCAVA voters with a ballot curing process. On the state level, SFI has consistently pushed for the expansion of electronic ballot return opportunities for UOCAVA voters.

70.     Because voting remains less accessible for its members and the broader military and overseas community, *see infra* Statement of Facts Part II.B, SFI educates, registers, and engages in non-partisan GOTV efforts for military voters in all elections. SFI routinely publishes voting resources to assist its members and the broader military and overseas community. For example, SFI publishes material explaining to its members how to vote by mail, how to find their voting assistance officer, and how to navigate state-specific election laws, including in Georgia.

---

[8] Voting Assistance Officers provide information and assistance to military and overseas voters regarding voter registration, absentee ballot procedures, and their voting rights under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). 10 U.S.C. § 1566a; *see also, Voting Assistance Officers*, Federal Voting Assistance Program, https://www.fvap.gov/vao.

71.     SFI has members registered in Georgia. SFI's members registered in Georgia include registered voters planning to vote absentee and in person. These members are registered to vote in different counties and face various barriers to access, such as frequent moves, overseas assignments, and confusion over where and how to register. It is unclear to these voters how each county will handle a potential challenge to their registration or eligibility, nor do they know how best to rebut a challenge made against them. SFI has worked to protect their members from voter eligibility challenges.

72.     Military and overseas voters face disproportionate barriers in trying to cast their ballot. For example, these voters must update their registration or request an absentee ballot each election cycle, print and scan back election forms, and deal with long and unreliable mail service or otherwise travel to their local embassy to submit their ballot.

73.     Military and overseas voters are also disproportionately affected by voter challenges because of the unique nature of establishing and maintaining their voting residence. Some of these voters, upon information and belief, are necessarily registered at P.O. boxes because they live on military bases that do not have "residential" addresses. Military and overseas voters also frequently move, which might lead to faulty evidence that they have changed their residence, and they are not able to adequately defend their right to vote if they are stationed or living outside of

Georgia. Nationwide, roughly 49 percent of new military recruits identify as Black or Indigenous or as a person of color and 22 percent of newly enlisted service members are Black. According to 2017 data, Georgia is overrepresented among the states providing military recruits, ranking third among southern states. According to that same data, Georgia's share of military recruits exceeds the state's share of the U.S.'s young adult population (18–24 years old) by 30 percent.

74.    As a result of S.B. 189, SFI will be forced to divert time and resources from their planned advocacy and educational efforts. Among other resource-intensive tasks, SFI will have to (1) determine whether their Georgia registered members will be susceptible to a sustained voter challenge because of the new probable cause standard; (2) educate those members on the challenge process; and (3) attempt to advise these members regarding how to defend their right to vote and navigate the O.C.G.A. § 21-2-230 challenge process.

75.    SFI has already had to explain the impact of S.B. 189 to its members and prepared online materials to assist members in monitoring their registration/eligibility status. SFI has had multiple follow-up conversations with members who had questions about their voting status because of S.B. 189 and SFI continues to check-in with its Georgia-voting members regarding their challenge status.

76.    To date, SFI has spent thousands of dollars in paid staff time toward education and coaching to ensure its Georgia-voting members are aware of S.B. 189

39

and prepared to respond to any challenge against their registration or eligibility. That time and that money would otherwise have gone toward other projects that remain unfinished, including working with members on utilization of voting assistance officers and membership recruitment.

77.     The interests SFI seeks to protect are germane to its organizational purpose; and neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

## II.     Defendants

Secretary of State Brad Raffensperger

78.     Defendant **Brad Raffensperger** is being sued by all Plaintiffs in his official capacity as the Georgia Secretary of State. Secretary Raffensperger is the designated chief election official responsible for the coordination of Georgia's list maintenance and other responsibilities under the NVRA as well as the Help America Vote Act of 2002. *Id*. §§ 21-2-210, 21-2-50, 45-13-20; 52 U.S.C. § 20509. In addition to these responsibilities under federal law, Secretary Raffensperger's responsibilities under state law include maintaining the state's official list of registered voters and preparing and furnishing information for citizens pertaining to voter registration and voting. O.C.G.A. §§ 21-2-50(a)(14), 21-2-211. Removals based on voter challenges are reflected on the state's official list of registered voters. Secretary Raffensperger is responsible for enforcing election statutes and routinely provides training and

issues guidance to county boards of registrars and elections of all 159 Georgia counties on various elections procedures. *Id*. Secretary Raffensperger touted his efforts to clean Georgia's registration list in advance of the 2024 election cycle, including by taking action to identify, correct, verify, or remove nearly 875,000 voters who purportedly moved in or out of Georgia, and ensure that outdated registrations were corrected.

<u>State Election Board Defendants</u>

79.     SEB Defendants **John Fervier, Sara Tindall Ghazal, Janice W. Johnston, Rick Jeffares, and Janelle King** are members of the Georgia State Election Board ("SEB Defendants") and are being sued in their official capacity. They are being sued by all plaintiff groups. The SEB is the body in Georgia that oversees elections; promulgates rules and regulations to obtain uniformity in the practices and proceedings of registrars and other election officials; and formulates, adopts, and promulgates rules and regulations pertaining to the conduct of elections, including such rules and regulations necessary to effectuate those provisions of Georgia election law created and amended by Sections 4 and 5 of S.B. 189. O.C.G.A. § 21-2-31. The SEB also has authority to impose sanctions on county boards of registrars who fail to comply with Georgia voter challenge provisions under O.C.G.A. §§ 21-2-229 and 21-2-230. O.C.G.A. §§ 21-2-229(f), 21-2-230(j).

80. The day after S.B. 189 was signed into law, Defendant SEB Chair John Fervier acknowledged the SEB's responsibilities under the new law by stating that the SEB is "going to probably have to try and provide some instruction telling" county election officials how to respond to S.B. 189. Secretary Raffensperger's office has previously supported the idea of SEB Defendants promulgating rules that clarify how county election officials must handle voter challenges.

### NGP Plaintiffs Group's County Defendants

81. The County Defendants listed in this sub-section are members of boards of election and registration from six counties. All six County Defendants are being sued by Plaintiffs NGP and APRI; Gwinnett, Fulton, Forsyth, Macon-Bibb, and Chatham County Defendants are being sued by GAMVP; and Fulton County Defendants are being sued by Plaintiff Huynh.

82. Defendants **Colin McRae, Wanda Andrews, William L. Norse, Katherine A. Durso, Debra Geiger** are members of the Chatham Board of Registrars and are being sued in their official capacity. The Chatham County Board of Registrars is a body created by state law to oversee voter registration in Chatham County.

83. Defendants **Barbara Luth, Joel Natt, Carla Radzikinas, Anita Tucker, and Dan Thalimer** are members of the Forsyth County Board of Voter Registrations and Elections and are being sued in their official capacity. Forsyth

County Board of Voter Registrations and Elections is a body created by state law to conduct elections and oversee voter registration in Forsyth County.

84. Defendants **Wandy Taylor, David Hancock, Loretta Mirandola, Alice O'Lenick, and Anthony Rodriguez** are members of the Gwinnett County Board of Registrations and Elections and are being sued in their official capacity. Gwinnett County Board of Registrations and Elections is a body created by state law to conduct elections and oversee voter registration in Gwinnett County.

85. Defendants **Ben Johnson, James Newland, Roy McClain, James A. O'Brien, and Dexter Wimbish** are members of the Spalding County Board of Elections and Voter Registration and are being sued in their official capacity. Spalding County Board of Elections and Voter Registration is a body created by state law to conduct elections and oversee voter registration in Spalding County.

86. Defendants **Sherri Allen, Aaron V. Johnson, Michael Heekin, Teresa K. Crawford, and Julie Adams** are members of the Fulton County Board of Registration and Elections and are being sued in their official capacity. Fulton County Board of Registration and Elections is a body created by state law to conduct elections and oversee voter registration in Fulton County.

87. Defendants **Karen Evans-Daniel, Robert Abbott, Joel Hazard, Thomas Ellington, and Mike Kaplan** are members of the Macon-Bibb County Board of Elections and are being sued in their official capacity. Macon-Bibb County

Board of Elections is a body created by state law to conduct elections and administer voter registration in Macon-Bibb County.

<u>Seventeen County Board and Board Member NVRA Defendants</u>

88.     The defendants listed in this sub-section are County Boards of Election and Registration and the members of boards of election and registration from seventeen counties (the "Seventeen County Board Member Defendants").

89.     Defendant Cherokee County Board of Elections and Registrations is a body created by state law to conduct elections and oversee voter registration in Cherokee County. Defendants **Glen Johnson, Julie Glade, Scott Little, Larry Hand, And John Wallace** are members of the of the Cherokee County Board of Elections and Registrations and are sued in their official capacity.

90.     Defendant Chatham County Board of Registrars is a body created by state law to oversee voter registration in Chatham County. Defendants **Colin McRae, Wanda Andrews, William L. Norse, Katherine A. Durso, Debra Geiger** are members of the Chatham County Board of Registrars and are being sued in their official capacity.

91.     Defendant Cobb County Board of Elections and Registrations is a body created by state law to oversee voter registration in Cobb County. Defendants **Steven Bruning, Tori Silas, Stacy Ferat, Debbie Fisher, and Jennifer Mosbacher** are

members of the Cobb County Board of Elections and Registrations and are being sued in their official capacity.

92. Defendant Columbia County Board of Elections is a body created by state law to oversee voter registration in Columbia County. Defendants **Ann Cushman, Wanda Duffie, and Larry Wiggins** are members of the Columbia County Board of Elections and are being sued in their official capacity.

93. Defendant Dekalb County Board of Registrations and Elections is a body created by state law to conduct elections and oversee voter registration in Dekalb County. Defendants **Vasu Abhiraman, Nancy Jester, Anthony Lester, Susan Motter, and Karli Swift** are members of the of the Dekalb County Board of Registrations and Elections and are being sued in their official capacity.

94. Defendant Doughtery County Board of Elections is a body created by state law to oversee voter registration in Doughtery County. Defendants **Frederick Williams, Benny Hand, Annabelle Stubbs, Price Corr, and Jacob Clawson** are members of the Doughtery County Board of Elections and are being sued in their official capacity.

95. Defendant Forsyth County Board of Voter Registrations & Elections is a body created by state law to conduct elections and oversee voter registration in Forsyth County. Defendants **Barbara Luth, Joel Natt, Carla Radzikinas, Anita**

**Tucker, and Dan Thalimer** are members of the Forsyth County Board of Voter Registrations & Elections and are being sued in their official capacity.

96. Defendant Fulton County Board of Registration and Elections is a body created by state law to conduct elections and oversee voter registration in Fulton County. Defendants **Sherri Allen, Aaron V. Johnson, Micheal Heekin, Teresa K. Crawford, and Julie Adams** are members of the Fulton County Board of Registration and Elections and are being sued in their official capacity.

97. Defendant Gwinnett County Board of Registrations and Elections is a body created by state law to conduct elections and oversee voter registration in Gwinnett County. Defendants **Wandy Taylor, David Hancock, Loretta Mirandola, Alice O'Lenick, and Anthony Rodriguez** are members of the Gwinnett County Board of Registrations and Elections and are being sued in their official capacity.

98. Defendant Hall County Board of Elections and Registration is a body created by state law to conduct elections and oversee voter registration in Hall County. Defendants **Jack Noa, David Kennedy, Ken Cochran, Johnny Varner, and Gala Shears** are members of the Hall County Board of Elections and Registration and are being sued in their official capacity.

99. Defendant Macon-Bibb County Board of Elections is a body created by state law to conduct elections and oversee voter registration in Macon-Bibb County.

Defendants **Karen Evans-Danieal, Robert Abott, Joel Hazard, Thomas Ellington, and Mike Kaplan** are members of the Macon-Bibb County Board of Elections and are being sued in their official capacity.

100.   Defendant Lee County Board of Elections and Registration is a body created by state law to conduct elections and oversee voter registration in Lee County. Defendants **Mike Sabot, Scott Beeley, Willie Allen, Charles Johnson, and George Houston** are members of the Lee County Board of Elections and Registration and are being sued in their official capacity.

101.   Defendant Lowndes County Board of Elections is a body created by state law to conduct elections and oversee voter registration in Lowndes County. Defendants **Ray Corbett, Jackie Goolsby, and Carla Jordan** are members of the Lowndes County Board of Elections and are being sued in their official capacity.

102.   Defendant Richmond County Board of Elections is a body created by state law to conduct elections and oversee voter registration in Richmond County. Defendants **Tim McFalls, Marcia Brown, Isaac McAdams, Sherry Barnes, and Betty Reece** are members of the Richmond County Board of Elections and are being sued in their official capacity.

103.   Defendant Spalding County Board of Elections is a body created by state law to conduct elections and oversee voter registration in Spalding County. Defendants **Ben Johnson, James Newland, Roy McClain, James A. O'Brien, and**

**Dexter Wimbish** are members of the Spalding County Board of Elections and are being sued in their official capacity.

104. Defendant Whitfield County Board of Elections is a body created by state law to conduct elections and oversee voter registration in Whitfield County. Defendants **Stephen Kelehear, Rob Cowan, and Carol Byers** are members of the Whitfield County Board of Elections and are being sued in their official capacity.

105. Defendant Worth County Board of Elections and Registration is a body created by state law to conduct elections and oversee voter registration in Worth County. Defendants **Forestine Morris, Drew Chestnutt, Felicia Crapp, Melvin Hariss, and Jill Ivey** are members of the Worth County Board of Elections and Registration and are being sued in their official capacity.

106. A copy of the notice letter advising the Seventeen County Board Member Defendants of the NVRA violations described herein is attached as Exhibit 2.

<u>Class Action Allegations—Defendant Class</u>

107. The Defendant Class, represented by Gwinnett County Board of Registrations and Elections is defined as: all county boards of registrars in the State of Georgia. Questions of law and fact are common among the county boards of registrars because they are responsible for adjudicating voter challenges under O.C.G.A. § 21-2-230, as modified by S.B. 189, and O.C.G.A. § 21-2-229 based on the same standards. *See* F.R.C.P. 23(a)(2); *see also Whitaker v. Perdue*, No. 4:06-CV-0140-

CC, 2006 WL 8553739, at *2 (N.D. Ga. Aug. 24, 2006) (government officials charged with enforcing an act satisfied the commonality requirement for F.R.C.P. 23 meriting class certification). The county boards of registrars, as a class, are sued in their official capacities.

108.    The Defendant Class, totaling 159 county board of registrars, is so numerous as to make it impractical to join all class members before this Court. Each county board of registrars has at least three registrars. *See* F.R.C.P. 23(a)(1).

109.    County Defendant Gwinnett County Board of Registrations and Elections (the "Board") can fairly and adequately represent the interests of the Defendant Class because the Board's interests do not conflict with the interests of the Defendant Class members the Board would represent, and the Board is similarly situated to members of the Defendant Class. *See* F.R.C.P. 23(a)(4). A class representative "empowered with the same election law enforcement and oversight functions as every other county [board of registrars] . . . [with] the same duties and responsibilities as all other county [board of registrars] . . . can fairly and adequately protect the interests of the defendant class." *Nat'l Broad. Co. v. Cleland*, 697 F. Supp. 1204, 1217 (N.D. Ga. 1988). O.C.G.A §§ 21-2-230 and 21-2-229 direct each county board of registrars to adjudicate voter registration and voter eligibility challenges and the Board has adjudicated O.C.G.A §§ 21-2-230 and 21-2-229 challenges including

challenges to military and overseas voters for multiple election cycles based on residency data.

110.   The defenses of County Defendant Gwinnett County Board of Registrations and Elections are typical of the Defendant Class as a whole. *See* F.R.C.P. 23(a)(3); *see also Whitaker*, 2006 WL 8553739, at *3 (the typicality requirement of F.R.C.P. 23 for class certification of defendants was met for government officials charged with enforcement of the same act and these officials had the same obligations under the act).

111.   Certification of a defendant class of all county boards of registrars is appropriate under both F.R.C.P. 23(b)(1) and (2). Separate actions against individual class members would create the risk of inconsistent or varying adjudications resulting in incompatible standards of conduct by the counties if only some counties could adjudicate S.B. 189 voter challenges while others could not. *See* F.R.C.P. 23(b)(1)(A). All county boards of registrars have an interest in "avoiding inconsistent results and obtaining guidance on the enforcement" of S.B. 189, meeting the requirements of F.R.C.P. 23(b)(1)(A). *Whitaker*, 2006 WL 8553739, at *4; *see also Nat'l Broad. Co. v. Cleland*, 697 F. Supp. at 1217. Additionally, a final decision on the merits in an action against a single county board of registrars would have an impact upon or be dispositive of the interests of other Georgia county boards of registrars and "any declaratory or injunctive relief would necessarily affect the class as

a whole," meeting the requirements of F.R.C.P. 23(b)(2). *Mauldin v. Wal-Mart Stores, Inc.*, No. CIV.A.1:01-CV2755JEC, 2002 WL 2022334, at *16 (N.D. Ga. Aug. 23, 2002).

112. A class action is therefore superior to other available means for the fair and efficient adjudication of the Defendant Class members' defenses.

## STATEMENT OF FACTS

### I. Requirements of the NVRA

113. The NVRA was passed to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4).

114. Section 8 of the NVRA sets requirements for administering voter registration, including notification and removal processes. 52 U.S.C. § 20507.

115. Sections 8(a), (c), and (d) of the NVRA include provisions that require election officials to notify voter registration applicants of the disposition of their application, 52 U.S.C. § 20507(a)(2), and mandate that election officials send notices to certain voters before they are removed from the registration list, *id*. § 20507(c)(1)(B), (d)(1)-(2).

116.    Section 8(b) of the NVRA requires that voter-list maintenance pro-grams and activities be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965. 52 U.S.C. § 20507(b) (citing 52 U.S.C. § 10301).

117.    Section 8(c) of the NVRA prohibits "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. 52 U.S.C § 20507(c)(2)(A).

118.    Under Section 8(d) of the NVRA, the only circumstances in which a registered voter may be removed from the rolls based on a change in residence are when (1) the voter requests or confirms his or her change of address in writing; or (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter thereafter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(2)(A)–(B).

119.    As the designated "Chief Elections Officer" for the State of Georgia, Secretary Raffensperger is responsible under federal law for the coordination of Georgia's responsibilities under the NVRA, including list maintenance, compliance with restrictions on voter removals, and required notifications.

120.    Any state law or practice that conflicts with the requirements of the NVRA is preempted and cannot be implemented.

**II.    Georgia's Voter Registration Requirements**

121.    The Constitution of the State of Georgia provides that

[e]very person who is a citizen of the United States and a resident of Georgia as defined by law, who is at least 18 years of age and not disenfranchised by this article, and who meets minimum residency requirements as provided by law shall be entitled to vote at any election by the people.

Ga. Const., Art. II, Sec. I, Par. II.

122.     The Georgia Legislature has codified this constitutional right to vote by providing an exclusive list of qualifications to vote in Georgia elections, which are that a person must be: (1) "[r]egistered as an elector in the manner prescribed by law"; (2) "a citizen of [Georgia] and of the United States"; (3) "[a]t least 18 years of age on or before the date of the primary or election in which such person seeks to vote"; (4) "[a] resident of [Georgia] and of the county or municipality in which he or she seeks to vote;" and (5) "[p]ossessed of all other qualifications prescribed by law." O.C.G.A § 21-2 216(a). The only exceptions to the right to register and vote are that (1) Georgians who have been "convicted of a felony involving moral turpitude" may only register, remain registered, or vote upon completion of the sentence; and (2) Georgians who have been "judicially determined to be mentally incompetent" may only register, remain registered, or vote once the disability has been removed. Ga. Const, Art. II, Sec. I, Par. III; O.C.G.A § 21-2-216(b).

123.     The Georgia Legislature has codified its definition of a person's residence as "that place in which such person's habitation is fixed, without any present intention of removing therefrom[,]" O.C.G.A. § 21-2-217(a)(1), and provided that

an individual does not lose residency by leaving their residence "for temporary purposes only, with the intention of returning, unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence[.]" O.C.G.A. § 21-2-217(a)(2); *see also Smith v. Long Cnty. Bd. of Elections & Registration*, 312 Ga. 306, 316 (2021); *Cook v. Bd. of Registrars of Randolph Cnty.*, 320 Ga. App. 447, 449–53 (2013).

124.    The Georgia Legislature has not prescribed any other qualifications to vote related to a person's residence, including the status, designation, type, "residential" nature, or other factor related to a particular residence or address—nor could it, given that it lacks authority to do so under the Georgia Constitution. *See Democratic Party of Georgia, Inc. v. Perdue*, 288 Ga. 720, 725 (2011) (citing *Franklin v. Harper*, 205 Ga. 779, 790(3) (1949)).

### A.    Voter Registration of Unhoused Persons Before S.B. 189

125.    In Georgia, residing at a "residential" address, as opposed to a "nonresidential" address, is not a qualification to register or to be eligible to vote. *See* O.C.G.A. § 21-2-216. Maintaining a permanent residence and/or mailing address is also not a qualification to register or to be eligible to vote. *See* O.C.G.A. §§ 21-2-216, 21-2-217(a).

126.    The determination of residence under Georgia law requires the board of registrars to consider the "applicant's expressed intent" as well as "any relevant

circumstances determining the applicant's residence." O.C.G.A. § 21-2-217(b). The laws provide a non-exhaustive list of factors that boards of registrars may consider, including:

> the applicant's financial independence, business pursuits, employment, income sources, residence for income tax purposes, age, marital status, residence of parents, spouse, and children, if any, leaseholds, sites of personal and real property owned by the applicant, [and] motor vehicle and other personal property registration.

> *Id.*

127.   Georgia law also prescribes certain "rules" to determine the residence of a person registering to vote. O.C.G.A. § 21-2-217(a). One of those rules provides that "the board of registrars . . . may consider evidence of where the person receives significant mail such as personal bills and other evidence that indicates where the person resides." O.C.G.A. § 21-2-217(a)(15).

128.   Every voter registration applicant must provide a residence when registering to vote. Unhoused individuals without a house number or street address for the location where they are domiciled can identify and draw or otherwise describe the physical location where they are residing, such as a sidewalk, trailer, car location or a local park. *See* Register to Vote In Your State By Using This Postcard Form and Guide, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf; State of Georgia Application for Voter

Registration, *available at* https://sos.ga.gov/sites/default/files/forms/GA_VR_APP_2019.pdf.

129. Many unhoused voters who lack a permanent address reside at what may be deemed as nonresidential addresses, such as a park or sidewalk.[9]

130. The federal voter registration form, which Georgia election officials are required to accept and use, and do use when Georgia residents get an ID via the state DMV and do not opt out, likewise affords registrants this option and includes Georgia-specific instructions that do not specify any requirement that Georgians reside at a "residential" address, much less prohibit Georgians from registering to vote with a "nonresidential" address. *See* Register to Vote In Your State By Using This Postcard Form and Guide, available at https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

131. All voter registration applicants have the option of identifying an optional separate, second address, called their mailing address, when they register. Until the passage of S.B. 189, all voters had the option of identifying the mailing address of their choice. Georgia Senate Bill 189, as introduced, *available at* https://legiscan.com/GA/text/SB189/id/2702104.

_____

[9] Off. of Cmty. Plan. and Dev., U.S. Dep. of Hous. and Urban Devel., 2023 Ann. Homelessness Assessment Rep. to Cong. 5, https://www.huduser.gov/portal/sites/default/files/pdf/2023-ahar-part-1.Pdf (last visited Dec. 17, 2024).

132.   Unhoused voters in Georgia who lack a permanent address often use a post office box, homeless shelter, friend or family member's residence, or social service agency as their mailing address.[10]

133.   Neither the state nor federal voter registration forms contain any instructions that "homeless voters without a permanent address" are required to designate the county registrar's office as their mailing address for election-related mail. Numerous Georgia voters are automatically registered to vote using the Federal Form when they obtain a state-issued ID from the Department of Driver Services. In order to amend the Federal Form instructions, a majority of the members of the U.S. Election Assistance Commission would be required to vote to approve the change, and that has not occurred. *See League of Women Voters of United States v. Harrington*, 560 F. Supp. 3d 177, 185–86 (D.D.C. 2021).

134.   Every other year, the Georgia Department of Community Affairs conducts a census of the number of unhoused people residing in Georgia on a particular date. As of the last reported statewide count, from February 2022, there were 10,689 people experiencing homelessness in the State—5,535 unsheltered and 5,154 residing in shelters that provide temporary living arrangements. Approximately 21

---

[10] *Id.*

percent of these individuals resided in Atlanta or Fulton County, 5 percent resided in Chatham County, and 4 percent resided in Macon-Bibb County.

**B.** **Voter Registration and Barriers to Casting Ballots for Military and Overseas Voters**

135. Voting is complicated for military and overseas voters, like Plaintiff SFI's members, because they move frequently, often must request an absentee ballot, and can face severe mail delays while living abroad, which impacts when they receive their absentee ballots and when their voted ballots are received by election officials.

136. Barriers facing military and overseas voters are nothing new and have sparked federal legislation meant to remedy these hurdles since at least 1955, with the Federal Voting Assistance Act. Nevertheless, confusing and restrictive state laws have continued to require additional legislation, such as the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), the Military and Overseas Voter Empowerment (MOVE) Act, and the National Voter Registration Act (NVRA). H.R. Rep. No. 99-765, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2012.

137. There are over four million U.S. citizens living overseas[11] and 7,494 Georgia registered electors were entitled to vote under UOCAVA as of 2022.

---

[11] The Federal Voter Assistance Program estimates there are 4.4 million U.S. citizens living overseas while the State Department estimates there are over nine million U.S. citizens living overseas. *Compare* 2022 Federal Voting Assistance Program Report

UOCAVA voters are U.S. citizens who are active members of the uniformed services, the Merchant Marines, the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members, and any other U.S. citizens residing outside the United States. When deliberating over the merits of enacting UOCAVA, Congress found that one reason why military and overseas citizens faced difficulties voting was because States had enacted legal and administrative obstacles that "discourage[d] or confuse[d] overseas citizens." *Id.* at 9.

138.   Federal law provides protections for people, like UOCAVA voters, who do not have a permanent residential address. For example, "[f]ederal law requires each State to provide absentee ballots to its former otherwise qualified residents who now reside outside of the United States." *Segovia v. United States*, 880 F.3d 384, 387 (7th Cir. 2018).

139.   Georgia law provides some similar protections, specifying that a person who moves to another state, federal territory, or foreign country "to engage in government service . . . shall not be considered to have lost [their] residence in [Georgia]

to Congress, Federal Voting Assistance Program (Aug. 3, 2023), https://www.fvap.gov/uploads/FVAP/Reports/rtc_20231113_V10_FINAL.pdf, *with* Consular Affairs By The Numbers, U.S. Department of State's Bureau of consular Affairs (January 2020), https://travel.state.gov/content/dam/travel/CA-By-the-Number-2020.pdf.

during the period of such service; and the place where the person resided at the time of [their] removal shall be considered and held to be such person's place of residence." O.C.G.A § 21-2-217(a)(11).

140. Military members have both a voting residence and a home of record and these addresses are not necessarily the same. A voting residence is the address a military voter considers their permanent home—it is within the state of their legal residence or is their domicile. The state of legal residence does not automatically change when a service member is assigned to a new location for military duty. The home of record is the address where a military voter lived when they entered the military. This address also does not change while a military voter is on active duty or when a military voter is assigned to a new duty location.

141. For U.S. citizens residing outside the United States, their voting residence is the last U.S. address at which they were domiciled. This address remains their voting residence even if they no longer own property or have other ties to the state, their intent to return to that state is uncertain, or their previous address is no longer a recognized residential address.

142. Some military voters register to vote near their military base addresses, which can be a nonresidential address. For example, the Joint Forces Headquarters in Georgia is located at 1000 Halsey Ave, P.O. Box 1970, Marietta, GA 30061-0965. Upon information and belief, UOCAVA voters stationed at Joint Forces

Headquarters use a nearby P.O. box as their voter registration address. P.O. boxes are considered nonresidential addresses.

143. By necessity of their deployment or being overseas, military and overseas voters almost always have their absentee ballots sent to an address that differs from their address of voter registration. Most military and overseas voters use the address where they were last domiciled for voter registration purposes and have their absentee ballots sent to their mailing address rather than their voting residence or home of record address.

144. Georgia requires UOCAVA voters to request an absentee ballot every election cycle. O.C.G.A § 21-2-381(a)(1)(G). UOCAVA voters must submit an application for a Georgia absentee ballot, either via the Federal Post Card Application ("FPCA") or via Georgia's absentee ballot application. *Id.*; 52 U.S.C. §§ 20302(a)(4).

145. While military and overseas voters are entitled to use the FPCA to request an absentee ballot, during the last three election cycles only 20-26% of all UOCAVA voters actually did so.[12] This suggests that many, if not most, of Georgia's

---

[12] *State of the Military Voter*, Federal Voting Assistance Program, https://www.fvap.gov/info/reports-surveys/StateoftheMilitaryVoter (last visited Oct. 11, 2024).

military and overseas voters instead request their absentee ballot via the state's absentee ballot application form.

146.   Georgia requires a "wet signature" on its absentee ballot applications, O.C.G.A § 21-2-381(a)(1)(C)(i), and there is no exception for UOCAVA voters. This means a voter stationed or living abroad, such as an active-duty military member stationed overseas, must find a printer to sign their application just to *request* an absentee ballot. Then voters must wait, enduring the inevitable delays of overseas mail, to finally receive their actual absentee ballot and return their voted ballot.

147.   Because military and overseas voters are subject to frequent moves that require updates to their mailing addresses, these voters often appear in the National Change of Address ("NCOA") Database. SFI has found that military voters are particularly vulnerable to challenges to voter registration or eligibility because a change of mailing address or registration at a nonresidential address can trigger a challenge.

148.   For example, a military voter registered in Georgia, who may be registered at an address where other Georgia electors now reside, could be stationed out-of-state and even own a house out-of-state. This voter will request an absentee ballot to the out-of-state residential address and may even change their driver's license or vehicle registration to correspond with their out-of-state address. A search of this voter's information would falsely indicate that the voter has changed their residence

even though they are in fact an eligible Georgia elector entitled to vote under UOCAVA.

149.    Overseas and military voters in particular have difficulty resolving the challenges against them because they are living abroad, are posted at military installations around the world, or are otherwise unable to receive notice, or respond to voter challenges in a timely way.

**III.    Georgia's Voter Challenge Process Pre-S.B. 189**

150.    Georgia law provides processes for individuals to challenge a voter's registration and/or right to vote under O.C.G.A. §§ 21-2-229 ("Section 229") and 21-2-230 ("Section 230").

151.    Both Section 229 and Section 230 allow individuals to challenge an unlimited number of voters.

152.    Under Section 229, any registered voter may challenge "the qualifications of any person applying to register to vote in the [same] county or municipality . . . [or] challenge the qualifications of any [voter] of the [same] county or municipality."

153.    Section 229 challenges, if sustained, result in the voter's removal from the registration list. O.C.G.A. § 21-2-229(d).

154.    Section 230 challenges apply to a voter's right to cast a ballot in a specific election. Under Section 230, any registered voter may challenge "the right of

any other [voter] of the [same] county or municipality . . . to vote in an election[.]" O.C.G.A. § 21-2-230(a). If the challenge is based on grounds that the voter is not qualified to remain on the registration list, the challenge can also serve as a challenge to the voter's registration and, if sustained, can result in the removal of the voter from the registration list. *Id.* § 21-2-230(g), (h), (i); s*ee also Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1368 (M.D. Ga. 2021). A Section 230 challenge is converted to a Section 229 challenge if the voter does not vote in the next election and the challenge is based on the grounds that the voter is not qualified to remain on the list of electors. O.C.G.A. § 21-2-230(f).

155. The challenge process set forth in Section 229 requires boards of registrars to set a hearing and provide notice of the hearing and a copy of the challenge to the challenged voter within ten business days after the challenge is filed. The challenged voter must receive at least three days' notice of a hearing. If the board of registrars upholds a challenge, depending on whether the elector is already registered, the challenged voter's registration application will be rejected or their name will be removed from the registration list.

156. The challenge process set forth in Section 230(a) requires the registered voter making the challenge to do so in writing and specify the grounds for the challenge. O.C.G.A. §21-2-230. Before S.B. 189, if the challenged voter is voting in-person, the challenge must be made prior to when the challenged voter votes. *Id.*

Also before S.B. 189, if the challenged voter votes absentee, the challenge must be made before 5:00 PM on the day before the absentee ballots are scanned and tabulated. *Id.*

157.    Section 230(b) provides that "[u]pon the filing of [a] challenge [to the right to vote], the board of registrars shall immediately consider such challenge and determine whether probable cause exists." O.C.G.A. § 21-2-230(b).

158.    When counties do provide advance notice of the challenge brought against the voter based on a change in residence, counties have varied where they send notice to. Some counties have mailed notice of the challenge to the address where the voter registered, while other counties have sent notice to both the alleged new mailing or physical address the challenger provided as well as the registration address.

159.    If the county finds there is no probable cause and denies the challenge, the challenged elector is able to cast their ballot. *Id.* Before S.B. 189, Section 230 did not define "probable cause" under the statute for a challenge.

160.    If the board of registrars finds that there is probable cause in support of the challenge, the board of registrars must also notify other election officials of the probable cause finding and, if practical, notify the challenged voter and afford them

an opportunity to answer the challenge.[13] *Id.* Once the Board sustains a finding of probable cause, the voter is put into "challenged" status in the statewide voter registration system. O.C.G.A. § 21-2-230.

161. If a voter is provided notice of the challenge against them and they appear at the county board meeting where the challenge will be heard, there is no guidance on how a voter can rebut the challenge. This has caused problems in previous election cycles, as county boards of registrars have a history of failing to advise voters about how to respond to third-party voter challenges. *See Majority Forward*, 512 F. Supp. 3d at 1371.

162. If the challenged voter votes in-person, the county must hold a hearing on the challenge that happens either before polls close or before certification of the returns. O.C.G.A. § 21-2-230(g)-(i). If the challenged voter votes in-person and the county upholds the challenge, the voter cannot vote and, if the challenge is based on registration status, the voter is removed from the registration list. O.C.G.A. § 21-2-230(h)-(i). If the challenged voter votes absentee and the county sustains the challenge, the challenged voter's ballot is rejected and not counted and, if the challenge

---

[13] The only situation where a challenged voter is required, under all circumstances, to be given an opportunity to appear before the board of registrars and answer a challenge is when the challenged voter appears at a polling place to vote. O.C.G.A § 21-2-230(c).

is based on registration status, the voter is removed from the registration list. O.C.G.A. § 21-2-230(g).

163.   Any decision by the registrar is appealable to the local superior court. O.C.G.A § 21-2-230(i).

## IV.   Exponential Proliferation of Voter Challenges in Georgia from 2020 to the Present

164.   Though Georgia's current voter challenge statutes have been in effect since at least 1994, until 2020 they were employed only sparingly. More recently, mass challenges have been brought by members of the public, some seeking to sow distrust in elections. In recent elections, hundreds of thousands of eligible Georgia voters have been subject to erroneous voter challenges. Some challenged voters did not know until Election Day that they would need to defend their right to vote. *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1288 (N.D. Ga. Jan. 2, 2024).

165.   In the wake of the 2020 Presidential Election, True the Vote ("TTV"), a Texas based organization, began a campaign to "Validate the Vote" and find the "illegal ballots . . . cast and counted in the 2020 general election." *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1250 (N.D. Ga. 2024). As part of this campaign, TTV facilitated mass challenges against voters under O.C.G.A. § 21-2-230 and planned to challenge over 350,000 voters right before Georgia's 2021 Senate runoff election. *Id.* at 1251. The list of challenged voters was generated from NCOA data,

which often includes eligible military, overseas, and student voters whose addresses appear to have changed but have not changed for purposes of voter registration. *Id.* One of the individuals who brought such a mass challenge under TTV's direction later acknowledged that such data was likely to sweep in eligible military and student voters. *Id.* at 1251, 1258. A court found "TTV's list utterly lacked reliability. Indeed, it verge[d] on recklessness." *Id.* at 1274.

166.    Similar issues arose in Ben Hill and Muscogee Counties, which sustained mass challenges to thousands of voters under O.C.G.A. § 21-2-230, including challenges to military and overseas voters, brought by two individuals affiliated with TTV.[14] These sustained challenges were also based on NCOA data, despite a county board member understanding that NCOA data alone is insufficient to recommend a finding of probable cause. *See Majority Forward v. Ben Hill County Board of Elections,* 512 F. Supp. 3d 1354 (M.D. Ga. 2021). A court found the sustained mass challenges likely violated federal law because they were sustained without an individualized inquiry and many were erroneous. *Id.*

167.    Georgia county boards of elections and registration have been unable to, or have otherwise failed to, conduct the level of individualized inquiry necessary

---

[14] Associated Press, *Judge Blocks Residency Challenges to 4,000 Georgia Voters*, LAW.COM (Dec. 29, 2020), https://www.law.com/dailyreportonline/2020/12/29/judge-blocks-residencychallenges-to-4000-georgia-voters/?slreturn=20241003140639.

to make an accurate determination as to whether there is probable cause to sustain a challenge to an individual voter's qualification in the context of mass challenges. *See, e.g.*, *id.* at 1371.

168.   As of July 1, 2021, with the enactment of Georgia S.B. 202, which amended, *inter alia*, aspects of Georgia law governing voter qualification challenges—specifically Sections 229 and 230—registered voters in a county can make unlimited mass challenges to the eligibility of other registered voters in that county to remain on the voter registration rolls and to cast a ballot that will be counted.

169.   Georgia law does not impose any good-faith requirement on such mass challenges, nor does it impose any penalty on challengers who submit challenges that are unfounded or discriminatory. Without fear of penalties for bringing frivolous or meritless challenges, mass challenges have exponentially increased post-S.B. 202 and have included challenges against unhoused, military and overseas voters, as well as voters living at an address deemed "nonresidential."[15]

170.   In 2022, a single challenger submitted over 31,500 challenges in Forsyth County under O.C.G.A. §§ 21-2-229 and 21-2-230, and only about 3 percent of

---

[15] Doug Bock Clark, *Close to 100,000 Voter Registrations Were Challenged in Georgia — Almost All by Just Six Right-Wing Activists*, PROPUBLICA (July 13, 2023), https://www.propublica.org/article/right-wing-activists-georgia-voter-challenges.

these were sustained.[16] Another resident of Forsyth County challenged over 15,700 voters—6 percent of the county's voter rolls—based on NCOA data.[17] Because the challenger made no attempt to weed out military or student voters (eligible voters who have valid reasons for appearing in the NCOA database), Forsyth's Board of Elections dismissed the challenges wholesale.[18]

171.   In 2022, in Gwinnett County, a group called VoterGA, which is run by an individual named Garland Favorito and claims Georgia's election systems are fraudulent, made 37,500 voter eligibility challenges—about 6 percent of that county's voting population—and another 20,000 challenges to ballots cast in the 2020 election.[19] After the board had spent around 250 hours investigating challenges, all were dismissed.[20]

---

[16] *Id.*

[17] Jane C. Timm, *Fraud hunters challenged 92,000 voter registrations in Georgia last year*, NBCNEWS (Feb. 27, 2023), https://www.nbcnews.com/politics/elections/fraud-hunters-challenged-92k-georgia-voter-registrations-2022-rcna71668.

[18] *Id.*

[19] *Affidavits to Challenge 37,500 Voter Roll Entries Including 20,000 Ballots Cast in the 2020 Election*, VOTERGA (Aug. 2022), https://voterga.org/wpcontent/uploads/2022/08/Media-Advisory-Citizens-Challenge-37000-Voter-Roll-Entries.pdf.

[20] *Supra* note 14.

172.   In August 2022, Marybelle Hodges, a participant in the organized voter challenge effort by VoterGA in Gwinnett County, lodged 269 challenges. She claimed the challenged voters had requested absentee ballot applications too early and therefore should not be issued any absentee ballots. Some of these challenged applications may have been from UOCAVA voters. The state is required to accept an absentee ballot application from UOCAVA voters even if they have applied for an absentee ballot before the official request window has opened. 52 U.S.C. § 20306.

173.   Other challenges brought in 2022 also claimed that voters were ineligible because they were registered at nonresidential addresses, even though some of the challenged voters were eligible to vote but just did not have a permanent address or were temporarily between residences.[21]

174.   In Spalding County, individuals have challenged voter registrations for several reasons, including changes of residency. One individual challenged 94 voters based on allegations of a change of residency and, at an August 9, 2022 hearing, the Spalding County Defendants voted to remove all 94 voters.[22]

---

[21] Eli Saslow, *3 Georgia Women, Caught Up in a Flood of Suspicion about Voting*, N.Y. TIMES (Sept. 15, 2024), https://www.nytimes.com/2024/09/15/us/politics/georgia-voting-2024-election.html.

[22] Attached as Exhibit 3.

175.   These mass challenges generated needless and time-consuming administrative burdens for the election officials who had to review the challenges. For example, in voting to dismiss one mass challenge in 2022, a Gwinnett County board member found "that 98% of all challenges submitted thus far have proved to be unsubstantiated and without merit . . . [and] these challenges [did] not follow the protocol."[23]

176.   In 2023 and 2024, counties increasingly began sustaining challenges and removing voters from the voter rolls.

177.   The Chatham County Defendants removed numerous voters following a series of mass voter challenges filed by individuals in 2023 and 2024.

178.   In 2023, the Chatham County Defendants upheld voter challenges brought by the City of Tybee Island, a municipality not allowed under state law to bring such challenges, against the City's own voters.[24] During a hearing held on January 24, 2024, which was within 90 days of Georgia's March 12, 2024 presidential preference primary election, Chatham County Defendants removed challenged voters from the registration list.[25]

---

[23] Meeting Minutes, Gwinnett County Board of Voter Registrations and Elections Minutes, Oct. 3, 2022, https://www.gwinnettcounty.com/static/upload/bac/6/20221003/m_97074_Official_Meeting_Minutes_10.03.2022.pdf.

[24] Attached as Exhibit 4.

[25] Attached as Exhibit 5.

179.   At an April 17, 2023 hearing, the Gwinnett County Defendants upheld challenges to over 50 voters and directed that they be removed from the registration list. The challenges were made around a couple of months before the hearing.[26]

180.   Similarly, in Forsyth County, one person challenged over 1,000 voters in 2023 based on residency and was successful in having the Forsyth County Defendants remove over 900 of the challenged voters from the registration list over the course of a series of hearings.[27] One of those challenge hearings was held on March 5, 2024, which was within 90 days of Georgia's March 12, 2024 presidential preference primary election.[28]

## V.   Georgia Enacts S.B. 189

### A.   <u>Sections 4 and 5 of S.B. 189</u>

181.   Section 4 of S.B. 189, which will become effective January 1, 2025, mandates that unhoused persons use the county board of registrar's office as their mailing address: "[T]he mailing address for election purposes of any person of this state who is homeless and without a permanent address shall be the registrar's office of the county in which a person resides." O.C.G.A. § 21-2-217(a)(1.1).

---

[26] Attached as Exhibit 6.

[27] Attached as Exhibit 7.

[28] Attached as Exhibit 8.

182.    Section 5 of S.B. 189, which became effective July 1, 2024, amended

Georgia's Section 230 challenge statute to mandate findings of probable cause by

county boards of registrars and inserted, for the first time, provisions that define what

constitutes "probable cause" for removing challenged voters from the registration

list in Georgia. O.C.G.A. § 21-2-230(b).

183.    Among other things, Section 5 of S.B. 189 states that:

> probable cause shall include . . . [a voter] voting or registering to vote in a
> different jurisdiction; [a voter] obtaining a homestead in a different jurisdic-
> tion; or [a voter] being registered at a nonresidential address as confirmed or
> listed by or in a government office, data base, website, or publicly available
> sources derived solely from such governmental sources.

O.C.G.A. § 21-2-230(b).

184.    Section 5 of S.B. 189 mandates a finding of probable cause for an

O.C.G.A. § 21-2-230 challenge

> "[i]f a challenged elector's name appears on the National Change of Address
> data base, as maintained by the United States Postal Service, as having
> changed such elector's residence to a different jurisdiction" and "additional
> evidence would indicate that the [voter] has lost his or her residency as deter-
> mined pursuant to Code Section 21-2-217."

This is despite (1) zoning of a registration address being inconsequential to

eligibility to register to vote in Georgia, and (2) NCOA data being notoriously unre-

liable and it being well-established that eligible Georgia voters appear in the NCOA

database.

185. A finding of probable cause leads to the voter being placed in challenged status. The voter then must rebut the challenge. *See supra* p. 66.

186. Section 5 of S.B. 189 further provides that the "board of registrars shall immediately consider such challenge[s] and determine whether probable cause exists" but that "any challenge of an elector within 45 days of a primary, run-off primary, election, or run-off election shall be postponed until the certification of such primary, election, or runoff is completed." O.C.G.A. § 21-2-230(b)(1).

**B.      The Process of Enacting S.B. 189 Was Rushed and Flawed**

187. The enacted version of S.B. 189 departs significantly from the version of the bill that was initially introduced. In fact, when S.B. 189 was first introduced in February 2023, it did not include the provisions challenged in this Complaint.[29] Georgia Senate Bill 189, as introduced, *available at* https://legiscan.com/GA/text/S.B.189/id/2702104.

188. The procedure leading up to the passage of S.B. 189 was rushed and irregular. Bills covering the same subjects had been introduced but ultimately stalled. On March 28, 2023, one day before Sine Die (the final day of session) in the Georgia Legislature, S.B. 189 was reintroduced as an omnibus elections bill, stitching together several disparate proposed bills under the purported rationale of protecting

---

[29] S.B. 189, 2022-2023 Gen. Assemb., Reg. Sess. (Ga. 2023), https://www.legis.ga.gov/api/legislation/document/20232024/214851

election integrity. Georgia Senate Bill 189, *available at* https://legiscan.com/GA/text/SB189/id/2970617.

189. Throughout the debate on S.B. 189, its supporters used the pretextual—and disproven—myth of mass voter fraud and unsubstantiated claims of election irregularities in Georgia to attempt to justify their actions.

190. The Georgia Legislature enacted S.B. 189 despite staunch opposition from minority legislators, Secretary Raffensperger's office, and other election officials. Many legislators opposed the bill, stating that it would enable baseless voter challenges, overwhelm election administrators, and disenfranchise eligible voters.

191. During a March 28, 2024 debate on S.B. 189 on the floor of the House of Representatives, statements made by a bill proponent, Representative Victor Anderson, and by a bill opponent, Representative Park Cannon, evince a common understanding that Section 4 applies broadly to unhoused voters in Georgia.[30]

192. During the March 28, 2024 debate, Representative Cannon raised concerns that Section 4 would disenfranchise unhoused voters, at one point asking rhetorically, "How does that make sense that everyone in Fulton County who is

---

[30] *See* Georgia House of Representatives, *Session Day 40: 03.28.24 (PM 2)*, VIMEO (Mar. 29, 2024), https://vimeo.com/showcase/10859770/video/928584876.

unhoused would put the government center's address? It just simply does not make sense."[31]

193.    Representative Anderson responded to those comments and others, saying "[w]e just had some discussion about Section 4 regarding the homeless. Section 4 provides a mechanism for the homeless to actually have the opportunity to vote. That has been left up to local jurisdictions up to this point. We're defining that in code."[32]

194.    Governor Brian Kemp signed S.B. 189 into law on May 6, 2024. Georgia Senate Bill 189, *available at* https://legiscan.com/GA/bill/SB189/2023.

## C.    Section 4's Implications for the Voter Registration of Unhoused Persons

195.    In 2023, the U.S. Department of Housing and Urban Development reported to the United States Congress that there were 12,294 people experiencing homelessness in the State of Georgia.[33] Of this population, 5,828 were unsheltered and 6,466 were residing in shelters providing temporary living arrangements.[34] The February 2022 Georgia Department of Community Affairs assessment of the number

---

[31] *Id.* (Representative Cannon's comments begin at 2:25:27).

[32] *Id.* (Representative Anderson's comments begin at 3:30:08).

[33] *See supra* note 9 at 16.

[34] *Id. at* 101.

of unhoused people residing in Georgia found that Black people comprised 35% of the unsheltered homeless population and 57% of the sheltered homeless population,[35] even though just 31% of Georgia's population is Black, according to the United States Census Bureau's 2023 American Community Survey.[36]

196.   By requiring that the mailing address for unhoused people without a permanent address be the address of their registrar's office, S.B. 189 makes it much harder for many unhoused voters without a permanent address to receive official election-related communications.

197.   Section 4 of S.B. 189 compounds the threat of disenfranchisement to unhoused and housing-insecure voters—who are already among the most vulnerable and marginalized groups of voters—by forcing them to receive their official election mail, including NVRA-required notices and other essential information such as precinct locations, challenge notices, and absentee ballots, at their county registrar's office rather than at their preferred address, even as all other Georgia voters are permitted to do so.

---

[35] GA. DEP. OF CMTY. AFF., DEP. OF CMTY. AFF., STATEWIDE POINT IN TIME COUNT HOMELESS REP. FOR 2022.

[36] Georgia: Demographic and Housing Estimates, 2023 American Community Survey, U.S. Census Bureau, https://data.census.gov/table/ACSDP1Y2023.DP05?g=040XX00US13 (last visited Dec. 17, 2024).

198. For example, S.B. 189 makes it harder for unhoused voters without a permanent address to receive and respond to NVRA confirmation mailings. The failure to respond to such mailings can result in voters being moved to inactive status or removed from the registration list. *See* 52 U.S.C. § 20507(d).

199. Many unhoused voters without a permanent address who live far from their county registrar's office and do not have access to transportation will now, as a practical matter, be unable to access election mail. These voters are also significantly more likely to face other barriers such as physical disability, illiteracy, and limited English proficiency, making it even more difficult for them to get to their registrar's office.

200. As noted above, as of 2022, approximately 21 percent of individuals experiencing homelessness in Georgia resided in Atlanta or Fulton County, 5 percent resided in Chatham County, and 4 percent resided in Macon-Bibb County.[37]

201. Without explanation or justification, Section 4 of S.B. 189 has singled out a particular class of Georgia voters for differential treatment. The law also fails to account for how each of Georgia's 159 counties will implement this requirement, providing neither a definition of "homeless and without a permanent address," nor a process for determining whether a voter falls under this category, nor resources to

---

[37] *Supra* note 35.

support county registrars' implementation of this new and burdensome administration function. This is likely to result not only in a significant administrative burden for county elections officials, but, more importantly, in differential treatment of these voters depending upon the county in which they reside.

202. Upon information and belief, as of this filing, no county registrar's office has made public a plan for administering a mailroom function or other processes necessary to serve as the newly required mailing address for voters who are "homeless and without a permanent address."

203. Nor is it clear whether voters or election officials are responsible for ensuring that the mailing address of a voter who is "homeless and without a permanent address" is actually designated as their county registrar's office. Some county registrars may interpret Section 4 of S.B. 189 as requiring them to unilaterally change whatever mailing address these voters provide on their voter registration application to the address of the registrar's office—an action registrars have no independent authority to take under Georgia law—while other counties may decide that it is necessary to reject unhoused voters' registration applications that do not list the registrar's office as the mailing address.

D.   **Section 5's Changes to Georgia's Voter Challenge Provisions**

204.    Before S.B. 189, county boards of elections and registration could dismiss unfounded challenges not demonstrating probable cause that a voter was unqualified.

205.    S.B. 189 removes the discretion of county administrators to dismiss unfounded challenges by dictating that county boards of registrars "shall" find probable cause to sustain a voter challenge that a voter is unqualified, and thus should be removed from the voter rolls, when the challenged voter has allegedly moved or is registered at a "nonresidential address," even when based upon unverified evidence by a third party.

206.    Neither Section 230 nor S.B. 189 specify the quality of evidence that may be used to bring a challenge or impose penalties for bringing unreliable, frivolous, or erroneous challenges.

207.    Section 5 of S.B. 189 also leaves open the question of how a challenged voter might "answer the grounds of the challenge" as required by O.C.G.A. § 21-2-230(c). This creates a situation where different counties may administer different requirements for what a challenged voter must do to rebut a finding of probable cause, in violation of the NVRA's requirement that list maintenance procedures be uniform. 52 U.S.C. § 20507(b)(1).

208.    Likewise, by failing to require that actual notice be provided to a challenged voter—notice need only be provided "if practical," which is undefined—

Section 5 of S.B. 189 allows a challenged voter to be disenfranchised for having a "nonresidential" address (however defined) or having moved without even being given the opportunity to respond.

209.   Because Section 5 of S.B. 189 makes it more likely that Section 230 challenges will be sustained, forcing military, overseas, student, and unhoused voters to defend their right to vote, Section 5 of S.B. 189 is likely to disproportionately impose burdens on these voters, who have a history of being subject to unfounded challenges and already face issues in casting their ballots, if they wish to make sure their vote is counted.

210.   Additionally, because a Section 230 challenge can result in a voter's removal from the voter rolls, S.B. 189's allowance of NCOA and other residency data to be the basis of a Section 230 challenge is preempted by Section 8(d) of the NVRA, which provides the exclusive method to lawfully remove voters based on a change in residence.

211.   As noted above, there is no requirement under federal or Georgia law for a voter to have a "residential" address. *See* O.C.G.A. § 21-2-217. Further, the eligibility of a voter's residence is not determined based on the particular zoning type or other designation as to the "residential" or "nonresidential" nature of their address, *see* O.C.G.A. § 21-2-217.

212. Eligible voters who are unhoused, housing-insecure, or otherwise living at a location with a nonstandard address—or no address at all—retain their right to vote regardless of the nature or status of their residence. *See, e.g.*, *Cook v. Bd. of Registrars of Randolph Cnty.*, 320 Ga. App. 447, 449–53 (2013); *Collier v. Menzel*, 176 Cal. App. 3d. 24, 35 (Cal. Ct. App. 1985); *Pitts v. Black*, 608 F. Supp. 696, 699 (S.D.N.Y. 1984).

213. But Section 5 of S.B. 189 identifies the circumstances under which probable cause to sustain a challenge must be found, to include a factor, residing at a "nonresidential" address, that is irrelevant under state and federal law—making it even more likely that eligible voters will be disenfranchised.

214. Accordingly, Section 5 of S.B. 189 is arbitrary and discriminatory in that it treats voters with an address deemed "nonresidential" differently from voters who reside at an address deemed "residential," despite the nature of a voter's address having no relevance to their qualification to vote. Many voters in Georgia are registered using nonresidential addresses. For example, unhoused or housing insecure people, students residing in campus dormitories, and voters residing in nursing homes, military facilities, or other facilities may be living in or registered under "nonresidential" addresses.

215. Further, S.B.189 fails to provide a conclusive statement that, even if registered at a "nonresidential" address, the voter may rebut a finding of probable

cause by showing that they have established residency under Georgia law. Thus, Section 5 of S.B. 189 exposes these challenged voters to erroneous disenfranchisement without a meaningful opportunity to be heard in defense of their eligibility.

216.   There is no clarity regarding how "nonresidential" should be defined for the purposes of a challenge, including, for example, whether "nonresidential address" refers to addresses zoned as nonresidential or instead to something else. Zoning and other official designations of address type are inconsistent across localities and unreliable indicators of whether a particular address is "residential" or "nonresidential" in practice. The Georgia Constitution, under its home rule provision, reserves to cities and counties the substantive power to zone and plan for land within their respective jurisdictions. Ga. Const. Art. IX, Sec. II, Para. IV. In fact, while the state legislature is authorized to adopt laws governing procedures for zoning, localities have sole authority to exercise the zoning power and adopt individual zoning plans. *Id*. There is, accordingly, wide variance across individual jurisdictions as to which types of uses and facilities may be permitted in particular zoning or land use designations, inevitably leading to arbitrary and disparate treatment dependent solely upon which county a voter happens to reside in.

217.   There are also numerous local ordinances that permit "residential" uses and facilities within "nonresidential" zoning designations, rendering baseless a county board of registrar's reliance on such a designation when determining whether

an individual voter's registered address is residential or not. For example, Georgia colleges and universities are frequently located at addresses zoned as commercial or for other nonresidential use, making students residing in campus dormitories subject to challenge under Section 5 of S.B. 189. *See, e.g.*, City of Atlanta Municipal Code, Pt. III, Pt. 16, Ch. 11 § 16-11.003(15) (permitted uses for commercial zoning include "[i]nstitutions of higher learning, including colleges and universities"); Athens-Clarke County Code of Ordinances, Tit. 9, Art. I, Ch. 9-5 § 9-10-2 (permitted uses for commercial zoning include "colleges").

218.   As another example, many shelters, nursing homes, and other personal care homes or assisted living facilities may be located at addresses zoned as commercial, making unhoused or housing-insecure and elderly voters particularly vulnerable to challenge under Section 5 of S.B. 189. *See, e.g.*, Atl. Code of Ordinances, Pt. III, Pt. 16, Ch. 11 §§ 16-11.005(1)(e), 16-11.005(1) (m) (permitted uses for commercial zoning include "nursing homes, assisted living facilities, rehabilitation centers and personal care homes" and "[s]helter[s]"); Athens-Clarke County Code of Ordinances, Tit. 9, Art. I, Ch. 9-10 § 9-10-2 (permitted uses for commercial zoning include "[p]ersonal care homes, group" and "[p]ersonal care homes, congregate").

219.   Special use permits further muddy the waters by granting zoning exceptions to individual facilities or structures. For instance, addresses located within a particular zoning designation in one county may be uniformly "nonresidential"

while the next county over may allow numerous "residential" uses within an otherwise "nonresidential" zone. Thus, reliance on zoning designations to determine address type is likely to produce different outcomes for different voters, even if the voters are similarly located at addresses with a "nonresidential" designation. Moreover, localities in Georgia are allowed to grandfather in non-conforming uses, so public records may not accurately account for this information in resolving a challenge.

220. Finally, under Georgia's VoteSafe program, individuals who have been, or may be, subject to acts of family violence or stalking or who currently reside in a family violence shelter may register to vote using a post office box to protect their privacy. Georgia VoteSafe Program, *available at* https://sos.ga.gov/page/votesaf. Senate Bill 189 contains no exemptions for participants in Georgia's VoteSafe program.

221. Thus, Section 5 of S.B. 189 significantly increases the likelihood that mass voter challenges will result in the removal and disenfranchisement of eligible voters simply because their address is determined to be "nonresidential"—a status designation that has nothing to do with their eligibility to vote under federal or Georgia law.

E. **Voter Challenges Since Passage of S.B. 189**

222. In 2024, mass challenges have continued to be brought by groups that claim Georgia's elections are fraudulent. One such group is the Georgia Election Nerds, who have produced videos maintaining the 2020 Election was stolen and claiming to explain how elections are manipulated.

223. In June 2024, Helen Strahl, on behalf of Georgia Election Nerds, challenged 826 voters in Chatham County, after which she sent the names of another 20,000 voters to Chatham County for "list maintenance" and challenged an additional 689 students and former students registered at Savannah State University, which is a majority Black institution.[38]

224. Challenges have continued to be based on NCOA and residency data during the 2024 election cycle, even though courts, the Secretary of State's office, and other authorities have recognized the unreliability of NCOA data for accurate list maintenance.[39] For example, in 2023, former general counsel of the Georgia Secretary of State's Office "Ryan Germany testif[ied] that he 'didn't believe' that NCOA 'was sufficient probable cause' for further inquiry" for a Section 230 challenge. *Fair*

[38] *Supra* note 17.

[39] UNDERSTANDING THE FLAWED DATA METHODOLOGIES UNDERLYING MASS VOTER CHALLENGES, All Voting is Local, Lawyers' Committee for Civil Rights Under Law, and Demos, at 5–8 (Sept. 2024), https://allvotingislocal.org/wp-content/uploads/All-Voting-Report-VPT-White-Paper-SEPT-2024-R3.pdf.

*Fight Inc.*, 710 F. Supp. 3d at 1258. Yet, some counties have continued to uphold challenges based on NCOA and residency data, even without the "additional evidence" required by Section 5 of S.B. 189.

225.   For example, in Walton County, Margaret Hubbard challenged 100 voters based solely on information she gleaned from "a free system that checks USPS moved out of state records and voter registration in about 30 states." Despite Hubbard's failure to provide any individualized evidence regarding each challenged voter, the Walton County Board of Registrars found probable cause to sustain her mass challenges.

226.   Challengers may bring forward *any* "additional evidence" to buttress NCOA data and have admittedly relied on "unconfirmed online evidence" that a voter lives elsewhere, whether it be screenshots of social media posts or real estate websites. This means that challenges brought under O.C.G.A. § 21-2-230 or O.C.G.A. § 21-2-229 continue to be "poorly created and carr[y] the enormous possibility of challenging voters' eligibility who [are] in fact eligible voters in Georgia." *Fair Fight Inc.*, 710 F. Supp. 3d at 1275.

227.   This lack of clarity causes havoc because counties do not know what "additional evidence" to support NCOA data is sufficient to find probable cause. In Richmond County, for instance, the Board asked its local counsel whether screenshots were sufficient evidence to find probable cause and were advised simply that

it was up to the Board to determine what "they feel [is] sufficient." Other counties and county attorneys may reach different conclusions about what is sufficient to establish probable cause, resulting in counties sustaining Section 230 challenges based upon varying standards. Thus, a voter's disenfranchisement or disenrollment may vary based on which county they happen to reside in and which county board reviews the challenge.

228. In Forsyth County, Stefan Bartelski challenged around 500 voters claiming the voters had moved or were registered to vote elsewhere, partly relying on NCOA data. For some of these voters, Bartelski provided screenshots he gathered that purported to show the voters had registered elsewhere, but for many voters, Bartelski provided no proof of his allegations and simply created a table in a Word document with the voter's new "out of state data." The Forsyth County Board of Voter Registrations and Elections found a lack of evidence for all but five of the voters on Bartelski's challenge lists and dismissed his challenges. Forsyth County, *Challenged Voters*, https://www.forsythco.com/Departments-Offices/Voter-Registrations-Elections/Challenged-Voters.

229. Earlier this year, the Macon-Bibb County Board of Elections received challenges to 45 voters from one individual. The 45 challenged voters provided either a post office or UPS store location as their residence address when they registered to vote. Jesse Fraga, *Dozens of Bibb voters have to prove residency after*

*accusations of false addresses, fraud*, THE TELEGRAPH (July 02, 2024),

https://www.macon.com/news/politics-government/article289695804.html.

230.    On July 1, 2024, the day Section 5 of S.B. 189 went into effect, Macon-

Bibb County Defendants deliberated on the challenges and placed all 45 of those

voters into "challenged status," requiring all 45 voters to provide proof of residency

to Macon-Bibb County election officials before they are allowed to vote in any fu-

ture election. Under "challenged status," the 45 voters will undergo the rest of the

voter challenge process laid out in Georgia law, which puts them at substantial risk

of removal from the registration list and/or disenfranchisement. *Id.*

231.    The use of a post office address was the sole reason cited by the Macon-

Bibb County Defendants for placing the 45 voters into challenged status. *Id.*

232.    In fact, Macon-Bibb County Defendants rejected a separate set of voter

challenges made by the same individual alleging that voters had moved out of Ma-

con-Bibb County. *Id.*

233.    According to news reports, the same individual has publicly promised

to challenge the eligibility of additional Macon-Bibb County voters in the future. *Id.*

234.    On Election Day during the 2024 General Election, Fulton County De-

fendants deliberated on nonresidential address challenges for hundreds of voters, at

least some improperly brought by the Fulton County Defendants themselves after

conducting an internal audit. The Fulton County Defendants required these

challenged voters, who had attempted to vote during the 2024 General Election, to attend this hearing and successfully answer their challenge for their votes to be counted. Many voters were not at the hearing, others left the hours-long hearing before their turn, and several voters who attended their individual hearing received an unfavorable ruling and were disenfranchised.

235.   Counties have also used different standards to handle challenges based on the new probable cause grounds mandated by Section 5 of S.B. 189. In particular, counties have applied different standards to residency-based and nonresidential-address-based challenges. For example, as mentioned, at their July 1, 2024 challenge hearing, Macon-Bibb County upheld challenges based on an alleged registration at a P.O. box address. Chattooga County, however, on September 17, 2024, dismissed some voter challenges based on alleged registrations at a nonresidential address while upholding others.

236.   Even though Section 5 of S.B. 189 only modifies Section 230 challenges, some counties have treated S.B. 189 challenges alleging that someone has moved as a Section 230 challenge (a challenge to participate in a specific election which, if sustained, does not always result in the removal from the voter rolls), while others have treated such challenges as a Section 229 challenge (a challenge to a person's voter registration which, if sustained, results in removal from the voter rolls).

237.  Some counties have outright dismissed challenges based on residency data while others have sustained the challenges.

238.  For example, in August 2024, an individual brought a series of challenges in Cobb County based on NCOA data and data from a discredited privately funded database (Eagle AI). Upon information and belief, many of those challenged were military and overseas voters. Cobb County Board of Elections and Voter Registration denied the challenges. Cobb County Gov, *Voters List Challenged*, https://www.cobbcounty.org/elections/news/voter-lists-challenged.

239.  Conversely, following enactment of S.B. 189, Defendant Members of the Gwinnett County Board of Registrations and Elections voted to uphold Section 230 challenges to almost one hundred voters in the lead-up to the 2024 General Election based on their registrations at "nonresidential" addresses. During the September 30, 2024 meeting, staff to the board indicated that due to the changes in S.B. 189, they believed the board was required to uphold certain challenges, even if that same challenge would have previously been dismissed. Upon information and belief, other Georgia counties are following similar procedures and making similar decisions in response to Section 230 challenges. Such challenges are likely to include, or have included, military and overseas voters, amongst others.

240.  Additionally, upon information and belief, some counties have refused to hear any Section 230 or Section 229 mass challenges within 90 days of the

election, in accordance with the NVRA's prohibition against systematic removal of voters from the voter rolls within 90 days of an election, 52 U.S.C. § 20507(c)(2)(A), while others have considered such challenges, even if they ultimately dismissed the challenges on other grounds.

241.    Finally, while the standards for determining probable cause are ostensibly the same for challenges under O.C.G.A. § 21-2-230 and O.C.G.A. § 21-2-229, when some voters are challenged under both O.C.G.A. § 21-2-230 and O.C.G.A. § 21-2-229 using the exact same evidence, counties have found the challenger has not met the burden of proof for O.C.G.A. § 21-2-229 challenges but has met the burden of proof under O.C.G.A. § 21-2-230.

242.    Upon information and belief, hundreds of military and overseas voters and thousands of other voters have been challenged in 2024. Some of these voters have been challenged in previous election cycles and now must address a duplicative challenge. Some have even been removed from the voter rolls this year due to such challenges.

**CAUSES OF ACTION**

***NVRA CLAIMS:***

243.    The paragraphs in this section apply to Counts I-V, which arise under the National Voter Registration Act.

244. Plaintiffs have a private right of action under the NVRA. 52 U.S.C. § 20510(b). A private plaintiff must "provide written notice of . . . violation[s] to the chief election official of the State involved," 52 U.S.C. § 20510(b)(2).

245. Plaintiffs NGP and APRI sent their notice on July 8, 2024, which was 120 days before the Presidential Election on November 5, 2024.[40]

246. Additionally, on July 10, 2024, Plaintiffs SFI, Georgia NAACP, and GCPA sent a joint notice letter to Defendant Raffensperger, the SEB Defendants, and 17 members of the Defendant Class of county elections boards, including class representative Gwinnett County Board of Registrations and Elections.[41]

247. If an NVRA violation occurs within 30 days before the date of an election for federal office, notice of the violation is not required. 52 U.S.C. § 20510(b)(3).

---

[40] Attached as Exhibit 9.

[41] Attached as Exhibit 2; The 17 members of the Defendant Class were: Cobb County Board of Elections and Voter Registration, Fulton County Board of Registration and Elections, Gwinnett County Board of Registrations and Elections, Dekalb County Board of Registration and Elections, Lee County Board of Elections and Registration, Worth County Board of Elections and Registration, Dougherty County Board of Registration and Elections, Forsyth County Board of Voter Registrations and Elections, Whitfield County Board of Elections, Spalding County Board of Elections and Voter Registration, Richmond County Board of Elections, Chatham County Board of Elections, Macon-Bibb County Board of Elections, Hall County Board of Elections, Lowndes County Board of Elections, Columbia County Board of Elections, and the Cherokee County Board of Elections and Voter Registration.

248. Plaintiff SFI filed their original complaint on October 15, 2024, within 30 days of the November 5, 2024 presidential election, so notice of NVRA violations was not required when Plaintiff SFI filed their original complaint. *Id.*

## COUNT I[42]

### The S.B. 189 Section 5 Residency-Based Probable-Cause Provisions of Section 230 Violate the NVRA 8(d) Removal Process

*52 U.S.C. § 20507(d)*

(Alleged by (1) Plaintiffs Georgia NAACP and GCPA as to Defendant Raffensperger, SEB Defendants, and the Seventeen County Board Member Defendants; (2) by Plaintiff SFI as to Defendant Raffensperger, SEB Defendants, and the Defendant Class Represented by the Gwinnett County Board of Registrations and Elections; and (3) Plaintiffs NGP and APRI as to all the NGP Plaintiffs Group's respective Defendants; Plaintiff GAMVP as to all the NGP Plaintiffs Group's respective Defendants except Spalding County Defendants; and Plaintiff Huynh as to all State Defendants and Fulton County Defendants)

249. Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

250. Persons aggrieved by violations of the NVRA have a private right of action under 52 U.S.C. § 20510.

251. Section 8(d) of the NVRA, 52 U.S.C. § 20507(d), expressly prohibits a state from removing a voter's name from the voter rolls due to a change in residence unless and until either: (1) the voter requests or confirms his or her change of address

---

[42] A claims chart illustrating the claims brought by each of the Plaintiffs is attached hereto as Appendix A.

in writing, or (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(1), (2).

252.   NVRA Section 8(d) sets forth the exclusive method by which states can remove a registered voter from the statewide voter registration list due to a change in residence. *See, e.g.*, *Fair Fight Inc.*, 710 F. Supp.3d at 1243.

253.   The probable cause criteria used to determine voter eligibility when a voter is challenged under O.C.G.A. § 21-2-230, as amended by Section 5 of S.B. 189, now requires that counties find probable cause and sustain the challenge when a third-party challenger alleges that the challenged voter: (1) voted or registered to vote in a different jurisdiction; (2) obtained a homestead exemption in a different jurisdiction; (3) registered at a "nonresidential" address; or (4) moved to a different jurisdiction according to the National Change of Address database, as maintained by the United States Postal Service, in combination with ambiguous and undefined "additional evidence."

254.   Applying these criteria forces Defendants and other election officials to find probable cause and make determinations on voter challenges based on allegations that individuals moved from their address of registration. County Defendants and Defendant Class of county election boards will remove voters from the registration list based on allegations that they have moved, and, if they have already voted,

reject their ballot without obeying the removal process required by the NVRA. *See* 52 U.S.C. § 20507(d).

255.   As a result of Section 5's residency-based probable cause criteria, Georgia's statewide voter registration database, maintained by Secretary Raffensperger in his role as the State's chief election official, will fail to maintain an accurate registration list as required by the NVRA. The NVRA mandates that voters who have moved remain on the registration list for at least two federal election cycles after receiving a confirmation notice unless they confirm in writing that they have moved out of the jurisdiction.

256.   If a challenged voter is unable to defend their right to vote, either due to lack of notice or logistical or resource challenges, the challenged voter will likely have to either submit a provisional ballot and then later take additional steps to verify their eligibility, have their ballot rejected, and/or be removed from Georgia's list of electors.

257.   Section 5 of S.B. 189 thus violates, and is therefore preempted by, federal law because it causes removal outside of the exclusive method of removal for change of residence set forth by Section 8(d) of the NVRA.

258.   This NVRA violation is traceable to County Defendants, which adjudicate the challenges brought under O.C.G.A. §§ 21-2-229 and 21-2-230 and determine whether a challenge is being brought on the basis that a voter is not a qualified

voter meriting removal from the voter rolls. Additionally, counties and municipalities, including County Defendants and the Defendant Class of county election boards, are at risk of being sanctioned by SEB Defendants if they fail to comply with the obligation under state law to apply the probable cause criteria set forth under Section 230.

259.   The NVRA violation is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter registration list, and for providing information on registration and absentee ballot procedures for voters, including military and overseas voters entitled to vote under UOCAVA. *See* O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger can redress this NVRA violation through his authority to interpret Georgia election law and provide guidance and trainings to county elections and registrations boards.

260.   This NVRA violation is also traceable to the SEB Defendants. Without promulgating rules and regulations requiring Section 5 of S.B. 189 to be interpreted and implemented in compliance with the NVRA, SEB Defendants fail to obtain uniformity in the practices of registrars responding to voter challenges as required by law, and SEB Defendants violate federal law and Georgia law requiring them to "formulate, adopt, and promulgate rules and regulations, *consistent with law*, as will

be conducive to the fair, *legal*, and orderly conduct of primaries and elections."

O.C.G.A. § 21-2-31(2) (*emphasis added*).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT II

### The S.B. 189 Section 5 "Nonresidential" Address Provision Violates the NVRA 8(b) Uniformity and Nondiscrimination Provisions

*52 U.S.C. §§ 20507(b)(1)*

(Alleged by (1) Plaintiffs Georgia NAACP and GCPA as to Defendant Raffensperger, SEB Defendants, and the Seventeen County Board Member Defendants; (2) by Plaintiff SFI as to Defendant Raffensperger, SEB Defendants, and the Defendant Class Represented by the Gwinnett County Board of Registrations and Elections; and (3) by the NGP Plaintiffs Group as to State Defendants and Fulton County Defendants, and by Plaintiffs NGP, GAMVP, and APRI also as to Macon-Bibb and Gwinnett County Defendants)

261. Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

262. Persons aggrieved by violations of the NVRA have a private right of action under 52 U.S.C. § 20510.

263. Section 8(b)(1) of the NVRA provides that "[a]ny State program or activity to . . . ensur[e] the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

264.	Section 5 of S.B. 189 violates Section 8(b)(1) of the NVRA because it allows county boards to find probable cause to sustain a challenge to the eligibility of a voter based on the characterization of the voter's registration address rather than their eligibility to vote in the jurisdiction. As such, the law categorically discriminates against eligible voters who may reside at an address that is deemed "nonresidential," forcing these voters—and only these voters—to prove, through an undefined process, that they are in fact Georgia residents. Voters who register to vote at addresses deemed "residential" are not subjected to challenges based upon the character of the premises where they are domiciled. The result is a non-uniform and discriminatory process for identifying people to potentially remove from the voter rolls. *See, e.g.*, *United States v. Fla.*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("A state cannot properly impose burdensome demands in a discriminatory manner.").

265.	Additionally, Section 5 of S.B. 189 is discriminatory and non-uniform because it fails to provide a clear process or standard to be used by county election officials evaluating such challenges, leading to divergent practices across jurisdictions. It provides that county boards may rely on an undefined and categorically non-uniform collection of sources of information in determining whether an individual registrant's address may be deemed "nonresidential"—a characterization of a voter's address type that is itself undefined and categorically non-uniform—which will necessarily result in the non-uniform application of Section 5 of S.B. 189 across

counties. From county to county, there will be inconsistent applications of differing standards for determining whether a particular address is "residential" or "nonresidential," including relying on disparate local zoning, land use, occupancy permit, and business license regimes. Such data sources are often inaccurate and contain outdated information.

266. This discriminatory and nonuniform treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. §§ 21-2-229 and 21-2-230.

267. The violations are traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. *See* O.C.G.A. §§ 21-2-50; 21-2-219(f). Defendant Raffensperger can redress this disparate treatment through his authority to interpret Georgia election law and provide guidance and trainings to county elections and registrations boards.

268. This disparate treatment is also traceable to SEB Defendants, who are responsible for promulgating rules interpreting state election laws which the Defendant Class, the County Defendants, and the Seventeen County Board Member Defendants are bound by. O.C.G.A. § 21-2-31.

269. Macon-Bibb County Defendants have violated Section 8(b) of the NVRA by placing unnecessary, discriminatory, and unreasonable requirements on voters with a nonresidential address. On the day that Section 5 of S.B. 189 became effective, Macon-Bibb County Defendants placed 45 voters into "challenged status" solely for having a post office or UPS store location as their residential address. Unlike other voters, these 45 voters will have to provide proof of residency before being able to vote in any future election. The mere fact that these voters used a post office address was deemed sufficient grounds to impose this requirement. These actions particularly place unhoused voters and voters with insecure housing in Macon-Bibb County at risk of being subjected to additional registration requirements, being removed from the registration list entirely, and/or disenfranchised in the future. Macon-Bibb County's interpretation of Section 230's residential address requirement, on information and belief, is out of step with other Georgia counties that have adjudicated similar types of voter challenges.

270. Fulton County Defendants have violated Section 8(b) of the NVRA by placing unnecessary, discriminatory, and unreasonable requirements on voters with a nonresidential address. For example, Fulton County Defendants forced voters placed into "challenged status" solely for having a nonresidential address to attend a hearing on Election Day. At the hearing, Fulton County Defendants disenfranchised certain voters by upholding their challenges solely based on these voters

registering with a nonresidential address. The mere fact that these voters used a post office or other nonresidential address was deemed sufficient grounds to impose these requirements and even disenfranchise some of them. These actions particularly place unhoused voters and voters with insecure housing in Fulton County at risk of being subjected to additional registration requirements, being removed from the registration list entirely in the future, and/or disenfranchisement. Fulton County's interpretation of Section 230's residential address requirement, on information and belief, is out of step with other Georgia counties' practices.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT III

### Chatham, Forsyth, Gwinnett, and Spalding County Defendants' Voter Removal Practices Violate the NVRA's Requirements for Processing Voters Who Move

*52 U.S.C. § 20507(d)*

(Alleged by Plaintiffs NGP and APRI as to Chatham, Forsyth, Gwinnett, and Spalding County Defendants, and by Plaintiff GAMVP as to Chatham, Forsyth, and Gwinnett County Defendants)

271.   Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

272.   Persons aggrieved by violations of the NVRA have a private right of action under 52 U.S.C. § 20510.

273. The NVRA prohibits removal based on a change of residence unless the registered voter either: (1) confirms the change of residence in writing, or (2) fails to respond to a confirmation notice, the contents and manner of mailing of which are prescribed by the NVRA, and fails to vote during the next two general federal election cycles after receiving the notice. 52 U.S.C. § 20507(d).

274. In violation of 52 U.S.C.§ 20507(d), Chatham, Forsyth, Gwinnett, and Spalding County Defendants have engaged in an ongoing practice of immediately removing voters from the registration list on the ground of an alleged change of address without (1) receiving written confirmation from the voter confirming the change in residence; or (2) providing proper notice to voters regarding each county's intention to remove them from the registration list, and waiting for two federal election cycles of voter inactivity to pass before removing them from the registration list.

275. These actions are traceable to the NGP Plaintiffs Group's County Defendants, who adjudicate the challenges brought under O.C.G.A. §§ 21-2-229 and 21-2-230.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT IV

## S.B. 189 Section 4's Unhoused Voter Mailing Address Restriction Violates the NVRA 8(b) Uniform and Nondiscriminatory Provision

### *52 U.S.C. § 20507(b)*

(Alleged by: (1) Plaintiffs NGP and APRI as to State Defendants and Chatham, Fulton, and Macon-Bibb County Defendants, and by Plaintiff Huynh as to State Defendants and Fulton County Defendants; and (2) Plaintiffs Georgia NAACP and GCPA as to Defendant Raffensperger, SEB Defendants, and the Seventeen County Board Member Defendants)

276.     Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

277.     Persons aggrieved by violations of the NVRA have a private right of action under 52 U.S.C. § 20510.

278.     Section 8(b)(1) of the NVRA provides that "[a]ny State program or activity to . . . ensur[e] the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). *See, e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350–51 (N.D. Fla. 2012) (finding Florida program "was likely to have a discriminatory impact on [naturalized] citizens" in violation of the NVRA); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (holding that Ohio law treating compensated canvassers differently than non-compensated canvassers violated

Section 8 because it was "not a uniform and non-discriminatory attempt to protect the integrity of the electoral process").

279.   S.B. 189 Section 4's unhoused voter mailing address restriction violates Section 8(b) of the NVRA because it explicitly identifies and places unnecessary, discriminatory, and unreasonable requirements solely on Georgia voters who are "homeless." O.C.G.A. § 21-2-217(a)(1.1). The statute only forces unhoused voters to receive election-related mail, including NVRA-mandated mailing, at their county registrar's office—but other voters are allowed to receive election mail at the address of their choice, not having it involuntarily directed to somewhere different from where they receive other mail. Additionally, this provision applies only to unhoused or housing-insecure voters "without a permanent address." The ambiguity of this phrase creates the possibility of arbitrary implementation among counties and the risk that the mailing address restriction could be applied to *any* unhoused voter.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT V

**S.B. 189 Section 4's Unhoused Voter Mailing Address Restriction Violates Multiple NVRA Notice Requirements**

*52 U.S.C. § 20507(a)(2), (c)(1)(B), (d)(1)-(2)*

(Alleged by Plaintiffs NGP and APRI as to State Defendants and Chatham, Fulton, and Macon-Bibb County Defendants, and by Plaintiff Huynh as to State Defendants and Fulton County Defendants)

280. Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

281. Persons aggrieved by violations of the NVRA have a private right of action under 52 U.S.C. § 20510.

282. Section 8 of the NVRA requires that election officials notify voter registration applicants of the disposition of their voter registration application, 52 U.S.C. § 20507(a)(2), and mandates that election officials send notices to certain voters before they are removed from the registration list. *Id*. § 20507(c)(1)(B), (d)(1)–(2).

283. In Georgia, county registrars mail each voter a registration card, often called a precinct card, after they have successfully registered to vote. County registrars also send a notice letter to individuals whose voter registration applications have been denied.

284. County registrars send a notice including a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, before moving voters who have allegedly moved from their address of registration to inactive status and initiating the list maintenance process. This notice is often called a "confirmation notice."

285. Unhoused voters lacking a permanent address who cannot travel regularly or at all to their county registrar's office cannot effectively access these notices in time, including those they are legally entitled to under the NVRA.

286. That is because O.C.G.A. § 21-2-217(a), as amended by Section 4 of S.B. 189, requires unhoused voters without a permanent address to use their county registrar's office as their mailing address for voting purposes. County Defendants are prohibited from sending out notices to any other address for these voters; unhoused voters without a permanent address must travel to the registrar's office to receive their notices.

287. Section 4 of S.B. 189 is thereby preempted. Section 8 of the NVRA requires that election officials provide certain notices "to each" applicant or registrant, including providing notification of the disposition of their voter registration application, 52 U.S.C. § 20507(a)(2), and notification to certain voters before they are removed from the voter registration list, *id.* § 20507(c)(1)(B), (d)(1)-(2). By involuntarily reassigning the address of unhoused voters without a permanent address from their chosen mailing address to their county registrar's office, S.B. 189 Section 4 interferes and conflicts with the required notifications under the NVRA.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## CONSTITUTIONAL CLAIMS:

## COUNT VI

### S.B. 189 Section 5's "Nonresidential Address" Provisions Violate the Fundamental Right to Vote

*42 U.S.C. § 1983; First and Fourteenth Amendments to the U.S. Constitution*

(Alleged by (1) Plaintiffs Georgia NAACP, GCPA, and VoteRiders as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections; and (2) by the NGP Plaintiffs Group as to State Defendants and Fulton County Defendants, and by Plaintiffs NGP, GAMVP, and APRI also as to Macon-Bibb and Gwinnett County Defendants)

288.    Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

289.    Under 42 U.S.C. § 1983, a plaintiff may file suit for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

290.    The First and Fourteenth Amendments require that state laws imposing burdens on the right to vote must advance relevant and legitimate state interests that are sufficiently weighty to justify the specific burden imposed. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.). When an individual's right to vote is subject to "severe" restrictions,

the state election law must be "narrowly drawn to advance a state interest of com-pelling importance." *Burdick,* 504 U.S. at 434.

291.    Section 5 of S.B. 189 allows for the disenfranchisement of eligible vot-ers based solely upon the purported "nonresidential" character of their address—despite the fact that residing at a premises deemed to be "residential" in character is not required by the Georgia Constitution or other any other Georgia law respecting voter eligibility in the State of Georgia.

292.    To avoid disenfranchisement, voters who receive notice of a residence-based challenge—notice which the statute does not require be given—must respond to and rebut the challenge. This could require them to expend considerable time and resources appearing before the county board and marshalling and presenting evi-dence to rebut the finding of probable cause, including determining what evidence would even be sufficient to do so in the first instance.

293.    While Georgia law provides for a hearing at which the voter may appear and present evidence to rebut the board's finding of probable cause, that appearance is a substantial burden in and of itself. That burden is further compounded by major deficiencies and unknowns in the rebuttal process, which S.B. 189 fails to address. S.B. 189 fails to define "nonresidential"; fails to clearly articulate in the law whether a probable cause finding based on the "nonresidential" nature of a voter's address can be rebutted by a showing that the voter actually satisfies Georgia's residency

requirements for voting, regardless of how their residence is categorized; and fails to ensure adequate notice is provided to challenged voters by only requiring notice "if practical."

294.   Section 5 of S.B. 189 thus imposes a severe burden on the right to vote for voters who register to vote at premises which may be deemed "nonresidential" in character, such as shelters, universities, nursing homes, or other facilities, which are indisputably residential by virtue of the fact that people actually do reside there, yet may be unexpectedly deemed "nonresidential" simply because of some aspect of a jurisdiction's local rules for classifying addresses.

295.   This burden is unjustifiable because registering to vote with a residential address is not a qualification to vote in Georgia elections and bears no relation to any such qualification, so there can be no state interest in creating probable cause for sustaining a challenge to a voter's eligibility on the basis that they reside at a "nonresidential" address, let alone a state interest sufficiently weighty enough to justify disenfranchising eligible voters on that basis.

296.   Mandating that probable cause be found and a voter challenge sustained based on a voter's address being purportedly "nonresidential" is further unjustified because it creates a process that results in the disparate treatment of eligible voters on arbitrary bases, including unhoused or housing-insecure voters, students living in campus housing, nursing home residents, persons domiciled at a premises deemed

commercial in character, and other individuals domiciled at locations characterized as something other than "residential." Such voters face disenfranchisement if they do not incur the time, expense, and other resources to respond to the challenge (if they are even notified of the challenge).

297.   Accordingly, Section 5 of S.B. 189 imposes a severe and unjustified burden on the right to vote for eligible Georgia voters who reside at addresses deemed "nonresidential" in violation of the First and Fourteenth Amendments.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT VII
## S.B. 189 Section 5 Violates the Fundamental Right to Vote as to Overseas and Military Voters

*42 U.S.C. § 1983; First and Fourteenth Amendments to the U.S. Constitution*

(Alleged by Plaintiff SFI as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections)

298.   Plaintiff re-alleges and incorporates every relevant allegation contained in the paragraphs above, as if fully set forth herein.

299.   42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

300.   The First and Fourteenth Amendments of the United States Constitution protect the fundamental right to vote of eligible Georgia voters. When analyzing the

constitutionality of a voting procedure, a court "must weigh 'the character and mag-nitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

301.  When an individual's right to vote is subject to "severe" burdens, the state election law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434.

302.  Section 5 of S.B. 189 severely burdens eligible voters' right to vote be-cause it allows voters, including eligible military and overseas voters, to be disen-franchised or removed from the voter rolls because of voter eligibility challenges based solely upon unverified evidence that the voter is no longer a Georgia resident or resides at a nonresidential address.

303.  First, Section 5 of S.B. 189 mandates that probable cause be found to sustain a challenge to a voter's eligibility based on unverified evidence, potentially including purported screenshots of social media posts, as long as the challenger does not rely solely on NCOA data to show that a voter has moved or resides at a

nonresidential address. However, upon information and belief, at least Walton County has sustained a mass challenge based solely on NCOA data.

304.   Second, counties only have to provide notice to a voter of a challenge against them "if practical." O.C.G.A. § 21-2-230(b). This means a voter may not know a challenge has been lodged against them until they attempt to vote. If voting in-person, the voter will need to prove they are a resident of Georgia and it is unknown what evidence is sufficient to do so.

305.   Most military and overseas voters have to vote via absentee ballot and thus will be unable to show up in-person to prove their eligibility. Instead, they may have to appear at a virtual hearing in the middle of their night due to time zone differences to prove they are a Georgia resident. That is, if they are informed of the hearing at all, and if the county allows for virtual appearances. If the military or overseas voter is not able to attend the hearing or access documents showing that they are in fact a Georgia resident because the military or overseas voter is temporarily residing elsewhere, the voter may not be able to rebut the challenge against them and thus will be disenfranchised.

306.   Even if the military or overseas voter is able to rebut the challenge made against them and prove their eligibility to vote, enduring such a process to cast their ballot or remain on the voter rolls subjects these voters, especially while overseas or serving elsewhere, to an onerous and severe burden on their right to vote.

307. This burden is not narrowly tailored, or even reasonably tied, to advance legitimate state interests because, *inter alia*, it mandates the sustaining of challenges based on unreliable evidence and imposes unreasonably high barriers on voters to resolve challenges against them.

308. Accordingly, Section 5 of S.B. 189 imposes a severe and unjustified burden on the right to vote for eligible military and overseas Georgia voters in violation of the First and Fourteenth Amendments.

309. This unconstitutional treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230 and require electors to prove their eligibility to be able to cast a ballot and remain on the voter rolls.

310. This unconstitutional treatment is also traceable to Defendant Raffensperger, who is responsible for providing guidance to counties on adjudicating challenges under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230, O.C.G.A. § 21-2-50, and SEB Defendants, who are responsible for promulgating rules interpreting state elections laws which the Defendant Class of county board members are bound by. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

# COUNT VIII

## S.B. 189 Section 4 Infringes on Unhoused Voters' Fundamental Voting Rights

*42 U.S.C. § 1983; First and Fourteenth Amendments to the U.S. Constitution*

(Alleged by (1) Plaintiffs Georgia NAACP, GCPA, and VoteRiders as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registration and Elections; and (2) Plaintiffs NGP and APRI as to SEB Defendants and Chatham, Fulton, and Macon-Bibb County Defendants, and by Plaintiff Huynh as to SEB Defendants and Fulton County Defendants)

311.    Plaintiffs re-allege and incorporate all relevant allegations contained in the paragraphs above.

312.    Under 42 U.S.C. § 1983, a plaintiff may file suit for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

313.    The First and Fourteenth Amendments require that state laws imposing burdens on the right to vote advance relevant and legitimate state interests that are sufficiently weighty to justify the specific burden imposed. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.). When an individual's right to vote is subject to "severe" restrictions, the state election law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick,* 504 U.S. at 434.

314.    Section 4 of SB 189 imposes discriminatory, arbitrary, and unjustified burdens on unhoused voters without a permanent address, particularly those who lack the means to travel to their county registrar's office to obtain their election mail.

315.    Section 4 of S.B. 189 subjects eligible voters "who [are] homeless and without a permanent address," like Plaintiff Huynh, and not other voters, to the significant burden of expending the resources required to routinely and repeatedly check in at the county registrar's office to determine if they have any election mail (assuming that office is even accepting that mail for them in the first place), or otherwise risk disenfranchisement due to failure to receive mail essential to their ability to successfully cast a ballot and have it counted. That includes information such as which precinct they may vote in; whether their qualification to vote has been challenged; and whether their request for an absentee ballot has been denied. An unhoused voter also risks losing access to the absentee ballot itself. *See* S.B 189 Section 4(a)(1)(1.1).

316.    The burdens imposed by Section 4 of S.B. 189 are particularly significant for the very voters affected by the challenged provision—"homeless" voters like Plaintiff Huynh—who are disproportionately likely to lack the resources needed to shoulder these burdens, including restricted ability to travel to their county registrar's office if they do not have access to a vehicle; little or no access to public transit; inability to walk to or otherwise access the county registrar's

office during business hours; lack of literacy or having a disability; or facing other challenges to retrieving their election-related mail at the registrar's office.

317. These burdens are further compounded by the law's failure to account for the fact that counties are not experienced in and may not be able to operate a mail room in a way that provides these voters effective access to their election mail.

318. There is no legitimate state interest in restricting the mailing address of unhoused voters without a permanent address so narrowly to their county registrar's office. The restriction also requires Defendants to violate federal obligations to send out election mail.

319. Any interest the State could try to assert in forcing "homeless" voters, but not other voters, to receive their election mail at the county registrar's office rather than the address of their choice would be undermined and exceeded by the State's own strong election administration and security interests in ensuring all voters receive essential election mail, and by the significant administrative burdens imposed on county registrars by the challenged provision.

320. Accordingly, Section 4 of S.B. 189 imposes a severe and unjustified burden on the right to vote for eligible Georgia voters who are determined to be "homeless and without a permanent address," violating the First and Fourteenth Amendments.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## COUNT IX

**S.B. 189 Section 5's "Nonresidential" Address Provisions Violate Due Process**
*42 U.S.C. § 1983; Fourteenth Amendments to the U.S. Constitution*

<u>(Alleged by Plaintiffs Georgia NAACP, GCPA, and VoteRiders as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections)</u>

321.    Plaintiffs re-allege and incorporate every relevant allegation contained in the paragraphs above as if fully set forth herein with respect to Section 5 of S.B. 189.

322.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

323.    The Due Process Clause of the Fourteenth Amendment requires that, before a constitutionally protected right is denied, individuals holding that right must be provided with adequate process to safeguard it—including both reasonable notice and an opportunity to be heard in defense of that right. *See, e.g., Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 313 (1950). *See also Louisiana v. United States*, 380 U.S. 145, 150 (1965) (striking down law providing local election officials discretion to deny right to vote on basis that law failed to provide an "objective standard to guide them"); *Roe v. State of Ala. by and Through Evans*, 43 F.3d 574, 580 (11th Cir.), certified question answered *sub nom. Roe v. Mobile Cnty. Appointment Bd.*,

676 So. 2d 1206 (Ala. 1995) (finding violation of Due Process Clause where "election process itself reaches the point of patent and fundamental unfairness" (citations omitted)).

324.    A court determining what process is due in connection with a potential deprivation of a liberty or property interest must evaluate three factors:

325.    1) the private interest that will be affected by the official action;

326.    2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

327.    3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mullane*, 339 U.S. at 335; *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). *See also Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1267–68 (11th Cir. 2019) (citing same).

328.    Eligible Georgia voters residing at addresses identified as "nonresidential" who are subjected to challenges under Section 5 of S.B. 189 face a high risk of being deprived of their right to vote—the most fundamental of liberty interests.

329.    As discussed above *supra* pp. 109-12, while Georgia provides some process through which a voter challenged on this basis may attempt to avoid disenfranchisement, this process as it relates to Section 5 of S.B. 189 is constitutionally

inadequate. There is no requirement that challenged voters be provided with actual notice, and even if the county board finds probable cause the voter may only be provided with notice and an opportunity to answer "if practical." O.C.G.A. § 21-2-230(b). As a result, under the plain language of the statute, a challenged voter may be disenfranchised for having a "nonresidential" address without even being given the opportunity to be heard in defense of their eligibility.

330. S.B. 189 also does not include any explanation or confirmation that a finding of probable cause may be rebutted by a showing that the voter meets the residency requirements under the Georgia Constitution, as defined in Georgia law, even if the voter actually resides at a nonresidential address, no matter how it is defined. This means that there may be no sufficient evidence that a challenged voter residing at their address of registration could present to demonstrate that, while their address is identified as "nonresidential," they do, in fact, reside at that address. In other words, despite the fact that living at a "residential" address is not a qualification to vote in Georgia, even where a voter whose eligibility is challenged on this basis is provided with notice, manages to appear, and attests and/or provides evidence that they in fact reside at their address of registration, the challenge to the voter's eligibility may nevertheless be sustained solely because that address is deemed "nonresidential".

331. Georgia can have no interest whatsoever in creating a basis for the challenge and subsequent disenfranchisement of eligible voters that has no relation to their qualification to vote under Georgia law.

332. Accordingly, Section 5 of S.B. 189 deprives eligible voters who reside at "nonresidential" addresses adequate notice and a meaningful opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**COUNT X**
**S.B. 189 Section 5 Violates Due Process as to Overseas and Military Voters**

*42 U.S.C. § 1983; Fourteenth Amendments to the U.S. Constitution*

(Alleged by Plaintiff SFI as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections)

333. Plaintiff re-alleges and incorporates every relevant allegation contained in the paragraphs above, as if fully set forth herein.

334. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

335. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that before the government can deprive an individual of a property or liberty interest, the individual must be afforded adequate process to safeguard that

interest—including both reasonable notice and an opportunity to be heard in a meaningful way. *See Armstrong v. Manzo*, 380 U.S. 545, 550, 552 (1965).

336. Notice and the opportunity to be heard is a threshold requirement of due process before the deprivation of a fundamental right. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950). The Supreme Court has held that notice is adequate where "notice [is] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*; *Dorman v. Aronofsky,* 36 F.4th 1306, 1315 (11th Cir. 2022) (noting that the *Mullane* test applies to determining the adequacy of notice).

337. The right to vote is a fundamental right granted to eligible Georgia residents by the federal and state constitutions. *See Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1271 (11th Cir. 2019); Ga. Const. art. II, § 1, ¶ II.

338. Under O.C.G.A. § 21-2-230, as amended by S.B. 189, counties may deprive an individual of the right to vote by sustaining a challenge to the voter's eligibility based on unsubstantiated data. As such, due process requires adequate notice and an opportunity to be heard, at minimum.

339. S.B. 189 lowers the probable cause standard for adjudicating Section 230 challenges by requiring counties to hear challenges based on unsubstantiated

and faulty data, and allows challenges based on unsubstantiated or faulty evidence to be sustained. *See* O.C.G.A. § 21-2-230(b).

340. Before S.B. 189, counties could dismiss challenges based on unsubstantiated or faulty evidence for lacking probable cause. S.B. 189 now mandates that counties find probable cause to sustain Section 230 challenges, even though the challenged voter may be an eligible Georgia elector, if a voter is registered at a "nonresidential" address or the voter appears to have changed their residence because the voter appeared in the NCOA database and there is "additional evidence" that suggests the voter changed their residence. O.C.G.A. § 21-2-230. NCOA data is an insufficient basis to challenge a military or overseas voter because there are legitimate reasons why an eligible military or overseas Georgia voter might appear on the NCOA database that do not affect their voter eligibility. *See supra* Part V.E. Thus, S.B. 189 lowers the probable cause standard by requiring county boards of elections and registrars to find probable cause and sustain a Section 230 challenge, regardless of the veracity of the evidence presented to the county board of registrars. *See* O.C.G.A. § 21-2-230(b).

341. The adjudication process for Section 230 challenges provides that notice will be given "if practical." O.C.G.A. § 21-2-230(b). For military and overseas voters, providing timely notice is critical to ensuring that the voter may rebut the challenge against them. But upon information and belief, many counties do not

provide timely notice to military and overseas voters, if they provide notice at all. And, because "practical" is undefined, counties do not have a uniform method for understanding what notice is "practical" for military and overseas voters.

342.   Because counties no longer have the discretion to dismiss unfounded challenges, S.B. 189 increases the imperative for meaningful notice and an opportunity to be heard to be provided to a challenged voter. Insofar that O.C.G.A. § 21-2-230 only requires notice "if practical," notice of challenges based on NCOA data must be given, and must be timely, in order to provide military and overseas voters the opportunity to be heard. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).

343.   Even if notice is provided, additional procedures are required to safeguard the due process rights of miliary and overseas voters in light of the high risk of error under S.B. 189. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution may require additional due process safeguards in order to prevent the erroneous deprivation of a fundamental right. *See Armstrong*, 380 U.S. at 550, 552. Additional procedures could entail notice of the challenge by telephone or email, a virtual option for hearings, the opportunity to rebut a challenge (both before or after being sustained) in writing, or increasing the time between when notice is provided to a challenged elector and the hearing adjudicating whether to sustain the challenge.

344.   Where "the risk of an erroneous deprivation of such interest through the procedures used" outweighs "the probable value [] of additional or substitute procedural safeguards," due process requires additional procedures to prevent the erroneous deprivation of a fundamental right. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)

345.   As noted above, S.B. 189 greatly increases the risk of erroneous deprivation of this fundamental right because it lowers the probable cause standard for adjudicating O.C.G.A. § 21-2-230 challenges.

346.   There is no government interest in failing to provide notice to challenged voters who are military and overseas, nor is there any fiscal and administrative benefit for the failure to provide notice, s*ee supra* Statement of Facts Part II.B, while the probable value of additional procedural safeguards would be high given the unique intricacies of residency for military and overseas voters and the risk of disenfranchisement.

347.   Accordingly, Section 5 of S.B. 189 deprives military and overseas voters of meaningful notice and opportunity to be heard in violation of the Due Process Clause of the Fourteenth Amendment.

348.   This unconstitutional treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230

and require electors to prove their eligibility to be able to cast a ballot and remain on the voter rolls.

349.   This unconstitutional treatment is also traceable to Defendant Raffensperger, who is responsible for providing guidance to counties on adjudicating challenges under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230, O.C.G.A. § 21-2-50, and Defendants State Elections Board members, who are responsible for promulgating rules interpreting state elections laws by which the Defendant Class of county board members are bound, O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## COUNT XI

**S.B. 189 Section 5 Violates the Equal Protection Clause of the Fourteenth Amendment**

*42 U.S.C. § 1983; Fourteenth Amendments to the U.S. Constitution*

(Alleged by Plaintiffs SFI as to as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections)

350.   Plaintiff re-alleges and incorporates all relevant allegations contained in the paragraphs above.

351.   Under 42 U.S.C. § 1983, a plaintiff may file suit for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

352. The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000).

353. To secure their fundamental right to vote, similarly situated Georgia voters may not be subject to "arbitrary and disparate treatment." *Id.*; *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1186 (11th Cir. 2008) ("When a state accords arbitrary and disparate treatment to voters in different counties, which results in their votes being weighed differently, those voters are deprived of their constitutional rights to due process and equal protection.").

354. Voters that are alleged to have changed their residence are treated differently depending on which county they are registered to vote in. When challenged on the basis that they have moved, some voters are treated as being challenged under Section 230 while others are treated as being challenged under Section 229. Still other voters are not subject to sustained voter challenges under either statute on the basis the voter has changed their residence. This discrepancy exists even where the evidentiary support for the challenges across the counties is comparable.

355. Whether counties decide to treat voters challenged on the basis they have moved under Section 230 or Section 229, or whether counties find probable cause to sustain a challenge based on the same caliber of evidence, has resulted in arbitrary and disparate treatment of eligible Georgia voters.

356. Voters subject to sustained voter challenge based on residency face different, arbitrary, and unnecessarily burdensome set of barriers to vote as compared to voters subject to residency-based challenges that are later dismissed.

357. This disparate treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230.

358. It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger can redress this disparate treatment through his authority to interpret Georgia election law and provide guidance and trainings to county boards of elections and registrations.

359. This disparate treatment is also traceable to SEB Defendants, who are responsible for promulgating rules interpreting state elections laws which the Defendant Class of county board members are bound. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## CIVIL RIGHTS ACT CLAIM:

## COUNT XII

### S.B. 189 Section 5 Violates Title I of the Civil Rights Act

*42 U.S.C. § 1983; 52 U.S.C. § 10101(a)(2)(A)*

(Alleged by: (1) Plaintiff SFI as to Defendant Raffensperger, SEB Defendants, and Defendant Class Represented by the Gwinnett County Board of Registrations and Elections; and (2) the NGP Plaintiffs Group as to State Defendants and Fulton County Defendants, and by NGP, GAMVP, and APRI also as to Macon-Bibb and Gwinnett County Defendants)

360. Plaintiff re-alleges and incorporates all relevant allegations contained in the paragraphs above.

361. The Civil Rights Act of 1964 provides, in relevant part:

No person acting under color of law shall[,] in determining whether any individual is qualified under State law . . . to vote in any election, apply any standard, practice, or procedure different from the standards, practices or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote[.]

52 U.S.C. § 10101(a)(2)(A).

362. Under 42 U.S.C. § 1983, a plaintiff may file suit for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law. Such rights include those secured by the Civil Rights Act. *See, e.g.*, *Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023).

363. The Civil Rights Act defines "vote" broadly to include, "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted . . . ." 52 U.S.C.A. § 10101(a)(3)(A).

364. By mandating that probable cause be found to sustain a voter challenge under O.C.G.A. § 21-2-230 merely because an eligible voter is registered at a "non-residential" address, Section 5 of S.B. 189 applies different, and heightened, standards, practices, and procedures to those voters, compared to other voters in the same county who are registered at "residential" addresses. *See Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (jurisdiction could not require students to fill out supplemental questionnaire).

365. Section 5 of S.B. 189 requires this differential treatment even though residing at a "residential" address is not a qualification to be an elector under federal or Georgia law. *See* O.C.G.A. § 21-2-217.

366. Under Section 5 of S.B. 189, a voter who is registered at a "nonresidential" address and who is subject to a challenge would be forced to prove, through Georgia's undefined procedure, that they are a Georgia resident eligible to vote, or else be subject to disenfranchisement or removal from the voter rolls entirely. Conversely, county boards may dismiss challenges to voters registered at a residential address without additional proceedings. This violates, and is therefore preempted by,

the Civil Rights Act because it subjects certain individuals—those voters registered at "nonresidential" addresses—to different standards, practices, and procedures than those applied to other individuals in the same county.

367.   This disparate treatment is traceable to the counties, who adjudicate the challenges brought under O.C.G.A. § 21-2-229 and O.C.G.A. § 21-2-230.

368.   It is also traceable to Defendant Raffensperger, who is responsible for the training of registrars and maintenance of the statewide voter roll and for providing information on registration and absentee ballot procedures for use by military and overseas voters entitled to vote under UOCAVA. O.C.G.A. § 21-2-50; O.C.G.A. § 21-2-219(f). Defendant Raffensperger can redress this disparate treatment through his authority to interpret Georgia election law and provide guidance and trainings to the Defendant Class of county boards of elections and registration with respect to challenges.

369.   This disparate treatment is also traceable to SEB Defendants, who are responsible for promulgating rules interpreting state elections laws that bind the Defendant Class of county boards of elections and registration. O.C.G.A. § 21-2-31.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.     Enter judgment in favor of Plaintiffs and against Defendants on the claims for relief as alleged in this Complaint;

b.     Enter a declaratory judgment that O.C.G.A. § 21-2-230 violates Section 8(d) of the National Voter Registration Act of 1993 because it creates a regime for removing challenged voters from the registration list based on impermissible reasons, including an allegation that they moved from their address of registration, without requiring that (1) the voter requests or confirms his or her change of address in writing, or that (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(1), (2);

c.     Enter a declaratory judgment that Chatham, Forsyth, Gwinnett, and Spalding County Defendants have violated Section 8(d) of the NVRA by removing voters on the basis that they allegedly moved from their address of registration without written confirmation of change in address or without providing confirmation notices and waiting two federal election cycles;

d.     Enter a declaratory judgment that O.C.G.A. § 21-2-217(a) violates Section 8(b) of the NVRA and the First and Fourteenth Amendments to the U.S. Constitution by restricting the address that unhoused voters without a permanent address may use for election mail to only their county registrar's office;

e.     Enter a declaratory judgment that Fulton, Gwinnett, and Macon-Bibb County Defendants violated Section 8(b) of the NVRA when they removed voters from the registration list based on challenges alleging that they registered to vote using a nonresidential address;

f.     Grant Plaintiffs preliminary/and or permanent injunctive relief by:

      i.     prohibiting all Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of S.B. 189 by removing voters from the registration list under O.C.G.A. § 21-2-230 based on allegations that the voters moved from their address of registration unless (1) the voter requests or confirms his or her change of address in writing, or (2) the voter is sent a postage prepaid and pre-addressed mailing, the voter fails to respond to that mailing, and the voter then fails to vote in two federal general election cycles. 52 U.S.C. § 20507(d)(1), (2);

      ii.     prohibiting Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from removing voters from the registration list based on a change in residency without (1) receiving written confirmation of change in

address or (2) providing proper notice and waiting two federal election cycles;

iii.    ordering Secretary Raffensperger and the Chatham, Forsyth, Gwinnett, and Spalding County Defendants to restore voters to the registration list who have been improperly removed from the rolls due to adjudications of residency-based challenges;

iv.    enjoining Secretary Raffensperger, his agents, officers, employees, successors, and all persons acting in concert with him from giving effect to the removal of any registered voter from the statewide voter registration system pursuant to a challenge to the voter's qualification on the basis that their residence address has been determined to be "nonresidential;"

v.    ordering Fulton, Gwinnett, and Macon-Bibb County Defendants to restore voters to the registration list who have been improperly removed from the rolls due to their adjudications of challenges alleging that the voter lives at a nonresidential address, and to cease from undertaking any similarly discriminatory voter removals in the future;

vi.    ordering all Defendants to maintain, preserve, and not destroy until after December 31, 2026, any and all records relating to all

list-maintenance programs that have resulted in challenges to voter eligibility based upon residency changes or "nonresidential" addresses;

vii.   prohibiting SEB Defendants from adopting revised rules, regulations, and procedures for processing and adjudicating challenges to voters' eligibility that are inconsistent with Section 8(d) of the NVRA;

viii.  prohibiting SEB Defendants and Chatham, Fulton, and Macon-Bibb County Defendants from implementing portions of O.C.G.A. § 21-2-217(a) that restrict the address unhoused voters without a permanent address can use for election mail to their county registrar's office;

ix.   prohibiting County Defendants from failing to count all ballots, including provisional ballots, cast by voters removed from the registration list pursuant to voter challenges in violation of the NVRA;

x.   ordering SEB Defendants to adopt revised rules, regulations, and procedures for processing the election mail of unhoused voters without a permanent address that comply with the NVRA and the United States Constitution;

xi.    ordering that Secretary Raffensperger issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from enforcing the challenged provision of Section 5 of S.B. 189 with respect to any voter qualification challenges made to any voter;

xii.    ordering that Secretary Raffensperger issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting or causing to be rejected any ballot cast by any voter pursuant to a determination that the voter's address is "nonresidential";

xiii.    ordering that Secretary Raffensperger issue guidance to all county boards providing that they, their agents, officers, employees, successors, and all persons acting in concert with them are prohibited from rejecting, causing to be rejected, cancelling, and/or causing to be cancelled any voter registration or voter registration application pursuant to a determination that the registrant's address is "nonresidential; and

xiv.   ordering that Secretary Raffensperger provide training to all county boards as to all of the preceding forms of relief; or

xv.   in the alternative, order the above relief as applied to military and overseas voters entitled to vote under the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301;

xvi.   in the alternative, order the above relief as applied to unhoused voters;

g.   Award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action, pursuant to 52 U.S.C. § 20510(c) and 42 U.S.C. § 1988;

h.   Retain jurisdiction over this action for such period of time as may be appropriate to ensure that Defendants comply with any order(s) issued by this Court; and

i.   Grant such additional relief as the Court deems just and proper.

Respectfully submitted this 17th day of December, 2024.

*/s/ Lindsey B. Cohen*
Lindsey B. Cohan**
Dechert LLP
515 Congress Ave. STE 1400
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
Lindsey.cohan@dechert.com

Neil A. Steiner**
Mara Cusker Gonzalez**
Biaunca S. Morris**
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Neil.steiner@dechert.com
Mara.cuskergonzalez@dechert.com
Biaunca.morris@dechert.com

Cory Isaacson (Ga. Bar No. 983797)
Caitlin May (Ga. Bar No. 602081)
Akiva Freidlin (Ga. Bar No. 692290)
**ACLU FOUNDATION OF GEORGIA, INC.**
P.O. Box 570738
Atlanta, Georgia 30357
(678) 310-3699
cisaacson@acluga.org
cmay@acluga.org
afreidlin@acluga.org

Julie M. Houk **
M. David Rollins-Boyd**
Ryan Snow**
Samantha Heyward*
Jeremy Lewis*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
General Fax: (202) 783-0857

jhouk@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
rsnow@lawyerscommittee.org
sheyward@lawyerscommittee.org
jlewis@lawyerscommittee.org

*Counsel for Plaintiffs Georgia NAACP, Georgia Coalition for the Peoples' Agenda, and VoteRiders*

*\*Pro hac vice forthcoming*
*\*\*Pro hac vice granted in original matter 1:24-cv-04287-SDG for Georgia State Conference of the NAACP and Georgia Coalition for the Peoples Agenda; forthcoming for VoteRiders*

<u>*/s/ Hani Mirza*</u>
Bryan L. Sells
Georgia Bar No. 635562
**THE LAW OFFICE OF BRYAN L. SELLS, LLC**
P.O. Box 5493
Atlanta, GA 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

John Powers*
Hani Mirza*
Matthew A. Fogelson*
**ADVANCEMENT PROJECT**
1220 L Street Northwest, Suite 850
Washington, DC 20005
(415) 238-0633
jpowers@advancementproject.org
hmirza@advancementproject.org
mfogelson@advancementproject.org

John A. Freedman*
Jonathan L. Stern*
Rachel L. Forman*

Jeremy Karpatkin*
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave. N.W.
Washington, DC 20001
(202) 942-5000
john.freedman@arnoldporter.com
jonathan.stern@arnoldporter.com
rachel.forman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

Michael A. Rogoff*
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019
(212) 836-8000
michael.rogoff@arnoldporter.com

*Pro hac vice granted*

*Counsel for Plaintiffs New Georgia Project, Sang Huynh, Georgia Muslim Voter Project, and A. Philip Randolph Institute*

/s/ *Katherine L. D'Ambrosio*
Katherine L. D'Ambrosio
(Ga. Bar No. 780128)
Jennifer Virostko
(Ga. Bar No. 959286)
Ben Watson
(Ga. Bar No. 632663)
COUNCILL, GUNNEMANN & CHALLY LLC
75 14th Street, NE, Suite 2475
 Atlanta, GA 30309
(404) 407-5250
kdambrosio@cgc-law.com
jvirostko@cgc-law.com
bwatson@cgc-law.com

*/s/ Alice Huling*

Alice Huling*

Danielle Lang*

Valencia Richardson*

Daniel S. Lenz*

Rachel Appel*

CAMPAIGN LEGAL CENTER

1101 14th St. NW, Ste. 400

Washington, D.C. 20005

Tel: (202) 736-2200

Fax: (202) 736-2222

ahuling@campaignlegalcenter.org

dlang@campaignlegalcenter.org

vrichardson@campaignlegalcenter.org

dlenz@campaignlegalcenter.org

rappel@campaignlegalcenter.org

*Pro hac vice granted*

*Counsel for Plaintiff Secure Families Initiative*