# EXHIBIT 2
# NVRA
# Notice Letter

July 10, 2024

Brad Raffensperger
Secretary of State
Georgia Department of State
214 State Capitol
Atlanta, GA 30334

State Election Board
2 MLK Jr. Drive
Suite 802 Floyd West Tower
Atlanta, GA 30334

*Via electronic mail and FedEx*

RE: *Georgia's Compliance with Section 8 of the National Voter Registration Act*

Dear Secretary Raffensperger, members of the State Election Board, and members of certain county boards of elections and registrars[1]:

We are writing on behalf of the Georgia State Conference of the NAACP, the Georgia's Coalition for the People's Agenda, the League of Women Voters of Georgia, Secure Families Initiative, their members, and other persons and organizations similarly situated, regarding Georgia Senate Bill 189 (S.B. 189), which was enacted into law. Parts of the law went into effect on July 1, 2024, while other provisions are scheduled to go into effect at later dates. This letter serves as written notice pursuant to 52 U.S.C. § 20510 that enforcement of Sections 4 and 5 of S.B. 189, as detailed below, violates Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507, which: (i) requires states, including Georgia, to ensure that any "program or activity to protect the integrity of the electoral process" is "uniform" and "nondiscriminatory," 52 U.S.C. § 20507(b)(1), and, (ii) sets out the exclusive basis for removing registered voters for a purported change of address, 52 U.S.C. § 20507(d).

I.     **Requirements of Section 8 of the NVRA**

The plain language of Section 8 of the NVRA requires that "any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office ... shall be uniform, nondiscriminatory,

---

[1] In addition to Secretary Raffensperger and the State Election Board, this letter is addressed to Macon-Bibb, Chatham, Cherokee, Columbia, Forsyth, Hall, Lowndes, Richmond, Spalding, Whitfield, Worth, Dougherty, Lee, Cobb, DeKalb, Fulton, and Gwinnett counties. The undersigned have emailed this letter to the boards of elections and registrars in the above-listed counties.

and in compliance with the Voting Rights Act of 1965." 42 U.S.C. 52 U.S.C. § 20507(b)(1). The directive for state registration and electoral programs to be "uniform" and "nondiscriminatory" is straightforward. *See, e.g.*, *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (holding that Ohio law treating compensated canvassers differently than non-compensated canvassers violated Section 8 of the NVRA because it was "not a uniform and non-discriminatory attempt to protect the integrity of the electoral process"); *United States v. Florida*, 870 F. Supp. 2d 1346, 1350-51 (N.D. Fla. 2012) (finding Florida program "was likely to have a discriminatory impact on [naturalized] citizens" in violation of Section 8 of the NVRA, and denying motion for preliminary relief only because Florida had already abandoned the challenged program).

In *Project Vote v. Blackwell*, the court concluded that the Ohio law at issue was discriminatory because it placed requirements on some voter registration canvassers and not on others. 455 F. Supp. 2d at 703. The court found that the Ohio law went "against the very spirit of the NVRA by erecting barriers—only for a *selected class* of persons—that previously did not exist." *Id.* (emphasis in original). When discussing the uniform and nondiscriminatory provision in *Project Vote*, the court noted "[t]he House Report for the NVRA cautions that 'the Committee believes Congress should assist in reducing barriers, particularly Government-imposed barriers to applying for registration wherever possible.'" *Id.*; *see also* 52 U.S.C. § 20501(b)(1)-(2) (noting the "purpose" of the NVRA is "to establish procedures that will increase the number of eligible citizens who register to vote" and to "enhance[] the participation of eligible citizens as voters").

Consistent with this purpose, Section 8 prohibits barriers that fall disproportionately on specific classes of voters. For example, in *United States v. Florida*, the Northern District of Florida found that a list maintenance program "probably ran afoul of [Section 8 of the NVRA]" because the challenged law "made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens." 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). Because the "program was likely to have a discriminatory impact on these new citizens," it likely violated Section 8. *Id.* Importantly, the court also disagreed with the state's assertion that requiring new citizens to provide this documentation was of "little import." *Id.* Instead, the court emphasized that "[a] state cannot properly impose burdensome demands in a discriminatory manner," full stop. *Id.*

Under Section 8, programs that are applied disproportionately to a subset of voters are not considered uniform. *See Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *41-44 (D. Ariz. Feb. 29, 2024). In *Mi Familia Vota*, the court found that Arizona's documentary proof of citizenship requirements violated Section 8 of the NVRA because they applied only to registered voters whom county officials had "reason to believe are not United States citizens...[which] would have a non-uniform and discriminatory impact on naturalized citizens." *Mi Familia Vota,* 2024 WL 862406 at *41. As the court's holding reinforces, the plain language of Section 8 requires that state programs related to list maintenance or to protect the integrity of the voter registration rolls must be implemented in a "uniform" and "nondiscriminatory" manner.

Further, Section 8(d) of the NVRA sets out the *only* way that a voter can be removed from the rolls for a purported change of address, detailing that "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant":

> (A) *confirms in writing* that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or (B)(i) has failed to respond to a notice described in paragraph (2); and (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d) (emphasis added). Any removal of a voter for a purported change of address that does not comply with Section 8(d) of the NVRA is unlawful.

## II. Georgia's Non-Compliance with Section 8 of the NVRA

S.B. 189 (attached as Exhibit 1) passed the Georgia legislature and was signed into law by Governor Kemp in 2024. Because the provisions of S.B. 189 detailed below were enacted explicitly[2] "to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office," *see* 52 U.S.C. § 20507(b), they must comply with Section 8 of the NVRA. Sections 4 and 5 of S.B. 189, and likely others, do not.

### a. S.B. 189 § 5

Section 5 of S.B. 189 states that, for purposes of an O.C.G.A. § 21-2-230 challenge to a registered voter's eligibility to vote in an election, "[p]robable causes shall include, but not be limited to ... an elector being registered at a nonresidential address as confirmed or listed by or in a government office, data base, website, or publicly available sources derived solely from such governmental sources." S.B. 189 § 5. This provision violates Section 8 of the NVRA both because: (1) it treats voters that registered using a non-residential address differently, and (2) some of these voters, such as people with insecure housing, are particularly ill-equipped to establish their residence and rebut a finding of probable cause, which puts them at significant risk of disenfranchisement not faced by housed voters.

This provision treats some Georgia voters differently based on their lack of access to a residential address. Once a board finds probable cause under this provision, a voter may be required to provide additional evidence before being allowed to cast a ballot, which other voters

---

[2] *See* Mark Niesse, *Kemp signs new voter challenge and election security laws*, Atlanta Journal Constitution (May 7, 2024) (quoting Secretary of State Brad Raffensperger calling these updates "additional election integrity measures").

are not required to do. The required evidence may include bringing additional documentation as to their identity and/or residence.

As a preliminary matter, there is no requirement under federal law for a voter to have a "residential" address to exercise their fundamental right to vote. Unhoused and housing-insecure citizens retain their right to vote even if they lack a fixed address or reside at non-traditional locations, such as public parks. *See, e.g.*, *Cook v. Bd. of Registrars of Randolph Cnty.*, 320 Ga. App. 447, 449-53 (2013); *Collier v. Menzel*, 176 Cal. App. 3d. 24, 35 (Cal. Ct. App. 1985); *Pitts v. Black*, 608 F. Supp. 696, 699 (S.D.N.Y. 1984). Likewise, in Georgia, residing at a residential address is not a qualification to register or be eligible to vote, *see* O.C.G.A. § 21-2-216, nor is a voter registrant's residence determined based on the particular zoning type or "residential" nature of their address, *see* O.C.G.A. § 21-2-217. Accordingly, under both federal and state law, a voter registrant living at a non-residential address is not indicative of or relevant to the voter's eligibility to participate in an election.

Despite this, Section 5 of S.B. 189 treats some Georgia voters differently based on their lack of access to a residential address by specifying that simply having a non-residential address establishes probable cause to sustain a voter challenge. Presumably, the challenged voter can then rebut that showing of probable cause, but state law, including S.B. 189, provides no guidance as to how to do so—or if it is, in fact, even rebuttable. At the very least, challenged voters without a residential address will have to go through extra steps and provide additional evidence before being allowed to cast a ballot, which other voters do not have to do. And challenged voters without a residential address—namely, unhoused voters—face a significant risk of disenfranchisement because of this unequal treatment. Unhoused voters are not well-positioned to rebut a finding of probable cause based on the non-residential address provision because they often do not have a fixed address and/or often do not have supporting documentation (e.g., a lease, a utility bill) to corroborate Georgia residency. A finding of probable cause for a non-residential address, in other words, amounts to a significant threat of disenfranchisement for unhoused voters. Other harms that may stem from this differential treatment include waiting in a longer line to resolve the voter challenge and the dignitary harm to having your vote challenged.

Another group of voters that may be disproportionately burdened by Section 5 is uniformed and overseas voters. Under Section 5, a uniformed and overseas voter having a nonresidential address establishes probable cause, even if that voter is eligible to vote. O.C.G.A. § 21-2-217(a)(11). Furthermore, such a voter may be unable to receive timely notice of a challenge against them and unable to refute the finding of probable cause because they are temporarily out of state. If such a voter then tries to vote via an absentee ballot, see § O.C.G.A, 21-2-230(g), the challenge could be sustained and the voter's ballot rejected or the voter removed from the voter rolls entirely.

By providing that mere lack of a "residential" address is sufficient to constitute "probable cause" for purposes of sustaining a voter challenge under O.C.G.A. § 21-2-230, Section 5 of S.B. 189 creates a list maintenance program that is not applied uniformly to all voters because only those voters registered at "nonresidential" addresses are subject to challenge on this basis. This has a discriminatory impact on this specific subset of voters—including and especially unhoused voters, who often lack a residential address and/or lack documentary evidence sufficient to rebut a probable cause finding. Therefore, Section 5 of S.B. 189 violates Section 8 of the NVRA's mandate to create a uniform and nondiscriminatory list maintenance program and risks disenfranchising unhoused voters ahead of the November 2024 election and beyond.

### b.   S.B. 189 § 4

Section 4 of S.B. 189 also requires that, as of January 1, 2025, "[t]he mailing address for election purposes of any person of this state who is homeless and without a permanent address *shall* be the registrar's office of the county in which such person resides." S.B. 189 § 4 (emphasis added). Unhoused voters are therefore subject to an additional requirement for registration that housed voters are not: these voters *must* use the registrar's office as their mailing address on their voter registration form, while housed voters may choose to use any address—including their home address, a P.O. box, a shelter or relative's address, or similar—as a mailing address. *See* O.C.G.A. 21020217(a)(15). Section 4's requirement differentiates voters based on the type or nature of a voter's residence, and explicitly singles out voters who are "homeless"—an unlawful differential treatment of a specific class of voters.[3]

Crucially, nothing in Georgia law—including S.B. 189—requires county registrar's offices to accept or process mail (including, but not limited to, precinct cards, absentee ballots, voter list maintenance address confirmation cards, notices of planned or final removals from Georgia's voter registration rolls due to inactivity, and notices of, and final action on, voter challenges) for the voters required to list that office as their mailing address. If any county registrar's office is unwilling or unable to accept and process mail for unhoused voters, or if any unhoused voter is unable to get to the registrar's office to receive such mail, Section 4 of S.B. 189 will effectively eliminate the ability for those citizens to vote by mail since they will be unable to receive their ballots and/or other important election-related mailings. This risk is serious. Many elections offices are already short-staffed during presidential election years in particular, and do not have the resources or processes to additionally operate a mail room for all unhoused voters in their county. Other voters will not face the same barriers or restrictions to accessing their election mail—mail which often requires timely action by the voter to maintain their registration status or ensure their

---

[3] Notably, Section 8 of the NVRA applies both to programs regarding new registrations and list maintenance. *See Voice of the Experienced v. Ardoin*, No. CV 23-331-JWD-SDJ, 2024 WL 2142991, at *5 (M.D. La. May 13, 2024) ("There is nothing in the NVRA to suggest that that its voter registration requirements only apply to how states treat new registrants."). List maintenance includes ensuring an actively registered voter maintains their registration or eligibility status even when they re-register or update their registration.

ballot is counted. In light of Section 4 of S.B. 189, Georgia's unhoused voters currently have *no* assurance under law that they will be able to receive their election-related mail and/or vote by mail. This constitutes differential and unlawful treatment that carries real risk of disenfranchisement.

Many unhoused voters currently use locations other than their county registrar's office as both their registration address and mailing address, which ensures both that these voters are properly registered and that they receive their election-related mail in a timely and expedient manner. For voters registered at homeless shelters, for example, using the homeless shelter as their mailing address ensures they receive their mail at the location where they spend much of their time, sleep at night, and have close relationships with staff, and so can make sure that their important election mail is accepted and available to them.

By contrast, registrar's offices may be located far across the county from where an unhoused voter resides, which is a significant problem given that unhoused voters generally have less access to transportation than other voters. For example, unhoused voters, unlike other voters, may have to spend many hours navigating and paying for public transit to travel to a county office, during limited business hours, in order to be able to pick up a ballot or other essential election mail solely because of this arbitrary statutory requirement. Thus, even in the event that county registrar's offices accept and process unhoused voters' election-related mail—which they are not required to do under Georgia law—Section 4 of S.B. 189 still impacts the unhoused in a non-uniform and discriminatory manner solely because of their status as "homeless."

Finally, Section 4 also violates Section 8(d) of the NVRA. As noted *supra*, Section 8(d) sets out the *exclusive* way for a registered voter to be removed from the rolls for a purported change of address. Yet Section 4(2)(A) of S.B. 189 states that: "If a person registers to vote in another state, county, municipality, or legislative district of any type or sort, that person shall be deemed to have changed his or her residency." Any interpretation of Section 4(2)(A) that finds that a voter simply registering in another jurisdiction would constitute written confirmation sufficient to remove a voter plainly violates Section 8(d) of the NVRA.

III. **Conclusion**

Enforcement of Sections 4 and 5 of S.B. 189 constitute current and ongoing violations of Section 8 of the NVRA by:

- Discriminating against voters who use non-residential addresses, particularly unhoused voters, by specifying that lacking a residential address serves as probable cause for a challenge to voter eligibility under O.C.G.A. § 21-2-230, leaving those voters at significant risk of disenfranchisement.

- Discriminating against unhoused voters by requiring them and not other voters to update their registered mailing address to a specific location, which limits their ability to receive important election materials sent via mail and threatens their ability to utilize absentee voting.
- Setting out a standard for a voter's purported written confirmation of a change of address that runs contrary to plain language of Section 8(d) of the NVRA.

These violations run the risk of depriving many Georgians of their right to vote and have a particularly harmful impact on unhoused Georgians, who are already marginalized and face many barriers to participation in elections.

As Secretary of State of Georgia, you are the State's Chief Elections Officer, O.C.G.A. §§ 21-2-50, 21-2-50.2, and, as such, are responsible for ensuring Georgia's compliance with the NVRA. *See* 52 U.S.C. § 20509. This letter constitutes notice pursuant to 52 U.S.C. § 20510(b) that enforcement of the SB 189 provisions detailed above will place you in violation of 52 U.S.C. § 20507(b)(1). As outlined above, we believe that enforcement of Sections 4 and 5 of S.B. 189 puts the State in danger of multiple violations of the NVRA, legal action, and, most importantly, unlawfully disenfranchising eligible voters.

As you know, the next election for federal offices will occur on November 5, 2024, which is less than 120 days away. If the violations identified above are not corrected within 20 days, July 30, 2024, the undersigned may seek declaratory or injunctive relief to remedy these violations. *See* 52 U.S.C.A. § 20510 ("If the violation is not corrected…within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action..."). We are prepared to meet with you and other officials at your earliest convenience to discuss these violations and to assist in your development of a comprehensive plan that addresses the problems identified in this letter.

Sincerely,

*/s/Julie M. Houk*
Ezra Rosenberg, Co-Director, Voting Rights Project
Julie M. Houk, Managing Counsel for Election Protection
David Rollins-Boyd, Senior Counsel, Voting Rights Project
Ryan Snow, Counsel, Voting Rights Project
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
General Fax: (202) 783-0857

erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
rsnow@lawyerscommittee.org

On behalf of the Georgia State Conference of the NAACP and the Georgia Coalition for the People's Agenda, Inc.

*/s/ Courtney O'Donnell*
Bradley Heard, Deputy Legal Director
Avner Shapiro, Senior Supervising Attorney
Courtney O'Donnell, Senior Staff Attorney
Poy Winichakul, Senior Staff Attorney
Southern Poverty Law Center
150 E Ponce De Leon Ave Ste 340
Decatur, GA 30030-2553
bradley.heard@splcenter.org
avner.shapiro@splcenter.org
courtney.odonnell@splcenter.org
poy.winichakul@splcenter.org

On behalf of the League of Women Voters of Georgia

*/s/ Valencia Richardson*
Valencia Richardson, Legal Counsel
Alice Huling, Senior Legal Counsel
Rachel Appel, Equal Justice Works Fellow
Shilpa Jindia, Legal Fellow
Campaign Legal Center
1101 14th St. NW Suite 400
Washington, DC 20005
(202) 736-2200
vrichardson@campaignlegalcenter.org
ahuling@campaignlegalcenter.org
rappel@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

On behalf of Secure Families Initiative

*/s/Caitlin May*

Caitlin May, Voting Rights Staff Attorney
ACLU of Georgia
P.O. Box 570738
Atlanta, GA 30357
Telephone: (706) 371-1171
cmay@acluga.org


*/s/Jonathan Topaz*
Jonathan Topaz
AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500
jtopaz@aclu.org