## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NEW GEORGIA PROJECT, *et al.*

    *Plaintiffs*,

      v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of the State
of Georgia, *et al*.

    *Defendants*.

Civil Action No. 1:24-cv-03412-SDG

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ......................................................... 4

   I.   Georgia voter list requirements and processes. .................................. 4

   II.   Changes made by in SB 189. ............................................................ 7

   III.   State obligations under the NVRA. ................................................. 10

ARGUMENT AND CITATION OF AUTHORITY ........................................... 11

   I.   Legal standard. ............................................................................. 11

   II.   Plaintiffs lack standing. ................................................................. 11

      A.  All claims about Section 5 of SB 189 are too speculative to be an injury in fact. ............................................................................. 14

      B.  Article III standing for organizations. ........................................ 15

      C.  Individual standing for Plaintiff Sang Huynh. ........................... 40

      D.  Plaintiffs' challenges to O.C.G.A § 21-2-230 are not traceable to State Defendants. ............................................................... 42

      E.  Plaintiffs lack standing to challenge O.C.G.A § 21-2-230 because the relief requested will not redress the alleged harm. ........... 43

   III.   There is no private right of action for Plaintiff's Civil Rights Act claim (Count XII). ....................................................................... 45

   IV.   Plaintiffs have failed to state a claim against State Defendants under the NVRA (Counts I, II, IV, V). ........................................... 47

      A.  Not all Plaintiffs have met the pre-suit notice requirements. ... 47

      B.  The probable-cause provisions of SB 189 do not violate NVRA Section 8(d) (Count I). .................................................. 49

      C.  The probable-cause and mailing-address provisions of SB 189 do not violate NVRA Section 8(b) (Counts II and IV). ................. 51

      D.  The mailing-address provisions of SB 189 do not violate the NVRA's notice requirements (Count V). ................................... 54

   V.   Plaintiffs have failed to state a claim under the Constitution (Counts VI, VII, VIII, IX, X, and XI). .................................................. 55

      A.  Section 5 of SB 189 does not violate the Constitution (Counts VI, VII, IX, X, XI). .............................................................. 58

B.  Section 4 of SB 189 does not violate the Constitution (Count VIII). ........................................................................................... 59

VI.  Plaintiffs have failed to state a claim under the Civil Rights Act (Count XII). ....................................................................... 62

CONCLUSION .................................................................................... 63

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*,
468 U. S. 737 (1984) ............................................................. 13, 42

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ................................................................... 56

*Arcia v. Detzner*,
No. 12–22282–CIV, 2015 WL 11198230 (S.D. Fla. Feb. 12, 2015) .......................... 53

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ............................................. *passim*

*Arizona Alliance for Retired Americans v. Mayes*,
117 F. 4th 1165 (9th Cir. 2024) ............................................. *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................... 11

*Avery v. Bower*,
170 Ga. 202 (1930) ...................................................................... 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................... 11

*Bell v. Raffensperger*,
No. 1:21-CV-02486-SEG, 2022 WL 18243320 (N.D. Ga. Dec. 6, 2022) ................. 56

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ............................................. 47, 55

*Broyles v. Texas*,
618 F. Supp. 2d 661 (S.D. Tex. 2009) ....................................... 62

*Burdick v. Takushi*,
504 U.S. 428 (1992) ................................................................... 56

*Bush v. Gore*,
531 U.S. 98 (2000) ............................................................... 57, 58

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) ..................................................................... 45, 46

*City of S. Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023) ...........................................*passim*

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..........................................................*passim*

*Common Cause/GA v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ............................................ 57, 60

*Cook v. Bd. of Registrars of Randolph Cnty.*,
    320 Ga. App. 447 (2013) ............................................................ 5

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007) ................................................... 62

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ...................................................... 57, 59, 60, 62

*Curling v. Raffensperger*,
    50 F.4th 1114 (11th Cir. 2022) .......................................... 56, 59, 60, 62

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ................................................................. 14

*Donald J. Trump for President, Inc. v. Bullock*,
    491 F. Supp. 3d 814 (D. Mont. 2020) ....................................... 58

*Dunn v. Blumstein*,
    405 U.S. 330 (1972) ................................................................. 58

*Fair Fight Action, Inc. v. Raffensperger*,
    634 F. Supp. 3d 1128 (N.D. Ga. 2022) ............................... 4, 6, 52, 62

*Fair Fight Action, Inc. v. Raffensperger*,
    No. 1:18-CV-5391-SCJ, 2021 WL 9553855 (N.D. Ga. Feb. 16, 2021) .......... 43

*Fair Fight Action, Inc. v. Raffensperger*,
    No. 1:18-CV-5391-SCJ, 2021 WL 9553856 (N.D. Ga. Mar. 31, 2021) ......... 56, 57, 60

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC,*
No. 23-3969, 2025 WL 16385 (6th Cir. Jan. 2, 2025) ................................................. 22

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ......................................................................... *passim*

*Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.,*
648 F.3d 1235 (11th Cir. 2011) .................................................................. 13

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
522 F.3d 1153 (11th Cir. 2008) .................................................................. 58

*Fusaro v. Cogan,*
930 F.3d 241 (4th Cir. 2019) ..................................................................... 61

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections,*
36 F.4th 1100 (11th Cir. 2022) .................................................................. 12

*Ga. Republican Party v. SEC,*
888 F.3d 1198 (11th Cir. 2018) ........................................................ 37, 39, 40

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees,*
344 F.3d 1288 (11th Cir. 2003) .................................................................. 19

*Georgia State Conf. of NAACP v. Kemp,*
841 F. Supp. 2d 1320 (N.D. Ga. 2012) ......................................................... 48

*Gill v. Whitford,*
585 U.S. 48 (2018) ....................................................................... 13, 43

*Halmos v. Bomardier Aerospace Corp.,*
404 F. App'x 376 (11th Cir. 2010) ............................................................. 61

*Handel v. Powell,*
284 Ga. 550 (2008) ............................................................................... 5

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ..................................................................... 21, 22

*Henderson v. Abhiraman,*
Case No. 24CV8564 (Sup. Ct. of DeKalb County Sept. 17, 2024) ........................... 9

*Holton v. Hollingsworth*,
   270 Ga. 591 (1999) ............................................................................. 8

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ................................................................... 34, 35

*Husted v. A. Philip Randolph Inst.*,
   584 U.S. 756 (2018) ................................................................... 51, 54

*In re Walter Energy, Inc.*,
   911 F.3d 1121 (11th Cir. 2018) ............................................... 7, 8

*Indiana Democratic Party v. Rokita*,
   458 F. Supp. 2d 775 (S.D. Ind. 2006) .................................... 62

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ............................................ 42, 56

*Jones v. Governor of Fla.*,
   975 F.3d 1016 (11th Cir. 2020) ............................................... 56

*Kirksey v. City of Jackson, Miss.*,
   663 F.2d 659 (5th Cir. 1981) ................................................... 63

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................ 12, 38, 42

*Matthews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................... 56

*Mullane v. Cent. Hanover Tr. Co.*,
   339 U.S. 306 (1950) ................................................................... 56

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ................................................................... 13

*New Georgia Project v. Raffensperger*,
   976 F.3d 1278 (11th Cir. 2020) ............................................ 56, 57

*NLRB v. Datapoint Corp.*,
   642 F.2d 123 (5th Cir. Unit A Apr. 1981) ............................ 19

*Pope v. City of Clearwater*,
    138 F.R.D. 141 (M.D. Fla. 1991) ............................................................ 43

*Project Vote v. Blackwell*,
    455 F. Supp. 2d 694 (N.D. Ohio 2006) ................................................... 53

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...................................................................................... 57

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ......................................................... 45, 46

*Scott v. Schedler*,
    771 F.3d 831 (5th Cir. 2014) ............................................................. 47, 48

*Shelby Advocs. for Valid Elections v. Hargett*,
    947 F.3d 977 (6th Cir. 2020) ............................................................. 22, 33

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .................................................................................. 19

*Spencer v. Specialty Foundry Prod. Inc.*,
    953 F.3d 735 (11th Cir. 2020) ................................................................... 8

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) .................................................................................. 13

*Summers v. Earth Island Institute*,
    555 U. S. 488 (2009) ........................................................................... 12, 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................. 11

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................................................. 11

*U.S. v. Richardson*,
    418 U.S. 166 (1974) .................................................................................. 44

*U.S. v. Texas*,
    599 U.S. 670 (2023) .................................................................................. 44

*United States v. Florida*,
   870 F. Supp. 2d 1346 (N.D. Fla. 2012) ....................................................53

*United States v. Marte*,
   356 F.3d 1336 (11th Cir.2004) ...................................................................19

*United States v. Vega-Castillo*,
   540 F.3d 1235 (11th Cir. 2008) ..................................................................19

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
   454 U.S. 464 (1982) .............................................................................12, 19

*Vega v. Tekoh*,
   597 U.S. 134 (2022) ...................................................................................45

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...................................................................................38

## Statutes

42 U.S.C. § 1983 ............................................................................................45

52 U.S.C. § 10101 ..........................................................................45, 46, 63

52 U.S.C. § 20501 ..........................................................................................10

52 U.S.C. § 20503 ..........................................................................................10

52 U.S.C. § 20507 ..........................................................................10, 50, 51, 54

52 U.S.C. § 20510 ..........................................................................47, 48, 49

O.C.G.A. § 21-2-2 ............................................................................................4

O.C.G.A. § 21-2-216 ..................................................................................8, 58

O.C.G.A. § 21-2-217 ..........................................................................4, 8, 53, 54

O.C.G.A. § 21-2-225.1 ......................................................................................9

O.C.G.A. § 21-2-226 ........................................................................................4

O.C.G.A. § 21-2-228 ................................................................................4, 7, 52

O.C.G.A. § 21-2-229 ........................................................................................6

O.C.G.A. § 21-2-230 .................................................................*passim*

O.C.G.A. § 21-2-231 ................................................................. 6, 52

O.C.G.A. § 21-2-232 ................................................................. 6

O.C.G.A. § 21-2-233 ................................................................. 5

O.C.G.A. § 21-2-234 ................................................................. 5, 6

O.C.G.A. § 21-2-235 ................................................................. 6

O.C.G.A. § 21-2-50 ................................................................. 4

**Other Authorities**

*Black's Law Dictionary* (11th ed.)................................................................. 8

*Community Planning and Development, U.S. HUD, 2023 Annual Homelessness Assessment Report (AHAR) to Congress* at 101
https://www.huduser.gov/portal/sites/default/files/pdf/2023-ahar-part-1.Pdf................................................................. 61

*Ga. Dept. of Comm. Affairs Statewide Point in Time Count Homeless Report for 2022*, at 42–43, 46–47
https://dca.georgia.gov/document/publications/2022-report-homelessness/download. ................................................................. 61

Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*,
104 Va. L. Rev. 933 (2018) ................................................................. 44

**Rules**

Fed. R. Civ. P. 12 ................................................................. 11

**Constitutional Provisions**

U.S. Const. Art. III, § 2 ................................................................. 12

# INTRODUCTION

Georgia's list of registered voters is one of the most accurate in the nation. To maintain accurate voter rolls while complying with federal laws like the National Voter Registration Act (NVRA)—and to continue to ensure voter confidence in elections—Georgia legislators updated several statutory provisions involving voter registration during the 2024 legislative session. Plaintiffs disagree with these updates, which are located in two sections of SB 189, but they do not provide any basis for this Court to enjoin or limit the scope of the legislature's carefully considered decisions. Even with the additional opportunity to refine their claims in a Consolidated Amended Complaint, [Doc. 155] (the "Complaint"), Plaintiffs still have not alleged enough to invoke this Court's jurisdiction or to provide any path for relief.

Plaintiffs' first problem is jurisdictional. Not all Plaintiffs provided the NVRA's required pre-suit notice. None of the Organizational Plaintiffs allege any certainly impending injury or allegations of resource diversion affecting their mission sufficient to support organizational or associational standing. The sole Individual Plaintiff likewise only alleges a speculative future injury, which is insufficient for standing.

Further, all Plaintiffs suffer from traceability and redressability problems on many of their claims related to State Defendants, which further demonstrates their

lack of standing. Instead, they offer speculation about what might happen, which is not enough to invoke this Court's jurisdiction. And they have no private right of action to bring claims under the Civil Rights Act.

Even if Plaintiffs make it past their jurisdictional problems, they have not stated a claim under any of their theories, despite nearly 150 pages of allegations. The NVRA provisions on which they rely are consistent with SB 189. Establishing probable cause for purposes of hearing a voter challenge does not mean a voter will be removed from the registration rolls—it only continues the process for registrars to fulfill part of their statutory duty of ensuring voter rolls are correct and that only eligible voters are allowed to vote. And there is nothing in the NVRA that allows an ineligible voter to vote. Next, providing homeless voters who cannot otherwise receive mail with a location where notices are sent is consistent with the NVRA, not a violation of it. And finally, there is no violation of the uniformity provisions of the NVRA, because none of the challenged processes involve systematic state removal programs and registrars are required by law to change voter statuses as they become aware of new information about the eligibility of voters.

Plaintiffs' constitutional claims fare no better. There is no unconstitutional burden on the right to vote imposed by SB 189 because all voters are required to provide their residential location to register. Voters who report their residence as

a P.O. Box, where they do not and cannot live, should be evaluated by registrars to determine if they are eligible to vote. And homeless voters who do not have a place to receive mail should have a consistent and reliable location to receive election-related communications, which SB 189 ensures. Neither of the challenged provisions are an increase over the usual burdens of voting. And even if this Court concluded there is an elevated burden posed by SB 189, the state interests in accurate voter rolls and limiting voting to eligible voters more than justifies any burden on the right to vote.

Finally, Plaintiffs' Civil Rights Act claim has nothing to do with racial discrimination. Even if it did, the Civil Rights Act provision Plaintiffs cite is not implicated because all voters are treated the same under SB 189—they must provide a residential location when they register. Without more, there is no claim here either.

This Court does not have jurisdiction and Plaintiffs have failed to state a claim for relief in this case. This Court should dismiss Plaintiffs' Complaint.

# FACTUAL AND LEGAL BACKGROUND

## I. Georgia voter list requirements and processes.

Georgia statutes establish specific roles for state and county officials to maintain an accurate list of registered voters.[1] First, the Secretary of State maintains the official list of registered voters, both active and inactive, in a state database. *See* O.C.G.A. § 21-2-50(a)(14); *see also Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1163 (N.D. Ga. 2022). Second, county officials are responsible for verifying and entering information into that statewide voter database. *Id.* Every Georgia county's board of registrars is responsible for determining the eligibility of new individuals registering to vote. O.C.G.A. § 21-2-226(a). Those county boards also have the continuing duty of "examining from time to time the qualifications of each elector" over whom they have responsibility. O.C.G.A. § 21-2-228(a).

County registrars use an extensive list of statutory factors to determine where a person resides for voting purposes. O.C.G.A. § 21-2-217. The primary focus of the statutory factors is to determine the intent of the individual voter. O.C.G.A. § 21-2-217(a)(1); *Cook v. Bd. of Registrars of Randolph Cnty.*, 320 Ga. App.

---

[1] The terms "elector" and "voter" are used interchangeably in the Election Code to mean anyone who possesses the qualifications to vote and is registered. *See* O.C.G.A. § 21-2-2(7), (39).

447, 452 (2013) ("The statutory factors that must be weighed are replete with references to the person's intent"). When determining a voter's residence, registrars must consider all of the statutory factors and cannot elevate a single factor above the others. *Handel v. Powell*, 284 Ga. 550, 554–55 (2008).

Turning to the responsibility of voters, every individual must provide information about his or her residence when registering to vote. O.C.G.A. §§ 21-2-219, -220, -223. The form designed by the Secretary requires in two places that voters provide their "residence" or "residential" address. *See* https://sos.ga.gov/sites/default/files/forms/GA_VR_APP_2019.pdf at box 2; Instructions, ¶ 2. For voters who live in areas without house numbers and street names, the voter-registration application advises them to include a drawing of their location to help the registrars identify the correct precinct, as Plaintiffs agree. *Id*. at Instructions, ¶ 9; [Doc. 155, ¶ 128].

Once an individual registrant is on the voter list, county officials have a continuing obligation to update the voter-registration list based on new data and remove ineligible individuals.[2] That includes reviewing data for new felons,

---

[2] Only certain types of list maintenance are the responsibility of the Secretary of State, specifically individuals who have died, O.C.G.A. § 21-2-231(e), individuals who filed change of address information with the Post Office, O.C.G.A. § 21-2-233(a), and voters who have no contact over multiple election cycles, O.C.G.A. § 21-2-234. When a mailing to a voter is returned as undeliverable, the voter is mailed a notice that will result in the voter being moved to inactive

individuals declared mentally incompetent, and people who reported they were not citizens when called for jury duty. O.C.G.A. § 21-2-231(c). Further, county officials are charged with removing individuals from the list of voters when they learn information showing someone has died. O.C.G.A. § 21-2-231(e.1); *see also Fair Fight Action*, 634 F. Supp. 3d at 1170. An individual voter can also request that their registrar remove their name from the voter list. O.C.G.A. § 21-2-232.

In addition to these processes, Georgia law has long provided two methods for other voters to challenge the eligibility of individuals on the voter list.[3] Under O.C.G.A. § 21-2-229, any voter can challenge the qualifications of new registrants and those on the voter list for their county to be listed as a voter, with the challenger bearing the burden of proof. *Id.* at (c). After a hearing, the decision of the registrars can be appealed. *Id.* at (e). Under O.C.G.A. § 21-2-230, a separate process exists to challenge the right of a voter to have his or her vote counted in a specific election. This type of challenge requires the registrars to consider whether probable cause exists to sustain the challenge. *Id.* If probable cause exists, the voter

_____

status if they do not respond. O.C.G.A. § 21-2-234(b). Once a voter is placed in inactive status and has no further contact with election officials for two general elections, the voter is moved from inactive to cancelled status and is then unable to vote. O.C.G.A. § 21-2-235(b). Plaintiffs do not challenge any of these provisions.

[3] Plaintiffs agree, noting that the current voter-challenge laws have been in effect for at least 30 years. [Doc. 155, ¶ 164]. Plaintiffs do not challenge those laws generally, but only the changes made by SB 189.

can still vote, but must resolve the challenge before voting or vote a provisional ballot until the challenge can be resolved. *Id.* at (d), (h). These challenge provisions are part of the duties of county registrars to continue their examination of the list of eligible voters. O.C.G.A. § 21-2-228(a).

## II.     Changes made by in SB 189.

In the 2024 legislative session, the General Assembly updated several provisions of the Election Code (Title 21) through SB 189, but only two sections of that bill are challenged in this now-consolidated case. In Section 4, SB 189 established a uniform mailing address for homeless voters who do not have a permanent address, clarified that casting a vote in another state means the person has changed their residence for voting purposes, and added filings of National Change of Address (NCOA) forms with the Post Office as a factor the registrars can consider during challenges. Section 5 defined probable cause for purposes of challenges under O.C.G.A. § 21-2-230, set forth a window before certification of the election where challenges must be postponed, and clarified that challenges in one election continue through runoffs of that election. *Id.* at (b), (k).

The legislature did not define the term "nonresidential" in Section 5, [Doc. 155, ¶¶ 208, 216], meaning that the "common usage" of the term governs. *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018) (quotation omitted). Determining the definition includes looking at the context and "dictionary

definitions for guidance." *Id.*; *see also Spencer v. Specialty Foundry Prod. Inc.*, 953 F.3d 735, 740 (11th Cir. 2020).

In Georgia, "[w]herever a form of the word 'reside' occurs either in the statutes or in the constitution of Georgia with respect to voting, it should be construed to mean 'domicile.'" *Holton v. Hollingsworth*, 270 Ga. 591, 593 (1999) (quoting *Avery v. Bower*, 170 Ga. 202, 206 (1930) (quotation marks omitted)). Domicile is generally regarded as "a dwelling place" or a "place of residence." "Domicile," https://www.merriam-webster.com/dictionary/domicile (Jan. 6, 2025); *see also Black's Law Dictionary* (11th ed. 2019) (defining "domicile" as "[t]he place at which a person has been physically present and that the person regards as home…"). This matters under Georgia law because an individual must be a "resident" of the state and the county where he or she is seeking to vote in order to be eligible to vote. O.C.G.A. § 21-2-216(a)(4). To determine residency (or domicile), O.C.G.A. § 21-2-217(a)(1) explains that a person's "residence" is "that *place* in which such person's *habitation* is fixed" (emphasis added). Thus, when considering the definition of a "nonresidential" address for purposes of O.C.G.A. § 21-2-230, it must be a location where a person is *unable to reside*. This contextual definition is bolstered by dictionaries, which generally refer to "nonresidential" as places that people do not live. *See* "nonresidential," *Black's Law Dictionary* (11th ed.) ("not being a place where people live"); "Nonresidential,"

https://www.merriam-webster.com/dictionary/nonresidential (Jan. 6, 2025) ("not used as a residence or by residents").[4] Despite a discussion in the Complaint about counties potentially using zoning maps for determining "nonresidential" addresses, [Doc. 155, ¶¶ 216–219], Plaintiffs point to no provision of Georgia law that would support the use of zoning designations to determine the residential character of an address and, given the context, that kind of definition would make no sense and be inconsistent with the statutory structure.

Plaintiffs also allege that participants in Georgia's VoteSafe program register using a Post Office Box and lack any exception under SB 189. [Doc. 155, ¶ 220]. But this wrong as a matter of Georgia law. Voters who have a protective order or who are residing at a family violence shelter may have their residence address made confidential. O.C.G.A. § 21-2-225.1(a). But this does not mean the voter provides a P.O. Box as their residence address as Plaintiffs claim—instead, the registrars make the residence address confidential. *Id*. at (b). The application for VoteSafe, like the voter-registration application, requires a residential address. *See*

_____

[4] While not taking a position on lawsuits filed to enforce challenges brought under O.C.G.A. § 21-2-230(b), at least one of those pending lawsuits includes references to challenges under the nonresidential address provision that are focused on individuals reporting their residence as "addresses of U.S. Post Offices, UPS Stores, or other Mail Center businesses," as opposed to Plaintiffs' proposed approach of relying on zoning for that definition. *See, e.g.*, *Henderson v. Abhiraman*, Case No. 24CV8564 (Sup. Ct. of DeKalb County Sept. 17, 2024), Application at ¶ 9.

*State of Georgia VoteSafe Application*, https://sos.ga.gov/sites/default/files/2022-03/votesafe_application.pdf (Jan. 6, 2025).

## III.    State obligations under the NVRA.

In addition to state law, Georgia's voter list is also subject to the requirements of federal law. One of those laws, the NVRA, sets national requirements for voter registration. 52 U.S.C. § 20501(b). This includes providing opportunities to register to vote, 52 U.S.C. § 20503, and processes for changing addresses and conducting list maintenance, 52 U.S.C. § 20507. States may not conduct programs "the purpose of which is to systematically remove the names of ineligible voters" within 90 days of a federal primary or general election. 52 U.S.C. § 20507(c)(2)(A). This does not include changes to the registration list at the request of the registrant, removal of felons, and removal for death. 52 U.S.C. § 20507(c)(2)(B). It also does not include removal of voter records based on individualized information. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). The 90-day provision does not provide, and Plaintiffs do not assert otherwise, that voters who do ***not*** retain all the qualifications to vote (including continued residency in Georgia) are allowed to have their vote counted—because the NVRA does not bestow eligibility on ineligible voters.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Legal standard.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678–79. In addition to the Complaint, this Court may consider any matters appropriate for judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### II. Plaintiffs lack standing.

In federal court, "[s]tanding is 'built on a single basic idea—the idea of separation of powers.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (*AHM*); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 422–23 (2021) (standing is "woven into" the Constitution through its structural separation of powers). James Madison explained that "no political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty," than the need for a robust separation of powers between and among the branches of the federal government. FEDERALIST No. 47 (J. Madison).

Article III standing requirements are one way in which this separation is expressed in practice, representing an "irreducible constitutional minimum" that litigants cannot avoid. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Plaintiffs in federal cases need a *personal* stake in the outcome, which serves to "ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *AHM,* 602 U.S. at 379 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 487 (1982)). Indeed, "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* at 382.

Instead, federal courts are limited to deciding only "Cases" or "Controversies." U.S. CONST. Art. III, § 2. To implement this requirement, courts apply a three-part inquiry requiring plaintiffs to demonstrate they (i) have suffered or likely will suffer an injury in fact; (ii) that the injury likely was caused or will be caused by the defendant; and (iii) that the injury likely would be redressed by the requested judicial relief. *See Summers v. Earth Island Institute*, 555 U. S. 488, 493 (2009); *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022).

The first requirement of an injury-in-fact, "prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." *AHM,* 602 U.S. at 382 (quoting *Allen v. Wright*, 468 U. S. 737, 756 (1984) (quotation marks omitted)). And the causation requirement contained in the second part, traceability, similarly "screens out plaintiffs who were not injured by the defendant's action" so that federal courts do not have to be "'virtually continuing monitors of the wisdom and soundness' of government action." *AHM,* 602 U.S. at 383-384 (quoting *Allen,* 468 U.S. at 760). The third part, redressability, is often considered along with traceability to be "flip sides of the same coin." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). The redressability inquiry targets whether a federal court, operating within the scope of its limited authority, may properly grant the relief requested in a way that is "tailored to redress *the plaintiff's* particular injury." *Gill v. Whitford,* 585 U.S. 48, 73 (2018) (emphasis added).[5]

---

[5] When addressing jurisdiction, federal courts frequently invoke the "one good plaintiff" rule. *See, e.g.*, *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 132 S. Ct. 2566, 183 L. Ed. 2d 450 (2012) ("The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing."). But this case does not lend itself to the application of that rule. The counts in the Complaint are brought by varying Plaintiff groups, some Plaintiff groups do not join some counts, and Plaintiffs seek attorneys' fees if successful. *See generally* [Doc. 155]. In this case, this Court should "confirm that

## A. All claims about Section 5 of SB 189 are too speculative to be an injury in fact.

Before turning to the claims of each Plaintiff, there is one overall issue to address: the injuries all Plaintiffs allege about Section 5 of SB 189 (the challenge and removal provisions) are too speculative to establish a concrete injury or meet the traceability necessary for standing under Article III. Every plaintiff must allege that it "either suffers actual present harm or faces a threat of imminent harm." *City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Neither organizations nor individuals can have an injury based on "fears of hypothetical future harm that is not certainly impending." *Id.* (quoting *Clapper*, 568 U.S. at 416). And "[t]he causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *AHM,* 602 U.S. at 383. But this type of fear of future harm and speculation about future actions is infused in each part of the Complaint challenging Section 5 of SB 189.

Even accepting the entirety of Plaintiffs' allegations as true, they can only be injured after a tenuous chain of uncertain eventualities: first, some elector

---

a plaintiff must demonstrate standing for **each claim** he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (emphasis added), and evaluate the standing of each Plaintiff as to each claim.

somewhere in Georgia must discover information indicating that an individual that is somehow connected to one of Plaintiffs may not be eligible to vote. Then, that elector must initiate the challenge process identified in Section 5 of SB 189. Then the county board of registrars must decide to hear the challenge and rule in a way that is unfavorable to the person the organization alleges an interest in. There are far too many unknowns in this chain of events. And that is directly contrary to the requirement that the alleged "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Clapper,* 568 U. S. at 409.

Because Plaintiffs' claims regarding the Section 5 removal provisions are too speculative, all counts related to those provisions should be dismissed as to State Defendants.

**B.    Article III standing for organizations.**

Plaintiffs in these consolidated cases are seven organizations and one individual. [Doc. 155, ¶¶ 12–77]. Organizations currently can establish standing through a diversion-of-resources theory or an associational standing theory. *See Arcia*, 772 F.3d at 1341. Thus, before turning to the standing analysis, the Court must first categorize which theory each organization is relying on for standing.

The first group of Plaintiffs only alleges organizational standing. New Georgia Project's ("NGP") standing allegations do not make a specific reference to

any individual members and generally focus on their mission and the purported diversion of resources they claim results from the challenged provisions of SB 189. [Doc. 155, ¶¶ 13–18]. Accordingly, they have only alleged an organizational injury. The Georgia Muslim Voter Project ("GMVP") similarly alleges standing only through a diversion-of-resources theory and thus is limited to establishing standing as an organization in its own right. *Id.* at ¶¶ 19–27. And A. Phillip Randolph Institute ("APRI") expressly limits its standing allegations by stating it "challenges Sections 4 and 5 of S.B. 189 on behalf of itself as an organization." *Id.* at ¶ 28.

The second group of Plaintiffs includes a mix of organizational and associational standing claims. The Georgia State Conference of the NAACP ("Georgia NAACP") expressly invokes both organizational and associational standing, stating that it "brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout Georgia whose right to vote is threatened by the challenged provisions of S.B. 189." *Id.* at ¶ 44.

VoteRiders brings its challenges to S.B. 189 solely through a diversion of resources theory. *See, e.g.*, *id.* at ¶¶ 60–64. While VoteRiders does state that "S.B. 189 will harm the 'homeless,' unhoused and housing insecure communities that VoteRiders assists," *id.*, it does not make any allegation that any VoteRiders'

*members* are affected by the law individually and that the organization is bringing its claim on their behalf.

The Georgia Coalition for the Peoples' Agenda ("GCPA") is unique: it relies on organizational standing but also seeks to achieve associational standing through the members of its organizational members. It nearly perfectly echoes the Georgia NAACP by expressly alleging that "GCPA brings this action on behalf of itself and its individual members, including those members who are registered voters residing throughout the State of Georgia and whose right to vote will be threatened by the challenged provisions of S.B. 189." *Id.* at ¶ 59. But GCPA also alleges that it "is a coalition of more than 30 organizations," which *themselves* "have more than 5,000 individual members across Georgia in various cities and counties." *Id.* at ¶ 45. Thus, for purposes of associational standing, "the allegedly injured parties… are two degrees removed from the party before [the court] pursuing those injuries." *AHM,* 602 U.S. at 400 (Thomas, J., concurring). And so, as discussed below, GCPA should be precluded from alleging associational standing on behalf of any of its members because they are organizations, which would need to establish standing on the basis of a separate diversion of resources or through the identification of one of their member organization's members.

The third plaintiff group, consisting of Secure Families Initiative, brings its challenge on behalf of both itself as an organization, as well as its purportedly affected members. [Doc. 155, ¶¶ 65–77].

In sum, all seven organizations seek to establish standing in their own right under a diversion-of-resources theory. And three of those organization either expressly, or at least appear to, attempt to establish standing through their members: Georgia NAACP, GCPA, and SFI.

### 1. *Organizational standing claims.*

The Eleventh Circuit has explained that "[u]nder the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia,* 772 F.3d at 1341. But recent precedent has made clear that is not enough to afford an organization standing in federal court on its own. Rather, it is a *necessary* but not *sufficient* condition of possessing organizational standing.

The Supreme Court explained that this "diversion of resources" must occur within the broader context of the Article III inquiry. *See AHM,* 602 U.S. at 393–94 ("[O]rganizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."). Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they

dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. And like individuals, an organization "may not establish standing based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct..." *Id.* at 394 (quoting *Valley Forge*, 454 U.S. at 486). This is true "no matter how longstanding the interest and no matter how qualified the organization." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

   *AHM* represents a critical clarification of organizational standing caselaw.[6] As the Ninth Circuit recently observed, *AHM* "put a halt" to a "confusing line of organizational standing cases" that allowed "an organization to assert standing if it diverts resources in response to a governmental policy that frustrates its mission." *Arizona Alliance for Retired Americans v. Mayes,* 117 F. 4th 1165, 1169–70 (9th Cir. 2024). The Supreme Court made clear that Article III has always required

---

   [6] In the Eleventh Circuit, "[f]or the Supreme Court to overrule a case, its decision must have 'actually overruled or conflicted with [this court's prior precedent].'" *United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008) (quoting *United States v. Marte*, 356 F.3d 1336, 1344 (11th Cir.2004) (citation and quotation omitted)). As discussed in this brief, *AHM* is "clearly on point," *Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1292 (11th Cir. 2003), especially when Plaintiffs' allegations of injuries exactly match the injuries found insufficient in *AHM*. Thus, any conflict with existing Circuit precedent on standing means that *AHM* is a case that is a "clearly contrary opinion of the Supreme Court." *Id.* (quoting *NLRB v. Datapoint Corp.*, 642 F.2d 123, 129 (5th Cir. Unit A Apr. 1981)).

more: organizations "must plead facts show that their *core activities* are *directly affected by the defendant's conduct." Id.* at 1172 (emphasis added).

In *AHM,* four medical associations and several individual doctors sought to require the FDA to revoke or reduce its approval of a drug called mifepristone. The Supreme Court held that neither the associations nor the individual plaintiffs established standing under Article III. *See generally, AHM,* 602 U.S at 374. The allegations (1) were too speculative, *id.* at 386–93, and (2) the organizational plaintiffs failed to establish the kind of "direct" injury to the organization *as a result of the challenged law* needed to establish standing under a correct reading of precedent, *id.* at 394–96.

As to the speculative nature of the injuries, the Supreme Court acknowledged a conscience injury *can* be sufficient to establish injury-in-fact for purposes of Article III, but that it was too speculative in the context alleged by the plaintiffs, especially when the doctors did not make any allegation—or indeed, point to any historical example—showing any such breach of a doctor's conscience. *Id.* at 388. Other claimed injuries, including "diverting resources and time from other patients" and the associated costs of treating patients presenting with complications from mifepristone, were also too speculative or attenuated. *Id.* at 390. The Court correctly recognized that this would open the floodgates to a special, industry-specific, form of Article III standing allowing doctors to "sue in

federal court to challenge almost any policy affecting public health." *Id.* at 391–92. Thus, the Court held the individual doctors lacked Article III standing. *Id.* at 393.

Turning to the medical association plaintiffs, the Court noted that while "organizations may have standing 'to sue on their own behalf for injuries they have sustained,'" *id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n.19 (1982)), they still "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 393–94. That means that organizations must allege "far more than simply a setback to the organization's abstract social interests." *Id.* at 394 (quoting *Havens*, 455 U.S. at 379). And an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. Such a standard would mean "all the organizations in America would have standing to challenge almost every federal policy they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. *Havens* did not support that broad of a standard because in that case, the defendant *directly* provided false information about apartment availability to the plaintiff organization, HOME. This "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers." *Id.* (citing *Havens*, 455 U.S. at 379). Put differently, the defendant's "actions *directly* interfered with HOME's core

business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

At least two other Circuits have recognized this clarification regarding organizational standing means that "[o]rganizations can no longer spend their way to standing based on vague claims that a policy hampers their mission." *Mayes,* 117 F.4th at 1170[7]; *see also Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, No. 23-3969, 2025 WL 16385, at *1 (6th Cir. Jan. 2, 2025) ("the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*"). This is also consistent with the Eleventh Circuit's directive that "an organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *City of S. Miami*, 65 F.4th at 639 (quoting *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020)).

---

[7] *Mayes* also involved a challenge to voting laws including the NVRA. One such challenged law referred to as the "Cancellation Provision" "allows county recorders to cancel a voter's registration if the county recorder" receives confirmation from another county that the voter has registered there or if he receives information that the voter has registered to vote in a different county. *Id.* at 1171. The plaintiff organizations alleged this law directly injured them, but they alleged "only a frustrated mission and diverted resources." *Id.* at 1178. The plaintiffs did not have standing because the challenged provision "does not directly affect their preexisting core activities. *With or without the Cancellation Provision, the plaintiffs can still register and educate voters*—in other words, their core activities that they have always engaged in." *Id.* (emphasis added).

Applying these clarified concepts of Article III standing to the organizations' allegations demonstrates that none of the Organizational Plaintiffs have adequately alleged an injury-in-fact.

a.    Plaintiff New Georgia Project.

Plaintiff NGP alleges SB 189 forces the organization to divert resources in several ways. [Doc. 155, ¶¶ 12–18]. But because they all track a similar theme of a purportedly frustrated mission and subsequent diversion of resources, a few example allegations demonstrate the problems of all of them. Broadly, NGP first claims that "[v]oter challenges are causing and will continue to cause harm to NGP's mission of encouraging voter registration and participation among underserved communities." [Doc. 155, ¶ 16]. It next contends that "Defendants' actions are causing and will continue to cause NGP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is being challenged…" *Id.* It also alleges it has "expended additional resources regularly monitoring boards of elections for voter challenges" to aid in preventing their constituents from "being targeted by challenges" under the provisions of SB 189. *Id.* And finally, it alleges that "[t]he mailing address restriction contained in Section 4 of SB 189 will force NGP to divert resources, such as staff and volunteer time, to educate unhoused voters without a permanent address about when and where to retrieve their election mail." *Id.* at ¶ 13.

NGP also alleges its general mission is to "increase the civic participation of historically marginalized communities across Georgia through nonpartisan voter registration, voter education, and get-out-the-vote ('GOTV') efforts, as well as by organizing and advocating on issues important to those communities." *Id.* at ¶ 13. It alleges it "work[s] closely with a network of key activists and leaders from underserved communities…" and that these activists "help shape NGP's agenda and play a critical role in implementing NGP's programs." *Id.* NGP claims to "register tens of thousands of voters every year," "provide[] rides to the polls for voters lacking transportation… [and] for unhoused voters," and "also assist[] voters whose registrations have been challenged." *Id.* at ¶ 14. And it alleges that voters registered by NGP (directly or indirectly through its GOTV drives) "have had their eligibility challenged though mass voter challenges" and that this activity is likely to continue. *Id.* at ¶ 15. Though voluminous, this litany of allegations is not sufficient for NGP to establish direct organizational standing.

As discussed above, the primary question this Court must answer is whether the law "directly affected and interfered with [NGP's] core business activities." *AHM,* 602 U.S. at 395. This is because a court "must not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities." *Mayes,* 117 F.4th at 1177 (emphasis original).

Nothing about the challenged provisions of SB 189 is aimed at NGP's voter registration and GOTV efforts—and NGP is not required to or forced to do anything at all. NGP's core activities may continue completely as they had before the enactment of SB 189. Nothing about a uniform mailing address for homeless voters who do not otherwise have them or findings of probable cause for voter challenges impedes or hinder the ability of NGP to register voters or to encourage them to vote through their various GOTV efforts. Nor do they stop or even impact NGP's ability to provide transportation to voters to the polls or anywhere else.

Instead, NGP's allegations show it is making unilateral choices, entirely divorced from any underlying requirements imposed by SB 189, to reallocate resources from one area of its operations to other related aspects of its operations. But as was true in *Mayes*, "the plaintiffs can still register and educate voters" and otherwise "continue their core activities they have always engaged in." *Id.* at 1178. The remaining allegations are based on "speculative fears of future harm," which are insufficient to show an injury. *City of S. Miami*, 65 F.4th at 640. Under the standard in *AHM*, none of that is not enough. And Plaintiff NGP accordingly has not established organizational standing under Article III.

b.　　Plaintiff Georgia Muslim Voter Project.

GMVP is in the same boat as NGP. It claims its mission is "to activate and elevate the voices of Muslim voters in Georgia." [Doc. 155, ¶ 19]. The organization

lists some of its top social-action priorities, including "[v]oter registration and voter education programs, as well as combatting voter suppression…" *Id.* GMVP claims to have "engaged over 100,000 voters across Georgia through trainings," by "provid[ing] the Muslim community with the tools to protect their right to vote; and by engaging in GOTV activities like text-banking, phone-banking, and door-knocking." *Id.* They also provide "assistance to Muslim voters whose registrations have been challenged and has been monitoring the impact of S.B. 189 on the Muslim community in Georgia." *Id.* at ¶ 24. GMVP alleges that "[v]oter challenges are causing, and will continue to cause, harm to [its] mission of encouraging voter registration and participation among the Muslim community." *Id.* at ¶ 26.

Like NGP, none of the allegations are enough to establish Article III standing. GMVP remains free to "continue their core activities they have always engaged in." *Mayes,* 117 F.4th at 1178 (citing *AHM,* 603 U.S. at 396). Any voter challenges do not affect the organization's ability to carry on its mission of "activat[ing] and elevat[ing] the voices of Muslim voters." [Doc. 155, ¶ 19]. And of course, "[l]ike an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct…" *AHM,* 602 U.S. at 369–70.

Nor does the decision of GMVP to "expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote

is being challenged," confer any additional injury-in-fact. [Doc. 155, ¶ 26]. That is because "spending money voluntarily in response to governmental policy cannot be an injury in fact." *Mayes,* 117 F.4th at 1178 (citing *AHM,* 602 U.S. at 394). And the only way in which SB 189 "arguably affects the plaintiffs 'core voter registration activities' is by causing the plaintiffs, in response to the provision, to decide to shift some resources from one set of pre-existing activities in support of their overall mission to another…" *Id.* at 1180. And that "represent[s] the same diversion-of-resources and frustration-of-mission injury that *[AHM]* rejected." *Id.* As a result, Plaintiff GMVP has not alleged a constitutionally cognizable injury.

c.  Plaintiff A. Phillip Randolph Institute.

APRI fares no better on its alleged diversions. APRI describes itself as a "non-profit civic organization of trade unionists who fight for racial equality and social economic justice for working families." [Doc. 155, ¶ 28]. It "registers voters, provides voter education services, and organizes GOTV initiatives." *Id.* Much like the other organizations, APRI claims that the "ongoing removal practices" of SB 189 require it to "expend additional resources, such as staff member, and volunteer time, instructing voters on what to do if they are challenged." *Id.* at ¶ 30. It also claims that the mailing-address provisions of SB 189 require it to "expend additional resources… by instructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve

election mail," and providing transportation services to unhoused voters when necessary. *Id.* at ¶ 31.

None of these allegations are sufficient to establish organizational standing. Once again, they almost exactly match those that were deemed insufficient in *AHM*: an impairment of the plaintiffs' "ability to provide services and achieve their organizational missions." *AHM,* 602 U.S. at 394. And the perceived need to engage "in public advocacy *and public education.*" *Id.* (emphasis added). Finally, like APRI, the *AHM* plaintiffs alleged these expenditures occurred "to the detriment of other spending priorities." *Id.* None of this is enough: "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.*

Thus, APRI cannot establish an injury by "instructing voters on what to do if they are challenged" under the provisions of SB 189 or by "reaching out to and assisting challenged voters." [Doc. 155, ¶ 30]. Nor is it injured by the permanent-address provisions of SB 189 when it is "[i]nstructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve election mail, and providing low cost or free transportation options." *Id.* at ¶ 31. These are the same self-imposed expenditures found insufficient in *AHM* when the plaintiffs said they were conducting studies, educating the public,

and formulating petitions to address the challenged rule. "An organization cannot manufacture its own standing in that way." *AHM,* 602 U.S at 394. Thus, Plaintiff APRI also has not alleged an injury sufficient to invoke this Court's jurisdiction.

d.    Plaintiff Georgia State Conference of the NAACP.

Georgia NAACP alleges its "mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular Black Americans." [Doc. 155, ¶ 36]. Georgia NAACP branches "across Georgia are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts…" *Id.* at ¶ 38. It also has "college and university units" that focus on student members. *Id.* at ¶ 40.

Georgia NAACP alleges that one of its college units, Spelman NAACP, "has to divert resources to change [its] programming in light of S.B. 189—changing its voter registration guidelines, updating its educational programming to prepare students for potential challenges, and printing updated material…" *Id.* at ¶ 41. Similarly, Georgia NAACP alleges, as a result of Section 4 of SB 189, that the organization at a broader level "not only has to modify its messaging to reflect [the change in the law], it also has to divert resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist voters impacted by these provisions." *Id.* at ¶ 43.

Applying these allegations to the standard in *AHM* demonstrates that each of these alleged harms is just a self-inflicted expenditure that is insufficient to confer Article III standing, because spending on educational programming and public advocacy is insufficient. Indeed, just like Georgia NAACP, the *AHM* organizations specifically complained that the challenged regulation "forced [them] to expend considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education…" *AHM,* 602 U.S. at 394 (internal quotations omitted). And all of this was apparently "to the detriment of other spending priorities." *Id.* As a result, Georgia NAACP also lacks an injury sufficient to pursue its claims.

e.     Plaintiff Georgia Coalition for the Peoples' Agenda.

GCPA alleges that it "is a coalition of more than 30 *organizations*…" [Doc. 155, ¶ 45] (emphasis added). It "works to encourage and support voter registration and participation, particularly among Black and other underrepresented communities in Georgia" such as the homeless and housing insecure, and other individuals residing at addresses the organization fears may be considered "nonresidential." *Id.* at ¶ 47. In a nutshell, this "includes, but is not limited to, registering voters at Georgia high schools, universities, churches and centers that provide meals to unhoused and housing-insecure individuals, and senior and assisted living facilities. *Id.* GCPA alleges that "support of voting rights is central

to its mission." *Id.* at ¶ 48. And as a result of SB 189, GPCA claims, it "has had to, and will continue to divert the attention of its staff and membership away from its other programmatic areas and focus instead on voter education, defense, and support." *Id.* at ¶ 53. This includes having staff "spend[] days attending challenge meetings in multiple counties… and addressing challenges to students registered at Savannah State University…" *Id.* at ¶ 54.

But the fact that SB 189 has "cause[ed] plaintiffs, in response to the provision, to decide to shift some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities," does not work to satisfy the rigorous requirements of Article III standing. *Mayes,* 117 F.4th at 1180. Put differently, there is no *direct* injury here to GCPA caused by SB 189. *AHM,* 602 U.S. at 394. And Article III "does not support such an expansive theory of standing." *Id.,* at 395. Thus, Plaintiff Georgia GCPA lacks organizational standing to pursue its claims.

### f.    Plaintiff VoteRiders.

VoteRiders is "dedicated to ensuring all citizens have the information and proof of identification ('ID') they need to exercise their right to vote." [Doc. 155, ¶ 60]. It provides "voter education and work[] directly with individuals who are eligible to obtain State IDs and any underlying documents required…" *Id.* The organization "covers the cost of transportation to vote for individuals who

VoteRiders previously provided ID assistance." *Id*. VoteRiders worries that SB 189's mailing address requirement "will hinder [it] in accomplishing its mission of ensuring that voter ID laws do not prevent eligible voters from exercising their right to vote." *Id.* at ¶ 63. In response to this fear, VoteRiders alleges it "will need to spend time and resources to effectively assist 'homeless' voters affected by S.B. 189," and lists several ways in which it says it will alter its allocation of resources purportedly on account of SB 189. *Id.* at ¶ 64.

Like the other organizations, VoterRiders' purported injuries are insufficient for Article III standing. SB 189 does not implicate or affect the ability of VoteRiders to pursue its mission and goals. And the fact that the organization is worried a law *might* affect their constituents does not mean there is "an imminent threat" to that community. *City of S. Miami*, 65 F.4th at 640. Diverting resources in response to that "speculative fear," *id.*, is not a direct harm to the organization's already-existing core activities. It is just a voluntary response to SB 189. And courts "must not allow the diversion of resources *in response* to a policy to confer standing…" *Mayes,* 117 F.4th at 1177 (emphasis original). Here, that is the *sole* basis on which VoteRiders alleges organizational standing. And that is not enough, meaning VoteRiders also lacks standing.

g.    Plaintiff Secure Families Initiative.

SFI alleges that its mission is to "mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities." [Doc. 155, ¶ 68]. It claims that, as a result of SB 189, "SFI will be forced to divert time and resources from their planned advocacy and educational efforts." *Id.* at ¶ 74. It also claims it will have to "determine whether their Georgia registered members will be susceptible to a sustained voter challenge because of the new probable cause standard," and will have to educate and advise members about SB 189. *Id.*

First, these injuries are too speculative. By its own admission, SFI does not know if *any* of its members are even susceptible to a sustained voter challenge, let alone in danger of being somehow injured by one. *Id.* at ¶ 74. And an organization cannot create standing when it commits resources "to a self-imposed injury 'based on speculative fears of future harm.'" *City of S. Miami*, 65 F.4th at 640 (quoting *Shelby Advocs.*, 947 F.3d at 982).

Second, merely embarking on educational efforts to advise or "coach" members or the public regarding SB 189 is not sufficient to give SFI organizational standing in its own right. That is exactly what the medical association plaintiffs alleged in *AHM. See, e.g., AHM,* 602 U.S. at 394. That was not enough there. And it is not enough here. Plaintiff SFI also lacks standing.

*       *       *

33

None of the seven organizational plaintiffs have adequately alleged organizational standing. Four exclusively rely on organizational standing to bring this case, which ends the analysis as to their claims. The remaining three organizations that alleged associational standing in addition to organizational should be dismissed as well for the reasons that follow.

2.     *Associational standing.*

Under existing Eleventh Circuit precedent, organizations may establish standing through an associational standing theory. *Arcia,* 772 F.3d at 1342. And the Supreme Court has previously recognized, without explanation, that an association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members of the lawsuit." *AHM,* 602 U.S. at 398 (Thomas, J., concurring) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977)).

But at least one member of the Supreme Court recently expressed skepticism about the ongoing viability of the associational standing doctrine because the "Court has never explained or justified [its] expansion of Article III standing." *Id.* This is because associational standing "creates a mismatch" with traditional Article III jurisprudence. *Id.* at 400. "Although the association is the plaintiff in the

suit, it has no injury to redress. The party who needs the remedy—the injured member—is not before the court. Without such members as parties to the suit, it is questionable whether" the Constitution permits the Court to grant relief. *Id.* As a result, Plaintiffs cannot rely on associational standing under a proper application of Article III. While State Defendants recognize that this Court is bound to apply the Eleventh Circuit's precedents in these circumstances, they raise the issue here for purposes of preserving it for appeal should that later be necessary. But even assuming the associational standing doctrine remains viable, none of the Plaintiffs alleging it have pleaded sufficient allegations to survive dismissal.

a.   <u>Plaintiff Georgia NAACP.</u>

Georgia NAACP brought this action on behalf of its members, alleging that "[d]ormitories or other student housing facilities located at universities and colleges in Georgia *may* be classified as 'nonresidential' in zoning designations in some jurisdictions, making student unit members… *vulnerable* to challenge under Section 5 of S.B. 189." [Doc. 155, ¶ 40] (emphasis added). It notes that student members of their Spelman College unit are registered at "addresses of dormitories on campus, which are located in an area that is zoned as nonresidential." *Id.* at ¶ 41. And the Georgia NAACP makes roughly the same allegation with respect to its members registered at student housing at Savannah State University. *See, e.g., id.* at ¶ 42.

But the fact that an address is *zoned* nonresidential has nothing to do with SB 189. And it certainly doesn't create any sort of injury for Georgia NAACP's members. *See* Facts, Section II (discussion of the meaning of "nonresidential"). The unfounded definition Georgia NAACP attempts to apply on behalf of its student members to the meaning of "nonresidential" in SB 189 renders the entire alleged injury far too speculative to be actionable. Such an interpretation effectively means that the "alleged harm 'rests on their highly speculative fear.'" *City of S. Miami,* 65 F.4th at 637 (quoting *Clapper,* 568 U.S at 410). Moreover, other circuits have recognized that courts "are not bound to accept an incorrect premise in determining whether a party has standing." *Mayes,* 117 F.4th at 1179 n.5. Indeed, a federal court "must look at whether a plaintiff is relying on a far-fetched speculation in assessing how a statute may be applied." *Id.*

Because Georgia NAACP rests its associational standing claims on a legally improper understanding and speculative potential injuries, it does not have standing to bring its claims on behalf of its members.

### b.    Plaintiff Secure Families Initiative.

SFI has the same initial problem at Georgia NAACP—it broadly alleges that it has members in Georgia but then only claims it "is unclear to these voters how each county will handle a potential challenge to their registration or eligibility, nor do they know how best to rebut a challenge made against them" because of SB

189. [Doc. 155, ¶ 71]. But this perceived lack of clarity regarding nonexistent voter challenges and the yet-to-occur handling of them is not a concrete injury for purposes of Article III associational standing because it is based on speculative fears of future harm. *City of S. Miami*, 65 F.4th at 637. That alone ends SFI's claim to associational standing.

But SFI faces another problem: it cannot identify any affected member. "To establish standing under [an associational] theory, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Summers*, 555 U.S. at 498). But "an organization's self-descriptions of its membership" are not sufficient to make this showing. *Id.* (cleaned up). The Eleventh Circuit found the plaintiff lacked standing because "the Georgia Party has failed to allege that a specific member will be injured by the rule, and it certainly offers no evidence to support such an allegation." *Id.* at 1203.

Here, SFI is in the same boat. First, they ignore the requirement "that an organization name at least one member who can establish *an actual or imminent injury*." *Id.* at 1204 (emphasis added). As a result, this Court is left to guess whether any of SFI's members are among the individuals that could possibly be affected by the provisions of Section 5 of SB 189 if anyone is injured at all.

But even if they could identify a member, Plaintiff SFI's challenge to Section 5 is not sufficiently imminent to establish standing for any member the organization could potentially point to by its own admission. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Lujan*, 504 U.S. at 565 n.2). Indeed, the Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." *Id*. (alteration and emphases in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). And, perhaps most relevant here, it has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413; *see also City of S. Miami*, 65 F.4th at 637.

Nevertheless, "guesswork as to how independent decisionmakers will exercise their judgment" is precisely what SFI relies on here to challenge Section 5. SFI's allegations in the Complaint made on behalf of its members requires a tenuous chain of events that is insufficient to establish standing. A member would only have an injury (1) if another voter discovered something and (2) challenged

them, then if (3) the county board of registrars decided to hear the challenge, and (4) if the board of registrars ruled against the member.

For the foregoing reasons, SFI cannot establish standing by bringing this action on behalf of its own members. It has not alleged sufficient information to do so in the first place. But even if it had SFI relies on speculative harms against unnamed members that lack the required imminence for Article III standing. This Court should dismiss Plaintiff SFI's claims.

c.    Plaintiff Georgia Coalition for the Peoples' Agenda.

GCPA has the same problems with the speculative nature of its alleged injury that all plaintiffs in this action have. But GCPA is unique because not only did it fail to identify any specific member as part of its associational standing allegations, its "members" are "30 organizations," as opposed to actual individuals. [Doc. 155, ¶ 45.] Thus, "the allegedly injured parties… are two degrees removed from the party before [the court] pursuing those injuries." *AHM*, 602 U.S. at 400 (Thomas, J., concurring). This presents a significant problem for GCPA in addition to that which confronts the other organizational plaintiffs. Under *Ga. Republican Party*, GCPA would at minimum need to allege that one of its *organizational member's* members was injured. 888 F.3d at 1203. But GCPA makes no such allegation beyond the broad claim that it "has an interest in preventing the disenfranchisement of eligible voters, including its members…" [Doc. 155, ¶

58]. Presumably, this is a reference to GCPA's members' members, but it is not enough under *Ga. Republican Party*: "To establish standing under [an associational] theory, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" 888 F.3d at 1203. There is no such allegation here. Thus, even if GCPA had a concrete harm it could identify, it cannot establish associational standing based on a speculative injury to its member's member.

*       *       *

For the foregoing reasons, none of the organizational plaintiffs adequately alleged associational standing and their claims should be dismissed.

## C.    Individual standing for Plaintiff Sang Huynh.

Sang Huynh is the only individual plaintiff in this organization-laden case. But like the organizations, Plaintiff Huynh has not adequately alleged an injury-in-fact. As a result, he does not have standing to pursue his claim in this Court.

Plaintiff Huynh's allegations in the Complaint amount to two paragraphs, and they exclusively relate to a challenge to Section 4 of SB 189. Plaintiff Huynh alleges he is "an unhoused Georgia resident who is eligible to vote and plans to vote in future elections in Georgia." [Doc. 155, ¶ 33]. But Plaintiff Huynh also admits that he has a current mailing address, "which is his ex-wife's residence." *Id*. In other words, the Complaint acknowledges that Section 4 of SB 189, which

only applies to voters who are homeless *and* without a permanent address, does not *currently* apply to him. *See* Section IV.D. below. But the Complaint alleges that Plaintiff Huynh's "ability to continue using that mailing address in the future is tenuous." *Id.* Thus—at best—Plaintiff Huynh asserts that (1) at some indefinite time in the future (2) he might lack a permanent address and at that point (3) he could possibly have difficulty retrieving election-related mail that (4) may or may not be sent to him at the standardized location provided by Section 4 of SB 189. But if Plaintiff Huynh does have difficulty obtaining a permanent mailing address in the future, the ability to receive election related mail at the Fulton County elections office could be a benefit to him.

This "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper,* 568 U.S. at 410; *see also City of S. Miami*, 65 F.4th at 637. Accordingly, Plaintiff Huynh does not have standing and his claims should be dismissed.

The Complaint also alleges that Plaintiff Huynh brings some claims regarding Section 5 of SB 189. *See* Counts I, II, VI, VIII, and XII. But as discussed above, the Complaint contains no allegations regarding any impact of Section 5 on Plaintiff Huynh. Thus, there is no factual basis to support any claim by Plaintiff Huynh regarding Section 5 and those counts should be dismissed.

## D. Plaintiffs' challenges to O.C.G.A § 21-2-230 are not traceable to State Defendants.

In addition to the injury problems, Plaintiffs face further problems with the other standing requirements. No Plaintiff can trace any alleged injury regarding Section 5 of SB 189 to State Defendants because the voter-challenge provisions are enforced by each of Georgia's 159 counties. "To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action *of the defendant*, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan,* 504 U.S. at 560) (emphasis added). "Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action. Without the causation requirement, courts would be 'virtually continuing monitors of the wisdom and soundness' of government action." *AHM,* 602 U.S. at 383–84 (quoting *Allen*, 468 U. S. at 760) (quotation marks omitted). Applying that rule to Plaintiffs' claims about Section 5 of SB 189, codified at O.C.G.A. § 21-2-230, demonstrates there is no role for State Defendants. That statute governs the conduct of *county registrars* of each county[8]

---

[8] Plaintiffs seek to certify a class of county defendants, which this Court will consider later. [Doc. 142, p. 2]. But it is worth noting that none of the Organizational Plaintiffs allege that they educate voters in all 159 counties or have members in every county. Georgia NAACP only alleges members in 120 counties. [Doc. 155, ¶¶ 36, 44]. GCPA estimates it serves fewer than 100 counties. *Id*. at ¶ 46.

and not the Secretary of State nor the State Election Board. So there can be no causal link between the complained-of law and State Defendants. *See Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553855, at *12 (N.D. Ga. Feb. 16, 2021) (dismissing claim regarding polling places because state law assigned responsibility to counties). For this reason, all counts related to the challenge process of Section 5 of SB 189 should be dismissed against State Defendants.

### E. Plaintiffs lack standing to challenge O.C.G.A § 21-2-230 because the relief requested will not redress the alleged harm.

"A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. As already discussed, State Defendants do not remove voters from the registration rolls under any challenged provision of SB 189. So, Plaintiffs' first category of relief requests that this Court issue an order "prohibiting all Defendants . . . [from] removing voters from the registration list under O.C.G.A. § 21-2-230." [Doc. 155, p. 134]. That includes ordering State Defendants to issue rules, guidance, and training. *Id*. at 136–38. Second, Plaintiffs request two other broad categories of relief related to State Defendants: "ordering Secretary Raffensperger . . . to restore [affected] voters to the registration list," and

---

Plaintiff Huynh only resides in Fulton County. *Id*. at ¶ 33. When the time comes to evaluate class certification, this Court must consider whether Plaintiffs have "standing to sue the members of the proposed defendant class." *Pope v. City of Clearwater*, 138 F.R.D. 141, 145 (M.D. Fla. 1991).

"ordering all Defendants to maintain, preserve, and not destroy" records related to voter challenges. *Id.* at 135–36.

The first request is beyond the scope of this Court's injunction authority. This Court cannot order the Secretary or SEB to adopt some process to restore voters to the rolls or create rules and training because "[t]he power of judicial review is more limited: It permits a court to decline to enforce a statute in a particular case or controversy, and it permits a court to enjoin executive officials from taking steps to enforce a statute…" Jonathan F. Mitchell, *The Writ-Of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018); *see also, id*. at n. 5 (collecting cases). Thus, this Court can enjoin the Secretary and/or the State Election Board from enforcing provisions of SB 189 it deems illegal or unconstitutional, but this type of injunction is not likely to redress Plaintiffs' alleged injury because it cannot direct the Secretary to take particular action regarding voter records. And while Plaintiffs may wish for more, "[t]he Framers of the Constitution did not 'set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts.'" *AHM*, 602 U.S. at 396 (quoting *U.S. v. Richardson*, 418 U.S. 166, 179 (1974)); *see also U.S. v. Texas*, 599 U.S. 670, 685 (2023)). As to Plaintiffs' second request, it has no effect on State Defendants because they are not involved in voter challenges, as discussed above.

Both of these realities show that there is no redressability for Plaintiffs' claims because State Defendants cannot redress the alleged harm, even if it existed.

## III. There is no private right of action for Plaintiff's Civil Rights Act claim (Count XII).

Plaintiffs also bring one count based on the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and 42 U.S.C. § 1983, but § 10101(a)(2)(B) does not provide for a private right of action and cannot be enforced by private parties in a § 1983 suit. This argument is made to preserve the issue for appeal, because the Eleventh Circuit held, nearly 20 years ago, that "the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983."[9] *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). But more recent Supreme Court decisions confirm that *Schwier* was decided incorrectly. As the Supreme Court recently reiterated, "Section 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Vega v. Tekoh*, 597 U.S. 134, 151 n.6 (2022) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005)) (cleaned up).[10]

---

[9] Former 42 U.S.C. § 1971 was renumbered as 52 U.S.C. § 10101.

[10] Indeed, even if § 10101(a)(2)(B) created an enforceable right that Plaintiffs could invoke, according to the Supreme Court:

> there is only a *rebuttable* presumption that the right is enforceable under § 1983. The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. Our cases have explained that evidence of such

In any event, Plaintiffs' attempt to invoke a private right of action under §
10101(a)(2)(B) fails regardless of *Schwier's* status. According to the Supreme Court,
"to sustain a § 1983 action, the plaintiff must demonstrate that the [underlying]
federal statute creates an individually enforceable right in the class of beneficiaries
*to which he belongs.*" *City of Rancho Palos Verdes*, 544 U.S. at 120 (emphasis added).
The class of beneficiaries created by § 10101(a)(2)(A) consists of individuals who
have had different standards applied to them. Unlike the plaintiffs in *Schwier*, who
were individual voters, 340 F.3d at 1285, Plaintiffs here are not in that class with
the exception of Plaintiff Huynh. And no Plaintiff has been denied the right to
vote. Indeed, the Organizational Plaintiffs cannot vote. Thus, there is no private
right of action for them to invoke.

---

> congressional intent may be found directly in the statute creating the
> right, or inferred from the statute's creation of a comprehensive
> enforcement scheme that is incompatible with individual
> enforcement under § 1983.

*City of Rancho Palos Verdes*, 544 U.S. at 120 (cleaned up; emphasis added). Here,
Congress created an alternative scheme for enforcing § 10101(a)(2)(B): It enacted
detailed statutory provisions authorizing the Attorney General of the United
States to enforce § 10101(a)(2)(B) with civil actions. *See* 52 U.S.C. § 10101(c), (e), and
(g). This comprehensive enforcement scheme reflects Congress's judgment that §
10101(a)(2)(B) should not *also* be enforced with private suits. State Defendants
emphasize this point and the related points in the text to preserve them, if
necessary, for appeal.

## IV. Plaintiffs have failed to state a claim against State Defendants under the NVRA (Counts I, II, IV, V).

Turning to the merits, in their Complaint, Plaintiffs bring claims against State Defendants under the NVRA in Counts I, II, IV, and V.[11] But even if Plaintiffs' alleged facts are presumed true, they have shown no right to relief under the NVRA.

### A. Not all Plaintiffs have met the pre-suit notice requirements.

Unlike the Voting Rights Act, the NVRA specifically provides a private right of action for individuals to bring a case in this Court after sufficient notice. 52 U.S.C. § 20510(b). That provision requires an aggrieved person to provide pre-suit notice, subject to exceptions, so that a state has "an opportunity to correct any violation prior to the commencement of a private action under the [NVRA]." *Bellitto v. Snipes*, 935 F.3d 1192, 1196 (11th Cir. 2019). This Court must review the notices provided by each Plaintiff because one plaintiff "cannot piggyback on [another's] notice." *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014).

#### 1. *Three Plaintiffs never allege they provided the required notice.*

Beginning with Plaintiff Huynh, the Complaint never alleges that he has given any notice to anyone and or that he is "represented by . . . or somehow

---

[11] Count III is also an NVRA claim, but it is brought only against specific County Defendants.

situated similarly to" any of the Organizational Plaintiffs. *Georgia State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012). And the notice letters attached to the Complaint do "not mention [Huynh] by name." *Compare Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014) *with* [Docs. 155-2, 155-10].

Two other Organizational Plaintiffs likewise do not claim they provided notice under the NVRA. The Complaint never alleges that Plaintiffs GMVP or VoteRiders provided any pre-suit notice. [Doc. 155, ¶¶ 245–48]. While each notice letter purports to include "others similarly situated," [Doc. 155-10 at 3], [Doc. 155-2 at 2], there are no allegations in the Complaint that suggest either Plaintiff is such a similarly situated organization to the groups that provided the notice letters. *But see Ga. State Conf. of the NAACP*, 841 F. Supp. 2d at 1334–35 (finding notice not required by additional organization but without any analysis on that point).

As a result, Plaintiffs Huynh, GMVP, and VoteRiders' NVRA claims in Counts I, II, IV, and V must be dismissed for lack of the required statutory notice. 52 U.S.C. § 20510(b); *see also Ga. State Conf. of the NAACP*, 841 F. Supp. 2d at 1335; *Scott*, 771 F.3d at 836 (individual voter "cannot piggyback" on NVRA notice from organization).[12]

---

[12] On January 9, 2025, all Plaintiffs sent a new NVRA notice letter to the Secretary by email. But this letter is not part of the record, does not alter the allegations of the Complaint, and is insufficient to explain the claims of Plaintiff Huynh. Further, the letter was not sent 90 days before the filing of this lawsuit or

2. *Five Plaintiffs allege they provided notice or were not required to.*

The next group of Organizational Plaintiffs allege they have provided notice or were not required to.[13] Plaintiffs NGP and APRI allege they provided notice on July 8, 2024, [Doc. 155, ¶ 245], and Plaintiffs SFI, Georgia NAACP, and GCPA allege they provided notice on July 10, 2024, [Doc. 155, ¶ 246]. Plaintiff SFI also relies on the 30-day exception in the statute, but does not identify a "violation" that *occurred* within 30 days of the election. *Compare* 52 U.S.C. § 20510(b)(3) *with* [Doc. 155, ¶ 248]. In any event, this Court need not resolve the question of whether the 30-day exception applies because SFI also provided notice on July 10, 2024. [Doc. 155, ¶ 246].

**B. The probable-cause provisions of SB 189 do not violate NVRA Section 8(d) (Count I).**

Turning next to the merits, Plaintiffs first claim that the probable-cause provisions of SB 189, codified at O.C.G.A. § 21-2-230, violate Subsection 8(d) the NVRA. [Doc. 155, ¶¶ 251–60]. They generally argue that requiring registrars to

_____

the filing of the Complaint. 52 U.S.C. § 20510(b)(2). Thus, the new letter has no relevance to the Court's evaluation of this motion.

[13] While Plaintiffs purport to certify a class of all county registrars, [Doc. 155, ¶¶ 107–112], they also admit they did not provide notice to all 159 county registrars but rather just a subset of counties, [Doc. 155, ¶ 246]. Statutory notice is only required to the "chief election official of the State involved." 52 U.S.C. § 20510(b)(1).

consider a challenge by making certain information sufficient for probable cause violates the "exclusive method" of removals due to change in residence.

But Plaintiffs miss the point. That section of the NVRA is limited to removals that occur "*on the ground* that the registrant has changed residence…" 52 U.S.C. § 20507(d)(1) (emphasis added). That is not how the probable-cause provisions of SB 189 work. First, challenges that are upheld by registrars after probable cause is found do *not* result in voters being removed from the voter rolls solely "on the ground" of a change in residence, because it is based on an individualized evaluation of that voter's circumstances. Also, if a Section 230 challenge is pending against a voter and he or she shows up to vote, the voter can vote a provisional ballot until the challenge is resolved. O.C.G.A. § 21-2-230(i). Thus, a voter is not removed "on the ground that the registrant has changed residence," by the Section 230 challenge process. Instead, the voter challenge *initiates* the probable-cause requirements, which results in an investigative process. When the challenge is evaluated at a hearing, it then involves the kind of "rigorous individualized inquiry" that is permissible under the NVRA at any time. *See Arcia*, 772 F.3d at 1346.

Because the probable-cause provisions of O.C.G.A. § 21-2-230 do not implicate Section 8(d) of the NVRA, Count I should be dismissed in its entirety.

## C. The probable-cause and mailing-address provisions of SB 189 do not violate NVRA Section 8(b) (Counts II and IV).

Plaintiffs next rely on the general provisions that list-maintenance programs must be uniform and nondiscriminatory under Section 8(b) of the NVRA. [Doc. 155, ¶¶ 263–70, 278–79]. But this provision of the NVRA is limited to *state removal programs*, not to every component of the administration of voter registration. And the text makes that clear. It applies to a "program or activity to protect the integrity of the electoral process," 52 U.S.C. § 20507(b)(1), which is only applicable to "state removal programs." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 764 (2018). As a result, this provision is not triggered by the probable-cause or mailing-address requirements of SB 189, because neither of those requirements are a state program to systematically remove voters. *Id*. Instead, any impact on a voter's status in the voter-registration database only happens after an individualized inquiry into that particular registrant, which is consistent with the NVRA. *Arcia*, 772 F.3d at 1346.

Declining to extend this section to the challenged provisions of SB 189 also makes good sense. If this Court applied 52 U.S.C. § 20507(b)(1) to the duties of county registrars making individualized decisions about voters, it is opening a Pandora's box that could cause ineligible individuals to remain on the voter rolls indefinitely. For example, "[c]ounties have an independent obligation to remove from the voter registration database persons they know to be deceased based on information from 'obituaries published by local newspapers, death certificates,

verifiable knowledge of the death, and information provided in writing and signed by a family member or members of the deceased person.' O.C.G.A. § 21-2-231(e.1)." *Fair Fight Action,* 634 F. Supp. 3d at 1170. What if one county used obituaries for death removals and the other did not? Ideally every county utilizes obituaries for death removals, but it does not create a uniformity problem for purposes of the NVRA if different counties use different processes because those decisions are not a *state* removal program—it is county registrars fulfilling their independent statutory duty to maintain accurate voter rolls. O.C.G.A. § 21-2-228(a).

The entirety of the O.C.G.A. § 21-2-230 process, including finding probable cause for nonresidential addresses, takes place under the individualized duty of the county registrar to make determinations about voter eligibility. Finding probable cause in no way demands a voter be removed from the rolls. It only means the challenge will be heard pursuant to a delineated statutory process, followed by an individualized *county* determination about removal—not a systematic *state* program of removal devoid of individualized inquiry. *Id.* Thus, it is irrelevant whether counties treat the term "nonresidential" differently, [Doc. 155, ¶ 265]—and as discussed above, they should not—so this Court need not address Plaintiffs' claims here.

The same logic applies to the mailing-address provisions. All voters who are homeless and lack a permanent address are treated the same—they must have mail sent to a predictable location where they can retrieve it. O.C.G.A. § 21-2-217(a)(1.1); [Doc. 155, ¶ 279]. Applying the "uniform" and "nondiscriminatory" requirements to any situation where differently situated voters are treated differently makes little sense.

The cases Plaintiffs cite do not require a contrary conclusion. First, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) has little to offer. That court declined to grant an injunction on several grounds, and only glancingly suggested that a citizenship-documentation program "probably ran afoul of this provision" based on a claimed discriminatory impact on naturalized citizens.[14] *Id.* Even less helpful is *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006), which applied the NVRA in a preliminary injunction against state laws regarding voter-registration workers. But that court's pre-*Husted* application of the NVRA is inconsistent with the text, which limits the "uniform" and "nondiscriminatory" language to state programs that involve the *removal* of voters

---

[14] The *Florida* district court's approach to the NVRA's 90-day maintenance provision was also later rejected by the Eleventh Circuit. *See Arcia,* 772 F.3d at 1348; *Arcia v. Detzner*, No. 12–22282–CIV, 2015 WL 11198230, at *1 (S.D. Fla. Feb. 12, 2015) (recognizing rejection of the approach taken in *Florida*).

from the rolls, not to every decision involving voter registration or a voter's address. 52 U.S.C. § 20507(b)(1); *Husted*, 584 U.S. at 764.

Thus, Plaintiffs have not sufficiently pleaded any violation of the NVRA in Counts II and IV and those claims should be dismissed against State Defendants.

**D.** **The mailing-address provisions of SB 189 do not violate the NVRA's notice requirements (Count V).**

For their final NVRA count, Plaintiffs claim the mailing-address requirement violates the notice provisions of the NVRA. [Doc. 155, ¶¶ 282–287]. But this is probably the biggest stretch of Plaintiffs' proposed application of the NVRA to Georgia's laws.

When new voters register to vote, registrars are required to "send notice to each applicant of the disposition of the application." 52 U.S.C. § 20507(a)(2). That required notice has to go somewhere—meaning it has to go to an address. If a homeless voter does not have a permanent address where he or she can receive mail and does not provide a useable mailing address like a P.O. Box or other address to receive mail, then, under SB 189, the registrar will list the county registrar's office as the voter's mailing address for voting purposes. O.C.G.A. § 21-2-217(a). And this makes sense because voters without permanent addresses and without valid mailing addresses have nowhere else to receive mail, just like voters who live in areas where the U.S. Postal Service does not deliver and thus must have a separate mailing address to receive notices. Further, the NVRA only

requires registrars to *send* notice to the voters—it does not require registrars ensure the voters to receive the notice, understand it, and act on it. *See, e.g., Bellitto v. Snipes*, 935 F.3d 1192, 1206 (11th Cir. 2019) (explaining Florida's death-notice process, which included notice to the voter, who is presumably deceased—meaning the voter cannot receive the notice and is unable to act on the information).

While State Defendants and registrars strive to ensure that every eligible voter is able to register and vote—and Georgia's automatic voter registration system is one of the best in the country[15]—the NVRA does not require more than sending notice to the voter. And SB 189 strikes a reasonable balance by providing a place where homeless voters without permanent addresses can receive and retrieve the required notices. Thus, it does not violate the NVRA and Count V should also be dismissed.

## V. Plaintiffs have failed to state a claim under the Constitution (Counts VI, VII, VIII, IX, X, and XI).

Plaintiffs next challenge Sections 4 and 5 of SB 189 as violating the First and Fourteenth Amendments to the Constitution under several different theories

---

[15] *See* Center for Election Innovation and Research, *Analyzing the Impact of Automatic Voter Registration in Georgia*, https://electioninnovation.org/update/new-ceir-report-analyzing-the-impact-of-automatic-voter-registration-in-georgia/ (June 2023).

(Counts VI, VII, VIII, IX, X, and XI). All of these kinds of claims are evaluated "under what is known as the *Anderson-Burdick* test, weighing 'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.' *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (internal quotation marks omitted))." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022).[16]

---

[16] While Plaintiffs claim the standard for their various due-process claims is governed by *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 313 (1950) and *Matthews v. Eldridge*, 424 U.S. 319, 344 (1976), [Doc. 155, ¶¶ 323–27, 336, 342–44], that is wrong. In the Eleventh Circuit, "we must evaluate laws that burden voting rights using the approach of *Anderson* and *Burdick*." *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (quoting *Jacobson*, 974 F.3d at 1261) (applied to due-process claim); *see also Bell v. Raffensperger*, No. 1:21-CV-02486-SEG, 2022 WL 18243320, at *10 n.12 (N.D. Ga. Dec. 6, 2022) (applying *Anderson/Burdick* to procedural due process claim); *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553856, at *29 (N.D. Ga. Mar. 31, 2021) (same).

But even if courts were not required to use *Anderson/Burdick* in this Circuit, procedural due process under the *Mathews* framework is only utilized for adjudicative actions, not legislative ones. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1049 (11th Cir. 2020). Because Plaintiffs do not challenge any specific individual decisions of county boards related to voter challenges as to State Defendants, they only challenge legislative actions and also cannot access the *Mathews* framework for that reason. At the very least, they cannot apply the *Mathews* framework to State Defendants because State Defendants do not make decisions related to individual voter challenges. *See* O.C.G.A. § 21-2-230 (decision by county registrars).

That inquiry is a sliding scale, with severe burdens subjected to strict scrutiny while reasonable and nondiscriminatory burdens can be justified by the "State's important regulatory interests in conducting orderly elections." *Id*. Courts use this balancing test because there is "no license for 'second-guessing and interfering with' state decisions; *the Constitution charges States, not federal courts, with designing election rules*." *Id*. (quoting *New Georgia Project*, 976 F.3d at 1284) (emphasis added). The "state undisputedly has a compelling interest in preserving the integrity of its election process," maintaining the accuracy of its voter rolls, and "promoting voter confidence." *Common Cause/GA v. Billups,* 554 F.3d 1340, 1353 (11th Cir. 2009) (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4, (2006) and citing *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 197 (2008)).

Further, it is not enough to just show some burden on the right to vote. Plaintiffs "must show, at the very least, that the burdens imposed 'represent a significant increase over the usual burdens of voting.'" *Id*. (quoting *Crawford*, 553 U.S. at 198). Applying these principles to Plaintiffs' various constitutional claims demonstrates the lack of any violation by SB 189.[17]

---

[17] Plaintiffs also claim an Equal Protection violation about the nonresidential address requirements unless there is *absolute* uniformity in how county registrars carry out their duties, citing *Bush v. Gore*, 531 U.S. 98 (2000) and other non-*Anderson-Burdick* cases. [Doc. 155, ¶¶ 352–56]. Even if this Court found those cases—and not *Anderson-Burdick*—governed Plaintiffs' claims, they do not support Plaintiffs' theories. The Supreme Court was clear about what *Bush* decided and,

## A. Section 5 of SB 189 does not violate the Constitution (Counts VI, VII, IX, X, XI).

Plaintiffs claim that the probable-cause provisions of SB 189 applied to nonresidential addresses imposes "a severe and unjustified burden on the right to vote for eligible Georgia voters who reside at addresses deemed 'nonresidential' in violation of the First and Fourteenth Amendments" to the U.S. Constitution. [Doc. 155, ¶ 297]; *see also* [Doc. 155, ¶¶ 302, 328, 345, 356]. But, as discussed above, Georgia law requires each voter to "be a *resident* of the state and of the county or municipality in which he or she seeks to vote." O.C.G.A. § 21-2-216(a)(4). And a nonresidential address is an address where a person cannot reside. *See above*, Facts, Section II.

---

perhaps more importantly, what it *did not* decide: "The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Bush*, 531 U.S. at 109. Further, Plaintiffs' citation to *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1186 (11th Cir. 2008) is to a single-judge concurrence, not the majority opinion. And the pre-*Anderson* case of *Dunn v. Blumstein*, which dealt with durational residency requirements, recognized that the "equal right to vote is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." 405 U.S. 330, 336 (1972) (citations omitted; cleaned up).

Plaintiffs' attempt to apply a non-*Anderson-Burdick* standard to variations in county practices makes little practical sense. Indeed, "few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause." *Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814, 837 (D. Mont. 2020) (*citing Bush*, 531 U.S. at 109). This case must be decided under *Anderson-Burdick*.

Despite Plaintiffs' baseless interpretation of the statute, residence halls on college campuses, student dormitories, residential housing for the elderly and nursing homes, even homeless shelters, are all places where people live and could not fall within the meaning of "nonresidential" as Plaintiffs claim. [Doc. 155, ¶¶ 214–17]. And they can point to no election official who has ever applied the term "residence" in a voter-challenge case in the unorthodox manner Plaintiffs suggest. Voters must provide their residential address when they register and cannot reside in a P.O. Box or UPS Store.

Applying this background to the *Anderson-Burdick* standard reveals no violation. There is no burden on the right to vote by requiring voters to provide an acceptable address, especially when being a resident is a longstanding requirement to be registered to vote. O.C.G.A. § 21-2-216(a)(4). At most, it is nothing more than an "ordinary and widespread burden" which requires the "nominal effort of everyone." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring). When faced with such a small burden, this requirement is justified by the State's regulatory interests in ensuring accurate voter rolls. *Curling*, 50 F.4th at 1121. As a result, this Court should dismiss Counts VI, VII, IX, X, and XI.

**B.      Section 4 of SB 189 does not violate the Constitution (Count VIII).**

Plaintiffs also claim that requiring homeless individuals who do not have a permanent mailing address to receive election mail at a centralized location

violates the Constitution. [Doc. 155, ¶¶ 313–20]. But providing a free, reliable, and consistent place to receive mail for those who are homeless and lack any such location is not unconstitutional.

Requiring registrars to use an address where homeless voters are able to receive election mail, even if it requires a trip to the registrar's office, is not a "burden" on the right to vote. Instead, it is a service. But if this Court determines it is a burden, at worst it is only a minimal burden—just like obtaining a photo ID in order to vote in person or re-registering if removed during list maintenance. *See Crawford*, 553 U.S. at 198–99 (photo ID); *Fair Fight Action*, 2021 WL 9553856 at *18 (re-registering). Thus, there is no increase over the usual burdens of voting by requiring a specific address for voters without one. *Curling*, 50 F.4th at 1123. Indeed, there can be no added burden because a homeless voter would already have to go to the post office or other location to check their mail if they could not receive mail at their residential location. SB 189 requires Georgia county registrars to have a uniform, secure place for homeless voters to receive election mail, and this service comes at no charge to the voters, both of which benefit voters who are experiencing homelessness.

But even if this Court looks further at the *potential* burden, the Complaint does not allege any "reliable evidence that quantifies the extent and scope of the [alleged] burden imposed by the Georgia statute." *Billups*, 554 F.3d at 1354. The

only fact alleged by Plaintiffs that could be relevant are two counts of homeless individuals in Georgia, one from 2022 and one from 2023. [Doc. 155, ¶ 195]. But Plaintiffs make no allegations regarding how many of those individuals would otherwise be eligible voters[18] or how many do not have a permanent address where they can receive mail. By their terms, both counts include sheltered and unsheltered individuals, at least some of whom would have an address where they could receive mail. But even if *every* individual alleged by Plaintiffs was impacted by SB 189, the total number of individuals affected is 0.15% of the registered voters in Georgia,[19] all of whom would already have to check their mail elsewhere if they

---

[18] Not all of the counted individuals are eligible. Setting aside felons and individuals found mentally incompetent, which are not separately enumerated in the reports, the 2023 U.S. Department of Housing and Urban Development (HUD) report includes children and youth in its count of homeless individuals in Georgia. *See Office of Community Planning and Development, U.S. HUD, 2023 Annual Homelessness Assessment Report (AHAR) to Congress* at 101 *available at* https://www.huduser.gov/portal/sites/default/files/pdf/2023-ahar-part-1.Pdf. Likewise, the 2022 Georgia report also includes children and youth in its count. *See Ga. Dept. of Comm. Affairs Statewide Point in Time Count Homeless Report for 2022,* at 42–43, 46–47 *available at* https://dca.georgia.gov/document/publications/2022-report-homelessness/download.

[19] Currently, Georgia has more than 8.2 million registered voters. Secretary of State, *Election Data Hub,* https://sos.ga.gov/election-data-hub. This Court may take judicial notice of this fact on a motion to dismiss. *See Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (using public record); *see also Fusaro v. Cogan*, 930 F.3d 241, 246 (4th Cir. 2019) (judicial notice of registered voters).

did not have a permanent mailing address. Thus, any burden on the right to vote is minimal at best. *Fair Fight Action*, 634 F. Supp. 3d at 1243 (noting limited impact of system that works for most voters under Section 2 of the VRA).

Without a more significant burden, the important regulatory interests of the state in conducting orderly elections and ensuring accurate voter rolls more than justifies any burden on the right to vote. *Curling*, 50 F.4th at 1121. As a result, this Court should dismiss Count VIII.

## VI. Plaintiffs have failed to state a claim under the Civil Rights Act (Count XII).

Plaintiffs also challenge Section 5 of SB 189 as a violation of the Civil Rights Act, specifically that it applies different standards, practices, or procedures to individuals in the same jurisdiction (Count XII). But it is "well-settled law [that] § 1971 was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating *racial discrimination* in voting requirements."[20] *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006) (emphasis added) (collecting cases), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *see also Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) ("only racially motivated deprivations of rights are actionable under 42 U.S.C. § 1971" (citing *Kirksey v. City of Jackson, Miss.*, 663 F.2d 659, 664–65

---

[20] Former 42 U.S.C. § 1971 was renumbered as 52 U.S.C. § 10101.

(5th Cir. 1981)). Plaintiffs never allege that there is any racial discrimination in the requirements of Section 5 of SB 189, which ends their Civil Rights Act claim. *See* [Doc. 155, ¶¶ 28, 36, 38] (only references to racial issues in Complaint are the missions of some of the Plaintiff organizations).

But even if 52 U.S.C. § 10101 extended beyond racial discrimination, there is no claim here. As discussed previously, voters who register at nonresidential addresses are claiming to reside at a location where they cannot live. *See* Facts, Section II above. All Georgia voters must be a "resident" of the state and county where they are seeking to vote. O.C.G.A. § 21-2-216(a)(4). Thus, there is no different standard applied—all Georgia voters are treated the same, and all those registering at an address where they cannot live may be subject to a challenge.

Plaintiffs cannot show that there is any racial discrimination or any different standard applied to different voters. 52 U.S.C. § 10101(a)(2)(A). Without that, Count XII of their Complaint must be dismissed as to State Defendants.

## CONCLUSION

Plaintiffs have a policy disagreement with the State about voter registration. But this Court is not the correct forum to hear that dispute because Plaintiffs do not have standing. And even if they did, Plaintiffs have failed to state a claim for relief under federal law or the Constitution. This Court should dismiss Plaintiffs'

Consolidated Complaint and allow the legislatively chosen solution to remain in force.

Respectfully submitted this 17th day of January, 2025.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**
3630 Peachtree Road NE
Suite 550
Atlanta, Georgia 30326
678.370.4377 (phone)

*Counsel for State Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Brief has been prepared in Book Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

> */s/ Bryan P. Tyson*
> Bryan P. Tyson