# IN THE UNITED STATES DISTRICT
# COURT FOR THE NORTHERN DISTRICT
# OF GEORGIA ATLANTA DIVISION

NEW GEORGIA PROJECT, et al.,

      Plaintiffs,

   v.

BRAD RAFFENSPERGER, et al.,

      Defendants.

No. 1:24-cv-03412-SDG
No. 1:24-cv-04287-SDG
No. 1:24-cv-04659-SDG

GEORGIA STATE CONFERENCE OF THE NAACP, et al.,

      Plaintiffs,

   v.

BRAD RAFFENSPERGER, et al.,

      Defendants.

SECURE    FAMILIES    INITIATIVE
AND THEIR MEMBERS,


    Plaintiff,

  v.

BRAD RAFFENSPERGER,  et al.,[1]


    Defendants.

**PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO
DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS**

---

[1] The NAACP Plaintiffs Group sue Defendant Gwinnett County Board of Registration and Elections on behalf of a class of all boards of registrars in the State with respect to their constitutional claims only.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............................2

LEGAL STANDARD ...........................................................................................4

ARGUMENT ........................................................................................................5

I.     Plaintiffs Have Properly Alleged Standing to Bring Each Claim. .................5

    A.     The Organizational Plaintiffs Have Sufficiently Pled
        Organizational Standing. ........................................................................6

        1.     The Eleventh Circuit's Well-Established Standard for
                Organizational Standing Remains Undisturbed.........................7

        2.     The Organizational Plaintiffs Have Each Suffered an
                Injury-in-Fact Sufficient to Confer Organizational
                Standing. ....................................................................................12

                i.     NGP, GAMVP, and APRI ...............................................13

                ii.     Georgia NAACP, GCPA, and VoteRiders ......................17

                iii.     SFI.....................................................................................22

    B.     Plaintiffs Have Adequately Alleged Membership-Based
        Associational Standing. .........................................................................24

        1.     Georgia NAACP ........................................................................26

        2.     GCPA .........................................................................................29

        3.     SFI..............................................................................................31

    C.     Plaintiffs Have Established Standing on Behalf of Their
        Constituents. ..........................................................................................33

    D.     Plaintiff Huynh Has Established Individual Standing. .......................35

E.    Plaintiffs' Injuries Are Traceable to and Redressable by State
       Defendants. ........................................................................................38

       1.    Plaintiffs' Injuries Are Traceable to State Defendants. ............38

       2.    Plaintiffs' Injuries Are Redressable by Defendants. ................41

II.    Plaintiffs Have Adequately Stated Each Claim. .............................................44

       A.    Plaintiffs Adequately State Claims Under the NVRA. ......................44

             1.    Plaintiffs Plausibly Allege a Claim that SB 189 Section 5
                   Violates Section 8(d) of the NVRA (Counts I and III). ............44

             2.    Plaintiffs Plausibly Allege a Claim Under Section 8(b) of
                   the NVRA. .................................................................................49

                   i.    Plaintiffs Adequately Allege that SB 189 Section
                         5's Nonresidential Address Provision Violates
                         Section 8(b) of the NVRA (Count II). ...........................49

                   ii.   Plaintiffs Adequately Allege That SB 189 Section
                         4's Unhoused Voter Mailing Address Provision
                         Violates Section 8(b) of the NVRA (Count IV). ...........54

             3.    SB 189 Section 4's Unhoused Voter Mailing Address
                   Provision Violates and Is Preempted by the NVRA's
                   Notice Requirements (Count V). ...............................................56

             4.    Plaintiffs Satisfy the NVRA's Pre-Suit Notice
                   Requirements or Satisfy the Judicially Recognized
                   Exception to Those Requirements (Counts I–VI)......................60

                   i.    State Defendants' NVRA Pre-Suit Notice
                         Arguments Against Huynh, GAMVP, and
                         VoteRiders Fail. .............................................................60

                   ii.   Cobb County Defendants' NVRA Pre-Suit Notice
                         Claims Fail......................................................................63

       B.    Plaintiffs Have Adequately Stated Claims Under the U.S.
             Constitution. ......................................................................................64

1.      Sections 4 and 5 of SB 189 Violate Voters' First and
        Fourteenth Amendment Rights. ..................................................65

        i.      Section 4 of SB 189 Violates Unhoused Voters'
                First and Fourteenth Amendment Rights (Count
                VIII). ...................................................................66

                a.      Section 4 of SB 189 Impermissibly Burdens
                        the Right to Vote. ...................................................66

                b.      There Is No Sufficient Justification for the
                        Burden Section 4 Imposes on Unhoused
                        Voters. ...................................................................69

        ii.     Section 5 of SB 189 Violates the First and
                Fourteenth Amendments. .................................................70

                a.      Section 5's Nonresidential Address
                        Provision Imposes a Severe Burden on the
                        Right to Vote (Count VI). ......................................70

                b.      Section 5 of SB 189 Imposes a Severe
                        Burden on the Right to Vote of Military and
                        Overseas Voters (Count VII). ................................73

                c.      There is No Sufficient Justification for the
                        Burdens Imposed by Section 5 of SB 189. ..........76

2.      Plaintiffs Sufficiently Pled Due Process Claims (Counts
        IX and X). ...............................................................................77

3.      Plaintiff SFI Sufficiently Pled an Equal Protection Claim
        (Count XI). ..............................................................................83

C.  Plaintiffs Plausibly Allege a Claim Under the Civil Rights Act
    of 1964 (Count XII). ...........................................................................86

    1.      Plaintiffs Adequately Allege a Private Right of Action
            Under the Civil Rights Act. ..........................................................87

    2.      The Amended Complaint States a Claim Under the Civil
            Rights Act. ...............................................................................88

3.    The Uniformity Provision Does Not Require Allegations
of Racial Discrimination. ..........................................................89

4.    Section 5 of SB 189 Violates the Civil Rights Act by
Treating Voters Differently Within the Same County. ..............92

CONCLUSION ........................................................................................95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan*,
   599 U.S. 1 (2023)..................................................................................92

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) ..........................................................24

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)....................................................................*passim*

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ......................................12, 45, 50, 88

*Ariz. Al. for Retired Ams. v. Mayes*,
   117 F. 4th 1165 (9th Cir. 2024) ..........................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................5

*Ass'n of Cmty. Orgs. for Reform Now v. Miller*,
   129 F.3d 833 (6th Cir. 1997) ..............................................................63

*Auerbach v. Kinley*,
   499 F. Supp. 1329 (N.D.N.Y. 1980)..................................................89

*Ball v. Brown*,
   450 F. Supp. 4 (N.D. Ohio 1977) ......................................................89

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................5

*Bell v. Hood*,
   327 U.S. 678 (1946)............................................................................29

*Bellitto v. Snipes*,
   935 F.3d 1192 (11th Cir. 2019) ..........................................................58

*Bergland v. Harris*,
   767 F.2d 1551 (11th Cir. 1985) ..........................................................66

*Burdick v. Takushi*,
    504 U.S. 428 (1992)..............................................................passim

*Bush v. Gore*,
    531 U.S. 98 (2000)............................................................84, 85

*City of Rome v. U.S.*,
    446 U.S. 156 (1980).............................................................92

*Common Cause Ind. v. Lawson*,
    937 F.3d 944 (7th Cir. 2019) .................................................46

*Common Cause N.Y. v. Brehm*,
    432 F. Supp. 3d 285 (S.D.N.Y. 2020) ...................................46, 57

*Common Cause/Ga League of Women Voters of Ga., Inc. v. Billups*,
    439 F. Supp. 2d 1294 (N.D. Ga. 2006)...................................76, 88

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) ........................................*passim*

*Condon v. Reno*,
    913 F. Supp. 946 (D.S.C. 1995) ...........................................63

*Corbett v. Trans/ Sec. Admin.*,
    930 F.3d 1225 (11th Cir. 2019) ..............................................4

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008)..........................................................65, 94

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008)................................113

*Curling v. Raffensperger*,
    403 F. Supp. 3d 1311 (N.D. Ga. 2019).....................................83

*Curling v. Raffensperger*,
    50 F.4th 1114 (11th Cir. 2022) .......................................65, 66, 74, 75

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) .......................................65, 71

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
    950 F.3d 790 (11th Cir. 2020) ....................................................................78

*Democratic Party of Georgia, Inc. v. Crittenden*,
    347 F. Supp. 3d 1324 (N.D. Ga. 2018)........................................................25, 31

*Doe v. Rowe*,
    156 F. Supp. 2d 35 (D. Me. 2001) ...............................................................80

*Doe v. Stincer*,
    175 F.3d 879 (11th Cir. 1999) ...............................................................5, 30, 33

*Donald J. Trump for President, Inc. v. Bullock*,
    491 F. Supp. 3d 814 (D. Mont. 2020)..........................................................85

*Dorman v. Aronofsky*,
    36 F.4th 1306 (11th Cir. 2022) ....................................................................79

*Dunn v. Blumstein*,
    405 U.S. 330 (1972).....................................................................................83, 85

*Fair Fight Action, Inc. v. Raffensperger*,
    No. 1:18-CV-5391-SCJ, 2021 WL 9553855 (N.D. Ga. Feb. 16,
    2021) ...........................................................................................................41, 42

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*,
    No. 23-3969, 2025 WL 16385 (6th Cir. Jan. 2, 2025)...................................10

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024).................................................................................*passim*

*Finn v. Cobb Cnty. Bd. of Elections & Registration*,
    682 F. Supp. 3d 1331 (N.D. Ga. 2023)........................................................43, 44

*Fla. State Conf. of the NAACP v. Browning*,
    2007 WL 9697660 (N.D. Fla. Dec. 18, 2007) .......................................25, 41, 54

*Fla. State Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ...............................................................*passim*

*Fla. State Conf. of NAACP v. Lee*,
  566 F. Supp. 3d 1262 (N.D. Fla. 2021) ............................................................66

*Frank v. Walker*,
  768 F.3d 744 (7th Cir. 2014) ...........................................................................75

*Frazier v. Callicutt*,
  383 F. Supp. 15 (N.D. Miss. 1974)...................................................................89

*Frazier v. Fulton Cnty. Dep't of Registration & Elections*,
  No. 1:24-cv-3819, 2024 WL 4191237 (N.D. Ga. Aug. 28, 2024) ....................36

*Frederick v. Lawson*,
  481 F. Supp. 3d 774 (S.D. Ind. 2020)...............................................................80

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)..........................................................................................25

*Friends of the Everglades*,
  570 F.3d 1210 (11th Cir. 2009) ........................................................................59

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of
  Registration & Elections*,
  36 F.4th 1100 (11th Cir. 2022) ...................................................................*passim*

*Ga. State Conf. of the NAACP v. Georgia*,
  2017 WL 9435558 (N.D. Ga. May 4, 2017).....................................................48

*Ga. State Conf. of the NAACP v. Hancock Cty. Bd. of Elecs. and
  Registration*,
  No. 5:15-cv-414, Doc. 67-1 (M.D. Ga. Mar. 1, 2017) .....................................48

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*,
  344 F.3d 1288 (11th Cir. 2003) ........................................................................10

*Georgia Latino All. for Human Rights v. Governor of Ga.*,
  691 F.3d 1250 (11th Cir. 2012) ........................................................................21

*Georgia Muslim Voter Project*,
  918 F.3d at 1267 (11th Cir. 2019) ...............................................................78, 79

*Georgia Republican Party v. S.E.C.*,
  888 F.3d 1198 (11th Cir. 2018) ....................................................................25, 30

*In re Georgia S.B. 202*,
    No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18,
    2023) ............................................................ 87*Get Loud Arkansas v. Thurston*,
    No. 5:24-CV-5121, 2024 WL 4142754 (W.D. Ark. Sept. 9, 2024) .................12

*Gonzalez v. Arizona*,
    No. CV 06-1268-PHX-ROS, 2006 WL 8431038 (D. Ariz. Oct. 12,
    2006) ...................................................................................................94

*Gray v. Sanders*,
    372 U.S. 368 (1963) ............................................................................85

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) .........................................................25

*Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration and
    Elections*,
    446 F. Supp. 3d 1111 (N.D. Ga. 2020) (Grimberg., J.).....................30

*In re Haas*,
    48 F.3d 1153 (11th Cir. 1995) ...........................................................91

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).....................................................................*passim*

*Houston v. Marod Supermarkets, Inc.*,
    733 F.3d 1323 (11th Cir. 2013) .........................................................33

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333
    (1977) .............................................................................24, 36, 34

*Hunter v. Hamilton Cnty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ............... 85*Husted v. A. Philip Randolph Institute*,
    584 U.S. 756 (2018)..............................................................51, 57, 58

*Indiana Democratic Party v. Rokita*,
    458 F. Supp. 2d 775 (S.D. Ind. 2006).........................................94, 95

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ....................................................*passim*

*Jones v. Governor of Fla.*,
    975 F.3d 1016 (11th Cir. 2020) .............................................78, 80, 81

*Judicial Watch, Inc. v. King*,
  993 F. Supp. 2d 919 (S.D. Ind. 2012) ................................................. 63

*Ga. State Conf. of NAACP v Kemp*,
  841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2017) ...................................... 63

*La Union del Pueblo Entero v. Abbott*,
  705 F. Supp. 3d 725 (W.D. Tex. 2023) ............................................... 90

*La Union Del Pueblo Entero v. Abbott*,
  No. 5:21–CV–0844–XR, 2024 WL 4488082 (W.D. Tex. Oct. 11,
  2024) ................................................................................................... 12

*League of Women Voters of N. Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ........................................................ 67, 71

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) .............................................................. 86

*League of Women Voters v. Lee*,
  595 F. Supp. 3d 1042 (N.D. Fla. 2022) .............................................. 34

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
  148 F.3d 1231 (11th Cir. 1998) .......................................................... 42

*Losch v. Nationstar Mortg. LLC*,
  995 F.3d 937 (11th Cir. 2021) ....................................................... 39, 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................. 4

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*,
  512 F. Supp. 3d 1354 (M.D. Ga. 2021) ..................................... 49, 81, 94

*Martin v. Kemp*,
  341 F. Supp. 3d 1323 (N.D. Ga. 2018) ............................................... 80

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ....................................................................... 78, 79

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 929 (D. Ariz. 2024) ........................................... *passim*

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)...............................................................78, 79, 81, 82

*Murthy v. Missouri*,
603 U.S. 43 (2024)..................................................................................4

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections and Ethics Enf't*,
2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ....................................47

*New Georgia Project v. Raffensperger*,
976 F.3d 1278 (11th Cir. 2020) ..........................................................78

*Norman v. Reed*,
502 U.S. 279 (1992)............................................................................69

*Northeast Ohio Coal. for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ..............................................................84

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ......................................................*passim*

*Obama for Am. v. Husted*,
888 F. Supp. 2d 897 (S.D. Ohio 2012), aff'd, 697 F.3d 423 (6th Cir. 2012) .....................................................................................73, 74

*Powers v. Ohio*,
499 U.S. 400 (1991)..............................................................................5

*Project Vote v. Blackwell*,
455 F. Supp. 2d 694 (N.D. Ohio 2006) ..................................51, 52, 55

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) ......................................................12, 23

*Reynolds v. Sims*,
377 U.S. 533 (1964)............................................................................85

*Rosebud Sioux Tribe v. Barnett*,
603 F. Supp. 3d 783 (D.S.D. 2022) ..............................................61, 62

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006)..........................................................................6, 35

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ................................................................87, 88, 90

*Shivelhood v. Davis*,
    336 F. Supp. 1111 (D. Vt. 1970) .............................................................................89

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)................................................................................................25, 29

*Stewart v. Blackwell*,
    444 F.3d 843 (6th Cir. 2006) ...................................................................................83

*Tenn. Conf. of the NAACP v. Lee*,
    730 F.Supp.3d 705 (M.D. Tenn. 2024), *stay granted on other
    grounds*, 105 F.4th 888 (6th Cir. 2024).................................................................53

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)..........................................................................................65, 66

*U.S. Student Ass'n Found. v. Land*,
    546 F.3d 373 (6th Cir. 2008) ...................................................................................46

*United States v. Alabama*,
    778 F.3d 926 (11th Cir. 2015) .................................................................................59

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001)..................................................................................................91

*United States v. Ward*,
    349 F.3d 795 (5th Cir. 1965) ...................................................................................91

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012) .............................................................49, 55

*United States v. Raines*,
    362 U.S. 17 (1960)....................................................................................................92

*United States v. State of Ala.*,
    188 F. Supp. 759 (M.D. Ala. 1960)..........................................................................91

*United States v. State of Tex.*,
    252 F. Supp. 234 (W.D. Tex. 1966), *aff'd sub nom. Texas v. United
    States*, 384 U.S. 155 (1966) ....................................................................................80

*United States v. Vega-Castillo*,
   540 F.3d 1235 (11th Cir. 2008) ..............................................................11

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ...................................................4, 5, 47

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021)................................................................42, 44

*Vega v. Tekoh*,
   597 U.S. 134 (2022)...........................................................................87

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)..........................................................................6

*Vote.org v. Byrd*,
   700 F. Supp. 3d 1047 (N.D. Fla. Oct. 30, 2023) .......................90, 92

*Vote.org v. Ga. State Elections. Bd.*,
   661 F. Supp. 3d 1329 (N.D. Ga. Mar. 9, 2023)...................87, 88, 91

*Vote.Org v. Callanen*,
   89 F.4th 459, 472 (5th Cir. 2023) .........................................34, 87

*Voto Latino v. Hirsch*,
   712 F. Supp. 3d 637 (M.D.N.C. 2024) ...........................................90

*Walters v. Fast AC, LLC*,
   60 F.4th 642 (11th Cir. 2023) ..............................................32, 39, 41

*Wesberry v. Sanders*,
   376 U.S. 1 (1964).............................................................................85

*Wexler v. Anderson*,
   452 F.3d 1226 (11th Cir. 2006) .....................................................85

*Wilding v. DNC Servs. Corp.*,
   941 F.3d 1116 (11th Cir. 2019) ................................................40, 41

*Williams v. Taylor*,
   677 F.2d 510 (5th Cir. 1982) ..........................................................80

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) ..............................................................43

## Constitutional Provisions

U.S. Const.
  amend. I ...............................................................................*passim*
  amend. XIV ...........................................................................*passim*
  amend. XV ...................................................................................92

## Statutes

52 U.S.C.
  § 10101(a) ............................................................................*passim*
  § 10101(e) .....................................................................................91
  § 20302(a)(6)(B) ..........................................................................59
  § 20501(b)(2) ..........................................................................48, 59
  § 20507 (NVRA Section 8) ..................................................*passim*
  § 20510...........................................................................................63

O.C.G.A.
  § 3-7-23.1(a)(3)............................................................................58
  § 8-3-301(2) ..................................................................................60
  §§ 21-2-31–230 ......................................................................*passim*
  § 36-80-31(a)(2)...........................................................................60

## Other Authorities

Fed. R. Civ. P
  12(b)(1) ...........................................................................................4
  12(b)(6) ...........................................................................................4

VoteSafe, Georgia Secretary of State,
  https://sos.ga.gov/page/votesafe .......................................................72

*Federal Voter Registration Form*, United States Election Assistance
  Commission at 2-3,
  www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Reg
  istration_ENG.pdf.........................................................................59

S. Rep. No. 105-6.....................................................................................51

Senate Bill 189 ...................................................................................*passim*

## INTRODUCTION

This lawsuit challenges the enforcement of Georgia's voter challenge provisions, including provisions updated by Section 5 of Senate Bill 189 ("SB 189"), which target, remove, and disenfranchise eligible Georgia voters through unlawful, residency-based mass challenges.[2] And Section 4 of SB 189, which targets unhoused voters without a permanent address and mandates that they use their county registrar's office as their mailing address for election mail instead of a mailing address of their choice, as is permitted for all other Georgia voters. Plaintiffs' Amended Complaint (ECF 155) amply demonstrates how each Plaintiff has been and will be harmed by Defendants' enforcement of these provisions and how these provisions violate the National Voter Registration Act of 1993 ("NVRA"), the Civil Rights Act of 1964 ("Civil Rights Act"), and the U.S. Constitution.

In their Motions to Dismiss, State Defendants (the Secretary of State and State Election Board members) joined by Gwinnett, Cobb, Spalding, Forsyth, Macon-Bibb, and Richmond County Defendants and Republican Party Intervenors, argue Plaintiffs lack standing and fail to state adequate claims, but those arguments fail.

---

[2] "Residency-based challenges" refer to challenges based on a voter's non-residential address as well as challenges based on a change in residence, both of which are adjudicated under unlawful standards pursuant to SB 189.

1

With regard to Plaintiffs' standing, Defendants misinterpret recent Supreme Court precedent, ignore well-established Eleventh Circuit precedent, and, most importantly, do not seriously address Plaintiffs' factual allegations establishing that they have sustained concrete injuries directly traceable to and redressable by Defendants. On the merits, Plaintiffs adequately pled each of the asserted constitutional and statutory violations. Plaintiffs' Amended Complaint adequately describes how Georgia's voter challenge and unhoused voter mailing address provisions, and Defendants' implementation of those provisions, violate the U.S. Constitution and federal law. Defendants' arguments, to the contrary, misapply the Rule 12 standard and ignore relevant precedent.

Defendants' and Intervenors' Motions to Dismiss should be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Enforcement of the following statutes are at issue in this lawsuit: Georgia's voter challenge provisions, O.C.G.A. §§ 21-2-229 and 21-2-230 ("Sections 229 and 230"), provide voters the ability to challenge the registration and voting rights of other voters in their jurisdiction. And O.C.G.A. § 21-2-217 provides Georgia's rules for determining residency to be eligible to register to vote in a jurisdiction.

On May 6, 2024, Georgia enacted SB 189, which amended Section 230, and Georgia's residency provisions under O.C.G.A. § 21-2-217. Specifically, Section 5 of SB 189 ("Section 5") amended Section 230 to define what constitutes "probable

cause" for disenfranchising challenged voters and removing challenged voters from the registration list. Am. Compl. ¶ 182; O.C.G.A. § 21-2-230(b). Section 4 of SB 189 ("Section 4") mandates that unhoused persons without a permanent address use their county registrar's office as their mailing address for election mail. Am. Compl. ¶ 181-84; O.C.G.A. § 21-2-217(a)(1.1).

In three lawsuits, later consolidated (ECF 137), Plaintiffs—New Georgia Project ("NGP"), Georgia Muslim Voter Project ("GAMVP"), A. Philip Randolph Institute ("APRI"), and Sang Huynh (collectively "NGP Plaintiffs Group"); Georgia State Conference of the NAACP ("Georgia NAACP"), the Georgia Coalition for the People's Agenda, Inc. ("GCPA"), and VoteRiders (collectively "Georgia NAACP Plaintiffs Group"); and Secure Families Initiative ("SFI")—alleged specific and ongoing harm due to Sections 4 and 5.[3] The NGP Plaintiffs Group also challenged certain county defendants' practices enforcing Georgia's voter challenge provisions.

Plaintiffs now respond to eight Motions to Dismiss filed by separate defendant groups: one filed by Secretary of State Raffensperger ("SOS") and the members of the State Elections Board ("SEB") (collectively "State Defendants") (ECF 168 and 168-1); one filed by the Republican National Committee and Georgia Republican Party, Inc. (collectively "Intervenors") (ECF 170); and one each from the members

---

[3] SFI and GAMVP challenge only Section 5 of SB 189.

of the Cobb, Macon-Bibb, Gwinnett, Spalding, Forsyth, and Richmond County boards (collectively "County Defendants") (ECF 169, 171, 173, 174, 176, 189).

## LEGAL STANDARD

For purposes of analyzing a Rule 12(b)(1) motion to dismiss, a court "must accept as true all material allegations of the [pleading], and must construe [it] in favor of the [pleading] party." *Corbett v. Trans/Sec. Admin.*, 930 F.3d 1225, 1228 (11th Cir. 2019). "In the context of a Rule 12(b)(1) challenge to standing, [courts] typically confine [their] standing analysis to the four corners of the complaint . . . ." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) ("*GALEO*"). To establish standing, a plaintiff "must show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). "[G]eneral factual allegations of injury resulting from the defendant's conduct" are sufficient because "on a motion to dismiss," it is "presum[ed]" that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court accepts the factual allegations in the complaint as true and construes them in a light most favorable to the nonmoving party. *United Techs. Corp. v. Mazer*,

556 F.3d 1260, 1269 (11th Cir. 2009). "[A] complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

## I.    Plaintiffs Have Properly Alleged Standing to Bring Each Claim.

Both the organizational plaintiffs and the individual plaintiff have sufficiently

alleged standing. An organization can establish standing: (1) "through its own injury

in fact that satisfies the traceability and redressability elements," ("organizational

standing"); or (2) "through its members," and/or constituents ("associational

standing)." *GALEO*, 36 F.4th at 1114; *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir.

1999). A plaintiff organization can also establish standing on behalf of a third party.

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991); *Stincer*, 175 F.3d at 886; *Fla. State*

*Conf. of the NAACP v. Browning*, 2007 WL 9697660 at *3 (N.D. Fla. Dec. 18, 2007).

Defendants challenge the standing of the seven organizational plaintiffs (NGP,

GAMVP, APRI, Georgia NAACP, GCPA, VoteRiders, and SFI), the three

membership-based associational plaintiffs (Georgia NAACP, GCPA, and SFI), and

the individual plaintiff, Mr. Huynh.

5

Defendants do not challenge the third-party/constituent-based associational standing of NGP, GAMVP, and APRI. These Plaintiffs assert claims in Counts I to VI, VIII, and XII; because at least one plaintiff has standing to bring each claim, the motions to dismiss these claims based on standing must be denied. *See Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,* 547 U.S. 47, 52 n.2 (2006); *GALEO,* 36 F.4th at 1113-14 (citation omitted).[4]

As shown below, Plaintiffs have adequately alleged an injury-in-fact and their injuries are traceable to and redressable by Defendants.

## A. The Organizational Plaintiffs Have Sufficiently Pled Organizational Standing.

Each of the seven organizational plaintiffs has standing to challenge SB 189 as organizations "on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). The Supreme Court in *Havens* established that organizations have standing to sue on their own behalf where the challenged law or practice causes a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's

---

[4] State Defendants argue the Court should not apply the "one good plaintiff" rule due to the division of the claims among the various plaintiffs and their requests for fees. ECF 168-1 at 13-14 n.5. The law is clear that, so long as one plaintiff has standing to pursue a given *claim*, this Court has jurisdiction. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977). The "one good plaintiff" rule is frequently applied in voting rights cases, *see e.g. GALEO,* 36 F.4th at 1113-14, and Defendants supply no contrary authority.

resources . . . ." *Id.* Such an injury is "far more than simply a setback to the organization's abstract social interests." *Id.* (citation omitted). Federal courts have applied *Havens* for decades to a wide range of contexts, including to organizational plaintiffs in voting rights cases. *See, e.g.*, *GALEO*, 36 F. 4th at 1114; *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1158 (11th Cir. 2008); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009).

1.    **The Eleventh Circuit's Well-Established Standard for Organizational Standing Remains Undisturbed.**

State Defendants argue that the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*") overrules (or at least fundamentally alters) *Havens* and the decades of Eleventh Circuit caselaw applying it. *See* ECF 168-1 at 11-23. But the Supreme Court in *AHM* did not overrule or fundamentally alter *Havens,* and no court in the Eleventh Circuit has concluded that it did. To the contrary, *AHM* restated and clarified longstanding principles from *Havens* and its progeny.

In *AHM*, a group of pro-life medical associations claimed organizational standing to challenge the Food and Drug Administration's ("FDA's") approval of "relaxed" prescribing requirements for mifepristone, a medication used to induce the termination of a pregnancy. 602 U.S. at 374-76, 393-94. The plaintiffs claimed that they satisfied *Havens*' injury requirement because they were forced "to spend considerable resources" to oppose the FDA's actions on mifepristone through public

7

education and advocacy. *Id.* at 394 (internal quotations omitted). Specifically, the *AHM* plaintiffs alleged that the FDA's actions caused them to "conduct their own studies on mifepristone" to "better inform their members," "draft[] citizen petitions to FDA," and "engag[e] in public advocacy and public education." *Id.* The Supreme Court rejected these allegations as sufficient to confer organizational standing, emphasizing that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. In doing so, the Court emphasized that its ruling was entirely consistent with *Havens*, which did not support the expansive theory of standing argued by plaintiffs in the case that would recognize *any* diversion of resources as sufficient to confer organizational standing. *Id.* at 395. As the *AHM* Court explained, in *Havens*, the plaintiff "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* at 395. The *Havens* plaintiff had standing to bring claims under the Fair Housing Act because the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Id.*

   *AHM* thus endorsed the core holding of *Havens*: an organization has standing to challenge a law or policy where defendants' action "perceptibly impaired [an organization's] ability to provide services to the people it serves," *AHM*, 602 U.S. at 395 (citing *Havens*), and where the organization diverts resources in response to

defendant's actions that "directly affect[] and interfere[] with [the plaintiff organization's] core business activities." *Id*.

As alleged in the Amended Complaint and set forth in greater detail below, the injuries suffered by the organizational plaintiffs here are the types repeatedly recognized by the Eleventh Circuit as sufficient to confer *Havens* standing in voting rights cases. *Cf. GALEO*, 36 F. 4th at 1114; *Browning*, 522 F.3d at 1158; *Billups*, 554 F.3d at 1350. Unlike the allegations asserted by the plaintiffs in *AHM*, the organizational plaintiffs here do not assert standing merely based on "moral, ideological, and policy objections" to SB 189 or any state statute. *See AHM*, 602 U.S. at 396. Nor do the organizational plaintiffs here assert an injury from spending money to advocate against SB 189 or any other bill. *See id.* at 394. Rather, each organizational plaintiff provides a range of direct services to voters, including voter registration, counseling, and assistance, as part of its core mission—services provided for years that are directly affected by and interfered with by Defendants' enforcement of Georgia's voter challenge provisions and Sections 4 and 5. *See* Am. Compl. ¶¶ 16-18 (NGP), 25-27 (GAMVP), 30-32 (APRI), 36-43 (Georgia NAACP), 52-57 (GCPA), 63-64 (VoteRiders), 68-71, 74-77 (SFI). Moreover, the injuries alleged by the organizational plaintiffs are already taking place and will only intensify as Sections 4 and 5 of SB 189 are further implemented and enforced.

Yet, State Defendants attempt, through an expansive and incorrect reading of *AHM* and reliance on a single Ninth Circuit case, to erase decades of Eleventh Circuit precedent applying *Havens*.[5] State Defendants' assertion that, in light of *AHM*, various Eleventh Circuit decisions addressing standing are no longer good law, ECF 168-1 at 19 n.6, is simply wrong. Neither the Supreme Court nor any Eleventh Circuit court has held that *AHM* overruled *Havens*.

"[A]n intervening decision of the Supreme Court can overrule the decision of a prior panel of [the Eleventh Circuit]" only if "the Supreme Court decision [is] clearly on point." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003) (holding that because Supreme Court decision "did not reject"

---

[5] State Defendants' rely primarily on a single out-of-circuit case for the proposition that *AHM* changed the established rule of *Havens*. ECF 168-1 at 19-22. That Ninth Circuit case, *Ariz. All. for Retired Ams. v. Mayes,* 117 F. 4th 1165, 1169–70 (9th Cir. 2024), has not been endorsed by the Eleventh Circuit, and State Defendants are unable to identify any Eleventh Circuit case that has questioned or otherwise undermined the validity of *Havens* in the aftermath of *AHM*. State Defendants' reliance on *Mayes* is also misplaced. There, the Ninth Circuit stated that *AHM* "clarified" that an organization suffers an Article III injury where "the new policy directly harms its already-existing core activities." *Mayes*, 117 F.4th at 1177. As noted *infra*, SB 189 affects the organizational plaintiffs' existing activities by perceptibly impairing their ability to counsel their constituencies in providing voter registration and voter assistance. As such, far from undermining the organizational plaintiffs' standing, *Mayes* supports it. The only other case referenced by State Defendants in support of their reading of *AHM* is also out-of-circuit. ECF 168-1 at 22 (citing *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, No. 23-3969, 2025 WL 16385, at *1 (6th Cir. Jan. 2, 2025)). That case simply requested additional briefing from the parties in light of *AHM* and did not endorse State Defendants' broad reading of *AHM*.

prior Eleventh Circuit interpretation, that interpretation remained controlling circuit law); *see also United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008) ("For the Supreme Court to overrule a case, its decision must have 'actually overruled or conflicted with [this court's prior precedent].'"). *AHM* is not the clear repudiation of *Havens* that would be necessary to overturn decades of Eleventh Circuit precedent. To the contrary, *AHM* specifically invokes and reaffirms *Havens*.

Thus, the long line of Eleventh Circuit cases recognizing an injury-in-fact through the diversion of resources by an organization that engages in voter registration, voter counseling, and voter assistance remains the law of this Circuit. *See, e.g.*, *GALEO*, 36 F. 4th at 1114; *Browning*, 522 F.3d at 1158; *Billups*, 554 F.3d at 1350. Under this precedent,

> [t]o establish standing under a diversion of resources theory, an organizational plaintiff must explain where it would have to 'divert resources away *from* in order to spend additional resources on combating' the effects of the defendant's alleged conduct.

*GALEO*, 36 F.4th at 1114.

The Eleventh Circuit has held that it is sufficient for organizational plaintiffs focused on voter registration to show "that they will suffer a concrete injury" when they can "reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [the challenged action] and to resolving the problem of voters left off the registration rolls on election day"— resources that "would otherwise be spent on registration drives and election-day

education and monitoring." *Browning*, 522 F.3d at 1166; *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (voting rights organizations demonstrated a "concrete and demonstrable injury" by showing they "diverted resources to address the [challenged] programs" seeking to remove suspected noncitizens from voter rolls); *see also Billups*, 554 F.3d at 1350. These and other decisions of the Eleventh Circuit are consistent with *Havens* and *AHM* and remain undisturbed.[6]

## 2. The Organizational Plaintiffs Have Each Suffered an Injury-in-Fact Sufficient to Confer Organizational Standing.

An organization can show a sufficient injury where a challenged action or law interferes with an organization's core activities or perceptibly impairs the organization's mission. At the pleading stage, the burden to establish injury-in-fact under organizational standing is not a heavy one. *See GALEO*, 36 F. 4th at 1114 (holding organizational plaintiff's "broad allegation of diversion of resources is enough at the pleading stage").

---

[6] Indeed, following *AHM*, courts continue to apply *Havens* to assess organizational standing. *E.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394, 397 (4th Cir. 2024) (holding that Republican National Committee and the North Carolina Republican Party had organizational standing to challenge North Carolina's alleged noncompliance with the Help America Vote Act of 2002); *Get Loud Ark. v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754, at *12–14 (W.D. Ark. Sept. 9, 2024) (holding voter registration organization had organizational standing to challenge rule requiring voter registration applications be signed with a handwritten signature); *La Union Del Pueblo Entero v. Abbott*, No. 5:21–CV–0844–XR, 2024 WL 4488082, at *36 (W.D. Tex. Oct. 11, 2024) ("As in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law—Section 208.").

As set forth in detail below, each organizational plaintiff has alleged an injury-in-fact sufficient to confer standing. Contrary to State Defendants' and Cobb County Defendants' arguments, *see* ECF 168-1 at 14-15; ECF 176-1 at 7-12, the organizational plaintiffs have each alleged non-speculative injuries, describing precisely how Defendants' actions and Sections 4 and/or 5 directly affect and interfere with their core missions. Am. Compl. ¶¶ 16-18 (NGP); 26-27 (GAMVP); 30-32 (APRI); 41, 43 (Georgia NAACP); 52-55, 57 (GCPA); 64 (VoteRiders); 68-71, 74-77 (SFI).

### i.    NGP, GAMVP, and APRI

Plaintiffs NGP, GAMVP, and APRI (bringing Counts I-VI, VIII, and XII) are direct service organizations whose core business activities include voter registration, voter assistance and counseling, and other get-out-the-vote ("GOTV") activities. *See*, *e.g.*, Am. Compl. ¶¶ 13-14, 16-17 (NGP); 19-22 (GAMVP); 28-29 (APRI). For example, NGP's voter assistance and counseling, voter registration, and GOTV efforts include "host[ing] registration drives across the state," *id.* ¶ 14, "provid[ing] rides to the polls for voters lacking transportation," *id.*, "assist[ing] voters whose registrations have been challenged," *id.*, "assist[ing] voters on how to address and seek dismissal of challenges or prevent a challenge from impacting their registration status and right to vote," *id.* ¶ 16, and "register[ing] unhoused voters who lack a permanent address and help[ing] them vote," *id.* ¶ 17. APRI similarly "registers

voters, provides voter education services and organizes GOTV initiatives", *Id.* ¶ 28, and provides assistance to challenged voters and counsels "voters on what to do if they are challenged." *Id.* ¶ 30 GAMVP also provides voter registration and voter assistance and counseling, including "by holding educational events—like . . . voter education workshops—to provide the Muslim community with the tools to protect their right to vote." *Id.* ¶ 20.

As alleged in the Amended Complaint, NGP, GAMVP, and APRI have been forced to divert resources from their core activities to attempt to neutralize the impacts of Defendants' actions and the challenged provisions of SB 189 on those core business activities. With respect to Section 5 and the enforcement of Georgia's voter challenge provisions, Defendants' conduct has caused and will continue to cause "NGP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is being challenged." Am. Compl. ¶ 16. NGP has already "expended additional resources regularly monitoring boards of elections for voter challenges." *Id.* ¶ 16. And NGP has had to

> divert resources to train staff and volunteers on how to assist voters who have been challenged, educate voters about what to do when they are challenged, and mobilize voters whose eligibility to vote is being challenged.

*Id.* Section 5 is similarly causing "GAMVP to expend additional resources, including money and staff and volunteer time, to protect eligible voters whose right to vote is

being challenged[,]" "for example, by training staff and volunteers on how to assist voters harmed by challenges, educating voters about what to do if they are challenged, and mobilizing and assisting challenged voters," as well as by "tracking voter challenges." *Id*. ¶ 26. APRI has also been forced to "expend additional resources, such as staff, member, and volunteer time, instructing voters on what to do if they are challenged," *id*. ¶ 30, "reaching out to and assisting challenged voters," *id*., and "pull[ing] in additional resources from other state chapters, including staff, members, and volunteers, to support statewide and local efforts to counteract the impact of Section 5," *id*.

With respect to Section 4, NGP will no longer be able to register unhoused voters using the mailing address of their choice. NGP will be

> force[d] . . . to divert resources, such as staff and volunteer time, to train staff and volunteers on how to assist voters harmed by the law, and to educate unhoused voters without a permanent address about when and where to retrieve their election mail … [including by] helping impacted voters create a plan to retrieve election mail or, in some cases, providing transportation or otherwise helping unhoused voters obtain their election mail.

*Id*. ¶ 17. Absent these additional forms of assistance,

> unhoused voters in Chatham and Fulton Counties lacking a permanent address who are registered to vote by NGP and aided by NGP's GOTV efforts will be unable to access their election mail due to the mailing address restriction,

directly affecting and interfering with NGP's core business activities. *Id.* APRI similarly must expend additional resources by "instructing unhoused voters without a permanent address when and where to retrieve their election mail, creating a plan to retrieve election mail," "providing low-cost or free transportation options, like bus cards, to retrieve election mail," and will "have to pull in additional resources from other state APRI chapters." *Id.* ¶ 31.

As a result of Defendants' actions and the challenged provisions of SB 189, NGP, GAMVP, and APRI have all been forced to devote fewer resources to their core business activities such as voter registration and GOTV work. *Id.* ¶¶ 18 (NGP); 27 (GAMVP); 32 (APRI). NGP, GAMVP, and APRI have alleged precisely how Defendants' actions and SB 189 have already directly affected or will directly affect and interfere with these core activities. *Id.* ¶¶ 16-17 (NGP); 26 (GAMVP); 30-31 (APRI). NGP and GAMVP have already had to devote resources to provide additional counseling and assistance to voters who registered through their respective registration drives or were aided by their respective GOTV efforts and have been challenged. *Id.* ¶¶ 15, 25; *accord AHM*, 602 U.S. at 395; *Havens,* 455 U.S. at 379.

State Defendants also contend that NGP and GAMVP are not really being required to divert resources and that they may continue their core activities as they had before the enactment of SB 189. ECF 168-1 at 25-26. This argument fails for at

least two reasons. First, State Defendants' argument ignores NGP's and GAMVP's factual allegations about the actual impact SB 189 has and will have on their operations, which the Court must accept as true for the purposes of this motion. Second, State Defendants' argument is logically incoherent: the challenged provisions of SB 189 frustrate NGP's and GAMVP's missions of increasing access to voting. Am. Compl. ¶¶ 16-18, 26. It is *harmful* to NGP and GAMVP to have to expend resources to double back and assist challenged voters or unhoused voters because that reduces the resources NGP and GAMVP have available to register new voters, to engage in GOTV efforts, and to conduct their other programs. *See*, *e.g.*, *id.* ¶¶ 15, 25; *AHM*, 602 U.S. at 395; *Havens,* 455 U.S. at 379.

The injuries suffered by NGP, GAMVP, and APRI are concrete and directly impact the organizations' core activities. *AHM*, 602 U.S. at 395. All three organizations have therefore adequately alleged injury-in-fact.

### ii. Georgia NAACP, GCPA, and VoteRiders

Plaintiffs Georgia NAACP and GCPA(bringing Counts I-II, IV, VI, VIII, and IX), and Plaintiff VoteRiders (bringing Counts VI, VIII, and IX) each engage in various voter registration, education, empowerment, and assistance activities that are core to their missions. Georgia NAACP has a long history of promoting and assisting with voter registration, voter education, GOTV efforts, and election protection. Am. Compl. ¶ 37. "GCPA works to encourage and support voter registration and

participation." *Id.* ¶ 47. And VoteRiders works to ensure Georgians "have the information and proof of identification ('ID') they need to exercise their right to vote" through voter education and providing direct assistance to eligible voters. *Id.* ¶ 60.

The organizations comprising the Georgia NAACP Plaintiffs Group have sufficiently alleged a diversion of resources caused by challenges under Section 5 and the need to use the county registrar's office for election mail under Section 4 under both *Havens* and Eleventh Circuit precedent.

For example, as a result of Section 5, a Georgia NAACP college unit has "divert[ed] resources to change [its] programming. . . , changing its voter registration guidelines, updating its educational programming to prepare students for potential challenges, and printing updated material[.]" *Id.* at ¶ 41. GCPA's Chatham County Coordinator had to "spend[] days attending challenge meetings in multiple counties . . . and addressing challenges to students registered at Savannah State University[.]" *Id.* ¶ 54. GCPA has also had to

> divert resources from other initiatives to *create tailored phone- and text-bank efforts* to reach potentially impacted members and individuals that GCPA has helped register who might be susceptible to challenges under Section 5 of SB 189.

*Id.* at ¶ 55 (emphasis added).

VoteRiders will also have to divert resources to address the impacts of Section 5 on housing-insecure voters and voters who have not registered with a residential

address. For example, VoteRiders assists victims of domestic violence, including by hosting "Voter ID Clinics" at shelters for women impacted by domestic violence, who are more likely to use a nonresidential address when registering to vote. *Id*. ⁋ 61. Section 5 does not carveout these voters or participants in Georgia's VoteSafe program that VoteRiders serves, so these VoteRiders clients are vulnerable to Section 5 voter challenges and probable cause findings because publicly available voter registration records may not display their actual residential address in order to protect them from threats or violence. VoteRiders will have to divert resources to assist voters they serve in the event challenges arise as a result of the voters' use of a "nonresidential" addresses for their voting domiciles under these circumstances.

Due to the requirement of Section 4 that all unhoused individuals receive mail at the county registrar's office, GCPA has diverted resources to help alert its unhoused or housing insecure members about the county registrar mailing address requirement. *See Id*. ¶¶53, 57. Similarly, Georgia NAACP has modified its messaging to reflect the changes of SB 189 and has had to "divert resources from its ongoing election protection, advocacy and GOTV efforts to educate and assist voters impacted by these provisions." *Id.* at ¶ 43. VoteRiders likewise must divert time and resources based on SB 189 Section 4, including

> to locate voters (many of whom are not reachable by phone), to confirm their current voter registration status and create a plan to ensure they can now pick up their election mail at county election offices, including

19

paying for transportation for these voters to their county elections office.

*Id*. ¶ 64. VoteRiders will also "have to develop new guidance for their staff and volunteers working with unhoused voters," communicate that guidance "to partner organizations who refer voters to VoteRiders for ID assistance," and "retrain[] individuals involved in providing ID assistance on behalf of VoteRiders." *Id*.

The injuries raised by Georgia NAACP, GCPA, and VoteRiders are not speculative. Thousands of voters have been challenged since July 2024 alone, including hundreds of students at Savannah State University where Georgia NAACP has a student chapter and where GCPA actively supports student voter registration. *Id*. ¶¶ 42, 55, 56, 222–223. Additional challenges in Walton, Forsyth, Macon-Bibb, Chattooga, and Cobb Counties confirm the inevitability of such challenges being brought again in the future. *Id*. ¶¶ 225, 228, 230, 235, 238.

The injuries pled by the Georgia NAACP, GCPA, and VoteRiders are neither "self-inflicted," ECF 168-1 at 30, nor, as the State Defendants contend, the result of a voluntary decision "to shift some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities." *Id.* at 31 (citing *Mayes*, 117 F.4th at 1180); *id.* at 32. State Defendants' arguments ignore the many actions identified by Georgia NAACP, GCPA, and VoteRiders that they have been forced to take in response to SB 189 Sections 4 and 5—including attending challenge meetings, creating guidance for and tailored phone and text lines to reach

potentially impacted individuals, and retraining their staff members—all of which directly affect and interfere with their core missions and activities.

For example, similar to the plaintiffs in *Governor of Georgia* and *Browning*, as a result of SB 189 Sections 4 and 5, VoteRiders will have to divert resources to ensure its unhoused or housing insecure clients receive elections mailings, by providing transportation to the county registrar's office during business hours, and by having appropriate IDs and addresses to avoid voter challenges and Section 5 probable cause findings. Otherwise, VoteRiders' unhoused or housing insecure voters face an imminent threat of losing their ability to vote. The need for VoteRiders to extend these additional resources, and for Georgia NAACP and GCPA to likewise divert their own resources to address the impacts of Sections 4 and 5 on the voters they serve, is not, in any practical sense, voluntary. *See Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012) (finding immigrants faced a "credible threat of detention" under a new immigration law and therefore the law "forc[ed]" the organizations to divert resources to protect immigrants from imminent harm); *see also Browning*, 522 F.3d at 1164-65 (finding plaintiff adequately alleged organizational standing when it "divert[ed] scarce time and resources from registering additional voters to helping applicants correct the anticipated myriad of false mismatches due to errors either by the Department of State or by the applicant").

21

Georgia NAACP, GCPA, and VoteRiders have adequately alleged injury-in-fact sufficient to confer organizational standing.

### iii. SFI

Plaintiff SFI (bringing Counts I, II, VII, X, XI, and XII) has organizational standing because Section 5 impairs the organization's ability to assist its constituents with voter registration and voting. SFI is a nonpartisan, 501(c)(4) not-for-profit organization comprising military spouses and family members. Am. Compl. ¶ 66. SFI's mission is to "mobilize diverse military partners, parents, children, and veterans to vote and advocate for their communities," *id.* ¶ 68, and its core activities include helping those constituents register to vote and cast their ballot. *Id.* ¶¶ 68-70. SFI undertakes these activities by, among other things, "educat[ing], register[ing], and engag[ing] in non-partisan GOTV efforts for military voters in all elections." *Id.* ¶ 70. In other words, SFI provides direct services to service members and their families in facilitating voting and voter registration.

Because of Section 5, SFI alleges it has had and will have to

(1) determine whether their Georgia registered members will be susceptible to a sustained voter challenge because of the new probable cause standard; (2) educate those members on the challenge process; and (3) attempt to advise these members regarding how to defend their right to vote and navigate the O.C.G.A. § 21-2-230 challenge process.

*Id.* ¶ 74. SFI is aware of instances where military and overseas voters were swept up in challenges both before and after the passage of SB 189. *Id.* ¶¶ 238-40. SFI spent

thousands of dollars in paid staff time toward education and coaching to ensure its Georgia-voting members are aware of SB 189 and its potential implications for their ability to vote. *Id.* ¶ 76. This "directly affect[s] and interfere[s] with" its already-existing "core business activities" of direct voter-registration assistance by requiring SFI to take additional action to ensure that their members are not unlawfully removed from the voter rolls because of SB 189. *AHM*, 602 U.S. at 395; *Havens*, 455 U.S. at 379. SFI's "core mission [of] . . . counsel[ing] voters" is thus similar to the *Havens* plaintiffs' "core mission[, which] included counseling low-and moderate-income home buyers." *Republican Nat'l Comm.*, 120 F.4th at 397.

SFI further alleges, *inter alia*, that SB 189 removes the discretion of county administrators to dismiss unfounded challenges without specifying the quality of the evidence, or the exact procedure, required to sustain a challenge, creating "a situation where different counties may administer different requirements for what a challenged voter must do to rebut a finding of probable cause," and

> allow[ing] a challenged voter to be disenfranchised for having a "nonresidential" address (however defined) or having moved without even being given the opportunity to respond.

Am. Compl. ¶¶ 205-08. As such, SB 189—as well as Defendants' actions and inactions with respect to its implementation—leaves SFI unable to effectively guide its members when their voter registration is challenged. *Accord Republican Nat'l Comm.*, 120 F.4th at 397 (where defendant's "actions or inactions" created

uncertainty for plaintiffs' voter registration activities, plaintiffs sufficiently alleged an Article III injury). Far from a speculative harm, SFI sufficiently alleges that SB 189 "concretely impaired [its] core missions" with specific allegations of the harm to their ability to counsel their constituencies. *Id.* Thus, SFI's allegations satisfy Article III's injury-in-fact requirement.

### B.    Plaintiffs Have Adequately Alleged Membership-Based Associational Standing.

Plaintiffs Georgia NAACP, GCPA, and SFI have sufficiently pled membership-based associational standing in accordance with the well-settled doctrine under which an "organization may vindicate the rights of its members by suing on their behalf." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024). While State Defendants assert an academic objection to the concept of associational standing, they acknowledge that "[u]nder Eleventh Circuit precedent," which "this Court is bound to apply," "organizations may establish standing through an associational standing theory." ECF 168-1 at 34-35.

To establish membership-based associational standing, an organization

must show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Am. All. for Equal Rts.*, 103 F.4th at 771; *Hunt*, 432 U.S. 333, 343 (1977). "At the pleading stage, 'general factual allegations of injury' . . . may suffice." *Georgia*

*Republican Party v. S.E.C.*, 888 F.3d 1198, 1201 (11th Cir. 2018); *see also GALEO*, 36 F.4th at 1115. A court should dismiss a suit on standing grounds only where a claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell*, 327 U.S. at 682–83). In addition, a request for "prospective relief weigh[s] in favor of finding that associational standing exists." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 n.29 (11th Cir. 2021).

Georgia NAACP, GCPA, and SFI satisfy the requirements for associational standing. Each has alleged that its members "face[] a probability of harm in the near and definite future," the only basis on which Defendants challenge associational standing. *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (quoting *Browning*, 522 F.3d at 1160-61). Defendants do not dispute that Georgia NAACP, GCPA, or SFI have made well-pled allegations that the "germaneness" and "participation" prongs of the test are satisfied. Am. Compl. ¶¶ 42-44, 58-59, 77. Therefore, there is no dispute that Georgia NAACP, GCPA, and SFI have sufficiently alleged prongs two and three of the associational standing inquiry. *See Friends of the Earth, Inc. v. Laidlaw Env'l. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000); *Hunt*, 432 U.S. at 343. *Browning*, 522 F.3d 1153, 1160-61 (11th Cir. 2008)).

1.    **Georgia NAACP**

Plaintiff Georgia NAACP brings this action on behalf of itself and its individual members. Am. Compl. ¶ 44. Georgia NAACP members include, among others, college and university units of students residing in college housing or dormitories. *Id*. ¶ 36. Those members, including the Spelman College and Savannah State University units, face a probability of harm under Section 5 of SB 189 because they include students who are registered at "addresses of dormitories on campus, which are located in an area that is zoned as nonresidential." *Id*. ¶¶ 41, 42. The Amended Complaint specifically alleges that, in the 2024 General Election, mass challenges to voter eligibility were brought against students based on their registration addresses pursuant to Section 5. *Id*. ¶ 223.

Additionally, Georgia NAACP assists other voters targeted by SB 189, partnering with "local churches, shelters and transitional housing facilities, and other organizations to help register to vote unhoused or housing-insecure individuals[.]" Am. Compl. ¶ 37. Thus, Georgia NAACP "has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it assists with navigating the registration and voting process." *Id.* ¶ 42.

State Defendants argue that "the fact that an address is zoned nonresidential has nothing to do with SB 189" and "doesn't create any sort of injury for Georgia NAACP's members." ECF 168-1 at 36. They contend that Georgia NAACP's

interpretation of "nonresidential" as including addresses *zoned* nonresidential is "unfounded" and "renders the entire alleged injury far too speculative to be actionable." *Id.* But challenges to a voter's eligibility based on residing at an address labeled "nonresidential" in zoning regulations and maps is not at all speculative. Zoning maps could be and have been read by challengers to be a designation confirmed or listed by a government office, within the meaning of SB 189, giving rise to additional challenges. *See, e.g.*, Sept. 20, 2024 Ltr. to Rabun Cnty. Bd. Of Elections & Registration, https://www.rabuncounty.ga.gov/media/2811. Indeed, Section 5 challenges on the basis that a voter's registration is associated with an address that is not coded or zoned for a residential purpose or use have *already* been made. *See id.*.

Notably, State Defendants do not acknowledge or address the Amended Complaint's allegations regarding mass challenges filed as to 689 students in the 2024 election cycle. Am. Compl. ¶ 223. Where a college student voter's address is nonresidential under local zoning regulations, such as in the case of Georgia NAACP student members living in both the Spelman College and Savannah State University dormitories, *id.* ¶¶ 41, 42, the voters' are vulnerable to being challenged under Section 5's nonresidential address provision, which applies to "a nonresidential address as confirmed or listed by . . . a government office." O.C.G.A. § 21-2-230(b). The Amended Complaint alleges that hundreds of such students were challenged in

the 2024 election cycle, and students (including NAACP members) residing in those and other non-residentially zoned dormitories are vulnerable to Section 230 challenges and disenfranchisement in the future. Georgia NAACP therefore has associational standing to maintain this action on their behalf.

State Defendants also claim that the use of "zoning designations to determine the residential character of an address . . . would make no sense and be inconsistent with the statutory structure" of SB 189. ECF 168-1 at 9. But this only underscores that SB 189's requirement that a voter reside at a "residential" address is unclear, undefined, and unsupported by state and federal registration requirements. As State Defendants concede, "[t]he legislature did not define the term 'nonresidential' in Section 5." *Id.* at 7. But State Defendants suggest that each county will rely on an amalgamation of identified sources as "context" and "dictionary definitions[;]" the "common usage" of the term; and "the definition of a 'nonresidential' address" in various other statutory texts. *Id.* at 7-8. And despite State Defendants' suggestion to the contrary, nowhere in SB 189 nor anywhere else under Georgia law is "nonresidential" defined as "a location where a person is *unable to reside*." *Id*. at 8 (emphasis in original).

State Defendants have omitted statutory language that compels a finding that Plaintiffs' allegations about the use of zoning designations meets their standing burden. "It is firmly established" that a plaintiffs' statutory interpretation need only

be "arguable" to support standing. *Steel Co.*, 523 U.S. at 89. As set forth above, Section 5 challenges based on "nonresidential" zoning designations have already been lodged as to hundreds of voters, dispelling any doubt that SB 189 can be construed to support such challenges. Because federal courts "[have] jurisdiction if 'the right of the [plaintiffs] to recover under their complaint will be sustained if the Constitution and laws . . . are given one construction and will be defeated if they are given another,'" the Court should reject State Defendants' challenge as to Georgia NAACP's associational standing. *Steel Co.*, 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 685 (1946)).

## 2.    GCPA

State Defendants erroneously argue that Plaintiff GCPA cannot establish associational standing because it "fail[ed] to identify any specific member as part of its associational standing allegations" and "its 'members' are '30 organizations,' as opposed to actual individuals." ECF 168-1 at 39. State Defendants ignore GCPA's allegations establishing that its membership includes, in addition to 30 organizations, "more than 5,000 individual members across Georgia in various cities and counties" who are subject to harm in the near and definite future as a result of SB 189. Am. Compl. ¶¶ 45, 59. "GCPA works to encourage and support voter registration and participation" with "unhoused, 'homeless,' and the housing insecure, students, nursing home residents and other individuals who are residing at addresses which

may be characterized as 'nonresidential.'" *Id.* ¶ 47. Where, as here, "the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.' The nub is whether the members themselves would have standing." *Browning*, 522 F.3d at 1160 (internal citations omitted). Thus, GCPA need only allege, as it has, that its members "face[] a probability of harm in the near and definite future." *Id.* at 1160–61. Defendants' claim that GCPA must identify a specific member in their pleadings (ECF 168-1 at 40) is not the law in the Eleventh Circuit. *Browning*, 522 F.3d at 1160; *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999); *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1119-20 (N.D. Ga. 2020) (Grimberg., J.).[7]

Here, it is likely that at least one of GCPA's members will be injured by facing a direct challenge under Section 5 (Am. Compl. ¶¶ 56-57, 59), or being required to assign the county registrar's office as their mandated mailing address for receiving election related mail under Section 4. *Id.* ¶¶ 57, 59; *cf. Browning*, 522 F.3d at 1162-63 (finding that "[g]iven that [organization plaintiffs] collectively claim around

---

[7] Defendants' contention that *Georgia Republican Party* requires naming a member at the pleading stage is wrong. *See* ECF 168-1 at 39-40. *Georgia Republican Party* was decided at summary judgment, where it is the moving party' burden to produce "specific facts supported by affidavit or other evidence." *Georgia Republican Party*, 888 F.3d at 1201-02 (internal punctuation omitted). *Georgia Republican Party* recognized that naming a specific member is not required in the pleadings. *See id.* ("At the pleading stage general factual allegations of injury . . . may suffice.") (cleaned up)).

20,000 members state-wide, it is highly unlikely—even with only a one percent chance of rejection for any given individual—that not a single member will have his or her application rejected due to a mismatch"); *see also Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337–38 (N.D. Ga. 2018) ("Given that the Democratic Party has tens of thousands of members who are active voters in the state, it is extremely unlikely that the [challenged provisions] will not affect a single Democratic Party member. This probable danger is sufficient to satisfy the injury prong for associational standing."). GCPA has thus adequately alleged injury sufficient to establish associational standing.

### 3.    SFI

Plaintiff SFI also has associational standing as a membership organization with military and other members deployed overseas and registered in Georgia who face various barriers to access voting, such as frequent moves, overseas assignments, and confusion over where and how to register. Am. Compl. ¶¶ 71-73. Because of the unique nature of SFI members' ability to establish and maintain their voting residence, Section 5's lowered probable cause standard increases the risk that eligible military and overseas voters like SFI's members will be swept up in frivolous mass challenges. *Id*. ¶¶ 71-73, 238-40. These injuries are concrete and imminent: the Amended Complaint specifically alleges overseas and military voters

like SFI's members had their voter registrations challenged during the 2024 election despite their eligibility. *Id*. ¶ 238.

Defendants argue that SFI's members' injury is too "speculative." ECF 168-1 at 36-37. Defendants are wrong. First, an individual may satisfy the injury-in-fact requirement where the allegations "identified concrete harms in addition to a statutory violation." *Walters v. Fast AC*, *LLC*, 60 F.4th 642, 649 (11th Cir. 2023). SFI alleges that its members will be harmed where they are unable to rebut a finding of "probable cause" in a Section 230 challenge, based on the myriad of problems military and overseas voters have in receiving notice and participating in a challenge hearing. E.g., Am. Compl. ¶¶ 230-40. Upon information and belief, some of SFI's members are registered at P.O. boxes because they live on military bases that do not have "residential" addresses. *Id*. ¶ 73. Likewise, SFI's Georgia members more frequently appear on the National Change of Address (NCOA) database, because military and overseas voters are subject to frequent moves, which require updates to their mailing address. *See id*. ¶ 147. SB 189's lower probable cause standard, lack of discretion to dismiss unfounded challenges, and allowance of NCOA data as a basis of a Section 230 challenge will necessarily sweep in military and overseas voters including, SFI members—a real and concrete harm. *Id*. ¶¶ 209-10. And where probable cause is found, military and overseas voters like SFI's members will be less able to appear in person or access documents to rebut those findings. *Id*. ¶ 305. These

harms are also imminent because SFI alleges that such challenges have already been made to military voters after the passage of SB 189. *Id.* ¶¶ 238-40; *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1337 (11th Cir. 2013) (where a previous action already occurred, "[t]he likelihood of [plaintiff] suffering future injury thus is not contingent upon events that are speculative or beyond his control").

Likewise, as addressed above with respect to GCPA's associational standing, Defendants' assertion that SFI must identify "a specific member" in their pleadings (ECF 168-1 at 37) is not the law in the Eleventh Circuit. *See Stincer*, 175 F.3d at 882. SFI has alleged sufficient facts to demonstrate that its members would have standing in their own right, and it need not name a specific member to survive a motion to dismiss. Therefore, SFI has adequately pled that it has associational standing to bring its claims.

### C. Plaintiffs Have Established Standing on Behalf of Their Constituents.

Defendants do not challenge the standing of Plaintiffs NGP, GAMVP, and APRI based on injuries to the non-member constituencies they represent and advocate for. *Compare* Am. Compl. ¶¶ 13, 18, 20-22, 27, 29, 32, 60 & 64 *with* ECF 168-1 at 23-29, 31-32 (only addressing organizational standing with respect to NGP, GAMVP, and APRI) and 34-40 (not addressing third-party or constituency-based associational standing). The Court should therefore reject the Rule 12(b)(1) motions to dismiss as to these Plaintiffs.

It is well-established that a plaintiff may assert standing on behalf of a third party if the following requirements are met: "(1) an injury in fact to the [organization], and (2) a close relationship to the third-party, and (3) a hindrance to the third-party's ability to assert its own interests." *Fla. State Conf. of the NAACP*, 2007 WL 9697660 at *3 (citing *Powers*, 499 U.S. at 410-11). This same principle applies to voting rights organizations protecting the interests of the voters they serve. *See id*. (finding that even where injuries asserted by an organization's formal members were "too remote or speculative" to confer standing, an organization could "still have standing on behalf of non-member registrants who will be denied the right to vote."); *see also Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) ("plaintiff's position as a vendor and voting rights organization is sufficient to confer third party standing[.]"). It is also well-established that a non-member organization has standing to sue on behalf of its constituents where the organization serves a "segment of the . . . community which is the primary beneficiary of its activities." *Stincer,* 175 F.3d at 885 (citing *Hunt*, 432 U.S. at 344). *See also League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1123-24, 1155 (N.D. Fla. 2022) (finding organizations had standing to challenge newly enacted restrictions on state voting laws based on impacts to organizations' non-member constituents).

NGP, GAMVP, and APRI have adequately pled each of the elements required for third-party standing. Specifically, each organization has pled a diversion of

resources sufficient to show an injury-in-fact to the organization. Am. Compl. ¶¶ 16-18 (NGP); ¶¶ 26-27 (GAMVP) & ¶¶ 30-32 (APRI). Each organization has also pled a close relationship to constituents whose interests the organization works to assert. *See id.* ¶¶ 13, 18 (NGP); *id.* ¶¶ 21-22, 27 (GAMVP); *id.* ¶¶ 29, 32 (APRI). These allegations are sufficient to establish third-party standing at the pleading stage. *See GALEO*, 36 F. 4th at 1115. Because Defendants have not challenged these organizations' third-party standing on behalf of their constituents, the court has no basis to dismiss the challenges in Counts I-VI, VIII, and XII for lack of standing. *See Rumsfeld,* 547 U.S. at 53, n.2.

### D.     Plaintiff Huynh Has Established Individual Standing.

Mr. Hunyh (bringing Counts I, II, IV-VI, VIII, and XII) lives in Fulton County, residing on the street in downtown Atlanta about a mile from this courthouse. Am. Compl. ¶ 33. Because he is unhoused and lacks a permanent address, Section 4's unhoused voter mailing address provision requires that Mr. Huynh's mailing address be listed as the Fulton County registrar, which is approximately 20 miles away. *Id*. ¶ 34. Mr. Huynh has no means to travel to the registrar, and because Georgia law makes no provision for notifying Mr. Huynh that he has election mail to pick up, Section 4's unhoused voter mailing address provision means he will not receive election communications, placing his inclusion in the electorate at risk. *Id*. ¶¶ 33-34.

His injury is compounded by Section 5, which leaves him vulnerable to being challenged because of his unstable housing situation and because he does not live at a residential address. Such challenges have been a constant feature of Georgia's—and Fulton County's—elections for years and show no signs of slowing down. *See*, *e.g.*, *Frazier v. Fulton Cnty. Dep't of Registration & Elections*, No. 1:24-cv-03819, 2024 WL 4191237 (N.D. Ga. Aug. 28, 2024) (complaint seeking to compel list maintenance program shortly before the November 2024 election). In November 2024, Fulton County conducted a challenge hearing on Election Day concerning hundreds of voters who, similar to Mr. Huynh, registered using nonresidential addresses, requiring them to attend or be disenfranchised. Am. Compl. ¶¶ 234, 270. Far from providing Mr. Huynh a "benefit," ECF 168-1 at 41, the provisions he challenges inflict an ongoing injury on him.

State Defendants suggest that Section 4 does not apply to Mr. Huynh because they claim he (1) resides in Fulton County; (2) is unhoused; and (3) can use his ex-wife's address in Gwinnett County, which he has been using as his temporary mailing address even though he does not live there. ECF 168-1 at 40-41. Defendants' muddying of the distinction between residential and mailing addresses is neither right on the facts nor the law. [8]

---

[8] Indeed, Defendants recognize a distinction between "permanent addresses," i.e. residences, and "valid mailing addresses" elsewhere in their brief. *See* ECF 168-1 at 54.

The plain text of Georgia's election code forecloses treating Mr. Huynh's mailing address as his "permanent address." Section 4 establishes the mailing address for any person "who is homeless and without a permanent address" as "the registrar's office of the county in which such person resides." O.C.G.A. § 21-2-217(1.1). Section 4 applies to individuals, such as Mr. Huynh, who lack a permanent *residential* address, not a permanent *mailing* address. And Mr. Huynh's ex-wife's Gwinnett County address is not his "permanent" mailing address by any meaning of the term, since he is not in control of whether he can continue using it.

State Defendants' argument that Mr. Huynh fails to allege facts relating to Section 5, *see* ECF 168-1 at 41, is also flawed. Section 5's inclusion of residency-based criteria, such as having a "nonresidential address," for establishing "probable cause" makes Mr. Huynh highly susceptible to challenge and removal from the rolls. This is not theoretical; as mentioned previously, it happened to hundreds of similarly situated Georgia voters in the 2024 election cycle. Am. Compl. ¶¶ 234, 270. Georgia law requires registrars to "immediately consider" eligibility challenges "and determine whether probable cause exists to sustain such challenge." O.C.G.A. § 21-2-230. Until he secures permanent housing, Mr. Hyunh will always be registered at a nonresidential address, which establishes "probable cause" under Section 5. *Id*. Moreover, with Mr. Huynh's election mail now being held at the registrar's office

pursuant to Section 4, he would never learn that he had been challenged or be able to respond and establish his eligibility.

For the reasons stated above, Mr. Huynh has adequately pled standing.

### E. Plaintiffs' Injuries Are Traceable to and Redressable by State Defendants.

Plaintiffs have adequately pled that their injuries are traceable to and redressable by State Defendants. State Defendants' arguments as to traceability and redressability are limited to Section 5; they do not dispute that the traceability and redressability requirements are satisfied for Plaintiffs' Section 4 claims (Counts IV, V, VIII, and IX). *See* ECF 168-1 at 14-15 & 42-44. As to Section 5, State Defendants' arguments misconstrue the facts, fail to properly apply the relevant law, and should be rejected.

### 1. Plaintiffs' Injuries Are Traceable to State Defendants.[9]

To satisfy the traceability requirement for standing,

> a plaintiff need only demonstrate, as a matter of *fact*, a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant, and an organizational plaintiff need only allege a drain on an organization's resources that arises from the organization's need to counteract the defendants' assertedly illegal practices.

---

[9] As the officials and entities which initially adjudicate voter challenges, County Defendants do not dispute that Plaintiffs' injuries are traceable to their conduct in implementing Sections 4 and 5 of SB 189. To the extent that any County Defendant(s) do dispute traceability, they are wrong for many of the same reasons as State Defendants and because of their close connection to administration of voter challenges. Cobb County, alone, raises factual disputes which are inappropriate for resolution under Rule 12(b)(6).

*GALEO*, 36 F.4th at 1116 (emphasis in original) (internal citations and quotation marks omitted). Article III's traceability requirement is "less stringent than the tort-law concept of 'proximate cause,'" (*Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023)), and a plaintiff's injury is fairly traceable to a defendant "so long as even a small part of the injury is attributable to [the defendant]," *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021).

As to Section 5, Plaintiffs easily meet this requirement with respect to State Defendants. State Defendants play an important role in the implementation and enforcement of Section 5. Defendant SOS is the "designated chief election official" responsible for (1) coordinating Georgia's responsibilities under the NVRA; (2) maintaining Georgia's list of registered voters, including reflecting removals of voters from the list based on voter challenges; (3) preparing and furnishing voter registration and voting information for citizens; (4) enforcing election statutes; and (5) routinely providing elections training and guidance to county boards of registrations and elections for all Georgia counties. Am. Compl. ¶¶ 78, 119. It is pursuant to these designated responsibilities that the SOS "touted his efforts to clean Georgia's registration list in advance of the 2024 election cycle." *Id*. ¶ 78. The SOS also provides training and issues guidance regarding SB 189's unlawful provisions to county boards of elections. *Id.* ¶¶ 255, 259, 267, 358, 368. This training and guidance create a close link between the SOS and unlawful enforcement of the

39

challenged provisions. Thus, the alleged harms flowing from Section 5 are plainly "not the result of the independent action of some third party not before the court." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020). Rather, they are the result of the action of the SOS—the government official solely responsible for these duties. This is enough to establish traceability.

The SEB Defendants promulgate rules and regulations to obtain uniformity in elections; and formulate, adopt, and promulgate rules and regulations pertaining to the conduct of elections, including such rules and regulations necessary to effectuate those provisions of Georgia election law created and amended by Sections 4 and 5. Am. Compl. ¶ 79. After SB 189 was signed into law, SEB Chair John Fervier acknowledged that the SEB would instruct county election officials regarding SB 189. *Id.* ¶ 80. And the SOS's office has even suggested the SEB should promulgate rules to clarify how county election officials should handle voter challenges. *Id*. The SEB also has authority to impose sanctions on county boards of elections who fail to comply with Georgia's voter challenge provisions. *Id.* Thus, Plaintiffs' injuries are plainly traceable to the SEB because, *inter alia*, by failing to promulgate regulations interpreting Section 5 in compliance with applicable law, the SEB has enabled arbitrariness and inconsistency in how counties treat voter challenges. *Id.* ¶ 260.

When assessing traceability, "[a] plaintiff [] need not show . . . that the defendant's actions are the very last step in the chain of causation." *Wilding v. DNC*

*Servs. Corp.*, 941 F.3d 1116, 1125–26 (11th Cir. 2019) (internal quotation marks omitted). "[H]arms that flow indirectly from the action in question can be said to be 'fairly traceable' for standing purposes." *Id.* Moreover, the case relied upon by State Defendants undermines, rather than supports, their argument. In *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553855 (N.D. Ga. Feb. 16, 2021), the court found that the SOS's statutory responsibility for list maintenance conferred standing. *See id.* at *14. The same responsibility for list maintenance is also implicated by Section 5's changes to the voter challenge provision.

The ultimate question for purposes of Article III standing is whether State Defendants can establish that they "caused *none*" of Plaintiffs' alleged injuries, *Losch*, 995 F.3d at 943, or whether Plaintiffs "would have been injured in precisely the same way without [State Defendants'] alleged misconduct," *Walters*, 60 F.4th at 650 (internal citation omitted). Under Plaintiffs' allegations, State Defendants cannot meet this showing. But it is the actions and inactions by the SOS and the SEB that harm Plaintiffs. Therefore, the Amended Complaint plausibly alleges State Defendants bear at least some responsibility for Plaintiffs' injuries, and that is sufficient to establish traceability for purposes of Article III standing.

### 2.    Plaintiffs' Injuries Are Redressable by Defendants.

*Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), compels a finding that Plaintiffs adequately allege redressability as to State

Defendants. State Defendants are necessary participants in the redress that Plaintiffs seek, and relief against State Defendants is necessary to redress Plaintiffs' injury. *See id.* at 1253-54. It is "likely, as opposed to merely speculative" that Plaintiffs' injuries would "be redressed by a favorable decision" against State Defendants. *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1253 (11th Cir. 1998).

Redressability is satisfied even where a particular defendant can only provide a "partial remedy." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (cleaned up). Here, Plaintiffs have adequately alleged that all State Defendants are necessary for the redress sought in the Amended Complaint, *see* Am. Compl. ¶¶ 259, 267-68, 358, 368-69, and State Defendants provide no authority to the contrary. They argue that county officials are responsible for hearing voter challenges under Section 5. ECF 168-1 at 44. But, as explained above, State Defendants' explicit statutory duties are implicated here. Further, the SOS may certainly order counties to restore unlawfully removed voters to the statewide voter registration database that the SOS is principally responsible for maintaining. Am. Compl. ¶ 78; *see also Fair Fight Action, Inc.*, 2021 WL 9553855 at *14.

Plaintiffs' injuries are also redressable by County Defendants. The Amended Complaint includes various allegations that individual County Defendants have already undertaken unlawful challenges and removals, including challenges that led to the removals of eligible voters. *See* Am. Compl. ¶¶ 222-42. These injuries will

continue absent injunctive relief against those counties. Thus, Plaintiffs' injuries *by those counties* are certainly redressable through relief against them. *See Jacobson,* 974 F.3d at 1256 (noting that the injury needs to be "redressable by relief against *that* defendant").

As to Plaintiffs' facial challenges, County Defendants primarily argue that they are not necessary parties to the litigation, and because they

> will abide by any order of this Court regarding the constitutionality of SB 189 or injunctive relief granted as to the enforcement of its provisions and would have done so without being named as defendants in this litigation,

they disagree with both Plaintiffs and State Defendants on redressability.[10] *See e.g.* ECF 177-1 at 4. But whether County Defendants "played any role in creating, evaluating, accepting, rejecting, or otherwise exercising any control over the [the passage of the legislation] is of no consequence" to the redressability analysis where County Defendants "do not contest that they have a legal obligation to conduct elections" under the challenged law. *Finn v. Cobb Cnty. Bd. of Elections &*

---

[10] All County Defendants declined to join State Defendants' arguments as to redressability as to the State, ECF 169 at 2; ECF 171 at 2; ECF 173 at 2; ECF 174 at 1-2; ECF 176-1 at 3; ECF 186 at 1-2, and State Defendants allege that Plaintiffs' injuries are only redressable by the counties. ECF 168-1 at 44. This dispute between Defendants means, at minimum, that the issue of redressability is appropriate for discovery. *See, e.g., Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir. 1981) ("Insofar as the defendant's motion to dismiss raises factual issues [as to subject matter jurisdiction], the plaintiff should have an opportunity to develop and argue . . . the disputed issues and evidence.").

*Registration*, 682 F. Supp. 3d 1331, 1341 (N.D. Ga. 2023). Just as "the ability 'to effectuate a partial remedy' satisfies the redressability requirement," Plaintiffs were free to sue county defendants in order to ensure uniform compliance with any relief. *See Uzuegbunam*, 592 U.S. at 280, 291 (internal citation omitted). Thus, Plaintiffs' injuries are redressable, even if County Defendants are not necessary parties.

## II.    Plaintiffs Have Adequately Stated Each Claim.

Plaintiffs have adequately pled claims under the NVRA, the First and Fourteenth Amendments to the U.S. Constitution, and the Civil Rights Act.

### A.    Plaintiffs Adequately State Claims Under the NVRA.

### 1.    Plaintiffs Plausibly Allege a Claim that SB 189 Section 5 Violates Section 8(d) of the NVRA (Counts I and III).

Plaintiffs have stated a claim that Section 5 violates, and is preempted by, Section 8(d) of the NVRA. Pursuant to Section 5's residency-based probable cause criteria, several County Defendants and members of the defendant class of county election boards have removed Georgia voters from the rolls on the basis that they have moved, in violation of Section 8(d)'s prohibitions on certain forms of residence-based removal.[11]

---

[11] Intervenors misleadingly cite *Fair Fight, Inc. v. True the Vote*, 710 F. Supp. 3d 1237 (N.D. Ga. 2024) to claim that a finding of probable cause under Section 230 "determines nothing about a voter's eligibility to vote, nor does it have an immediate impact of removing a voter from a registration list." ECF 170-1 at 6-7 (citing *Fair Fight*, 710 F. Supp. 3d at 1287). This language only comments on the filing of a voter challenge, not a probable cause determination. Further, *Fair Fight*'s discussion of

State Defendants argue that a Section 8(d) claim is not viable because the relevant voter challenge procedures require county registrars to undertake a "rigorous individualized inquiry." *See* ECF 168-1 at 50 (citing *Arcia*, 772 F.3d at 1346). State Defendants' argument lacks merit because it conflates different sections of the NVRA. The presence—or absence—of an individualized inquiry into a voter's eligibility is only pertinent to claims brought under Section 8(c) of the NVRA, a separate prohibition on "any program the purpose of which is to *systematically* remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. 52 U.S.C. § 20507(c)(2)(A) (emphasis added); *see also Arcia*, 772 F.3d at 1346 (courts ask if voters are being removed based on individualized inquiry in Section 8(c) cases to ascertain whether removal program is "systematic").

The text of Section 8(d), the basis of Counts I and III, does not include any language suggesting its scope is limited to systematic removals. Rather, Section 8(d) prohibits the removal of any registered voter on the basis of a change in residence unless the registrant: (a) confirms the change of residence in writing, or (b) both fails to respond to a notice and fails to vote or otherwise contact the elections office during the next two federal election cycles after receiving the notice. 52 U.S.C. §

the NVRA is only dicta that focuses on NVRA Section 8(c), not the NVRA provisions at issue in this case.

20507(d)(1). There are no exceptions for individualized inquiries. The requirements of Section 8(d) are mandatory, straightforward, and unequivocal, as courts have recognized. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 959 (7th Cir. 2019); *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381-82 (6th Cir. 2008). Courts have relied on Section 8(d) to reject the removal of voters who allegedly moved where the state has not complied with the mandatory notice-and-waiting-period requirement, which lasts for two federal election cycles. *See*, *e.g.*, *Lawson*, 937 F.3d at 959-62; *Land*, 546 F.3d at 386, 389; *Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 318-19 (S.D.N.Y. 2020).

By expanding the definition of probable cause to include residency-based voter challenges, Section 5 expands the scope of O.C.G.A. § 21-2-230 to circumvent Section 8(d)'s carefully circumscribed removal protocols.

State Defendants' "rigorous individualized inquiry" argument also fails because Section 5's structure and the facts alleged in the complaint—which must be taken as true at this stage—establish that voters may be deemed ineligible based simply on documentation of "an elector voting or registering to vote in a different jurisdiction; an elector obtaining a homestead exemption in a different jurisdiction[;]"[12] or NCOA data accompanied by unspecified evidence that a voter

---

[12] Citing only a concurrence from a case analyzing an inapposite state removal process, Intervenors argue that "voting" and "registering to vote in a different

may no longer live at their registration address. In other words, the evidence that is meant to *begin* the removal process under the NVRA can be *sufficient* for a challenge under SB 189. As such, SB 189 unquestionably subverts the NVRA's "notice-and-waiting period" requirement. Am. Compl. ¶¶ 251-57.

The Amended Complaint alleges several Georgia counties removed voters based on an alleged change of address or struck them from the list of eligible voters for an election pursuant to O.C.G.A. §§ 21-2-229 and 21-2-230. *See id.* ¶¶ 174 (Spalding), 177-78 (Chatham), 179 (Gwinnett), 180 (Forsyth); *id.* at Count III. Defendants do not deny the substance of those allegations, which at the Motion to Dismiss stage must be accepted as true. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1269 (11th Cir. 2009).

Courts have already held that Section 8(d) applies to purges initiated by voter challenges. *See N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16CV1274, 2018 WL 3748172, at **4, 8-9 (M.D.N.C. Aug. 7, 2018) (holding county election boards "violated § 20507(d) of the NVRA in sustaining challenges to voter registrations based on change of residence . . . without complying with the prior notice and waiting period requirement"). In Hancock County, Georgia

_____

jurisdiction" are "confirmations 'in writing' that the voter has changed residence" under Section 8(d). ECF 170-1 at 7-8. But the NVRA clearly states that a voter can only confirm a changed residence by contacting the registrar at the voter's previous residence or returning a notice sent by that registrar. *See* 52 U.S.C. § 20507(b)(2)(A).

election officials entered into a consent decree subjecting the county to outside monitoring after organizations contested a series of voter "challenge proceedings" conducted by the board in 2015 as, among other things, violating Section 8(d) of the NVRA. *Ga. State Conf. of the NAACP v. Hancock Cty. Bd. of Elections & Registration*, No. 5:15-cv-414, ECF 67-1 at 2-3 (M.D. Ga. Mar. 1, 2017).

Some Defendants assert that the voter challenges at issue here do not result in immediate removal from the rolls but that does not insulate Section 5 from the requirements of the NVRA. *See* ECF 170-1 at 6-7; ECF 171 at 3; ECF 174 at 2. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States,* 567 U.S. 387 (2012) (internal citations and quotations omitted). As such, the State cannot evade the NVRA's mandates by allowing voters to nominally remain on the rolls while denying their votes.[13] *See* 52 U.S. §20501(b)(2)( the NVRA's purpose is to "enhance the participation of eligible citizens as voters*"*); *see also ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) ("Registration is indivisible from election. A state could not, by separating registration from voting . . . undermine the power that Article I section 4 grants to Congress."). Further, as discussed *infra* Argument

---

[13] Even if not removed from the rolls, a voter challenged under Section 230 is prevented from voting, and "once the election occurs, there can be no do-over and no redress." *Ga. State Conf. of the NAACP v. Georgia*, No. 1:17-CV-1397-TCB, 2017 WL 9435558, at *4 (N.D. Ga. May 4, 2017) (citation omitted).

II.A.2.i, Section 5 removals do in fact lead to removal from the rolls.  *See Majority Forward v. Ben Hill Cnty. Bd. Of Elections*, 512 F. Supp. 3d 1354, 1368-70 (M.D. Ga. 2021). Finally, the ability of a voter to contest a challenge and to appeal an adverse decision in state superior court still fails to abide by the NVRA's notice requirement.

For these reasons, the Court should deny motions to dismiss Counts I and III.

### 2. Plaintiffs Plausibly Allege a Claim Under Section 8(b) of the NVRA.

#### i. Plaintiffs Adequately Allege that SB 189 Section 5's Nonresidential Address Provision Violates Section 8(b) of the NVRA (Count II).

Section 8(b)(1) of the NVRA provides that

> [a]ny State program or activity to . . . ensur[e] the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."

52 U.S.C. 20507(b), & (b)(1). "A state cannot properly impose burdensome demands in a discriminatory manner." *United States v. Fla*., 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012).[14]

Here, Section 5 categorically discriminates against voters who may reside at an address that is deemed nonresidential, forcing these voters to prove, when their

---

[14] State Defendants assert that the *United States v. Florida* court only "glancingly suggested" that the program at issue there ran afoul of Section 8(b)(1), ECF 168-1 at 53, but that is belied by the court's Section 8(b)(1) holding.

right to vote is challenged, that they are in fact eligible residents. Section 5 is therefore nonuniform and discriminatory in its treatment of these voters in violation of Section 8(b)(1) of the NVRA.

State Defendants insist, as with Plaintiffs' Section 8(d) claim, that Section 8(b)(1) of the NVRA applies solely to "systematic" removal programs and not to "individualized decisions about voters." ECF 168-1 at 51, 52. State Defendants have again conflated the NVRA's 90-Day Provision, Section 8(c)(2)(A), with a different statutory provision. Section 8(b)(1), like Section 8(d), does not refer to "systematic" list maintenance programs or refer in any way to a program's scope or scale. State Defendants' citations to courts interpreting Section 8(c), like *Arcia*, 772 F.3d at 1346, are again irrelevant to Plaintiffs' Section 8(b) claims. In any event, Plaintiffs have properly alleged that the nonresidential address provision *does* establish a systematic state program or activity. Those allegations must be taken as true. Take, for example, the thousands of challenges that County Defendants have received and adjudicated since 2020. Am. Compl. ¶¶ 164-80, 222-42. The mere fact that county officials, as opposed to state officials, adjudicate numerous voter challenges does not make them individualized.

State Defendants contend that Section 5 of SB 189 does not result in the removal of voters. ECF 168-1 at 51. First, this merits-based argument is premature on a motion to dismiss. Second, it is also demonstrably incorrect—the voter

challenge procedures at issue in Section 5 and the individual voter removals overseen by County Defendants unquestionably initiate a purge of the voter rolls. *See* O.C.G.A. §§ 21-2-230(f)-(i); Am. Compl. ¶¶ 179, 234, 239, 270, 274. Finally, even if State Defendants were correct about Section 5, which they are not,[15] it would not foreclose a Section 8(b) claim[16] because the NVRA's command that voting rolls be maintained in a uniform and nondiscriminatory manner is not limited solely to removal programs. In *Project Vote v. Blackwell*, 455 F. Supp. 2d 694 (N.D. Ohio 2006), a district court found that imposing requirements only on certain voter registration workers and not others is "on its face [] not a uniform and nondiscriminatory attempt to protect the integrity of the electoral process" in violation of Section 8(b). *See id.* at 703.

Intervenors' arguments that the nonresidential address provision is uniform and nondiscriminatory because it is part of the overall definition of "probable cause" and thus applies to everyone fare no better. ECF 170-1 at 9-10. This is tantamount to arguing that a provision that defines "eligible voter" as "a white male eighteen

---

[15] The legislative history of Section 8(b)(1) clearly indicates that it was not so limited. *See* S. Rep. No. 103-6 at 31 (1993).

[16] State Defendants' reliance on *Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018) (cited at ECF 168-1 at 51) is misplaced. The *Husted* plaintiffs' uniform and nondiscriminatory claim was not before the Supreme Court, and the dicta cited merely observes in passing that Section 8(b)(1) is one of the NVRA's "two general limitations that are applicable to state removal programs." 584 U.S. at 764. *Husted* does not purport to define Section 8(b)'s scope or describe every possible voting list maintenance activity that fits within its ambit.

years of age or older" is uniform and nondiscriminatory because the definition "appl[ies] to everyone involved in the process." *Id*. at 9 (quoting *Project Vote*, 455 F. Supp. 2d at 703). Of course, that argument conflicts directly with the letter and purpose of the NVRA.

Intervenors also argue that Plaintiffs must allege racial discrimination to assert a claim under Section 8(b)(1) of the NVRA. ECF 170-1 at 9. Not so. Section 8(b)(1) requires that state programs or activities be "uniform, nondiscriminatory, *and* in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1) (emphasis added). A program or activity that comports with the Voting Rights Act but is otherwise not uniform or nondiscriminatory is nonetheless prohibited because the terms "uniform," "nondiscriminatory," and "in compliance with the Voting Rights Act" are not co-extensive. *See, e.g.*, *Project Vote*, 455 F. Supp. 2d at 703-04 (finding violation of Section 8(b)(1) notwithstanding absence of race discrimination allegation because "[t]he regulations [] have the discriminatory effect of imposing an undue burden primarily on poor and/or elderly voter registration workers"); *Tenn. Conf. of the NAACP v. Lee*, 730 F. Supp. 3d 705, 738 (M.D. Tenn. 2024) (finding violation of Section 8(b)(1) notwithstanding absence of race discrimination allegation where plaintiffs alleged that "challenged policy imposes unjustified burdens and barriers to registration on a class of applicants—those with prior felony

convictions—that do not apply to other classes of applicants"), *stay granted on other grounds*, 105 F.4th 888 (6th Cir. 2024).

Intervenors also argue that Section 5 is not discriminatory because it furthers a "neutral" voter qualification under state law, namely, Georgia's residency requirement. *See* ECF 170-1 at 10. Critically, Intervenors misinterpret O.C.G.A. § 21-2-217(a)(2)(C). That law does not, in fact, "prohibit[] persons from claiming residence at non-residential addresses such as 'a post office box or private mailbox service address.'" ECF 170-1 at 10. The statute instead merely provides that owning or renting a P.O. Box or private mailbox does not, by itself, establish residency within a particular jurisdiction. And it says nothing about other types of nonresidential addresses, like dormitories zoned as nonresidential. Many Georgia residents, like Mr. Huynh, have a nonresidential address and are entitled to vote there. Having a nonresidential address is not legitimate prima facie evidence that the registrant does not reside in the jurisdiction.

In support of their "neutral" voter qualification argument, Defendants misread *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929 (D. Ariz. 2024). The district court in *Mi Familia Vota* did not hold that Arizona had carte blanche under the NVRA to impose restrictions related in any way to legitimate voter qualifications. To the contrary, the court reasoned that even though citizenship is a nondiscriminatory voter qualification,

> [o]nly naturalized citizens would be subject to scrutiny under the Reason to Believe Provision, who if 'confirmed' as non-citizens, would be required to provide [documentary proof of citizenship]. This would have a non-uniform and discriminatory impact on naturalized citizens.

*Id.* at 999. Applying this reasoning, the court held that a statute directing county recorders to investigate the citizenship status of voters whom the recorders had "reason to believe" were non-citizens violated Section 8(b). *Id*. The same rationale applies here. While residency generally is a nondiscriminatory voter qualification, only some voters—those who reside at an address deemed nonresidential—are at risk of being required to provide additional documentation or face removal from the rolls. Since Section 5 imposes non-uniform and discriminatory burdens solely on unhoused voters and other individuals who have a nonresidential address, the Court should deny motions to dismiss Count II.

### ii. Plaintiffs Adequately Allege That SB 189 Section 4's Unhoused Voter Mailing Address Provision Violates Section 8(b) of the NVRA (Count IV).

In Count IV, Plaintiffs allege that Section 4, which targets unhoused voters, also violates Section 8(b)(1) of the NVRA. State Defendants argue that Section 4 is uniform and nondiscriminatory because "[a]ll voters who are homeless and lack a permanent address are treated the same" and they are "differently situated" from other groups of voters. ECF 168-1 at 53. This argument ignores the entire purpose of Section 8(b), which is to ensure that *all* eligible voters are treated the same, not that members of some subgroup arbitrarily delineated by the state are treated the

same as other members of that subgroup. The NVRA does not permit separating out unhoused voters who lack a permanent address for separate treatment. To the contrary, they should enjoy the same rights to vote and designate their mailing address the same way as everyone else. *Project Vote*, 455 F. Supp. 2d at 703 (requiring only voter registration workers who are compensated to navigate additional requirements "is—on its face—not a uniform and nondiscriminatory attempt to protect the integrity of the electoral process"); *see also Tenn. Conf. of the NAACP*, 730 F. Supp. 3d at 738, 740; *Mi Familia Vota*, 719 F. Supp. 3d at 999-1000; *United States v. Fla*., 870 F. Supp. 2d at 1350.

Intervenors' arguments regarding the mandated mailing address for receiving election related mail  for the unhoused in Section 4 are largely identical to those concerning the "nonresidential" address provision in Section 5, ECF 170-1 at 11-12, and fail for the same reasons discussed above. *Supra* Argument II.A.2.ii.

Intervenors also argue that Section 4 is not a voter list maintenance "program" and so falls outside the ambit of Section 8(b). ECF 170-1 at 11. This provision directs election mail, including NVRA required list maintenance mailings under NVRA Sections 8(a)(2), 8(c)(1)(B), and 8(d)(1-2), to be sent to a prescribed location. Intervenors do not explain why such direction would not make Section 4 a voter list maintenance "program or activity." 52 U.S.C. § 20507(b). Perhaps that is because Intervenors characterize the provision as voluntary—in their telling, Section 4

simply "permits" unhoused voters "to receive their election-related mail at their county 'registrar's office'," and merely provides "mailing accommodations" for unhoused voters. ECF 170-1 at 11. But, the statutory language of the provision is mandatory, requiring unhoused voters to involuntarily receive their election mail at a place not of their choosing. O.C.G.A. § 21-2-217(a)(1.1); *supra* Argument I.D. The mandatory nature of the provision confirms it is a program or activity.

The Court should deny motions to dismiss Count IV.

**3.    SB 189 Section 4's Unhoused Voter Mailing Address Provision Violates and Is Preempted by the NVRA's Notice Requirements (Count V).**

In Count V, Plaintiffs allege that Section 4 conflicts with mandates imposed on election officials to send notice to voters under Section 8 of the NVRA.

Section 4 specifically prohibits election officials from sending election mail, including NVRA-required notices, to unhoused voters without a permanent address, and further requires election officials to hold all election mail for those voters to pick up instead. *See* O.C.G.A. § 21-2-217(a)(1.1).

However, Section 8 of the NVRA explicitly requires election officials to send notice to voters. Section 8(a)(2) requires counties to "send notice to each applicant of the disposition of [their voter registration application.]" 52 U.S.C. § 20507(a)(2). And Section 8(d) requires counties to provide notice, which is described as "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which

56

the registrant may state his or her address," as a part of the process to remove a voter from the registration list for changing residence to outside of a jurisdiction. 52 U.S.C. § 20507(d)(2).

Section 4 directly conflicts with these NVRA provisions. Due to Section 4, unhoused voters without a permanent address are effectively deprived of these NVRA notices, which Section 4 prohibits election officials from sending anywhere outside of their own offices. As a result, Section 4 causes a de facto violation of Sections 8(a)(2) and 8(d) of the NVRA. *See Brehm*, 432 F. Supp. 3d at 318-19.

Supreme Court jurisprudence analyzing Section 8(d) further supports Plaintiffs' argument. In *Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018), the Supreme Court described Section 8(d) and explained its role as part of the list maintenance process for removing voters who have allegedly changed addresses:

> The [NVRA] . . . prescribes requirements that a State must meet in order to remove a name on change-of-residence grounds. §§ 20507(b), (c), (d).
>
> **The most important of these requirements is a prior notice obligation**. Before the NVRA, some States removed registrants without giving any notice . . . The NVRA changed that by providing in § 20507(d)(1) that a State may not remove a registrant's name on change-of-residence grounds unless either (A) the registrant confirms in writing that he or she has moved or (B) the registrant fails to return a preaddressed, postage prepaid "return card" containing statutorily prescribed content. This card must explain what a registrant who has not moved needs to do in order to stay on the rolls, *i.e.*, either return the card or vote during the period covering the next two general federal elections. § 20507(d)(2)(A)....

57

And for the benefit of those who have moved, the card must contain "information concerning how the registrant can continue to be eligible to vote." § 20507(d)(2)(B). **If the State does not send such a card** or otherwise get written notice that the person has moved, **it may not remove the registrant on change-of-residence grounds**.

*Husted*, 584 U.S. at 761-62 (emphasis added). As the Supreme Court recognized, the notice requirement in Section 8(d) is mandatory; it does not allow election officials to circumvent their obligations to attempt to notify affected voters or confirm changes to their registration status.[17] But Section 4 would do exactly that for unhoused voters without a permanent address. Unhoused voters will not receive Section 8(d) notices because Section 4 requires election officials to hold their election mail and bars mailing such notices to an address of their choosing.[18]

Other federal statutes support Plaintiffs' reading of Section 8's notice requirements.[19] For instance, the Uniform and Overseas Citizens Absentee Voting

---

[17] *See Bellitto v. Snipes*, 935 F.3d 1192, 1206 (11th Cir. 2019) ("[I]f the County is still unable to confirm a death, it will send a death notice to the registrant's last-known address for confirmation before removing the voter from the rolls.").

[18] Section 4's unhoused voter mailing address provision also conflicts with the NVRA's process to send voters "forwardable mail," a required measure that increases the likelihood of a notice reaching a voter. *See* 52 U.S.C. § 20507(d). Because Section 4 requires a mailing address that is not on file or connected with a voter's address on file with the U.S. Postal Service, NVRA-related mail will not be forwarded to unhoused voters, nullifying and conflicting directly with the NVRA's forwardable mail requirement for those voters.

[19] Defendants' interpretation would allow it to veto multiple fields of the Federal Voter Registration Form, which requires voters to provide "Home Address" and "Address Where [They] Get [Their] Mail If Different From [Their Home Address]" to ensure voters provide information "where [they] can be reached by mail." *See*

Act ("UOCAVA") requires election officials to establish procedures to "send by mail and electronically . . . voter registration applications and absentee ballot applications" to military and overseas voters not present in their home jurisdiction. 52 U.S.C. § 20302(a)(6)(B). UOCAVA's process to send important election mail to military and overseas voters would be similarly upended if federal law allowed state law to unilaterally change a voter's mailing address for election purposes. *Compare United States v. Ala.*, 778 F.3d 926, 928 (11th Cir. 2015) (UOCAVA is "aimed at ending the widespread disenfranchisement of military voters") *with* 52 U.S.C. § 20501(b)(2) (The purpose of the NVRA is "to make it possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office.").

State Defendants and Intervenors suggest that Section 4's unhoused voter mailing address requirement would apply only to individuals lacking a "usable" or "valid mailing address[]." ECF 168-1 at 54. But the text of Section 4 does not include such limiting terms, *see* O.C.G.A. § 21-2-217(a)(1.1), and this Court is "'not allowed to add or subtract words from a statute.'" *Houston*, 733 F.3d at 1334 (quoting *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,* 570 F.3d 1210, 1224 (11th Cir. 2009)). This is particularly true because Georgia law uses a broad definition of "homeless."

---

Federal *Voter Registration Application* , U.S. Election Assistance Commission at 2-3 (last visited Feb. 19, 2025), www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

*See, e.g.*, O.C.G.A. §§ 8-3-301(2), 3-7-23.1(a)(3), 36-80-31(a)(2) ("'Homeless [individual]' means [a] person[] who ha[s] no access to or can reasonably be expected not to have access to either traditional or permanent housing which can be considered safe, sanitary, decent, and affordable."). Even if Defendants' proposed rereading of the statute had the salutary effect of sparing some additional unhoused voters from Section 4's burdens, it would leave many others behind while creating new, thorny implementation-related questions, like, for example, which mailing addresses might be considered "usable" or "valid" by election officials.

For these reasons, the Court should deny the motions to dismiss Count V.

### 4. Plaintiffs Satisfy the NVRA's Pre-Suit Notice Requirements or Satisfy the Judicially Recognized Exception to Those Requirements (Counts I–VI).

#### i. State Defendants' NVRA Pre-Suit Notice Arguments Against Huynh, GAMVP, and VoteRiders Fail.

State Defendants argue that Plaintiffs Huynh, GAMVP, and VoteRiders have failed to satisfy the NVRA's pre-notice requirements. ECF 168-1 at 47-48.[20] As a threshold matter, Defendants' argument as to VoteRiders is entirely misplaced. VoterRiders brings only constitutional claims and does not assert claims under the NVRA. *See* Am. Compl. Counts VI, VIII, and IX. Mr. Huynh and GAMVP bring claims under both the U.S. Constitution and the NVRA. Their constitutional claims

---

[20] Gwinnett County also asserts Claim III fails "for some plaintiffs, due to their failure to properly comply with the pre-suit notice requirements." ECF 174 at 2.

are not subject to a notice requirement. The sole question before the Court is whether Mr. Huynh and GAMVP may also bring their NVRA claims before April 9, 2025 under the circumstances present here.

Mr. Huynh and GAMVP decided to participate in this litigation after the November 2024 election had passed. And, to that end, Mr. Huynh and GAMVP sent an NVRA notice letter to Defendants on January 9, 2025. While the normal procedure would usually involve waiting 90 days and filing or moving to amend the complaint on or after April 9, 2025, Mr. Huynh and GAMVP joined the Amended Complaint, which was filed with the Court on December 17, 2024. This was due principally to the Court-ordered deadline for filing the Amended Complaint and a desire to avoid causing undue delay.

If the Court were to dismiss Mr. Huynh's and GAMVP's NVRA claims without prejudice,[21] their constitutional claims in this case would remain. They could seek leave to re-file their NVRA claims on April 9, which is 90 days after they provided the requisite notice under the NVRA. Defendants could then move to dismiss those NVRA claims, potentially delaying the case and the adjudication of NVRA claims that were initially brought by NGP and APRI in

---

[21] If the Court rules against Mr. Huynh and GAMVP, Plaintiffs ask that any dismissal be without prejudice to allow refiling after the 90-day deadline. *See Rosebud Sioux Tribe v. Barnett*, 603 F. Supp. 3d 783, 791 (D.S.D. 2022) ("if a person fails to comply with the notice requirement and is dismissed as a plaintiff, the person may send a notice letter and file suit subsequently.").

July 2024. Under these unique circumstances, dismissing Mr. Huynh's and GAMVP's NVRA claims would disserve the Court's interest in promoting judicial economy and lead to unnecessary delay.

Mr. Huynh and GAMVP exclusively bring claims that were raised in the July 8, 2024 NVRA notice letter sent by NGP and APRI. *See* ECF 155-10, Am. Compl. Ex. 9. And, in fact, Mr. Huynh and GAMVP join NVRA claims initially brought by NGP and APRI. *See* ECF 155-1, Am. Compl. Appendix A, (Claims Chart). Defendants already had notice of the exact same NVRA violations and did not attempt compliance within 90 days. And the July 8 NVRA letter stated that it was written on behalf of "other persons and organizations similarly situated," so Defendants already had notice of other aggrieved parties. *See Rosebud Sioux Tribe,* 603 F. Supp. 3d at 793 (declining to dismiss non-parties to NVRA notice letter because it "advised [d]efendant of the claims at issue and designated 'others similarly situated' as possible aggrieved persons").

Both new Plaintiffs are undoubtedly similarly situated. Mr. Huynh is an unhoused individual. The July 8 NVRA letter explains in detail how Sections 4 and 5 harm unhoused people like Mr. Huynh. *See* ECF 155-10 at 3-4. And GAMVP is similarly situated to NGP and APRI, which must divert additional resources from core activities to assist voters harmed by the challenged provisions. *Id*. Requiring Mr. Huynh and GAMVP to submit yet another NVRA notice letter alleging the same

violations would prove futile and be needlessly duplicative without furthering the purpose of the NVRA's notice requirement. *See Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997); *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012) ("[T]he receipt of duplicative notices from the additional plaintiffs would not have furthered the purpose of the NVRA's notice requirement."); *Condon v. Reno*, 913 F. Supp. 946, 960 (D.S.C. 1995).

> ### ii.    Cobb County Defendants' NVRA Pre-Suit Notice Claims Fail.

Contrary to Cobb County Defendants' argument that Plaintiffs lack standing on their NVRA claims because they did not provide "proper" notice to the County, ECF 176-1 at 3,[22] Georgia NAACP and GCPA provided pre-suit notice on July 10, 2024, by sending it to all members of the Cobb County Board of Elections and Registration and their counsel. ECF 155-3; *see also* Ex. A (July 11, 2024 email correspondence from Cobb Cnty. Board of Elections). Counsel for Cobb County Defendants subsequently acknowledged receipt of the letter. *Id.* Plaintiffs therefore satisfied the notice requirements set forth in 52 U.S.C. § 20510; *see Ga. State Conf. of NAACP v Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2017).

---

[22] No other County defendants' motion to dismiss has argued that they were not provided with proper notice of Plaintiffs' NVRA claims because the letter was addressed to the Secretary of State but sent to seventeen counties.

Cobb County Defendants contend that they have since "corrected" certain alleged violations. ECF 176-1 at 6-7. But in addition to being an argument on the merits that is inappropriate for a motion to dismiss, this only further supports a finding that Plaintiffs satisfied their notice obligation. Moreover, although Cobb County Defendants claim to have denied certain voter challenges involving voter addresses, they do not claim to have adopted any policy against sustaining voter challenges of the type identified in the NVRA notice letter. Even if Cobb County Defendants denied these specific challenges on the basis that sustaining them would have violated the NVRA as alleged in Plaintiffs' NVRA notice letter—which Cobb County Defendants have neither alleged nor substantiated—that would do nothing to render the notice provided as somehow "improper" or insufficient to confer standing to bring suit to block sustaining such challenges in the future. Because Cobb County Defendants have acknowledged they received NVRA notice, and their NVRA violations will persist through their enforcement of SB 189, the Court should reject their notice argument.

The Court should deny motions to dismiss Counts I, II, and IV.

### B. Plaintiffs Have Adequately Stated Claims Under the U.S. Constitution.

Plaintiffs have stated claims under the U.S. Constitution. Sections 4 and 5 violate the fundamental rights of Georgia voters, including unhoused voters and military and overseas voters. Moreover, Section 5 violates voters' rights to

procedural due process and protection against arbitrary and disparate treatment as guaranteed by the Fourteenth Amendment.

### 1. Sections 4 and 5 of SB 189 Violate Voters' First and Fourteenth Amendment Rights.

Under the *Anderson-Burdick* standard, a court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). "However slight [the] burden may appear, it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Billups*, 554 F.3d at 1352 (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.)). Key to this balancing test is properly identifying (1) the injury, and (2) the particular state interest and the necessity of the burden.

Regulations that impose "severe burdens" on a plaintiff's rights "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022). A restriction is severe when it poses a significant

increase over the usual burdens of voting. *See Curling*, 50 F.4th at 122. "Lesser

burdens . . . trigger less exacting review." *Fair Fight Action, Inc.*, No. 1:18-CV-5391-

SCJ, 2019 WL 13221296, at *7 (citing *Timmons*, 520 U.S. at 358).

The *Anderson-Burdick* balancing test is fact-specific, and "[b]ecause [it]

'emphasizes the relevance of context and specific circumstances,' it is particularly

difficult to apply at the motion to dismiss stage." *Fla. State Conf. of NAACP v. Lee*,

566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021); *see also Bergland v. Harris*, 767 F.2d

1551, 1555 (11th Cir. 1985). Dismissing an *Anderson-Burdick* claim under Rule

12(b)(6) is thus generally inappropriate. *See*, *e.g.*, *Fla. State Conf. of NAACP*, 566

F. Supp. 3d at 1286.

> ### i.    Section 4 of SB 189 Violates Unhoused Voters' First and Fourteenth Amendment Rights (Count VIII).
>
> #### a.    Section 4 of SB 189 Impermissibly Burdens the Right to Vote.

Section 4 infringes on constitutionally protected rights of unhoused voters

without a permanent address. The discriminatory and arbitrary requirement for

unhoused voters without a permanent address to use their county registrar's office

as their mailing address for election mail causes significant harm. *See Obama for*

*Am. v. Husted*, 697 F.3d 423, 434-35 (6th Cir. 2012) (constitutional violation in part

due to discriminatory nature of burden imposed on nonmilitary voters). The

provision will either force counties to unilaterally change the mailing address for

unhoused voters without a permanent address to the county registrar's office or require unhoused voters without a permanent address to update their voter registration themselves. Am. Compl. ¶ 203. As discussed above, unhoused voters without a permanent address will then be forced to pick up election mail at a different address from where they regularly collect mail and only during the days and times when the registrar's office is open. *Supra* Argument I.D., II.A.2.ii, II.A.3. The provision also burdens unhoused voters because it lacks any mechanism to inform them when election mail is available to pick up, which increases the chances of unhoused voters missing important mail that can impact their ability to vote in an election or remain registered. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("even one disenfranchised voter—let alone several thousand—is too many"). The mandated mailing address for receiving election related mail  for unhoused voters additionally violates statutory rights provided to unhoused voters under Section 8 of the NVRA. *Supra* Argument II.A.2.ii, II.A.3.

In their brief, State Defendants compare the burden placed on unhoused voters in having to collect election mail from the county registrar's office with the burden of "obtaining a photo ID in order to vote in person or re-registering if removed during list maintenance." ECF 168-1 at 60. To the contrary, the burden imposed by the unhoused voter mailing address provision is significantly higher because it requires

unhoused voters to regularly travel to their county registrar's office—a different location from where they receive all of their other mail—to pick up their election mail, including, but not limited to, time sensitive NVRA-required notices, polling location changes, sample ballots, voter challenge notices, and other notices. Consequently, Section 4 requires unhoused voters to travel to the county registrar's office at a much higher frequency than the single time a voter needs to travel to obtain a photo ID, a burden further accentuated by the voters' uncertainty about when election mail might be sent to them. Additionally, the burden of frequently traveling to pick up election mail is much higher than re-registering to vote, which can also be done by mail or online in Georgia. *See* O.C.G.A. §§ 21-2-221.2, 21-2-223.

State Defendants also argue that the unhoused voter mailing address provision only applies to voters that are unhoused and without a permanent mailing address. ECF 168-1 at 40-41. As discussed above, this interpretation is wholly divorced from the plain reading of the provision, which ensnares all unhoused voters who happen to not have a permanent residential address. *Supra* Argument I.D., II.A.2.ii, II.A.3. Regardless, even if the provision somehow applied to unhoused voters without a

"permanent mailing address," the provision would still impose the same discriminatory and arbitrary burdens on unhoused voters.[23]

>           **b.    There Is No Sufficient Justification for the Burden
>                   Section 4 Imposes on Unhoused Voters.**

The significant restriction imposed by Section 4's unhoused voter mailing address provision only survives under *Anderson-Burdick* if it has been "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 288-89 (1992). Defendants do not characterize the unhoused voter mailing address provision as narrowly tailored, nor can they. The provision places a blanket restriction on all unhoused voters without a permanent address, and it provides no discretion to unhoused voters or election officials to use an address other than the county registrar's office. *See* O.C.G.A. § 21-2-217(a)(1.1).

*Anderson-Burdick* requires that even a minimal burden must be weighed against "the precise interests put forward by the State," and that courts must consider why "those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Defendants fail to provide any legitimate justification for the burden they impose on unhoused voters without a permanent

---

[23] State Defendants attempt to rely on Voting Rights Act precedent to claim that the state can impose discriminatory restrictions on unhoused voters without a permanent address because of their alleged population size. ECF 168-1 at 61-62. State Defendants' argument ignores the *Anderson-Burdick* precedent discussed in this and the previous section. *Supra* Argument II.B.1.

address. State Defendants instead offer the misleading and offensive assertion that Section 4 provides a service to unhoused voters, despite the fact that unhoused voters without a permanent address have no ability to opt out of the mailing address restriction. ECF 168-1 at 60; O.C.G.A. § 21-2-217(a)(1.1). State Defendants then conclude their analysis of Plaintiffs' claims in Count VIII by asserting that the unhoused voter mailing address provision promotes "conducting orderly elections and ensuring accurate voter rolls" without offering any explanation whatsoever. ECF 168-1 at 620. The allegations in the Amended Complaint show that the opposite is true. *Supra* Argument I.D., II.A.2.ii, II.A.3.

The Court should deny the motions to dismiss Count VIII.

> **ii.    Section 5 of SB 189 Violates the First and Fourteenth Amendments.**
>
> > **a.    Section 5's Nonresidential Address Provision Imposes a Severe Burden on the Right to Vote (Count VI).**

Section 5's nonresidential address challenge provision similarly violates the fundamental right to vote as protected by the First and Fourteenth Amendments to the U.S. Constitution because it imposes a severe burden on voters while failing to advance any sufficiently compelling state interest. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.

The probable cause provisions in Section 5 impose a severe burden on voters by subjecting voters with nonresidential addresses to challenge and

disenfranchisement without any clear way to rebut a finding of probable cause. Am. Compl. ¶ 215. During the 2024 General Election, voters who were challenged on the basis that their addresses were nonresidential were alerted of those challenges to their eligibility as late as Election Day. *Id.* ¶¶ 234, 270. Many of those voters were disenfranchised because "[m]any voters were not at the hearing, others left the hours-long hearing before their turn, and several voters who attended their individual hearing received an unfavorable ruling and were disenfranchised." *Id.* Because eligible Georgia voters have already been disenfranchised and more will be in the future unless this aspect of Section 5 is enjoined, it imposes a severe burden on their right to vote. Indeed, the Eleventh Circuit has recognized that imposing this type of burden on voters constitutes "at least a serious burden on the right to vote." *See Lee*, 915 F.3d at 1320-21. After all, it is a "basic truth that even one disenfranchised voter . . . is too many." *Id*. at 1321 (quoting *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014)).

The events in Fulton County on Election Day, as well as removals of nonresidential address voters from the rolls in Forsyth, Gwinnett, and Macon-Bibb Counties, Am. Compl. ¶¶ at 228-31, 239, demonstrate the fallacy of the State Defendants' argument that only voters who are not Georgia residents are swept in by the nonresidential address provision. *Compare id*. with ECF 168-1 at 7-8, 58. Not surprisingly, in the absence of a statutory definition, county election officials are

71

relying on various—and sometimes quite broad—definitions of "nonresidential address," leading to the removal of eligible voters who are in fact residents of that locality. Nothing in Section 5 prevents a county from sustaining a challenge disenfranchising an eligible voter simply because that voter resides at a location that is identified as commercial or industrial in nature—and indeed Section 5 invites such a result. Am. Comp. ¶¶ 216, 265, 293-94.[24] This is a severe burden under any analysis. Plaintiffs have adequately alleged that counties are *not* uniformly applying the State Defendants' proposed definition of nonresidential address—which hinges on election officials somehow knowing whether any given address actually has someone living at it—and those allegations must be taken as true. Defendants' motion to dismiss Count VI fails.

---

[24] Additionally, registrants participating in Georgia's VoteSafe program remain vulnerable to nonresidential address challenges under Section 5. State Defendants are correct that VoteSafe participants must register for the program with their residential address and that only their mailing address remains publicly available. ECF 168-1 at 9-10; *see* VoteSafe, Georgia Secretary of State (last visited February 17, 2025) https://sos.ga.gov/page/votesafe. As SB 189 contains no exemption for VoteSafe participants, it does not prevent the county from sustaining challenges on the basis that the only public address associated with their voter file is a nonresidential address. Also, without an exception for VoteSafe, a challenge under Section 5 puts VoteSafe participants in harm's way by forcing them to appear to defend their right to vote at a hearing.

b.    **Section 5 of SB 189 Imposes a Severe Burden on the Right to Vote of Military and Overseas Voters (Count VII).**

Defendants have also unduly burdened military and overseas voters' right to vote by making it more likely, and, in some cases, ensuring that voter eligibility challenges based only on unverified evidence will be upheld. *See* Am. Compl. ¶¶ 302-06. This significantly increases the risk of disenfranchisement or removal from the voter rolls of eligible Georgia voters. *Id.* ¶ 305.

The facts alleged in the Amended Complaint are more than sufficient to establish that Section 5 severely burdens the right to vote for military and overseas voters, is not reasonably tied to Georgia's proffered state interest, and that the burden on Plaintiffs' right to vote outweighs any claimed state interest.

In *Obama for America,* the Sixth Circuit held the district court did not err in finding that the defendant placed more than a usual burden on nonmilitary voters by eliminating early voting options that would result in "thousands of voters who would have voted during those three days [to] not be able to exercise their right to cast a vote in person." 697 F.3d at 431. Notably, in arguing in district court that nonmilitary voters were not burdened by the state's directive, the state specifically argued that "[m]ilitary voters have almost no control over their schedules, particularly in times of sudden deployment," such that the state was obligated to provide additional opportunities for them to vote. *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 908

(S.D. Ohio 2012), *aff'd*, 697 F.3d 423 (6th Cir. 2012). Likewise, *Curling* recognized

that "

> if excessive wait times result in many voters leaving their polling places
> before voting, and doing so with a likelihood that they will not return
> to vote, that may well rise to the level of a severe burden."

50 F.4th at 1123. Thus, burdens which make it substantially more likely that voters

are not able to cast their ballot rise above the "usual burdens" of voting to state an

*Anderson-Burdick* claim.

Section 5 not only exacerbates existing obstacles military and overseas voters

face, but it adds new ones, imposing a severe burden on their right to vote. *See* Am.

Compl. ¶¶ 137-49; 302-08. Military and overseas voters face more barriers to voting

than the average voter because they move frequently, often must request an absentee

ballot, and can face severe mail delays while living abroad, which impacts when

they receive their absentee ballots and when their voted ballots are received by

election officials." *Id.* ¶ 135, *see also id.* ¶ 146. Because these voters move frequently,

they often appear in the NCOA database, which means they are disproportionately

subjected to challenges erroneously declaring these voters have moved and are no

longer residents of Georgia. *Id.* ¶¶ 147-48, 224-228, 238. Wrongfully challenged

military and overseas voters must prove their eligibility to vote and often have

difficulty doing so. *Id.* ¶ 149. For example, a voter may only be able to rebut the

challenge by appearing at a virtual hearing in the middle of their night due to time

zone differences or need to locate documents on a separate continent to prove they are a Georgia resident. *Id*. ¶ 305. These hoops are more than the "usual burdens" associated with exercising the right to vote. *Curling*, 50 F.4th at 1123; *see also Obama for Am.*, 697 F.3d at 431; Frank v. Walker, 768 F.3d 744 (7th Cir. 2014) (collection of documents and "stand[ing] in line" deemed not "hard"). The Amended Complaint alleges that in previous election cycles and since SB 189 was enacted, hundreds of thousands of voters have been erroneously challenged and some of these challenges have been sustained, leading to some individuals needing to defend their right to vote. Am. Compl. ¶¶ 164-66, 169-174, 242. Various counties have sustained wrongful voter challenges based on allegations a voter has moved or resides at a nonresidential address and voted to remove those voters from the voter rolls. *Id*. ¶¶ 176-180.

Previously, county boards of registrars had the discretion to dismiss unfounded challenges and often did so. By removing county boards of registrars' discretion to dismiss unfounded challenges, Section 5 now requires such erroneous challenges against votersto be sustained, forcing challenged voters to defend their right to vote, or if they are unable to, face disenfranchisement or removal from the voter rolls entirely. *Id*. ¶ 224-228. Section 5 thus imposes a severe burden on the right to vote for voters, including those in the military and overseas.

### c. There is No Sufficient Justification for the Burdens Imposed by Section 5 of SB 189.

Section 5 is not remotely justified by any sufficient regulatory interest. Though Defendants claim Section 5 ensures the accuracy of Georgia's voter rolls, ECF 168-1 at 57, it in fact does the opposite. The provision forces county boards of registrars to sustain Section 230 challenges, even when they are based on unsubstantiated, unverified, or faulty data, *see* Am. Compl. ¶¶ 205, 302-303, 339-340, creating a high likelihood that eligible Georgia voters will be disenfranchised and eventually removed from the voter rolls. The history of voter eligibility challenges in Georgia demonstrates as much—county boards dismissed most mass voter challenges prior to SB 189. *See id.* ¶¶ 170-71, 175. Thus, rather than ensure accuracy, by removing county boards' discretion to dismiss erroneous challenges, Section 5 makes it more difficult for local officials to maintain accurate voter rolls, and makes election administration less efficient by inviting and forcing adjudication of unsubstantiated voter challenges. *See id.* ¶¶ 170-71, 175, 205, 302-303, 339-340. Defendants' unsubstantiated recitation of a previously-recognized state interest does not defeat Plaintiffs' well-pled allegations. This Court must still conduct a fact-intensive inquiry to weigh the burden on the right to vote against the state's proffered regulatory interest. *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups*, 439 F. Supp. 2d 1294, 1350 (N.D. Ga. 2006) ("the fact that the interest asserted is important and is legitimate does not end the Court's inquiry.").

While the state has asserted an abstract "interest in preserving the integrity of its election process," ECF 168-1 at 57, Section 5 is not narrowly drawn to advance that interest because many eligible voters will be subject to challenge and potential disenfranchisement on the basis that their address is deemed "nonresidential," despite actually residing at that address, or on the basis that they have moved, despite being a Georgia resident. Am. Compl. ¶¶ 294-96, 302-03. Simply put, by failing to define "nonresidential," and allowing unreliable evidence to be considered in the determination that a voter has moved, SB 189 casts the net too wide. And by failing to provide a clear means for eligible voters to rebut a finding of probable cause made on the basis of the nature of their address, SB 189 further burdens eligible voters while utterly failing to advance the state's proffered interest.

Section 5 imposes a severe burden and threat of disenfranchisement and/or removal from the rolls on voters with a nonresidential address, including military and overseas voters, and is unjustified by any supposed state regulatory interest.

The Court should deny the motions to dismiss Counts VI and VII.

## 2. Plaintiffs Sufficiently Pled Due Process Claims (Counts IX and X).

The Amended Complaint alleges that Section 5 violates the procedural due process protections guaranteed by the U.S. Constitution as to all voters (Count IX) and as to overseas and military voters (Count X). Defendants wrongly assert that Plaintiffs cannot challenge these provisions as Due Process violations and must

instead address them only under the *Anderson-Burdick* framework (as Plaintiffs have done elsewhere in the Amended Complaint).[25] *See* ECF 168-1 at 56 n.16. Defendants also ignore key statutory language that makes clear how SB 189 jeopardizes the right to vote not only as a burden on voters properly evaluated under the *Anderson-Burdick* standard, but also separately as a denial of Due Process evaluated under the standards established in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), and *Mathews v. Eldridge*, 424 U.S. 319 (1976). In short, and as described more thoroughly herein, Section 230, as amended by Section 5, is not only a voting regulation, but also establishes an administrative process through which voters may be deprived of their right to vote without the safeguards guaranteed by the Due Process Clause.

The Due Process Clause requires notice and the opportunity to be heard before the deprivation of a fundamental right, including the right to vote. *Mullane*, 339 U.S. at 314; *Georgia Muslim Voter Project*, 918 F.3d 1262, 1267 (11th Cir. 2019) (Pryor, Jill, J., concurring in stay-panel's opinion) (finding the right to vote a liberty interest

---

[25] Defendants base their assertion on a stay panel opinion—*New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). A "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.,* 950 F.3d 790, 795 (11th Cir. 2020) (emphasis original); *accord Jacobson*, 974 F.3d at 1256. Eleventh Circuit binding authority makes clear that Due Process claims implicating the right to vote are to be analyzed under the traditional due process framework. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020).

protected by the Due Process Clause). Notice is adequate where "[it is] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314; *Dorman v. Aronofsky*, 36 F.4th 1306, 1315 (11th Cir. 2022) (noting that the *Mullane* test applies to determining the adequacy of notice). The Due Process Clause demands that notice of the challenge to the voter's eligibility and an opportunity for them to be heard regarding the challenge "must be granted at a meaningful time and in a meaningful manner" in order to prevent erroneous deprivation of their right to vote. *Armstrong*, 339 U.S. at 552. And at times, the Due Process Clause requires additional procedural safeguards, even if notice and an opportunity to be heard are provided, to prevent erroneous deprivation of a fundamental right. *See Mathews*, 424 U.S. at 335 (when the risk of erroneous deprivation outweighs the costs of additional procedures, such procedures are required to prevent against such deprivation).

Multiple courts, both within and outside of the Eleventh Circuit, have applied the traditional procedural due process framework to claims implicating the right to vote. *Georgia Muslim Voter Project*, 918 F.3d at 1267 (Pryor, Jill, J., concurring in stay-panel's opinion) (*Mathews* factors supported an injunction against rejecting absentee ballot applications and ballots based on perceived signature mismatch); *Jones*, 975 F.3d at 1048 (*Mathews* applied to deprivations of liberty based on

adjudicative actions implicating the right to vote); *United States v. State of Tex.*, 252 F. Supp. 234, 250 (W.D. Tex. 1966), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966) (enforcement of a poll tax as a prerequisite to voting violated the Due Process Clause); *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982) (applying *Mathews* to a procedural due process claim regarding inadequate notice of pending disenfranchisement for a person previously incarcerated); *see also Frederick v. Lawson,* 481 F. Supp. 3d 774 (S.D. Ind. 2020) (applying *Mathews* to signature matching process); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338-40 (N.D. Ga. 2018) (same); *Doe v. Rowe*, 156 F. Supp. 2d 35, 48 (D. Me. 2001) ("When the State chooses to use such proceedings as the basis for the denial of a fundamental liberty, an individual is entitled to basic procedural protections that will ensure 'fundamental fairness.'").

State Defendants concede that *Mathews* is properly applied for adjudicative actions, ECF 168-1 at 56 n. 16, which would include the type of governmental conduct at issue here.[26] Section 230, as amended by Section 5, sets out an adjudicative process by which counties determine the eligibility of a Georgia voter

---

[26] State Defendants falsely claim they play no role in the adjudicative process of voter eligibility challenges, but Defendant SOS is responsible for providing guidance to counties on adjudicating challenges under Sections 229 and 230, *see* O.C.G.A. § 21-2-50, and SEB Defendants are responsible for promulgating rules interpreting state elections laws by which the defendant class of county board members are bound, *see* O.C.G.A. § 21-2-31.

whose eligibility has been challenged. Am. Compl. ¶¶ 150-163; *see Majority Forward*, 512 F. Supp. 3d at 1354 (Section 230 process is one which entails evidence, analysis, and final determination by county boards of registrars). Indeed, in *Jones*, which Defendants cite, the court held that "voter-eligibility determinations . . . could qualify as adjudicative action[s]." 975 F.3d 1016, 1049 (11th Cir. 2020). And unlike the adjudicative process at issue in *Jones*, challenged voters in Georgia are not guaranteed notice or the opportunity to be heard. *Id.*; O.C.G.A. § 21-2-230. Thus, Plaintiffs have stated valid procedural due process claims that require this Court to consider whether Defendants have provided the threshold requirements of sufficient notice and an opportunity to be heard under *Mullane*, or whether additional safeguards are necessitated, which defendants concede should be analyzed under *Mathews*. *Mullane,* 339 U.S. at 314; *Armstrong*, 339 U.S. at 550, 552; ECF 168-1 at 56 n. 16.

Following the changes of Section 5, Section 230 challenges infringe on rights that are at the core of procedural due process. Section 230's procedural safeguards were ineffective even before SB 189, Am. Compl. ¶¶ 164, 167, 234, but now that counties no longer have the discretion to dismiss these unfounded challenges, SB 189 significantly increases the need for meaningful notice and opportunity to be heard to prevent the disenfranchisement of eligible voters.

Given Section 5's changes, Section 230's process for adjudicating voter eligibility challenges now fails to satisfy both of *Mullane's* requirements. 339 U.S. at 314. First, Section 230 does not require notice to the voter, but simply asks that county boards of registrars provide notice of a voter eligibility challenge—which can result in disenfranchisement or removal from the voter rolls—"if practical." Am. Compl. ¶¶ 157; 160; 208. Counties have varied in how they have implemented this suggestion. *Id.* ¶ 158. Some voters never receive notice and are confronted and must defend their right to vote when they show up to vote on Election Day, which is difficult, if not impossible, for all voters and is not an option at all for most military and overseas voters. *Id.* ¶ 158; 164; 341. Second, Section 230 only requires a hearing to be held to evaluate a sustained voter challenge if the challenged voter votes in person, which is almost never the case for military and overseas voters. *Id.* ¶¶ 143; 160; 162. Even if the county does provide a hearing, voters are not always able to appear (if they are even aware of it) nor are they afforded an effective opportunity to be heard because they are forced to wait for hours for the hearing to take place. *Id.* ¶¶ 234; 305. Challenged voters have been provided with no information or guidance on how they might rebut a determination that their address is nonresidential, nor are they likely to possess or have brought with them documentation or other evidence that might be sufficient to rebut such a determination. *Id*. ¶¶ 161, 185. Additionally, for military and overseas voters to have

82

an opportunity to be heard, boards must make accommodations for these voters, such as a virtual or telephonic option, so that voters temporarily residing out of state may be able to appear at a hearing and defend their right to vote. *Id.* ¶ 343. Defendants do not even attempt to contend that, in light of SB 189, Section 230's process to adjudicate voter eligibility challenges is constitutionally adequate. ECF 168-1 at 55-59.

The Court should deny the motion to dismiss Counts IX and X.

### 3.    Plaintiff SFI Sufficiently Pled an Equal Protection Claim (Count XI).

As with Plaintiffs' due process claims, State Defendants incorrectly argue that the *Anderson-Burdick* balancing test applies to Plaintiff SFI's equal protection claim, rather than addressing the merits of the alleged arbitrary and disparate treatment. But where the right to vote and ability to cast an effective ballot is at issue, it is not necessary to "address or cite *Burdick* when applying a heightened standard of review." *See Stewart v. Blackwell*, 444 F.3d 843, 860-62 (6th Cir. 2006); *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1339 n. 35 (N.D. Ga. 2019); *see also Obama for Am.*, 697 F.3d at 429. SFI pled sufficient facts to state a claim that Defendants' non-uniform, arbitrary, and disparate treatment of voters under Section 5 imposes a severe burden that violates the Equal Protection Clause. Am. Compl. ¶¶ 222-42, 350-59.

"[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); Am. Compl. ¶ 352. Thus, "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); Am. Compl. ¶ 352. Where the government fails to ensure that a person's vote in one county is valued equally to that of a voter in a different county, it may be subject to an Equal Protection claim, and the court must determine whether the "absence of specific standards" or the "formulation of uniform rules" resulted in the arbitrary, disparate, or unequal treatment of voters. *Bush v. Gore*, 531 U.S. at 106; *Browning*, 522 F.3d at 1186; *see also Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016); Am. Compl. ¶ 353.

Georgia voters' eligibility is subject to arbitrary and disparate treatment as counties interpret and apply Section 5 differently. Am. Compl. ¶¶ 222-42, 354-56. Similarly situated voters are subject to different challenge processes,[27] and different probable cause standards and interpretations. *Id.* ¶¶ 224-42, 354-56. The Amended Complaint includes several examples of the disjointed approaches various counties are taking to challenges based on residency data. *Id.* ¶¶ 224-39. These discrepancies lead to arbitrary results in who is permitted to exercise their right to vote and who is

---

[27] For example, some counties treat Section 5 challenges as Section 229 challenges, where others treat as Section 230 challenges. Am. Compl. ¶ 236.

not, and thus the constitutional right to participate in elections on an equal basis is denied. *Id.* ¶¶ 354-56.

SFI does not seek an unreasonable level of "absolute uniformity," ECF 168-1 at 57 n. 17, but only the protections ensured by the Fourteenth Amendment and cases guaranteeing the right to have one's vote counted on equal terms. *Dunn*, 405 U.S. at 336 (1972);[28] *Reynolds v. Sims*, 377 U.S. 533, 567–68 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964); *Gray v. Sanders*, 372 U.S. 368, 380 (1963). To that end, Count XI pertains not to the "systems for implementing elections" alone, *Bush*, 531 U.S. at 109, but rather to the "absence of specific standards" to ensure the equal application of the state's laws. *Id.* at 105-06.[29]

---

[28] State Defendants' attempt to distinguish *Dunn* as a pre-*Anderson* case dealing with durational residency requirements is unavailing. ECF 168-1 at 58 n. 17. Even after *Anderson*, *Dunn* continues to be part of a tradition of constitutional law. "In decision after decision, [the Supreme Court] has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *See Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 232 (6th Cir. 2011); *Wexler v. Anderson*, 452 F.3d 1226, 1231-32 (11th Cir. 2006); *see also Browning*, 522 F.3d at 1190 n. 40.

[29] Defendants' reliance on *Donald J. Trump for President, Inc. v. Bullock* is inapposite. ECF 168-1 at 57-58 n.17 (citing 491 F. Supp. 3d 814, 836-837 (D. Mont. 2020). Here, Plaintiffs do not challenge merely the use of different voting methods such as absentee ballots or electronic interfaces, but rather the imposition of completely different challenge processes and different probable cause standards that yield opposing conclusions for similarly situated voters. Am. Compl. ¶¶ 222-42, 354-56. Such a lack of  uniformity violates the Equal Protection Clause. *Bush*, 531 U.S. at 106; Am. Compl. ¶¶ 222-42, 354-56.

Since *Bush*, courts have confirmed that the Equal Protection "analysis [is] applicable in challenges to voting systems" that "arbitrarily [deny] its citizens the right to vote or burdens the exercise of that right based on where they live [including] county to county." *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476-78 (6th Cir. 2008) (internal citation omitted). Thus, Plaintiffs plausibly allege under Claim XI that Defendants' arbitrary and disparate treatment of voters violates the Equal Protection Clause.[30]

## C. Plaintiffs Plausibly Allege a Claim Under the Civil Rights Act of 1964 (Count XII).

Plaintiffs have adequately alleged a claim under the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(A). Controlling Eleventh Circuit precedent confirms Plaintiffs may pursue a private right of action under the Civil Rights Act. And the plain text of the statute and long-standing precedent make clear that Plaintiffs need not allege racial discrimination in such a claim. Section 5 requires Defendants to treat certain voters differently within a jurisdiction and thereby runs afoul of the Civil Rights Act.

---

[30] For the reasons described *supra* at Argument II.B.3(ii), Plaintiffs have also stated a claim under the *Anderson-Burdick* standard.

1.    **Plaintiffs Adequately Allege a Private Right of Action Under the Civil Rights Act.**

As they acknowledge, State Defendants' argument that Plaintiffs are not entitled to bring their Civil Rights Act claim is foreclosed by binding Eleventh Circuit law. ECF 168-1 at 45; *see Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003). State Defendants nonetheless attempt to cast doubt on *Schwier* based on dicta having nothing to do with the Plaintiffs' Civil Rights Act claim. ECF 168-1 at 45 (*citing Vega v. Tekoh*, 597 U.S. 134, 150 n.6 (2022) (finding *Miranda* violations do not confer a right to sue)). The Eleventh Circuit has determined that the law authorizes private litigation to address this sort of violation—a conclusion the court reached after performing the analysis required by Supreme Court precedent. *Schwier*, 340 F.3d at 1296-1297 (internal citations omitted). And the Fifth Circuit recently endorsed *Schwier*'s analysis notwithstanding the "more recent Supreme Court decisions" on which the State Defendants rely. *Vote.Org*, 89 F.4th at 477.

Courts in this district have continued to hold that private litigants may bring claims under the Civil Rights Act. *See Vote.org v. Ga. State Elections. Bd.*, 661 F. Supp. 3d 1329, 1338-1339 (N.D. Ga. Mar. 9, 2023); *In re Georgia S.B. 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *9 n.16 (N.D. Ga. Aug. 18, 2023); *Common Cause/Ga. League of Women Voters of Ga., Inc.*, 439 F. Supp. 2d at 1355; *see also Vote.Org*, 89 F.4th at 473-76.

State Defendants' arguments that, despite *Schwier*, organizations may not enforce the Civil Rights Act fare no better. Voting rights organizations brought all of the cases cited above. *Ga. State Elections. Bd.*, 661 F. Supp. 3d at 1334; *In re Ga. S.B. 202*, 2023 WL 5334582, *1; *Billups*, 439 F. Supp. 2d at 1301-1302.[31] And although organizations themselves cannot vote, "[a]n organizational plaintiff has standing to enforce the rights of its members." *Arcia*, 772 F.3d at 1342 (cleaned up). Moreover, in addition to Huynh, SFI has brought suit on behalf of its members, who certainly are individuals whose voting rights are protected by the Civil Rights Act. Am. Compl. ¶¶ 44, 59, 66, 71; *supra* Argument I.B. State Defendants' argument regarding a private right of action is without merit.

### 2.    The Amended Complaint States a Claim Under the Civil Rights Act.

The Civil Rights Act of 1964 provides that

> [n]o person acting under color of law shall—in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote . . .

52 U.S.C. § 10101(a)(2)(A) (the "Uniformity Provision"). Count XII alleges that Section 5 violates the Uniformity Provision by treating voters registered at

---

[31] As in this case, there was also one individual plaintiff in *Billups*. 439 F. Supp. 2d at 1302.

nonresidential addresses differently by reflexively upholding Section 230 challenges brought against them. State Defendants and Intervenors both try to escape the application of this plain language, first by attempting to inject another requirement into the text of the statute and second by trying to avoid its meaning. Neither argument is persuasive.

### 3. The Uniformity Provision Does Not Require Allegations of Racial Discrimination.

Both State Defendants and Intervenors try to import a racial discrimination requirement into the Uniformity Provision. ECF 168-1 at 62-63; ECF 170-1 at 17-20. The text supports no such requirement and is instead written broadly to cover "*any* standard, practice, or procedure different" from that applied "to other individuals." 52 U.S.C. § 10101(a)(2)(A) (emphasis added). Given the breadth of the statute, it is not surprising that federal courts have long held the Uniformity Provision may be applied "to prohibit discrimination on non-racial as well as racial grounds." *Frazier v. Callicutt*, 383 F. Supp. 15, 20 (N.D. Miss. 1974); *Auerbach v. Kinley*, 499 F. Supp. 1329, 1339-1340 (N.D.N.Y. 1980) (allegations of racial discrimination are not a prerequisite for a claim under the Uniformity Provision); *Ball v. Brown*, 450 F. Supp. 4, 7 (N.D. Ohio 1977). For example, within a decade of the statute's enactment, a district court enjoined a requirement for "students to fill out a supplemental questionnaire involving questions concerning their domicile unless all applicants are required to complete the same questionnaire." *Shivelhood v.*

*Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1970). More recently, a federal district court held the Uniformity Provision barred further investigation of naturalized voters who county recorders suspect are not U.S. citizens without reference to race. *Mi Familia Vota*, 719 F. Supp. 3d at 995-996. The Eleventh Circuit has similarly applied a parallel provision of 52 U.S.C. § 10101(a)—the "Materiality Provision"—without regard to discriminatory motive. *Schwier*, 439 F.3d 1286; *Browning*, 522 F.3d at 1174 ("[W]e recognize that Congress in combating specific evils might choose a broader remedy. The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent.") (cleaned up).

Neither State Defendants nor Intervenors provide a compelling reason why this Court should depart from the plain text of the statute and impose this atextual requirement. ECF 170-1 at 17; ECF 168-1 at 62. In at least one of Defendants' cases, the court expressly declined to issue the holding that the defendants ask this Court adopt. *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 662 (M.D.N.C. 2024); *see also La Union del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 763 n.31 (W.D. Tex. 2023) (explaining *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) was mistakenly decided). And as recently as 2023, a court in this circuit held there is no such requirement under the Civil Rights Act. *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1054-1055 (N.D. Fla. Oct. 30, 2023).

Intervenors' reliance on 52 U.S.C. § 10101(e) is unavailing. ECF 170-1 at 18. Subsection (e) establishes a different procedure for district courts to follow, and different remedies to provide, upon a finding that a person "has been deprived on account of race or color of any right or privilege secured by subsection . . . pursuant to a pattern or practice." 52 U.S.C. § 10101(e); *see e.g. United States v. Ward*, 349 F.2d 795, 800-802 (5th Cir. 1965). The existence of a wholly separate subsection requiring allegations of racial discrimination undermines, rather than supports, Intervenors' argument. Subsection (e) demonstrates that, if Congress intended to include racial discrimination as an element of the Uniformity Provision, it knew how to do so. Congress's decision not to do so indicates no such requirement exists. *In re Haas,* 48 F.3d 1153, 1156 (11th Cir. 1995) ("Where Congress knows how to say something but chooses not to, its silence is controlling."). Because the text of the Uniformity Provision plainly includes no requirement of allegations of racial discrimination, Intervenors' constitutional avoidance argument has no purchase. *Compare* ECF 170-1 at 18-19 *with United States v. Oakland Cannabis Buyers' Co-op*., 532 U.S. 483, 494 (2001) ("the canon of constitutional avoidance has no application in the absence of statutory ambiguity."); *see also Ga. Election Bd.*, 661 F. Supp. 3d at 1342. Courts have continuously upheld Section 10101 of the Civil Rights Act (and previous iterations thereof) as appropriate applications of Congress's authority. *United States v. State of Ala.*, 188 F. Supp. 759, 762 (M.D. Ala.

1960) (listing cases); *see also United States v. Raines*, 362 U.S. 17, 28 (1960) (Frankfurter, J., concurring in the judgment). And the Supreme Court has long held, and recently affirmed, that the Fifteenth Amendment does not prohibit Congress from regulating voting practices even absent a showing of racial motivation. *Allen v. Milligan*, 599 U.S. 1, 41 (2023) (citing *City of Rome v. U.S.*, 446 U.S. 156, 173 (1980)). A separate district court recently rejected this precise argument—also raised there by Intervenor Republican National Committee—in a case involving the Materiality Provision. *Byrd*, 700 F. Supp. 3d at 1055.

Each of the plaintiff groups bringing a Civil Rights Act Claim—NGP, GAMVP, APRI, and SFI—represents and works on behalf of large groups of Georgia voters, particularly voters of color. *See* Am. Compl. ¶¶13-14, 19-21, 29, 73. But the relevant portion of the Civil Rights Act is not limited to claims involving racial discrimination, and this Court should not re-write the statute to preclude the relief Congress sought to grant. *Byrd*, 700 F. Supp. 3d at 1055.

### 4. Section 5 of SB 189 Violates the Civil Rights Act by Treating Voters Differently Within the Same County.

The Uniformity Provision "mandates that [election] officials refrain from applying differential standards or procedures to 'any individual.'" *Mi Familia Vota*, 719 F. Supp. 3d at 991. By mandating a finding of probable cause to sustain a voter challenge under Section 230, Section 5 does precisely what the Uniformity Provision prohibits—it singles out a category of voters who will be forced to endure additional

procedures to make their votes effective. There is no requirement that a Georgia voter reside at a "residential address." *See* O.C.G.A. § 21-2-217. Yet under Section 5, two similarly situated voters on the same challenge list—one who is registered at a nonresidential address and one who is not—will be treated differently. One will have to endure additional proceedings, including a potential hearing. O.C.G.A. § 21-2-230(b); Am. Compl. ¶¶ 156-163 (describing Section 230 challenge procedures). Such a voter will not be able to vote without rebutting the challenge and is at risk of being removed from the registration list. O.C.G.A. § 21-2-230(g)-(i). This is a quintessential Uniformity Provision violation.

State Defendants claim that any voter registered at a nonresidential address cannot be a resident of Georgia and, therefore, cannot vote. ECF 168-1 at 63. But eligible voters may nonetheless be living in or registered at nonresidential addresses, such as campus dormitories, nursing homes, on the street, and military facilities. *See e.g.* Am. Compl. ¶¶ 40, 41, 73, 142, 214, 217, 294.

Intervenors' argument that Section 5 regulates evidence and not voters, *see* ECF 170-1 at 14-16, is equally unpersuasive as it conflates the residency requirement of O.C.G.A. § 21-2-216(a)(4) with a requirement that does not exist under Georgia law that a person reside at a residential address. A voter establishes that they are a resident when they register to vote, and Georgia law describes how a voter may do so. O.C.G.A. §§ 21-2-220(c), 21-2-417(c). But maintaining a

permanent residence or residential mailing address is not a qualification to register or to be eligible to vote. *See* O.C.G.A. §§ 21-2-216, 21-2-217(a). Indeed, voters may establish residence by, for example, identifying, drawing, or otherwise describing the physical location where they are residing, such as a sidewalk, trailer, car location, or a local park. *See e.g.* Am. Compl. ¶¶ 126-130, 138-143. Plaintiffs are not challenging any aspect of Georgia's initial voter registration process. Rather, Section 5 applies to a wholly separate aspect of Georgia's elections processes—Section 230 challenges, which necessarily involve voters who have *already* established their residence for purposes of voter registration. Section 5 nonetheless treats one category of those voters—those with nonresidential addresses—differently, in violation of the Uniformity Provision. This is not merely an evidentiary issue: "a voter for whom a challenge is ultimately upheld will not be allowed to cast a ballot." *Majority Forward*, 512 F. Supp. 3d at 1368. For much the same reason, Intervenors' reliance on *Indiana Democratic Party v. Rokita* and *Gonzalez v. Arizona* is misplaced. ECF 170-1 at 15-16. *Rokita* involved a challenge to a standard that differed across two different voting practices—absentee and in-person, election-day voting. 458 F. Supp. 2d 775, 840 (S.D. Ind. 2006); *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008). *Gonzalez*, which relied on *Rokita*, likewise involved differing standards for early voting and election-day voting. *Gonzalez v. Arizona*, No. CV 06-1268-PHX-ROS,

2006 WL 8431038, at *8 (D. Ariz. Oct. 12, 2006). Both cases addressed what the respective district courts described as "*inherently* different procedure[s]" in determining that the Uniformity Provision did not apply. *Id.*; *see also Rokita*, 458 F. Supp. 2d at 830-31. That is plainly not the case here, where voters on the same Section 230 challenge list may be subject to differing procedures and outcomes based solely on the nature of their address. This is precisely the type of differential standard the Uniformity Provision prohibits. 52 U.S.C. § 10101(a)(1)(A).

The Court should deny motions to dismiss Count XII.

## CONCLUSION

For all of these reasons, Plaintiffs respectfully request that this Court deny all Defendants' and Intervenors' Motions to Dismiss.

Respectfully submitted this 21st day of February, 2025,

<table>
<tr><td></td><td>/s/John A. Freedman</td></tr>
<tr><td>Caitlin May (Ga. Bar No. 602081)</td><td>John A. Freedman*</td></tr>
<tr><td>Cory Isaacson (Ga. Bar No. 983797)</td><td>Jeremy Karpatkin*</td></tr>
<tr><td>Akiva Freidlin (Ga. Bar No. 692290)</td><td>Rachel L. Forman*</td></tr>
<tr><td>**ACLU FOUNDATION OF GEORGIA, INC.**</td><td>**ARNOLD & PORTER KAYE SCHOLER LLP**</td></tr>
<tr><td>P.O. Box 570738</td><td>601 Massachusetts Ave. N.W.</td></tr>
<tr><td>Atlanta, Georgia 30357</td><td>Washington, DC 20001</td></tr>
<tr><td>(678) 310-3699</td><td>(202) 942-5000</td></tr>
<tr><td>cisaacson@acluga.org</td><td>john.freedman@arnoldporter.com</td></tr>
<tr><td>cmay@acluga.org</td><td>jeremy.karpatkin@arnoldporter.com</td></tr>
<tr><td>afreidlin@acluga.org</td><td>rachel.forman@arnoldporter.com</td></tr>
<tr><td></td><td>Michael A. Rogoff*</td></tr>
<tr><td></td><td>**ARNOLD & PORTER KAYE**</td></tr>
</table>

95

Julie M. Houk*
**Lawyers' Committee for Civil Rights Under Law**
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
General Fax: (202) 783-0857
jhouk@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
rsnow@lawyerscommittee.org
sheyward@lawyerscommittee.org
jlewis@lawyerscommittee.org

Neil A. Steiner*
Mara Cusker Gonzalez*
Biaunca S. Morris*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Neil.steiner@dechert.com
Mara.cuskergonzalez@dechert.com
Biaunca.morris@dechert.com

Lindsey B. Cohan*
**Dechert LLP**
515 Congress Ave. STE 1400
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
Lindsey.cohan@dechert.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, and VoteRiders*

**SCHOLER LLP**
250 West 55th Street
New York, NY 10019
(212) 836-8000
michael.rogoff@arnoldporter.com

John Powers*
Hani Mirza*
Matthew A. Fogelson*
**ADVANCEMENT PROJECT**
1220 L Street Northwest, Suite 850
Washington, DC 20005
(415) 238-0633
jpowers@advancementproject.org
hmirza@advancementproject.org
mfogelson@advancementproject.org

Bryan L. Sells
Georgia Bar No. 635562
**THE LAW OFFICE OF BRYAN L. SELLS, LLC**
P.O. Box 5493
Atlanta, GA 31107
Tel: (404) 480-4212
bryan@bryansellslaw.com

*Admitted Pro Hac Vice*

*Counsel for Plaintiffs New Georgia Project, Sang Huynh, Georgia Muslim Voter Project, and A. Philip Randolph Institute*

Katherine L. D'Ambrosio (Ga. Bar No. 780128)
Jennifer Virostko (Ga. Bar No. 959286)
Ben Watson (Ga. Bar No. 632663)
**COUNCILL, GUNNEMANN & CHALLY LLC**

96

75 14th Street, NE, Suite 2475
Atlanta, GA 30309
(404) 407-5250
kdambrosio@cgc-law.com
jvirostko@cgc-law.com
bwatson@cgc-law.com

Alice Huling*
Danielle Lang*
Valencia Richardson*
Daniel S. Lenz*
Rachel Appel*
Lucas Della Ventura*
**CAMPAIGN LEGAL CENTER**
1101 14th St. NW, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
ahuling@campaignlegalcenter.org
dlang@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
rappel@campaignlegalcenter.org
ldellaventura@campaignlegalcenter.org

*Admitted Pro Hac Vice*

*Counsel for Plaintiff Secure Families
Initiative*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

> */s/ John A. Freedman\**
> John A. Freedman
> **ARNOLD & PORTER KAYE**
> **SCHOLER LLP**
> 601 Massachusetts Ave. N.W.
> Washington, DC 20001
> (202) 942-5000
> john.freedman@arnoldporter.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2025, I electronically filed the foregoing PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANTS' AND INTERVENORS' MOTIONS TO DISMISS with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record in this matter.

> */s/ John A. Freedman\**
> John A. Freedman
> **ARNOLD & PORTER KAYE**
> **SCHOLER LLP**
> 601 Massachusetts Ave. N.W.
> Washington, DC 20001
> (202) 942-5000
> john.freedman@arnoldporter.com