**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

A. PHILIP RANDOLPH INSTITUTE, *et al.*,

   Plaintiffs,

             v.

BRAD RAFFENSPERGER, *in his official capacity as Georgia Secretary of State*, *et al.*,

   Defendants.

Consolidated
Civil Action No.
1:24-cv-03412-SDG

## OPINION AND ORDER

Plaintiffs in this consolidated action are organizations alleging that Sections

4 and 5 of Georgia Senate Bill 189 violate the National Voter Registration Act, the

Civil Rights Act, and the First and Fourteenth Amendments.[1] Plaintiffs seek a

variety of declaratory and injunctive relief, as well as attorneys' fees.[2] Defendants

are the Georgia Secretary of State, members of the Georgia State Board of Elections,

---

[1]   Plaintiffs are A. Philip Randolph Institute, Georgia Muslim Voter Project, Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, VoteRiders, and Secure Families Initiative.

   On November 4, 2024, the Court consolidated for all pretrial purposes three separate actions that challenged Sections 4 and 5 [ECF 137, at 2]. Not every Plaintiff presses every cause of action, nor has every Plaintiff sued every Defendant [*see generally* ECF 276-1].

[2]   *See generally* ECF 276. The parties stipulated to the dismissal of former lead Plaintiff New Georgia Project [ECF 358, at 2], which was dismissed from the case on November 13, 2025. [Nov. 13, 2025 D.E.] Accordingly, this Order does not address allegations or arguments specific to New Georgia Project.

and various county boards of election and their members.[3] Defendants move to dismiss the Consolidated Second Amended Complaint (SAC), arguing that Plaintiffs lack standing and that the SAC fails to state a claim. The Intervenors (the Georgia Republican Party, Inc. and the Republican National Committee) also filed a motion to dismiss.[4]

Meanwhile, certain Plaintiffs seek to certify a defendant class consisting of every county election board in Georgia (which has 159 counties).[5] Plaintiffs also move for entry of a declaratory judgment as to the meaning of Section 4.[6]

Having considered the parties' briefing, and with the benefit of oral argument, the Court concludes that Plaintiffs have not alleged a concrete and particularized injury-in-fact and therefore lack standing. Accordingly, the Court

---

[3]  For ease of reference, this Order uses the term "boards of election" or "election boards" in the generic sense. Georgia's counties do not use a uniform term to refer to these boards, calling them (among other things): boards of registrars; boards of voter registration(s) and elections; boards of elections and voter registration; or boards of election. These variations in appellation do not reflect any difference in function that is relevant here.

Further, while Plaintiffs named various individual county election board members as Defendants, those individuals were all sued in their official capacities [ECF 276, at 1–7]. Some of the identified individuals no longer serve in that capacity and their replacements may not have been named as substitute Defendants or their board seat may still be vacant [*see, e.g.*, ECF 287, at nn.1–2]. Such changes in personnel are not material for purposes of this Order.

[4]  ECF 288.

[5]  ECF 319.

[6]  ECF 381.

lacks subject matter jurisdiction to hear Plaintiffs' claims and they must be dismissed. With their claims dismissed, Plaintiffs' motions for class certification and for a declaratory judgment cannot be considered, and are denied as moot.

## I.   Factual Allegations

For purposes of the motions to dismiss, the Court treats the well-pleaded allegations of the SAC as true and construes all reasonable inferences in Plaintiffs' favor. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

### A.   SB 189

Georgia Senate Bill 189 (SB 189) was adopted on May 6, 2024. It amended several sections of the Georgia Code that address voter registration. Relevant here are Sections 4 and 5 of SB 189, which amended O.C.G.A. §§ 21-2-217 and 21-2-230, respectively. Section 4 became effective on January 1, 2025, and Section 5 took effect on July 1, 2024. Ga. Legis. 697 (2024), 2024 Georgia Laws Act 697 (S.B. 189). Thus, Section 5 (but not Section 4) was in effect during the 2024 Presidential election cycle. *Id.*

#### 1.   Section 4

Section 4 added a new subsection to O.C.G.A. § 21-2-217(a), which provides rules for determining a person's residence for purposes of voting or running for office. This new subsection states:

> (a) In determining the residence of a person desiring to register to vote or to qualify to run for elective office, the

> following rules shall be followed so far as they are applicable . . .
>
> > (1.1) The mailing address for election purposes of any person of this state who is homeless *and without a permanent address* shall be the registrar's office of the county in which such person resides . . . .

O.C.G.A. § 21-2-217(a)(1.1) (emphasis added).

The gist of Plaintiffs' attack on this new subsection is that it purportedly forces homeless voters to use their county election board's address to receive election-related communications, which threatens to disenfranchise them.[7] Before SB 189, all voters "had the option of identifying the mailing address of their choice" when registering to vote.[8] Plaintiffs allege that homeless voters would often use a post office box, homeless shelter address, or friend or family member's residence as a mailing address.[9] But Plaintiffs claim that Section 4 now requires all homeless voters to use *only* the county election board address for election-related mailings.[10] Defendants respond that Section 4 does not apply to homeless individuals who have an address where they can receive mail.[11] Nor does the SAC

---

[7]   ECF 276, ¶¶ 2(3), 130, 196–197.

[8]   *Id.* ¶ 130.

[9]   *Id.* ¶ 131.

[10]   *See generally id.* ¶¶ 195–203, Counts IV–V, VIII.

[11]   ECF 385, at 2. *See also* ECF 305, at 28 ("Plaintiffs continue to ignore the text of Section 4 in search of an NVRA violation: it only applies to voters who are (1) homeless and (2) lack a permanent address. Thus, the provision does not apply to homeless individuals who have an address where they can receive

allege that any individual has in fact been required to use an election board's

address to receive election-related mail since Section 4 became effective.

---

mail and it does not apply to individuals who do not have a permanent address but are not homeless.") (footnote omitted).

In the Court's view, Plaintiffs' Section 4 claims are based on a flawed legal presumption. Nothing in the plain language of O.C.G.A. § 21-2-217(a)(1.1) requires every homeless voter to use the county election board address to receive mail. Reading the section as a whole, it is clear that the provision applies only to those homeless voters who do not otherwise have a mailing address: "The *mailing* address for election purposes of any person of this state who is homeless *and without a permanent address* shall be. . . ." *Id.* (emphasis added). Plaintiffs' interpretation—that the section applies to every homeless person because they are all without a permanent address—reads in a redundancy and reads out words contained in the full sentence.

"Homeless" means someone "without a permanent address" where they live. *See, e.g.*, *Homeless*, OXFORD ENGLISH DICTIONARY, https://www.oed.com /dictionary/homeless_adj?tab=meaning_and_use#1490674 ("Having no home or permanent abode; spec. (of a person) having no settled home, shelter, or place of refuge owing to poverty or destitution; living on the streets or in temporary accommodation.") (last visited Mar. 24, 2026). Plaintiffs treat these two phrases as meaning the same thing. This reads § 217(a)(1) as applying to people who are "homeless and homeless." That makes no sense. Plaintiffs' interpretation also ignores the beginning of the subsection which refers specifically to *mailing* addresses for election purposes.

Rather than reading § 217(a)(1.1) as connecting two terms that mean the same thing with a conjunction (homeless *and* without a permanent address), the most logical way to read this provision and to give every word meaning is to interpret "without a permanent address" as applying to those without a permanent *mailing* address. *Camden Cnty. v. Sweatt*, 315 Ga. 498, 509 (2023) (quoting *Middleton v. Georgia*, 309 Ga. 337, 342 (2020)) ("It is well settled that in interpreting statutory text, 'courts generally should avoid a construction that makes some language mere surplusage.'"). Interpreted in this way, it is hard to see how the new subsection would disenfranchise or threaten to cause injury to anyone.

### 2.    Section 5

Before the adoption of SB 189, O.C.G.A. § 21-2-230 provided a process for a voter (an "elector" in the statute's parlance) to challenge the ability of another voter in the same county to vote in a particular election. Subsection (b) dictates that a county elections board "immediately" consider such a challenge, notify the appropriate poll officers if it finds probable cause, and supply the challenged voter an opportunity to answer "if practical." SB 189 did not change these provisions. Instead, Section 5 added language defining a threshold for what constitutes "probable cause":

> Probable causes shall include, but not be limited to, an elector who is deceased; an elector voting or registering to vote in a different jurisdiction; an elector obtaining a homestead exemption in a different jurisdiction; *or an elector being registered at a nonresidential address as confirmed or listed by or in a government office, data base, website, or publicly available sources derived solely from such governmental sources*. If a challenged elector's name appears on the National Change of Address data base, as maintained by the United States Postal Service, as having changed such elector's residence to a different jurisdiction, the presence of such elector's name on such data base shall be insufficient cause to sustain the challenge against the elector unless additional evidence would indicate that the elector has lost his or her residency as determined pursuant to Code Section 21-2-217 . . . .

O.C.G.A. § 21-2-230(b) (emphasis added). Challenges to a voter's right to vote in a particular election made within 45 days of that election are not considered until

6

after the election has been certified. *Id.* § 21-2-230(b)(1) ("Any challenge of an elector within 45 days of a primary, run-off primary, election, or run-off election shall be postponed until the certification of such primary, election, or runoff is completed."). This means such a challenge does not prevent a person from casting a ballot in that election. *Id.*

Plaintiffs contend that Section 5 of SB 189 violates various provisions of the National Voter Registration Act (NVRA); Title I of the Civil Rights Act; and the constitutional rights to vote, to due process, and to equal protection.[12] They take issue with the statutory language that requires a finding of probable cause to sustain a voter-initiated challenge when certain facts are presented, purportedly removing the boards' discretion to make such findings.[13] Because (according to Plaintiffs) being "registered at a nonresidential address" automatically satisfies probable cause, the SAC alleges that voters can now be disenfranchised for living in places that are zoned as "nonresidential," including college dorms.[14] Plaintiffs claim this violates the NVRA because that statute prohibits removal of a person from voter rolls unless certain criteria have been met, including the passage of two federal election cycles. Plaintiffs further contend that members of the military are

---

[12]   ECF 276, Counts I–III, VI–VII, IX–XII.

[13]   *Id.* ¶¶ 184, 205.

[14]   *Id.* ¶ 205, 213–214.

especially vulnerable to these types of challenges because they move frequently and sometimes have addresses that are "nonresidential."[15]

The SAC does not allege that anyone has been removed from Georgia's voter registration list in violation of the NVRA since Section 5 became effective or that any individual has been prevented from voting in a particular election because of the amendments to the challenge provision.

### B.    The SAC

The SAC asserts twelve causes of action based on the alleged flaws in Sections 4 and 5.[16] Plaintiffs seek a declaratory judgment, injunctive relief, and an award of attorneys' fees and expenses.[17] But standing is a constitutional requirement and a jurisdictional prerequisite for this Court to hear any dispute. Plaintiffs have not alleged facts showing that any one of them has standing to pursue these claims.

## II.   Standing

Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is jurisdictional, such that "a dismissal for lack of standing has the same effect as a

---

[15]   *Id.* ¶ 147.

[16]   *Id.* at 90–126.

[17]   ECF 276, *ad damnum* clause.

dismissal for lack of subject matter jurisdiction." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). It cannot be waived. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019).

Standing is "built on a single basic idea—the idea of separation of powers." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (hereinafter, *AHM*) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To have standing,

> first, the plaintiff must demonstrate that she has suffered an injury in fact—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, the plaintiff must show a causal connection between her injury and the challenged action of the defendant—*i.e.*, the injury must be fairly traceable to the defendant's conduct, as opposed to the action of an absent third party. Finally, the plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress her injury.

*Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (cleaned up). Plaintiffs bear the burden to show standing, *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (citing *Lujan*, 504 U.S. at 561), which is determined as of the time the complaint is filed, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014).

When there are multiple plaintiffs and only injunctive relief is sought, only one plaintiff need demonstrate that it has standing. *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d

9

949, 951 (7th Cir. 2007)). But "standing is not dispensed in gross." *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)) — there must be at least one plaintiff with standing for each claim as to each defendant. *Id.*

A defendant can raise a lack-of-standing defense by motion, and make either a facial or factual attack. Fed. R. Civ. P. 12(b)(1); *Stalley*, 524 F.3d at 1232. A facial attack only requires the Court to determine whether the plaintiff has "sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true." *Stalley*, 524 F.3d at 1232–33. By contrast, a factual attack is based on material extrinsic to the pleadings. *Id.* at 1233 (citation omitted). Here, Defendants raise only facial attacks to Plaintiffs' standing.

### A.   Injury

The Court's analysis here focuses only on the first element of standing — injury in fact — because no Plaintiff has alleged facts that show it has suffered (or is likely to suffer) a concrete harm. Pleading a "speculative chain of possibilities" that might cause harm in the future is not enough. *Murthy*, 603 U.S. at 70. Rather, a plaintiff must have a personal stake in the dispute. *AHM*, 602 U.S. at 379. In short, before proceeding in court, "Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Id.* (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983)). To have a concrete and particularized injury, the plaintiff must have been

harmed in a "personal and individual way." *AHM*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1). Article III standing "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.*

An organization can show injury through a "diversion-of-resources" theory (where the alleged harm is to the organization itself, so-called organizational standing) or an "associational-standing" theory (where the organization is representing its members who have been harmed). *Arcia*, 772 F.3d at 1341–42. Here, all Plaintiffs assert they have organizational standing; Georgia NAACP, Georgia Coalition, and SFI argue that they also have associational standing. The Randolph Institute and Muslim Voter Project separately contend that they have standing on behalf of their non-member constituents (so-called third-party standing).[18] Each theory will be addressed in turn.

### 1.     Organizational Standing

The parties disagree about what a plaintiff must show after *AHM* to establish standing under a diversion-of-resources theory. The State Defendants assert that it is not enough just to demonstrate an impairment to the organization's ability to engage in its own projects because the organization diverts resources in

---

[18]   ECF 304, at 26–56.

response to a defendant's conduct.[19] *AHM*, in the State Defendants' view, clarified that Article III requires more—mandating that organizations establish that the defendant's conduct directly affects their core activities to have standing.[20] Plaintiffs counter that *AHM* did not alter existing Eleventh Circuit law or the Supreme Court's own pre-*AHM* decision applicable to assessments about organizational standing.[21] A discussion of the relevant case law and its evolution over time is therefore appropriate. Suffice it to say, the Court agrees with the State Defendants that Article III requires more than what Plaintiffs contend.

### *i.* **Relevant Case Law**

The Court begins with the two leading Supreme Court cases addressing the requirements for organizational standing, then turns to the Eleventh Circuit case that best embodies the application of those requirements. Contrary to the State Defendants' suggestion, *AHM* did not overrule *all* Eleventh Circuit organizational standing cases.[22]

---

[19]    ECF 283-1, at 28.

[20]    *Id.* at 29–30.

[21]    ECF 304, at 26–31.

[22]    The State Defendants rely on the decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), to support their argument that *AHM* overruled Eleventh Circuit organizational standing cases [*see, e.g.*, ECF 283-1, at 29, 32]. However, that panel decision was vacated by the Ninth Circuit *en banc* before the current round of motion to dismiss briefing in this case. 130 F.4th 1177 (9th Cir. Mar. 18, 2025). The *en banc* Ninth Circuit heard

        *a.*       ***Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)**

In *Havens*, three individuals and an organization (HOME) sued Havens Realty, the owner-operator of two apartment complexes, for violations of the Fair Housing Act. *Id.* at 366–68. HOME was a nonprofit working to "make equal opportunity in housing a reality." It operated a housing counseling service and investigated complaints about housing discrimination. *Id.* at 368. Two of the individual plaintiffs were "testers" employed by HOME to see if Havens Reality engaged in racial steering. *Id.* While the black tester was told on several occasions that Havens Realty had no vacancies, the white tester was told there *were* vacancies. *Id.* HOME therefore asserted that it had been injured because it had to devote significant resources to identifying and counteracting Havens Realty's discriminatory steering practices. *Id.* at 369, 379. The Supreme Court concluded that the allegations supported a "concrete and demonstrable injury to the organization's activities," not just a "setback to the organization's abstract social interests." *Id.* at 379. It is from *Havens* that the principle of organizational standing through a diversion of resources theory developed.

---

argument in June 2025, but no opinion has been issued to date. *Az. Alliance for Retired Ams. v. Mayes*, Case No. 22-16490, Dkt. 143 (9th Cir. June 26, 2025).

b.      *Food & Drug Administration v. Alliance for Hippocratic Medicine (AHM)* **(2024)**

Forty years after *Havens*, the Supreme Court again looked at standing based on an alleged diversion of resources. The *AHM* plaintiffs were several doctors and organizations that alleged the FDA's actions concerning mifepristone violated the Administrative Procedure Act. 602 U.S. 367. The plaintiffs did not themselves use or prescribe the drug, nor did the FDA's regulations require them to do (or refrain from doing) anything. The Supreme Court therefore concluded that no plaintiff could meet the standard set out in *Havens*: "[A] plaintiff's desire to make a drug less available *for others* does not establish standing to sue." *Id.* at 374 (emphasis in original). The court noted that citizens do not have standing to challenge a government regulation just because they believe the government is acting illegally. *Id.* at 381. *AHM* made clear that "impairment" of an organization's mission is insufficiently concrete to create standing, as is simply diverting resources "in response to a defendant's actions." *Id.* at 394, 395. "[A]n organization *that has not suffered a concrete injury caused by a defendant's action* cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id.* at 394 (emphasis added).

The *AHM* decision also clarified (and perhaps cabined) its *Havens* holding, explaining that Havens Realty's actions had "directly affected and interfered with

14

HOME's core business activities" because Havens Realty lied to HOME's employees about the availability of housing, thereby impairing HOME's ability to provide its counseling and referral services. *AHM*, 602 U.S. at 395. *AHM* further cautioned that *Havens* "was an unusual case" that the court "ha[d] been careful not to extend [ ] beyond its context." *Id.* at 396.

### c.    *Arcia v. Florida Secretary of State*, **772 F.3d 1335 (11th Cir. 2014)**

In between *Havens* and *AHM*, the Eleventh Circuit considered organizational standing in *Arcia v. Florida Secretary of State*. There, two individuals and various organizations challenged Florida's systematic removal of suspected non-citizens from the voter rolls within 90 days of a federal election, in violation of the NVRA. The plaintiff organizations alleged that they diverted resources from their regular activities to locate and assist their members who had been wrongly identified as non-citizens. *Id.* at 1339. The Court of Appeals thus concluded that the organizations had a concrete and demonstrable injury sufficient to convey organizational standing.

Although the *Arcia* court used broad language to describe the Circuit's prior precedent,[23] the court's basic conclusion is consistent with *Havens'* and *AHM's*

---

[23] *See, e.g., Arcia*, 772 F.3d at 1341 (citing *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008)) ("[O]ur precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters

determinations that an organizational plaintiff must have a direct and concrete injury caused by the defendant. The plaintiff organizations in *Arcia* were actively engaged in assisting members who had been affected by the state law purportedly in violation of the NVRA. This Court therefore finds no inconsistency among the holdings in these three cases. In *Havens*, the racial steering directly affected the organization—its employees were provided false information that impacted HOME's ability to carry out its mission. In *AHM*, the plaintiffs lacked standing because the FDA's conduct had no direct effect on them—the plaintiffs were instead trying to change how the FDA regulated *other* people. In *Arcia*, the organizations had members who were wrongly removed from Florida's voter rolls and the organizations expended resources to help ensure those members could vote consistent with federal law, thereby suffering a direct injury.

### ii.     *AHM* **undermines the holdings in several Eleventh Circuit cases addressing organizational standing.**

Plaintiffs argue that nothing in *AHM* altered Eleventh Circuit case law applicable to organizational standing.[24] For support, they rely on *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009); and *Georgia Association of*

---

on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day.").

24     ECF 304, at 26–31.

*Latino Elected Officials, Inc. v. Gwinnett County Board of Registration and Elections*, 36 F.4th 1100 (11th Cir. 2022) (hereinafter, *GALEO*). In contrast, the State Defendants argue that *AHM* overruled these cases.

*AHM* emphasized that certain expenditures of time and money are not a concrete Article III injury; the inquiry must focus on whether the organization suffered a harm *because of* the defendant's actions. For this reason, it suffices to conclude, as the Court does, that many aspects of the pre-*AHM* Eleventh Circuit cases on which Plaintiffs rely are inconsistent with *AHM*, so the Court may not rely on those aspects. Nevertheless, the Court addresses Plaintiffs' arguments.

### a.    *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)

*Browning* involved an appeal from a preliminary injunction that barred enforcement of a Florida law that the plaintiffs asserted was preempted by federal statutes. The law required first-time voter registrants to disclose their driver's license number or the last four digits of their social security number; if the number did not match the state's or SSA's databases, the person would not be registered to vote. 522 F.3d at 1156–57. The plaintiffs were organizations "representing the interests of minority communities in Florida." *Id.* at 1155. They worked to increase voter registration and participation among racial and ethnic minorities. *Id.* at 1158. Although the Eleventh Circuit reversed the injunction, the court concluded that the plaintiffs had both organizational and associational standing. *Id.* at 1155, 1158

17

n.7. As here, the principal dispute in *Browning* was whether the plaintiffs had suffered an injury in fact. *Id.* at 1159.

In support of their organizational standing arguments, the *Browning* plaintiffs asserted that the Florida law would hinder their ability to "carry out their missions of registering voters." *Id.* at 1164. Specifically, the plaintiffs claimed that they would have to divert time and resources from registering additional voters because of time spent correcting false mismatches between the number on the registration form and the various databases. *Id.* at 1164–65. The Court of Appeals agreed that the plaintiffs had organizational standing:

> The organizations reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with [the statute] and to resolving the problem of voters left off the registration rolls on election day. These resources would otherwise be spent on registration drives and election-day education and monitoring. . . . [T]he diversion of personnel and time to help voters resolve matching problems effectively counteracts what would otherwise be [the statute's] negation of the organizations' efforts to register voters.

*Id.* at 1165–66.

In undersigned's view, this reasoning about the diversion of resources to educate volunteers and voters is knocked to the ground by *AHM*.[25] *AHM* made

---

[25] That said, a specific diversion of resources by the *Browning* plaintiffs devoted to helping voters resolve matching errors caused by the Florida law seems to remain good law on this narrow proposition—fitting within *Havens'* reasoning

clear that "impairment" of an organization's mission or the diversion of resources to "educate" in response to a defendant's actions are not enough, on their own, to support Article III standing. 602 U.S. at 394, 395. The Court cannot square this directive in *AHM* with *Browning*.[26]

> ### b.   *Common Cause/Georgia v. Billups*, **554 F.3d 1340 (11th Cir. 2009)**

For the same reasons, *Billups's* assessment of organizational standing is likewise inconsistent with *AHM*. The Eleventh Circuit held in *Billups* that the NAACP had standing to challenge Georgia's voter ID requirement, relying heavily on *Browning*. The court found that the NAACP would have to divert resources from its "regular activities" to educate and assist voters in complying with the new rules. *Billups*, 554 F.3d at 1350. But the voter ID law did not directly impede the NAACP's involvement in "voting activities." The Eleventh Circuit's conclusion that the NAACP had standing because its diversion of resources would cause its other goals to suffer is squarely at odds with *AHM*.

---

that actions that interfere with or directly affect the plaintiff's core business activities can sustain standing. *Havens*, 455 U.S. at 379; *see also AHM*, 602 U.S. at 395.

[26] As discussed below, the Court concludes that *Browning* is still good law as to its discussion of associational standing, notwithstanding *AHM*. *See infra* Section II.A.2.

c.      ***Georgia Association of Latino Elected Officials, Inc. v. Gwinnett County Board of Registration and Elections***, 36 F.4th 1100 (11th Cir. 2022)

In *GALEO*, the plaintiffs (a collection of organizations and individuals) alleged that absentee ballots and voting-related information was not published in both English and Spanish as required. The Eleventh Circuit concluded that at least one of the organizations had standing under a diversion of resources theory. *Id.* at 1113–14. In so doing, the court relied on the formulation espoused in *Browning*— that "an organization has standing if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Id.* at 1114 (cleaned up). The organization had diverted resources from its civic engagement and voter registration priorities to educate and assist Spanish speakers with mail voting and other aspects of the electoral process. In the Court of Appeals' view, that was enough to satisfy organizational standing. *Id.* at 1115. But as with *Browning* and *Billups*, this conclusion runs headlong into what *AHM* forbids. The failure to provide resources in English and Spanish did not directly regulate the organizations (which themselves could not vote) and did not prevent their civic engagement or voter

registration efforts. Rather, the organizations simply diverted resources "in response to" the defendants' actions. Under *AHM*, that is not enough.[27]

### iii.   Plaintiffs' Alleged Injuries

Ultimately, whether *AHM* effected a sea change in organizational standing law or simply reiterated a longstanding principle that had improperly been expanded beyond its intended scope is of no consequence here: No Plaintiff has alleged the type of direct, concrete injury-in-fact that was present in *Havens* or *Arcia*. After *AHM*, voluntary expenditures like those in *Browning*, *Billups*, and *GALEO* are not enough to create standing. Unlike the organizations in *Arcia*, Plaintiffs here do not claim that they have diverted resources to assist any voter whose right to vote has been affected by SB 189. Unlike the organization in *Havens*, Defendants here are not alleged to have taken any action that interfered with Plaintiffs' ability to pursue their core activities.

---

[27] Even the Eleventh Circuit has acknowledged as much, albeit not in the organizational standing context. *See Nelson v. Experian Info. Sols. Inc.*, 144 F.4th 1350, 1355 (11th Cir. 2025) (citing *AHM*, 602 U.S. at 394) ("[W]hether a plaintiff's assertion of wasted time and effort is a concrete harm depends on whether the wasted time and effort responded to something that is itself a concrete harm. . . . A plaintiff's efforts to 'force' a defendant to do something . . . does not establish standing unless the defendant's failure to act has caused or is likely to cause an injury. [A] plaintiff cannot manufacture standing by spending time and money to rectify an otherwise harmless statutory violation.") (cleaned up).

Instead, the SAC describes Plaintiffs' injuries in a way that is strikingly close to the injuries claimed by the *AHM* plaintiffs—that they have spent time and money to combat the alleged effects of a law they don't like. Plaintiffs assert that they have spent money to advocate against SB 189 and to plan for events that may or may not happen in the future (such as an improper challenge to a voter or a homeless voter being required to use an election board's address). These types of allegations were insufficient in *AHM*. *See, e.g.*, *AHM*, 602 U.S. at 381 (the injury-in-fact must be actual or imminent, not speculative); *id.* at 394 (holding that an impairment of an organization's ability to provide services and achieve its organizational mission does not establish standing). So too here.

No Plaintiff claims that it has incurred expenses (1) to help a member respond to a challenge raised under the post-SB 189 version of O.C.G.A. § 21-2-230; or (2) to contest a member being required to receive election-related mail at a county election board's address. No Plaintiff alleges that one of its members has been wrongfully removed from Georgia's voter registration list. No Plaintiff asserts that SB 189 requires it to do, or not do, anything. *AHM* precludes organizational standing cases exactly like this one.

### a.    A. Philip Randolph Institute (the Randolph Institute)

The Randolph Institute is a nonprofit organization of "trade unionists" that registers voters and provides voter education services.[28] It has members statewide.[29] The Randoph Institute alleges that, because of SB 189, it has had to expend additional resources to educate voters on what to do if they face a challenge and to assist challenged voters.[30] But it does not allege that it has actually assisted any voter whose registration was challenged under the SB 189 amendments to O.C.G.A. § 21-2-230.

The Randolph Institute also alleges that, because of Section 4, it will expend additional resources to inform homeless voters about how to retrieve their election mail.[31] It does not allege that it has in fact assisted any voter required to receive mail at the address of the county election board.

### b.    Georgia Muslim Voter Project (Muslim Voter Project)

The Muslim Voter Project is the "largest Muslim civic organization" in Georgia and engages in get-out-the-vote and voter registration efforts.[32] In the

---

[28]    ECF 276, ¶ 28.

[29]    *Id.*

[30]    *Id.* ¶ 30.

[31]    *Id.* ¶ 31.

[32]    *Id.* ¶ 20.

past, it has assisted voters whose registrations have been challenged and is monitoring the impact of SB 189 on Georgia's Muslim communities.[33] It does not, however, allege that it has actually assisted any voter whose registration was challenged under the SB 189 amendments to O.C.G.A. § 21-2-230. Despite this, the Muslim Voter Project asserts that—in some unspecified fashion—Defendants' actions are causing it to expend resources to protect challenged voters.[34]

### c.    Georgia State Conference of the NAACP (Georgia NAACP)

Georgia NAACP is a nonprofit organization that seeks to "eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons."[35] It helps homeless and housing-insecure individuals register to vote, as well as individuals who live at locations that may be classified as "nonresidential," such as students who live on college and university campuses.[36] Georgia NAACP asserts that it has an interest in "preventing the disenfranchisement of eligible voters, including its members and voters it assists" with registering to vote and voting.[37]

---

[33]    *Id.* ¶ 24.

[34]    *Id.* ¶ 26.

[35]    *Id.* ¶ 34.

[36]    *Id.* ¶¶ 35, 38.

[37]    *Id.* ¶ 40.

> ### *d.* **Georgia Coalition for the People's Agenda (Georgia Coalition)**

Georgia Coalition is an alliance of over 30 organizations. It is those organizations, not Georgia Coalition itself, that have individual members.[38] Georgia Coalition works to support voter registration and participation, including among African American communities and the homeless and housing-insecure.[39] It alleges that its "support of voting rights is central to its mission."[40]

Because of SB 189, Georgia Coalition claims it "has had to, and will continue to have to, divert the attention of its staff and membership away from its other programmatic areas and focus instead on voter education, defense, and support."[41] It alleges that one of its officers has had to spend several days attending challenge meetings in several different counties and another employee has had to address voter challenges to Savannah State University students.[42] However, Georgia Coalition does not explain the purpose of attending these challenge meetings—whether to assist a challenged voter, for observation, or otherwise. Nor does it explain how it "address[ed]" the voter challenges of Savannah State

---

[38]   *Id.* ¶ 43.

[39]   *Id.* ¶ 45.

[40]   *Id.* ¶ 46.

[41]   *Id.* ¶ 51.

[42]   *Id.* ¶ 52.

students, who by definition cannot themselves be members of Georgia Coalition. While such an allegation could help demonstrate organizational standing, Georgia Coalition does not provide any details about the alleged support it provided. And since it does not have individual members, it is unclear how Georgia Coalition could have organizational standing in this context.

### e. VoteRiders

VoteRiders describes itself as a nonprofit organization that operates nationwide to ensure that all citizens have the identification they need to exercise their right to vote.[43] It works directly with people to obtain the necessary documents.[44] VoteRiders alleges that many of the voters it assists are housing insecure.[45] As a result, it asserts that Section 4 will hinder its mission to ensure "that voter ID laws do not prevent eligible voters from exercising their right to vote."[46] It asserts that it will have to spend resources to assist affected voters and to develop new guidance for its staff and volunteers.[47] In short, VoteRiders alleges

---

[43] *Id.* ¶ 58.

[44] *Id.*

[45] *Id.* ¶ 59.

[46] *Id.* ¶ 61.

[47] *Id.* ¶ 62.

that SB 189 will harm the communities it assists,[48] but it does not allege that it has expended resources to assist anyone actually injured or affected by SB 189.

### f.    Secure Families Initiative (SFI)

SFI is a nonprofit organization the members of which are spouses and family members of people in the military, some of whom are stationed abroad.[49] Among other things, SFI advocates for policies that increase voting accessibility for absentee voters and members of the military.[50] Some of SFI's members are Georgia registered voters.[51] SFI alleges that some members of the military have voting registration addresses that are nonresidential and that members of the military move frequently.[52] SFI contends that it "will be forced to divert time and resources from [its] planned advocacy and educational efforts" because of SB 189.[53] Specifically, its members *may* be "susceptible to a sustained voter challenge," which would require it to educate those members on the challenge process and advise them how to defend their right to vote.[54] SFI has spent time and money on

---

[48]    *Id.*

[49]    *Id.* ¶¶ 64–65.

[50]    *Id.* ¶ 67.

[51]    *Id.* ¶ 70.

[52]    *Id.* ¶ 72.

[53]    *Id.* ¶ 73.

[54]    *Id.*

this education and coaching.[55] But it does not plead that any of its members has actually been affected by SB 189 through a challenge under O.C.G.A. § 21-2-230 or a requirement to use a county election board address to receive election-related mail under O.C.G.A. § 21-2-217.

### *iv.* **Summary: No Plaintiff has organizational standing.**

No Plaintiff alleges any kind of direct injury caused by Defendants' conduct that can support organizational standing. Plaintiffs' claims boil down to assertions that they are spending money to educate their members and the public about the possible effects of SB 189, and *if* there's a challenge to one of their members or constituents, they will provide assistance. But this is exactly the type of spending one's way into standing that *AHM* does not permit.

### 2. **Associational Standing**

Under an associational standing theory, an organization can enforce the rights of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Browning*, 522 F.3d at 1160; *see also Arcia*, 772 F.3d at 1342 (same).

---

[55]    *Id.* ¶ 75.

To demonstrate an injury-in-fact under this theory, organizational plaintiffs "need not establish that all of their members are in danger of suffering an injury," but merely that "at least one member faces a realistic danger of suffering an injury." *Arcia*, 772 F.3d at 1342. Here, Georgia NAACP, Georgia Coalition, and SFI press the argument that they have associational standing. But none of these organizations has demonstrated that any of their members suffered or has a "realistic" possibility of suffering an injury that would give the individual standing to sue. As pointed out previously, there is no allegation in the SAC that anyone has been *unlawfully* removed from Georgia's voter registration list since SB 189 came into effect, prevented from voting in a particular election, or forced to use an election board address to receive election-related mail.

### i.    Georgia NAACP

The only associational allegations Georgia NAACP makes concern its Section 5 claims.[56] And all of those allegations are couched in the conditional: university dorms "may be classified" as nonresidential, which would make those who live in such housing "vulnerable to challenge" under Section 5.[57] Speculative

---

[56]    ECF 276, Counts I, II, VI, IX.

[57]    *Id.* ¶ 38; *see also, e.g., id.* ¶ 39 (alleging that many members of the Spelman College NAACP are "vulnerable to voter challenges because they are registered at campus, nonresidential addresses").

allegations do not support associational standing. *Arcia*, 772 F.3d at 1342 (indicating that a member must face a "realistic danger" of incurring an injury).

### ii.   Georgia Coalition

As pointed out previously, Georgia Coalition does not even have individuals as members—it consists solely of other organizations. Plaintiffs have pointed to no law suggesting that associational standing can be predicated on such twice-removed harm. *See Browning*, 522 F.3d at 1160 (permitting an organization to achieve associational standing if "*its* members" would otherwise have standing) (emphasis added). Nor has Georgia Coalition identified what injuries its member organizations have suffered or are likely to suffer that might give those members standing to sue.

Georgia Coalition, like Georgia NAACP, conditionally asserts that students residing on campus at various universities where it supports voter registration and education programs are "vulnerable" to challenges under Section 5.[58] The organization supports registration for students who are "unhoused or housing insecure" and who are "being forced" to use the county election board office for election-related mail.[59] But the SAC contains no allegations that any students who may be vulnerable to challenges under SB 189 are members of Georgia Coalition

---

[58]   *Id.* ¶ 54.

[59]   *Id.* ¶ 55.

or of its member organizations. Nor, as the Court has already noted, are there any allegations that anyone has been actually forced to use an election board office to receive election-related mail. Georgia Coalition's allegations doubly fail: first, for the same reasons as Georgia NAACP's, and second, because it doesn't have any individual members at all.

### *iii.*    **SFI**

SFI's alleged associational injuries are likewise speculative—it claims it will have to determine whether its members "will be susceptible to a sustained voter challenge," educate those members, and "attempt to advise" them.[60] As noted, SFI does not assert that any of its members has *in fact* been (or has a realistic danger of being) challenged or required to use a county election board address despite having a preferred mailing address. SFI's associational standing allegations suffer from the same ills as its co-plaintiffs.

### 3.    **Third-Party Standing**

The Randolph Institute and Muslim Voter Project contend that they have third-party standing on behalf of their constituents—the voters they serve or the communities that benefit from their activities.[61] These Plaintiffs acknowledge, however, that such third-party standing requires an injury-in-fact to the

---

[60]    *Id.* ¶ 73.

[61]    ECF 304, at 54–56.

organization itself. *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) ("We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.") (cleaned up). As discussed above, neither Randolph Institute nor Muslim Voter Project has shown such a direct injury to itself.[62] Accordingly, neither organization possesses third-party standing on behalf of its constituents.

## III.  Conclusion

Because the SAC fails to allege that any Plaintiff has suffered an injury-in-fact, Plaintiffs lack standing to pursue their claims and the Court lacks subject matter jurisdiction. Defendants' motions to dismiss are **GRANTED** to this extent [ECFs 281, 282, 283, 285, 287, 289, 290, 291, 293, 294, 295, 297, 298, 300, 301, 302] and **DENIED as moot** in all other respects. The Intervenors' motion to dismiss [ECF 288] is **DENIED as moot**. The Motion to Certify Class of Defendants [ECF 319] is **DENIED as moot**. The Motion to Enter Declaratory Judgment as to Counts Challenging Section 4 [ECF 381] is **DENIED as moot**.

---

[62]  *See supra* Section II.A.1.iii.a. & b.

Plaintiffs' claims are **DISMISSED without prejudice**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 31st day of March, 2026.

Steven D. Grimberg
United States District Judge

33